**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**

| | |
|---|---|
| JAMES GINZKEY, RICHARD FITZGERALD, CHARLES CERF, BARRY DONNER, and on behalf of the class members described below, | **Case No.: 2:18-cv-1773** |
| *Plaintiffs*, | **COMPLAINT-CLASS ACTION** |
| v. | **DEMAND FOR JURY TRIAL** |
| NATIONAL SECURITIES CORPORATION, a Washington Corporation | |
| *Defendant*. | |

Plaintiffs James Ginzkey, Richard Fitzgerald, Charles Cerf, and Barry Donner (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, allege the following based upon personal knowledge as to Plaintiffs' own acts and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiffs' attorneys, which included, among other things: a review of the offering materials presented to Plaintiffs by Defendant, National Securities Corporation, ("Defendant" or "NSC") regarding private placement securities offerings made by Beamreach Solar, Inc. ("Beamreach"), a review of press releases and other publicly available information about Beamreach, and other publicly available information about Beamreach and NSC. Plaintiffs believe that substantial additional

1

evidentiary support exists for the allegations set forth herein and will be available after a reasonable opportunity for discovery.

I.      **NATURE OF THE ACTION**

1.      Beamreach was a California-based company that held itself out as providing the world's best combination of high performance and low-cost solar energy production for the residential and commercial solar energy markets.

2.      Beamreach was founded in 2007 and floundered for eight years, burning through more than $200 million in funds raised from large institutional investors, venture capital firms, and grants from the United States Department of Energy. By 2015 Beamreach was forced to raise capital from individual retail investors because it could no longer rely exclusively on traditional institutional and venture capital equity markets due to nearly a decade of consistent failure.

3.      Starting in February 2015, NSC, a registered broker-dealer, began acting as placement agent for Beamreach's Series D securities offering. The securities purchased by Plaintiffs and Class Members in the Series D round consisted of preferred stock, beginning in February 2015 (the "Series D Offering"). A secondary offering in June 2016, the Series D-1 preferred stock round, was initially an equity offering (the "Series D-1 Offering") then was switched to a 9% convertible promissory note offering a 300% "principal step up" in the event of an acquisition, in November 2016 (the "Series D-2 Offering")( collectively referred to as the "Beamreach Offerings").

4.      NSC acted as both the primary placement agent and exclusive broker/dealer for the Beamreach Offerings. NSC was paid a commission of 10% of whatever it sold, which was far greater than commissions generated on most investments it sold. The total capital raised by

2

Class Action Complaint
Case No. 2:18-cv-1773

STOLTMANN LAW OFFICES, P.C.
233. S. Wacker 84th Floor
Chicago, Illinois 60603
312-442-3200

NSC in the Beamreach Offerings was approximately $34.5 million.

5.      Plaintiffs and the Class were all clients of NSC. Thus, NSC and its agents were obligated to perform thorough due diligence to understand the risks and rewards of the Beamreach Offerings and to form a reasonable basis to believe that an investment in the Beamreach Offerings would be suitable for at least some investors.

6.      NSC had a clear and substantial financial incentive to ignore obvious red flags that Beamreach was a failing company with no future regardless of how much money NSC could raise from its retail clients.

7.      Despite this conflict of interest and the red flags detailed herein, NSC pressed on with its nationwide sales campaign notwithstanding the fact that Beamreach only had enough cash to survive for a period of months—even if NSC was successful in raising capital for it.

**II.      JURISDICTION AND VENUE**

8.      This Court has jurisdiction over the subject matter presented by this class action complaint because it is a class action arising under the Class Action Fairness Act of 2005 ("CAFA"), Pub. L. No. 102-2, 119 Stat. 4 (2005), which explicitly provides for the original jurisdiction of the federal courts of any class action in which any member of the plaintiff class is a citizen of a state different from any defendant, and in which the matter in controversy exceeds in the aggregate the sum of $5,000,000.00, exclusive of interest and costs.

9.      Plaintiffs allege that the total claims of the individual members of the Class in this action are in excess of $5,000,000 in the aggregate, exclusive of interest and costs, as required by 28 U.S.C. § 1332(d)(2), (5).

10.      Plaintiffs are citizens of Illinois, Nebraska, District of Columbia, and California, and as set forth below, NSC is a citizen of Washington. Therefore, diversity of citizenship exists

Class Action Complaint
Case No. 2:18-cv-1773

STOLTMANN LAW OFFICES, P.C.
233. S. Wacker 84th Floor
Chicago, Illinois 60603
312-442-3200

under CAFA as required by 28 U.S.C. § 1332(d)(2)(A) because "any member of a class of plaintiffs is a citizen of a State different from any defendant."

11.     Furthermore, Plaintiffs allege that more than two-thirds of all of the members of the proposed Class (as defined below) in the aggregate are citizens of a state other than Washington, in which this action is originally being filed, and that the total number of members of the proposed Class is greater than 100, pursuant to 28 U.S.C. § 1332(d)(5)(B).

12.     Venue in this judicial district is proper pursuant to 28 U.S.C. § 1391 because, as set forth below, Defendant conducts business in, and may be found in, this District.

### III.     PARTIES AND RELEVANT ENTITIES

### A.     PLAINTIFFS

13.     Plaintiff, James Ginzkey ("Ginzkey"), is a citizen of Illinois and domiciled in Illinois, purchased interests in Beamreach from NSC during the relevant time periods, and was damaged thereby.

14.     Plaintiff, Richard Fitzgerald ("Fitzgerald"), is a citizen of Nebraska and domiciled in Nebraska, purchased interests in Beamreach from NSC during the relevant time periods, and was damaged thereby.

15.     Plaintiff, Charles Cerf ("Cerf"), is a citizen of Washington, District of Columbia and domiciled in the District of Columbia, purchased an interest in Beamreach from NSC during the relevant time periods, and was damaged thereby.

16.     Plaintiff, Barry Donner ("Donner"), is a citizen of California and domiciled in California, purchased interests in Beamreach from NSC during the relevant time periods, and was damaged thereby.

4

Class Action Complaint
Case No. 2:18-cv-1773

STOLTMANN LAW OFFICES, P.C.
233. S. Wacker 84th Floor
Chicago, Illinois 60603
312-442-3200

**B.    DEFENDANT**

17.    Defendant, NSC, is a FINRA member and registered broker-dealer, CRD # 7569 with its corporate headquarters in Seattle, Washington.

18.    NSC is a wholly-owned subsidiary of National Holdings Company, (NASDAQ: NHLD). On or about April 28, 2016, NHLD merged with Fortress Biotech, a publicly traded pharmaceutical company based in New York (NASDAQ: FBIO). On or about November 19, 2018, Fortress Biotech sold 24% of its stake in NHLD to B. Riley Financial. Upon approval by FINRA, B. Riley will own an additional 25% of the company, raising its stake to 49%.

**IV.    ALLEGATIONS COMMON TO ALL COUNTS**

**A.    AT ALL TIMES RELEVANT TO THIS COMPLAINT BEAMREACH WAS A FAILURE**

19.    Beamreach Solar, Inc. (f/k/a Solexel, Inc.) was incorporated in 2007,and in 2008 it received $3 million in funding from the Department of Energy to pursue its stated project objective to develop and manufacture more efficient silicon solar cells. The plan called for Beamreach's product to hit the market by 2012.

20.    Since 2008, Beamreach has switched its core business model three times and has never met a single sales projection or quota.

21.    This start-up project never met expectations, and after burning through cash and calling it quits on its initial plan, Beamreach reemerged in 2012 with a new plan. This time, after raising even more money from venture capitalists and receiving more money from the Department of Energy, Beamreach's plan was to mass produce a super-thin, energy-efficient, and cheap to produce solar photo-voltaic cell.

5

Class Action Complaint
Case No. 2:18-cv-1773

STOLTMANN LAW OFFICES, P.C.
233. S. Wacker 84th Floor
Chicago, Illinois 60603
312-442-3200

22.     By 2012, Beamreach raised approximately $150 million from venture capital investors like hedge funds and other companies interested in taking a small piece of the company and had received $17 million in grants from the Department of Energy.

23.     Much like its 2007 plan to hit the market with its product by 2012, in 2012 Beamreach promised to hit the market with its cheap, high-efficient product by 2014. Once again, that did not happen.

24.     By December 2014, Beamreach had raised $147 million through securities offerings and borrowed tens of millions of dollars more, and had virtually nothing to show for it.

25.     On December 9, 2014, Beamreach and Opus Bank reached a senior debt financing deal where Opus Bank agreed to provide Beamreach with a $15 million line of credit with $10 million available to draw from if the initial line of credit was exhausted.  Opus Bank was granted a security interest in all of Beamreach's assets. This loan was at 8% and was to be repaid on an interest-only basis until June 2016 at which point principal payments would also be required.

26.     By 2015, Beamreach was spending $1.2 million per month just to maintain debt service.

27.     In 2015, Beamreach did an about-face and sought to use its low-cost, thin, lightweight solar cell technology to get into the commercial and industrial solar rooftop niche of the solar energy market.

28.     At all times relevant to this complaint, Beamreach was not a party to any formal manufacturing arrangement and only had one small domestic manufacturing center in Milpitas, California

6

Class Action Complaint
Case No. 2:18-cv-1773

STOLTMANN LAW OFFICES, P.C.
233. S. Wacker 84th Floor
Chicago, Illinois 60603
312-442-3200

29.     At all times relevant to this complaint, Beamreach leased all or most of its equipment. Not only was the monthly bill for this lease extremely high, in the event of bankruptcy, the company owned no equipment it could sell off to pay creditors or investors.

30.     By Febarury 2015, purported Beamreach "customers" like Walmart and Target had been installing these roof top units for years, and had contracted with major publicly traded companies like SolarCity and SunPower to do so.

31.     By the time of the June 2016 Series D-1 offering, Walmart had already contracted with SolarCity to install new solar rooftop installations by 2018.

32.     In early 2016 WholeFoods announced it had contracted with NRG Energy and SolarCity to install rooftop solar panel arrays on almost a quarter of its stores and distribution centers nationwide.

33.     From a market perspective, although solar power increased in usage and popularity dramatically since 2010, it also became cheaper to deliver because of cheap overseas labor driving the cost of materials down.  Unless Beamreach could: 1) contract with an overseas manufacturer; 2) build a manufacturing plant capable of the high-tech required to manufacture its product; and 3) deliver that product to customers in the United States on a grand scale, it never stood a chance in the solar market. The fact that Beamreach's own valuations decreased from $650 million in 2011 to $250 million by 2016, a 61% decrease, is clear evidence of this deteriorating marketplace.

34.     By June 2016, Beamreach still had not entered into a contract with a manufacturer for its product, despite it being repeatedly referenced as imminent by the company for years.

35.     By June 2016, Beamreach was burning through $3 million per month and had

Class Action Complaint
Case No. 2:18-cv-1773

STOLTMANN LAW OFFICES, P.C.
233. S. Wacker 84th Floor
Chicago, Illinois 60603
312-442-3200

lost $48 million in 2015 and lost another $12 million in the first six months of 2016.

36.     As of June 2016, Beamreach had announced a reduction in its workforce of 15%-30% as the company reorganized.  The company only had 90 employees at that time.

37.     As of June 2016, Beamreach had only "memoranda of understanding" memorializing 170 Mega-Watts of product with customers. There were no formal contracts, sales agreements, or distribution agreements. These MOUs are little more than wink/nod arrangements used by companies like Beamreach to create the appearance that it has actual customers when in fact not one customer had been secured

38.     In February 2015, Beamreach hired NSC as its placement agent.

39.     NSC got to work and amended an existing SEC Form D, increasing the expected capital raise from $54 million to $88 million. In two more amendments, the expected amount of this capital raise increased to $98 million and then to $138 million.

40.     As of February 10, 2016, $100 million of the $138 million offering was sold out.

41.     The stock sold in the Series D Offering was offered at a value of $1.499 per share and at this time, Beamreach's valuation was set at $250 million.

42.     During this same time period, between February 2015 and April 2016, NSC raised an additional $8 million from investors for the Series D Offering, bringing NSC's total capital raise for the Beamreach Series D preferred stock offering to $26.5 million.

43.     After the Series D Offering was sold out, Beamreach was still in dire need of cash because it had no product and generated no revenue, and was burning through about $2 million a month.

44.     In June 2016, Beamreach, through NSC, offered the Series D-1 Offering of preferred stock. This offering was for $15 million of Series D-1 preferred stock plus one share

8

Class Action Complaint
Case No. 2:18-cv-1773

STOLTMANN LAW OFFICES, P.C.
233. S. Wacker 84th Floor
Chicago, Illinois 60603
312-442-3200

of common stock. Like the Series D Offering, the share price was set at $1.499 per share. This offering required the proceeds to be held in escrow until at least $10 million was raised.

45.     NSC only raised $8 million of the $10 million minimum to release the investor cash raised in the D-1 offering from escrow so Beamreach, through NSC, amended the D-1 Offering to substitute the preferred stock for a convertible secured promissory note (notwithstanding the fact that Opus Bank had a senior security interest on all of Beamreach's assets). The terms for these purported notes was 9% with a six-month term, and featured a 300% premium on principal to be paid after six months, or if the company was sold, whichever occurred first. The D-1 Offering was formally waived allowing Beamreach to ignore the escrow requirement immediately releasing $2.5 million to Beamreach that otherwise should have remained in escrow and returned to investors.

46.     This Series D-2 Offering of promissory notes were memorialized by a Form D filed with the SEC on November 10, 2016. This new Form D disclosed a debt offering for Beamreach in the amount of $16.2 million of which $8 million remained to be sold.

47.     On February 9, 2017, Beamreach filed for Chapter 7 bankruptcy citing a "catastrophic cash flow situation" and "loans due" for its demise.

48.     Beamreach thought so little of its alleged product, its "valuable" intellectual property, and the market it had allegedly penetrated for commercial and industrial solar roofing, that it threw in the towel.

49.     Instead of filing for Chapter 11 bankruptcy to restructure its debt, the company that burned through a quarter of a billion dollars in investor money simply folded its tent.

50.     All of the nearly $35 million raised for Beamreach by NSC was raised in the eighteen months preceding a Chapter 7 filing, which wiped out all of the investor money, with

Class Action Complaint
Case No. 2:18-cv-1773

STOLTMANN LAW OFFICES, P.C.
233. S. Wacker 84th Floor
Chicago, Illinois 60603
312-442-3200

no hope for recovery.

**B.     THE BEAMREACH SERIES D SECURITIES OFFERINGS WERE UNREGISTERED, NON-EXCHANGE-TRADED, EXEMPT PRIVATE PLACEMENTS**

51.     From February 6, 2015 through Beamreach's Chapter 7 bankruptcy on February 9, 2017, NSC raised over $35 million from retail investors through three securities offerings that were exempt from registration under Section 4(a)(2) of the Securities Act of 1933 (the "1933 Act").

52.     Rule 506 of Regulation D under the 1933 Act offers a "safe harbor" for companies raising funds through private placements such as this. Companies relying on the Rule 506 exemption can raise an unlimited amount of money, while being assured its offering is within the Section 4(a)(2) exemption if certain requirements are met. For each offering during the Class Period, Beamreach relied on the Rule 506(b) exemption.

53.     Beamreach was never required to register with the SEC, and therefore it was not a publicly traded company and was not subject to the reporting requirements of the Securities Exchange Act of 1934 (the "1934 Act").

**C.     NATIONAL SECURITIES OWED THE CLASS MEMBERS A DUTY TO PERFORM REASONABLE DUE DILIGENCE ON EACH BEAMREACH OFFERING PRIOR TO SELLING THE SECURITIES TO THEIR CUSTOMERS.**

54.     NSC's role as both placement agent and exclusive sales agent for Beamreach created an untenable conflict of interest for NSC. On the one hand, NSC had a duty as the placement agent for Beamreach to raise capital for the company. On the other hand, NSC had a duty to its retail investor clients to perform adequate due diligence on any private placement prior to offering it for sale  to ensure it had a reasonable basis to make a recommendation to purchase a particular offering. A debt-laden company in financial tatters that had burned

10

Class Action Complaint
Case No. 2:18-cv-1773

STOLTMANN LAW OFFICES, P.C.
233. S. Wacker 84th Floor
Chicago, Illinois 60603
312-442-3200

through $250 million in investor capital that had not attained a single goal for eight years and whose very existence as a going concern relied on NSC's ability to raise more capital, was not a valid, legitimate, securities offering.

55.     Brokerage firms and stockbrokers who sell private placements to retail customers for a commission such as NSC are required to register with the Financial Industry Regulatory Authority ("FINRA").

56.     FINRA regulates broker/dealer firms like NSC and their registered representatives (*i.e.*, stockbrokers), and promulgates rules and regulations that brokerage firms and their registered representatives must adhere to.

57.     NSC is a FINRA-registered broker-dealer.

58.     A broker-dealer is required to perform reasonable due diligence on a private placement prior to offering it for sale to its customers pursuant to FINRA Rule 2111.05(a), FINRA Regulatory Notice 10-22, NASD Notice to Members 03-71, and NASD Notice to Members 05-26.

59.     NSC's compliance manuals, supervision manuals, and internal practices and procedures also detail the requirement to perform due diligence when selling private placements.

60.     In order to ensure that it has fulfilled its responsibilities, FINRA requires that a broker-dealer in a Regulation D offering must, at a minimum, conduct a reasonable investigation concerning:

a.      the issuer and its management;

b.      the business prospects of the issuer;

c.      the assets held by or to be acquired by the issuer;

11

Class Action Complaint
Case No. 2:18-cv-1773

STOLTMANN LAW OFFICES, P.C.
233. S. Wacker 84th Floor
Chicago, Illinois 60603
312-442-3200

d.      the claims being made; and

e.      the intended use of proceeds of the offering.

61.     A broker-dealer must conduct a reasonable investigation in connection with each offering, notwithstanding that a subsequent offering may be for the same issuer.

62.     FINRA has also provided detailed guidance on how a broker-dealer may ensure an adequate investigation has taken place into the issuer and its management, the issuer's business prospects, and the issuer's assets.

63.     As set forth in FINRA Regulatory Notice 10-22 and securities industry standards, a reasonable investigation of Beamreach and its history by NSC would have included:

a.      Examining historical financial statements of Beamreach, with particular focus, if available, on financial statements that have been audited by an independent certified public accountant and auditor letters to management;

b.      Looking for any trends indicated by Beamreach's financial statements;

c.      Contacting customers and suppliers regarding their dealings with Beamreach;

d.      Reviewing Beamreach's contracts, leases, and financing arrangements;

e.      Inquiring about Beamreach's past securities offerings and the degree of their success;

f.      Inquiring about the length of time that Beamreach had been in business and whether the focus of its business was expected to change.

64.     As set forth in FINRA Regulatory Notice 10-22 and securities industry standards, a reasonable investigation of Beamreach's business prospects by NSC should include:

12

Class Action Complaint
Case No. 2:18-cv-1773

STOLTMANN LAW OFFICES, P.C.
233. S. Wacker 84th Floor
Chicago, Illinois 60603
312-442-3200

a. Inquiring about the viability and value of any patent or other intellectual property rights held by Beamreach;

b. Inquiring about the industry in which Beamreach operates, and the competitive position of Beamreach;

c. Requesting any business plan, business model or other description of the business intentions of Beamreach and its management and their expectations for the business, and analyzing management's assumptions upon which any business forecast is based. A broker/dealer should test models with information from representative assets to validate projected returns, break-even points, and similar information provided to investors.

65. As set forth in FINRA Regulatory Notice 10-22 and securities industry standards, a reasonable investigation of Beamreach's assets and facilities should include:

a. Visiting and inspecting a sample of Beamreach's facilities to determine whether the value of assets reflected in the financial statements is reasonable;

b. Carefully examining any reports by third-party experts that may raise red flags;

c. Obtaining an expert opinion from engineers and others as necessary to form a basis for determining the suitability of the investment prior to recommending the security to investors.

66. A broker-dealer that offers securities, including those offered under Regulation D, must meet the suitability requirements of FINRA Rule 2111. This means that the broker-dealer must have a reasonable basis to believe that a recommendation to purchase, sell or exchange a security is suitable for the customer.

67. FINRA Rule 2111.05(a) is the source of a broker-dealer's obligation to perform a reasonable investigation of the issuer and offered securities before offering securities in a

13

Class Action Complaint
Case No. 2:18-cv-1773

STOLTMANN LAW OFFICES, P.C.
233. S. Wacker 84th Floor
Chicago, Illinois 60603
312-442-3200

Regulation D for sale to its clients. Reasonable-basis suitability requires that a broker-dealer (1) perform reasonable diligence to understand the potential risks and rewards associated with a recommended security or strategy and (2) determine whether the recommendation is suitable for at least some investors based on that understanding. A broker-dealer can violate reasonable-basis suitability under either prong of the test.

68.     A broker-dealer may not rely blindly upon the issuer for information concerning a company, nor may it rely on the information provided by the issuer in lieu of conducting its own reasonable investigation.

69.     While broker-dealers like NSC are not expected to have the same knowledge as an issuer or its management, firms are required to exercise a high degree of care in investigating and independently verifying an issuer's representations and claims. The fact that a broker-dealer's customers may be sophisticated and knowledgeable does not obviate this duty to investigate.

70.     Of course, under these circumstances, NSC was in a position to know more about Beamreach, understand its business, its finances, and its outlook better than just a mere broker-dealer. As the placement agent and investment banker for Beamreach, NSC was in a unique position compared to another broker-dealer that was merely part of the investment banking syndicate.

71.     In the course of a reasonable investigation, a broker-dealer must note any information that it encounters that could be considered a "red flag" that would alert a prudent person to conduct further inquiry. A broker-dealer's reasonable investigation responsibilities obligate it to follow up on any red flags that it encounters during its inquiry as well as to investigate any substantial adverse information about the issuer. When presented with red flags,

14

Class Action Complaint
Case No. 2:18-cv-1773

STOLTMANN LAW OFFICES, P.C.
233. S. Wacker 84th Floor
Chicago, Illinois 60603
312-442-3200

the broker-dealer must do more than "blindly rely" upon representations by the issuer's management or the disclosure in an offering document.

72.     As described below, unfortunately for the Plaintiffs and the Class, NSC failed to conduct proper due diligence, which caused Defendant's conduct to fall below the standard of care thereby breaching the duties that it owed the Plaintiffs and the Class.

**D.   NSC BREACHED THE DUTY IT OWED THE PLAINTIFFS AND THE CLASS BY RECOMMENDING THE INVESTMENT INTO BEAMREACH  DESPITE NUMEROUS RED FLAGS**

**i.     Proper due diligence would have made it apparent that Beamreach was a failed startup on the verge of collapse, and that it had only engaged NSC to try to avoid its inevitable demise.**

73.     Analyzing the historical financials, Beamreach had burned through more than $200 million in investor money without even having a viable product to sell before engaging NSC to raise additional funds.

74.     As of February 5, 2015, NSC knew that Beamreach only had a cash runway to continue operations through April 2016 (even with a fully subscribed offering).

75.     NSC also knew that the Beamreach valuation from the Series B round offered in 2008, had dropped by more than 60% from $625 million to only $250 million for the Series D round. As NSC knew or should have known, a sharp valuation drop like this is an ominous sign, and could hurt Beamreach in raising additional funds. NSC knew that Beamreach had trouble raising capital after the Series B round, and that if it failed to raise capital in the short time frame required, it would have to prepare for the sale of the company. In other words, NSC knew Beamreach was in a desperate financial condition at the time of each Beamreach Offering.

76.     NSC knew that Beamreach had no revenue. After burning through more than $200 million in investor funds, Beamreach was only able to secure a handful of non-binding

15

Class Action Complaint
Case No. 2:18-cv-1773

STOLTMANN LAW OFFICES, P.C.
233. S. Wacker 84th Floor
Chicago, Illinois 60603
312-442-3200

Memoranda of Understanding ("MOUs") with prospective customers, which expired on December 31, 2014 (prior to the commencement of the offering).

77.     After eight years and burning through over $200 million, Beamreach had no actual customers. Had NSC actually talked with prospective customers or solar panel installers, they would have learned that the market had little interest in a lightweight panel, and were too expensive compared to a commoditized silicon panel, which has a commercially proven reliability and a better price point.

78.     NSC knew that highly subsidized Asian solar panel manufacturers drove industry pricing below the cost of production, causing many producers to shut plants or cease production entirely. Simply put, it was too expensive to manufacture these panels in the United States. NSC knew that between early 2009 and 2013, more than 100 solar companies were sold or liquidated. In other words, the solar panel manufacturing industry was not in a growth phase during the time Beamreach approached NSC to raise capital for it.

79.     As Beamreach disclosed, "fundraising subsequent to the Series B Preferred Stock round has been difficult for [Beamreach] and may suggest that it could be difficult for [Beamreach] to complete the Offering or raise future rounds. As discussed elsewhere in these Risk Factors, failure to raise additional capital could cause significant harm to [Beamreach's] operations and financial condition.".

80.     By the time NSC was selling to Plaintiffs and the Class, sophisticated private equity funds and venture capitalists, which have their own teams of professionals who vet companies like Beamreach prior to investing, (as NSC should have), slowed their investment to a trickle.

16

Class Action Complaint
Case No. 2:18-cv-1773

STOLTMANN LAW OFFICES, P.C.
233. S. Wacker 84th Floor
Chicago, Illinois 60603
312-442-3200

81.     In connection with evaluating the foregoing red flags for Beamreach investors, a reasonably prudent broker-dealer firm under the same or similar circumstances would not have approved the Beamreach Offerings for sale to any investor when considering these risks because the risk of a complete loss in the short term far outweighed any potential long term rewards, even for those investors that sought to speculate with their funds.

82.     By approving the Beamreach Offerings for sale to the Plaintiffs and the Class notwithstanding these red flags, NSC acted in a manner which a reasonably prudent broker-dealer firm under the same or similar circumstances would not have.

**ii.     Opus Bank's Financing Terms Made it a Virtual Certainty that Beamreach Preferred Stock Was Worthless**

83.     Just before NSC was engaged to raise capital for Beamreach from retail investors, Beamreach agreed to a financing deal with Opus Bank that effectively set a noose around Beamreach's neck.

84.     Prior to the Opus Bank deal, Beamreach had relied on equity capital raises to fund its research, development, and business. But on December 9, 2014, Beamreach struck a deal with Opus Bank for senior secured debt financing in the amount of $15 million with an additional $10 million available to draw from subsequently. The loan was primarly used to finance equipment leasing. This loan was at 8% annualized interest and was to be repaid on an interest-only basis until June 2016 at which point principal repayments would be required.

85.     NSC was aware of the terms of the Opus Bank financing including:

a.     Opus Bank had secured their debt financing with a blanket lien against "substantially all" of Beamreach's domestic assets;

17

Class Action Complaint
Case No. 2:18-cv-1773

STOLTMANN LAW OFFICES, P.C.
233. S. Wacker 84th Floor
Chicago, Illinois 60603
312-442-3200

b.      If there was any bankruptcy or other change in control prior to the repayment of the loan, Opus Bank would have a senior secured claim on the assets;

c.      Given that Beamreach's only real asset after all of their fundraising was their "valuable" intellectual property, the equity investors would have nothing left in the event of a default on this loan;

d.      Beamreach owed $1.2 million per month just to service debt; and

e.      By mid 2016, that debt service would jump to $1.7 million per month.

86.     This Opus Bank agreement caused the risk of a complete loss in the short term to far outweigh any potential long term reward.

87.     By approving the Beamreach Offerings for sale to the Plaintiffs and the Class, notwithstanding the red flags presented by the Opus Bank deal, NSC acted in a matter which a reasonably prudent broker-dealer under the same or similar circumstances would not have.

### iii.     NSC Failed to Detect that Beamreach's Intellectual Property Portfolio was Virtually Worthless, and Had Little to No Commercial Appeal

88.     Beamreach prided itself on having a valuable IP portfolio which was central to the value proposition it offered investors.

89.     Had NSC conducted adequate due diligence on the IP portfolio, it would have discovered that there was little commercial appetite for the IP that Beamreach had spent $250 million developing, and that the valuable IP portfolio was virtually worthless.

90.     Following Beamreach's bankruptcy, and as recently as May 2018, IP consulting firms were engaged by Opus Bank to salvage value from the assets secured by its senior security interest were soliciting bids on the Beamreach IP portfolio, which consisted of 79 patent families made up of 122 granted/allowed patent assets and 112 pending applications.

18

Class Action Complaint
Case No. 2:18-cv-1773

STOLTMANN LAW OFFICES, P.C.
233. S. Wacker 84th Floor
Chicago, Illinois 60603
312-442-3200

91.     These firms priced the IP as follows for fully paid-up, non-exclusive, portfolio-wide, life-of-patent license in the designated field of use for a mere $300,000.

92.     In other words, NSC raised tens of millions of investor capital for a company that had no revenue, had a senior secured debt financing noose round its neck, and had assets worth only $300,000.

93.     A reasonably prudent broker-dealer under the same or similar circumstances would have conducted reasonable diligence on the value of Beamreach's purported IP portfolio. If reasonable diligence was conducted, a reasonably prudent broker-dealer under the same or similar circumstances would have also concluded that the IP portfolio had little value. Had NSC conducted proper due diligence in this case, it too would have detected that the IP portfolio had little value and would have rejected the Beamreach Offerings and refused to approve of the offerings for sale to the Plaintiffs and Class Members.

**iv.     Beamreach's Extremely Short Cash Runway was a Flashing Warning Sign that NSC Failed to Yield To.**

94.     In each offering, Beamreach made it crystal clear that at any given time it had a cash runway of less than 15 months (depending on the amount of capital raised) before it would hit financial distress. In addition, NSC knew that Beamreach would require continuing infusions of debt or equity capital after the cash runways expired to continue operations.

95.     At this point, for a company that had previously raised $250 million and (i) was eight years old; (ii) still had no positive cash flow; (iii) inked a deal with a venture bank that put a noose around its neck; (iv) only had non-binding MOUs with potential customers; and (v) had an IP portfolio only worth $300,000 – an extremely short cash runway is probably the biggest red flag of them all.

Class Action Complaint
Case No. 2:18-cv-1773

STOLTMANN LAW OFFICES, P.C.
233. S. Wacker 84th Floor
Chicago, Illinois 60603
312-442-3200

96.     In connection with evaluating the red flags with regard to the short cash runway that Beamreach disclosed, a reasonably prudent broker-dealer under the same or similar circumstances would not have approved of the sale of the Beamreach Offerings to its clients when considering these risks because the risk of a complete loss in the short term far outweighed any potential long term rewards. By approving of the sale of the Beamreach Offerings to the Plaintiffs and the Class notwithstanding the red flags regarding Beamreach's extremely short cash runway, NSC acted in a manner which a reasonably prudent broker-dealer under the same or similar circumstances would not have.

### v.     The Fifth Amendment to the Opus Bank Deal Created a Terminal Event for Beamreach as a Going Concern.

97.     The October 2016 Fifth Amendment to the Opus Bank financing essentially placed a terminal date on Beamreach. Beamreach was effectively required to replace or refinance the Opus Bank loan by March 2017 – within six months of the Fifth Amendment. Given their short cash runway, lack of revenue, lack of binding commercial contracts, virtually worthless IP, it would be virtually impossible for them to sell or refinance in such a short timeframe. As a result, Beamreach's death spiral was set in motion. Whatever the outcome, the Plaintiffs and Class Members would only receive what was left after Opus was paid – which would be nothing.

98.     Beamreach disclosed the following regarding the Fifth Amendment to NSC:

a.     Opus Bank instructed Beamreach to find a successor bank or non-bank lender or sell the company on or before March 31, 2017;

b.     If the Opus Bank loan was not replaced or repaid or Beamreach was not sold on or before March 31, 2017: (1) Beamreach was required to have $30 million in cash in an account

20

with Opus Bank by that date; (2) The limited forbearance on events of default occurring before the Opus Amendment would lapse; and (3) The requirement that Beamreach be solvent and stay current on all other payments would be reinstated.

c.      If Beamreach was unable to replace or pay off the Opus Bank loan on or before March 31, 2017, Beamreach would be required to complete a sale of the company before such date or risk an event of default, which could result in Opus Bank calling its complete loan for immediate payment and, if such funds were not available, could result in an immediate wind down of the Company.

99.     In connection with evaluating this red flag for the Series D-2 Offering, a reasonably prudent broker-dealer under the same or similar circumstances would have not approved of the sale of Beamreach to any investor when considering the Fifth Amendment to the Opus Bank deal because it posed an unmistakable and obvious risk of a complete loss in the short term, for even those investors that sought to speculate with their funds. By approving the sale of the Series D-2 Beamreach offering to the Plaintiffs and the Class notwithstanding this red flag, NSC acted in a manner which a reasonably prudent broker-dealer under the same or similar circumstances would not have.

### vi.    Beamreach had Already Retained Bankruptcy Counsel Prior to the Series D-2 Offering

100.    NSC knew or should have known that Beamreach had retained bankruptcy counsel prior to the November 2016 offering.

101.    On October 19 and October 24, 2016, Beamreach paid its bankruptcy counsel, Pachulski Stang Ziehl & Jones, LLP, for services in connection with restructuring or bankruptcy

Class Action Complaint
Case No. 2:18-cv-1773

STOLTMANN LAW OFFICES, P.C.
233. S. Wacker 84th Floor
Chicago, Illinois 60603
312-442-3200

of the company. Ultimately, on February 9, 2017, the Pachulski firm filed Beamreach's voluntary petition for Chapter 7 bankruptcy.

102.    By November 2016, NSC knew that the company was in dire financial straits, and was being forced to sell the company or refinance the Opus loan by March 2017. Naturally, in conducting reasonable diligence on a company that clearly disclosed heavy short-term obstacles which concern the viability of a company as a going concern, a reasonably prudent broker-dealer in the same or similar circumstances would have inquired into whether or not Beamreach was contemplating bankruptcy in the short term, and if it had retained bankruptcy counsel. Upon information and belief, NSC made no such inquiry.

103.    Had NSC conducted proper due diligence on the Series D-2 Offering, it would have detected that Beamreach intended to file for bankruptcy if it was not able to find a buyer, or refinance the Opus Bank deal.

104.    In conducting reasonable diligence into the Beamreach Series D-2 Offering, a reasonably prudent broker-dealer firm under the same or similar circumstances would have inquired into whether Beamreach was planning to file bankruptcy and whether it had retained bankruptcy counsel. By approving the sale of the Beamreach Series D-2 offering to the Plaintiffs and the Class without making such an inquiry, NSC was acting in a manner which a reasonably prudent broker-dealer under the same or similar circumstances would not have.

105.    Moreover, if a reasonably prudent broker-dealer under the same or similar circumstances had knowledge of the fact that Beamreach had retained bankruptcy counsel prior to the Series D-2 Offering and intended on declaring bankruptcy if it could not find a buyer or refinance the Opus Bank loan, the risk of a complete short term loss would far outweigh any potential reward the investors would enjoy – even for those investors that sought to speculate.

22

Class Action Complaint
Case No. 2:18-cv-1773

STOLTMANN LAW OFFICES, P.C.
233. S. Wacker 84th Floor
Chicago, Illinois 60603
312-442-3200

Accordingly, a reasonably prudent broker-dealer under the same or similar circumstances with the knowledge of this red flag would not have approved of the sale of the Beamreach Series D-2 Offering to any of its clients.

### vii. The Culmination of Red Flags In Connection with the Beamreach Offerings Should have Resulted in NSC Rejecting the Offerings.

106.    A reasonably prudent broker-dealer under the same or similar circumstances would have considered each of the foregoing red flags and concluded, based on reasonable diligence and investigation into the Beamreach Offerings, that the offerings failed the reasonable basis suitability test and were therefore unsuitable for any investor, necessitating NSC to reject the Beamreach Offerings.

107.    When considering the culmination of the multiple serious red flags disclosed by Beamreach – as well as those that were undisclosed but would have been detected with reasonable diligence – a reasonably prudent broker-dealer would have determined that the risks of the Beamreach offering far outweighed the potential rewards from the offering, and would have declined to approve of the sale of the Beamreach Offerings to any clients (including those willing to speculate).

108.    By approving of the sale of the Beamreach Offerings to the Plaintiffs and the Class notwithstanding each individual red flag, as well as the culmination of all of the foregoing red flags, NSC failed to act as a reasonably prudent broker-dealer would have under the same or similar circumstances.

109.    Notwithstanding these facts which NSC either knew or, if it had done any reasonable, objective level of due diligence in to Beamreach, it should have known, NSC proceeded to approve three Beamreach Offering for sale to its captive retail investor client base.

23

Class Action Complaint
Case No. 2:18-cv-1773

STOLTMANN LAW OFFICES, P.C.
233. S. Wacker 84th Floor
Chicago, Illinois 60603
312-442-3200

110.    Less than three months after NSC approved of the Series D-1 Preferred Stock transition to the Series D-2 promissory note – including the release of investor money from an escrow account to Beamreach – the writing on the wall became reality and Beamreach filed for Chapter 7 bankruptcy protection.

**E.    DISCOVERY OF NSC'S NEGLIGENCE**

111.    Each of the Plaintiffs was a client of NSC and as such, were reasonable in relying on NSC's expertise and skill in conducting due diligence on Beamreach. As such, the Plaintiffs placed great weight in NSC's decision to promote and approve of the sale of the Beamreach Offerings to the Plaintiffs and NSC retail investor client base.

112.    At the time NSC approved and promoted the Beamreach Offerings, Plaintiffs reasonably believed (i) that NSC had conducted thorough due diligence on Beamreach, (ii) that NSC understood the risks and rewards of each Beamreach offering; and (iii) that based on NSC's due diligence and its understanding of the risks and rewards of the Beamreach offerings, NSC concluded that it could approve the Beamreach Offerings for sale to at least some of its clients.

113.    It was not until the Plaintiffs received notice of the Beamreach Chapter 7 filing after February 9, 2017 that Plaintiffs began to suspect that NSC may have been negligent in connection with its due diligence and understanding of the risks and rewards of the Beamreach Offerings.

**F.    NSC IS DIRECTLY AND PROXIMATELY LIABLE FOR ALL OF THE INVESTMENT LOSSES SUFFERED BY THE PLAINTIFFS AND THE CLASS.**

114.    It was reasonably foreseeable that by approving the sale of Beamreach Offerings to its clients, that the Plaintiffs and Class Members would rely on such approval as a basis to

24

Class Action Complaint
Case No. 2:18-cv-1773

STOLTMANN LAW OFFICES, P.C.
233. S. Wacker 84th Floor
Chicago, Illinois 60603
312-442-3200

invest in the Beamreach Offerings.

115.    A reasonably prudent broker-dealer under the same or similar circumstances as NSC would not have approved of the sale of the Beamreach Offerings to its clients based on the facts readily available to NSC. By approving the Beamreach Offerings for sale to its clients notwithstanding the existence of these readily apparent red-flags, it is clear NSC's due diligence process was not objective but was instead clouded by its financial incentive to sell the Beamreach Offerings.   Had NSC conducted proper due diligence to allow it to form an understanding of the risks and rewards of the Beamreach offerings, it would not have approved of the sale of the Beamreach Offerings to its clients..

116.    As a direct and proximate cause of NSC's approval of the Beamreach Offerings for sale to the Plaintiffs and Class, each of the Plaintiffs and the Class invested in Beamreach.

117.    NSC is therefore liable for any and all damages that resulted from its decision to approve the Beamreach Offerings for sale to its clients. The Plaintiffs and the Class suffered a complete loss on their investment following Beamreach's Chapter 7 bankruptcy.

**F.   INDIVIDUAL PLAINTIFFS' LOSSES**

118.    On or about November 15, 2016, Ginzkey invested $89,214.75 in the Beamreach Series D2 Offering. This investment resulted in a total loss for Ginzkey.

119.    On or about April 30, 2015, Fitzgerald invested $175,000 in the Beamreach Series D offering. This investment resulted in a total loss for Fitzgerald.

120.    On or about October 28, 2016, Fitzgerald invested $12,745 in the Beamreach Series D-2 offering. This investment resulted in a total loss for Fitzgerald.

121.    On or about February 9, 2016, Cerf invested $52,479 in the Beamreach Series D offering. This investment resulted in a total loss for Cerf.

25

Class Action Complaint
Case No. 2:18-cv-1773

STOLTMANN LAW OFFICES, P.C.
233. S. Wacker 84th Floor
Chicago, Illinois 60603
312-442-3200

122.   On or about April 10, 2015, Donner invested $149,940 in the Beamreach Series D offering. This investment resulted in a total loss for Donner.

123.   On or about October 20, 2016, Donner invested $100,459 in the Beamreach Series D-1 offering.  These investments resulted in a total loss to Donner.

## V.   CLASS ALLEGATIONS

124.   Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure ("FRCP") on behalf of a Class and Three Sub-Classes consisting of:

**Beamreach Class**

All persons for who invested in Beamreach Offerings (as defined above) through the Defendant, at any time between February 6, 2015 and February 9, 2017 inclusive (the "Class Period").

**Series D Sub-Class**

All persons for who invested in Beamreach Series D (as defined above) through the Defendant, at any time between February 6, 2015 and December 31, 2016 inclusive (the "Sub-Class D Period").

**Series D-1 Sub-Class**

All persons for who invested in Beamreach Series D-1 (as defined above) through the Defendant, at any time between June 1, 2016 and February 9, 2017 inclusive (the "Sub-Class D-1 Period").

**Series D-2 Sub-Class**

All persons for who invested in Beamreach Series D-1 (as defined above) through the Defendant, at any time between October 1, 2016 and February 9, 2017 inclusive (the "Sub-Class D-2 Period").

Excluded from the Class is Defendant and any of its officers, directors, employees, agents, parents, affiliates or subsidiaries. Also excluded is any entity related to or affiliated with Beamreach, and any judicial officers presiding over this matter and their immediate family members.

125.   At least hundreds of persons are believed to be members of the putative Class, and those persons or entities are geographically dispersed. Therefore, joinder is impracticable pursuant to FRCP Rule 23(a)(1).

26

Class Action Complaint
Case No. 2:18-cv-1773

STOLTMANN LAW OFFICES, P.C.
233. S. Wacker 84th Floor
Chicago, Illinois 60603
312-442-3200

126.    Common issues of fact or law predominate over individual issues within the meaning of FRCP Rule 23(a)(2). Common issues of law and fact include but are not limited to:

a.      Whether Defendant failed to conduct due diligence on Beamreach;

b.      Whether Defendant failed to understand the risks and rewards of offering securities in Beamreach;

c.      Whether Defendant was negligent in approving the Beamreach Offerings for sale to its clients;

d.      Whether Defendant failed to act as a reasonably prudent broker-dealer would have under the same or similar circumstances;

e.      Whether Defendant acted negligently by virtue of their uniform acts and omissions alleged herein;

f.      Whether Defendant was unjustly enriched; and

g.      Whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

127.    Plaintiffs' interests are typical of, and not antagonistic to the interests of, the Class.

128.    Plaintiffs have retained competent counsel experienced with class actions and complex litigation and intend to vigorously prosecute this action.

129.     Common issues predominate. A class action is superior to all other methods for the fair and efficient adjudication of this controversy. Indeed, a class action is the only method by which Plaintiffs and the Class can efficiently seek redress and obtain a uniform adjudication of their claims.

Class Action Complaint
Case No. 2:18-cv-1773

STOLTMANN LAW OFFICES, P.C.
233. S. Wacker 84th Floor
Chicago, Illinois 60603
312-442-3200

130.    The size of individual damages is small in comparison to the complexity and scope of the Defendant's alleged unlawful conduct. Plaintiffs do not anticipate any difficulties in the management of this action as a class action.

Class Action Complaint
Case No. 2:18-cv-1773

STOLTMANN LAW OFFICES, P.C.
233. S. Wacker 84th Floor
Chicago, Illinois 60603
312-442-3200

**V.     CLAIMS**

**COUNT I**
***Donner, Cerf, and Fitzgerald  and Series D Sub Class v. NSC***
**NEGLIGENCE**

131.    Plaintiffs, Donner, Cerf, and Fitzgerald, on behalf of themselves and the Series D Class, reallege and incorporate by reference herein the allegations contained in Paragraphs 1 through 130 as Paragraph 131 of Count I of the Complaint as if fully set forth herein.

132.    To establish the applicable standard of care under the circumstances, the Court may examine professional standards of conduct in the industry. In this case, the applicable standards of conduct for NSC are the rules promulgated by FINRA, which each FINRA member firm like NSC is required to adhere to.

133.    NSC's compliance and supervision manuals also provide guidelines and obligations applicable to NSC in connection with acting as a placement agent and in performing due diligence on private placement offerings.

134.    NSC owed the Plaintiffs and the Series D Class a duty to act as a reasonably prudent broker-dealer would do under the same or similar circumstances. The duties set forth herein arise from the regulations, customs and usage of the brokerage trade, including rules promulgated by FINRA, a self-regulatory organization to which Defendant belongs and whose rules NSC must obey. These duties and obligations flow to the Plaintiffs and Class members as a result of the client relationship between NSC, the Plaintiffs, and the Class.

135.    As described above in paragraphs 73-98 and 106-110, Defendant negligently breached its duties to Plaintiffs and the members of the Series D Class.

136.    Had a reasonably prudent broker-dealer under the same or similar circumstances conducted adequate due diligence on Beamreach to understand the risks and rewards of the Beamreach Offerings, it would have concluded that the risks in investing in Beamreach far

29

Class Action Complaint
Case No. 2:18-cv-1773

STOLTMANN LAW OFFICES, P.C.
233. S. Wacker 84th Floor
Chicago, Illinois 60603
312-442-3200

outweighed any potential reward, and it would not have approved of the Beamreach Offering for sale to any of its clients.

137.   By approving of the sale of the Beamreach Offerings to its clients notwithstanding the numerous red flags identified herein, NSC demonstrated that it failed to understand the risks and rewards of the Beamreach offerings, or consciously ignored the risks presented by these red flags in order to ensure it maximized its placement agent fees and commissions.

138.   NSC knew or should have known that the Plaintiffs would place their trust and confidence in NSC that it had a reasonable-basis to conclude that Beamreach was suitable for at least some investors, and that it had conducted adequate due diligence to understand the risks and rewards of the Beamreach offering.

139.   NSC knew or should have known that it was reasonably foreseeable that the Plaintiffs and the Class would act in reliance on NSC's approval to sell the Beamreach Offerings.

140.   The Plaintiffs and the Class acted in reliance on NSC's approval to offer to sell the Beamreach offerings.

141.   But for NSC's approval to sell the Beamreach Offerings, the Plaintiffs or the Series D Class members would not have invested in the Beamreach Offerings.

142.   As a direct and proximate result of NSC's negligence, NSC is liable to the Plaintiffs and the Class for all of the investment losses that they suffered in Beamreach.

30

Class Action Complaint
Case No. 2:18-cv-1773

STOLTMANN LAW OFFICES, P.C.
233. S. Wacker 84th Floor
Chicago, Illinois 60603
312-442-3200

## COUNT II
### *Donner and Series D-1 Class v. NSC*
### NEGLIGENCE

143.    Plaintiff, Donner on behalf of himself and the Series D-1 Class, realleges and incorporates by reference herein the allegations contained in Paragraphs 1 through 129 as Paragraph 143 of Count I of the Complaint as if fully set forth herein.

144.    To establish the applicable standard of care under the circumstances, the Court may examine professional standards of conduct in the industry. In this case, the applicable standards of conduct for NSC are the rules promulgated by FINRA, which each FINRA member firm like NSC is required to adhere to.

145.    NSC's compliance and supervision manuals also provide guidelines and obligations applicable to NSC in connection with acting as a placement agent and in performing due diligence on private placement offerings.

146.    NSC owed the Plaintiffs and the Series D-1 Class a duty to act as a reasonably prudent broker-dealer would do under the same or similar circumstances. The duties set forth herein arise from the regulations, customs and usage of the brokerage trade, including rules promulgated by FINRA, a self-regulatory organization to which Defendant belongs and whose rules NSC must obey. These duties and obligations flow to the Plaintiffs and Class members as a result of the client relationship between NSC, the Plaintiffs, and the Class.

147.    As described above in paragraphs 73-98, 102, and 106-110, Defendant negligently breached its duties to Plaintiffs and the members of the Series D-1 Class.

148.    Had a reasonably prudent broker-dealer under the same or similar circumstances conducted adequate due diligence on Beamreach to understand the risks and rewards of the Beamreach Offerings, it would have concluded that the risks in investing in Beamreach far

31

Class Action Complaint
Case No. 2:18-cv-1773

STOLTMANN LAW OFFICES, P.C.
233. S. Wacker 84th Floor
Chicago, Illinois 60603
312-442-3200

outweighed any potential reward, and it would not have approved of the Beamreach Offering for sale to any of its clients.

149.    By approving of the sale of the Beamreach Offerings to its clients notwithstanding the numerous red flags identified herein, NSC demonstrated that it failed to understand the risks and rewards of the Beamreach offerings, or consciously ignored the risks presented by these red flags in order to ensure it maximized its placement agent fees and commissions.

150.    NSC knew or should have known that the Plaintiffs would place their trust and confidence in NSC that it had a reasonable-basis to conclude that Beamreach was suitable for at least some investors, and that it had conducted adequate due diligence to understand the risks and rewards of the Beamreach offering.

151.    NSC knew or should have known that it was reasonably foreseeable that the Plaintiffs and the Class would act in reliance on NSC's approval to sell the Beamreach Offerings.

152.    The Plaintiffs and the Class acted in reliance on NSC's approval to offer to sell the Beamreach offerings.

153.    But for NSC's approval to sell the Beamreach Offerings, the Plaintiffs or the Series D-1 Class members would not have invested in the Beamreach Offerings.

154.    As a direct and proximate result of NSC's negligence, NSC is liable to the Plaintiffs and the Class for all of the investment losses that they suffered in Beamreach.

Class Action Complaint
Case No. 2:18-cv-1773

STOLTMANN LAW OFFICES, P.C.
233. S. Wacker 84th Floor
Chicago, Illinois 60603
312-442-3200

### COUNT III
#### *Ginzkey and Fitzgerald Series D-2 Sub Class v. NSC*
### NEGLIGENCE

155.　Plaintiffs, Ginzkey and Fitzgerald on behalf of themselves and the Series D-2 Class, reallege and incorporate by reference herein the allegations contained in Paragraphs 1 through 129 as Paragraph 155 of Count III of the Complaint as if fully set forth herein.

156.　To establish the applicable standard of care under the circumstances, the Court may examine professional standards of conduct in the industry. In this case, the applicable standards of conduct for NSC are the rules promulgated by FINRA, which each FINRA member firm like NSC is required to adhere to.

157.　NSC's compliance and supervision manuals also provide guidelines and obligations applicable to NSC in connection with acting as a placement agent and in performing due diligence on private placement offerings.

158.　NSC owed the Plaintiffs and the Series D-2 Class a duty to act as a reasonably prudent broker-dealer would do under the same or similar circumstances. The duties set forth herein arise from the regulations, customs and usage of the brokerage trade, including rules promulgated by FINRA, a self-regulatory organization to which Defendant belongs and whose rules NSC must obey. These duties and obligations flow to the Plaintiffs and Class members as a result of the client relationship between NSC, the Plaintiffs, and the Class.

159.　As described above in paragraphs 73-110, Defendant negligently breached its duties to Plaintiffs and the members of the Series D-2 Class.

160.　Had a reasonably prudent broker-dealer under the same or similar circumstances conducted adequate due diligence on Beamreach to understand the risks and rewards of the Beamreach Offerings, it would have concluded that the risks in investing in Beamreach far

33

Class Action Complaint
Case No. 2:18-cv-1773

STOLTMANN LAW OFFICES, P.C.
233. S. Wacker 84th Floor
Chicago, Illinois 60603
312-442-3200

outweighed any potential reward, and it would not have approved of the Beamreach Offering for sale to any of its clients.

161.    By approving of the sale of the Beamreach Offerings to its clients notwithstanding the numerous red flags identified herein, NSC demonstrated that it failed to understand the risks and rewards of the Beamreach offerings, or consciously ignored the risks presented by these red flags in order to ensure it maximized its placement agent fees and commissions.

162.    NSC knew or should have known that the Plaintiffs would place their trust and confidence in NSC that it had a reasonable-basis to conclude that Beamreach was suitable for at least some investors, and that it had conducted adequate due diligence to understand the risks and rewards of the Beamreach offering.

163.    NSC knew or should have known that it was reasonably foreseeable that the Plaintiffs and the Class would act in reliance on NSC's approval to sell the Beamreach Offerings.

164.    The Plaintiffs and the Class acted in reliance on NSC's approval to offer to sell the Beamreach offerings.

165.    But for NSC's approval to sell the Beamreach Offerings, the Plaintiffs or the Series D-2 Class members would not have invested in the Beamreach Offerings.

166.    As a direct and proximate result of NSC's negligence, NSC is liable to the Plaintiffs and the Class for all of the investment losses that they suffered in Beamreach.

Class Action Complaint
Case No. 2:18-cv-1773

STOLTMANN LAW OFFICES, P.C.
233. S. Wacker 84th Floor
Chicago, Illinois 60603
312-442-3200

## COUNT IV
### *Donner, Fitzgerald, Ginzkey, Cerf and Beamreach Class v. NSC*
### UNJUST ENRICHMENT

167. Plaintiffs, Donner, Fitzgerald, Ginzkey, Cerf on behalf of themselves and the Beamreach Class, reallege and incorporate by reference herein the allegations contained in Paragraphs 1 through 130 as Paragraph 167 of Count IV of the Complaint as if fully set forth herein.

168. NSC has received and retained a benefit from Plaintiffs and Class Members and inequity has resulted.

169. NSC has benefitted from selling an investment they knew or should have known was of little or no value and unsuitable for any investor by earning a 10% commission.

170. Thus, all the Beamreach Class Members conferred a benefit on NSC by paying a commission for the worthless investment.

171. It is inequitable for NSC to retain these benefits.

172. Plaintiffs were not aware of the true facts about the Beamreach investment, and did not benefit from NSC's conduct.

173. NSC  knowingly accepted the benefits of its unjust conduct.

174. As a result of NSC's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

35

Class Action Complaint
Case No. 2:18-cv-1773

STOLTMANN LAW OFFICES, P.C.
233. S. Wacker 84th Floor
Chicago, Illinois 60603
312-442-3200

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of the Class and Sub-Classes as defined herein, respectfully request that this Court enter a judgment against NATIONAL SECURITIES CORPORATION and in favor of Plaintiffs and the Class, and grant the following relief:

A. Determine that this action may be maintained and certified as a class action on a nationwide basis under Rule 23(b)(1), 23(b)(2) and/or 23(b)(3); or alternatively, certify all questions, issues and claims that are appropriately certified under 23(c)(4); and that it designate and appoint Plaintiffs as Class Representatives, and appoint Class Counsel under Rule 23(g);

B. Award Plaintiffs and Class Members their actual, compensatory and/or statutory damages, according to proof;

C. Award Plaintiffs and Class members their reasonable attorneys' fees, costs, and pre-judgment and post-judgment interest;

D. Award Plaintiffs and Class members such other, further and different relief as the case may require; or as determined to be just, equitable, and proper by this Court.

Class Action Complaint
Case No. 2:18-cv-1773

STOLTMANN LAW OFFICES, P.C.
233. S. Wacker 84th Floor
Chicago, Illinois 60603
312-442-3200

## **DEMAND FOR JURY TRIAL**

Plaintiffs and the Class demand a trial by jury on all claims so triable.


Dated:  December 10, 2018

By:  /s/ *David Neuman*
        Attorneys for Plaintiffs

David Neuman, Esq. (WSB #48176)
ISRAELS NEUMAN PLC
10900 NE 8th Street, Suite 1000
PMB #155
Bellevue, WA 98004
dave@israelsneuman.com

Alexander Loftus, Esq.
Joseph Wojciechowski, Esq.
Jeffrey Dorman, Esq.
Ryan Moore, Esq.
*Pro Hac Vice Pending*
STOLTMANN LAW OFFICES, P.C.
233 S. Wacker, 84th Floor
Chicago, Illinois 60603
PH: (312) 332-4200
alex@stoltlaw.com
joe@stoltlaw.com
jeff@stoltlaw.com
ryan@stoltlaw.com

Joshua B. Kons, Esq.
LAW OFFICES OF JOSHUA B. KONS, LLC
939 West North Avenue, Suite 750
Chicago, Illinois  60642
PH: (312) 757-2272
joshuakons@konslaw.com

37

Class Action Complaint
Case No. 2:18-cv-1773

STOLTMANN LAW OFFICES, P.C.
233. S. Wacker 84th Floor
Chicago, Illinois 60603
312-442-3200