# Exhibit C

Excerpts from Supplement to Beamreach Confidential Private Placement Memorandum

# Beamreach Solar, Inc.

## Private Offering of up to $15,000,000 of Convertible Secured Promissory Notes

**SUPPLEMENT TO BEAMREACH SOLAR, INC.**
**CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM**

(November 14, 2016, 6:00 p.m. Pacific Time)

1

**SUPPLEMENT TO CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM**

This Supplement (this "Supplement"), dated as of November 14, 2016, 6:00 p.m. Pacific Time, the stockholder update letter dated October 21, 2016 (the "Update Letter") attached as Appendix 1 hereto and the updated disclosure schedule (the "Updated Disclosure Schedule") attached as Appendix 2 hereto provide certain updates to that certain Confidential Private Placement Memorandum dated as of September 15, 2016 (the "Memorandum") relating to the offer and sale by Beamreach Solar, Inc., a Delaware corporation (the "Company," "Beamreach," "we" or "us"), of Series D-1 Units (the "Units"). Capitalized terms used but not otherwise defined herein have the meanings set forth in the Memorandum. This Supplement replaces and supersedes all previously distributed supplements or similar distributions containing information related to the Memorandum or the Offering.

_____

**1.    REVISED OFFERING**

The Company previously issued the Memorandum describing an offering of Units. In light of various factors, including delays in completion of the initial closing of the Offering, reduced cash runway, developments at the Company, developments in the solar market and discussions with prospective participants in the Offering, the Company has revised the terms of the Offering as described in this section. The Update Letter distributed to all stockholders (attached hereto as Appendix 1), describes the market conditions and recent developments at the Company that are factors contributing to this revised offering. This Supplement replaces and supersedes all previously distributed memoranda or similar distributions containing information related to the Offering or any other offering of the Company's securities.

*Summary of Offering:*

The Offering has been revised for the sale and issuance of up to $15.0 million of convertible secured promissory notes of the Company on the terms described in this Supplement and in the form attached as Exhibit B hereto (the "Notes"). The Offering will no longer involve the direct issuance of equity securities as contemplated in the prior Memorandum. Instead, the Company is raising money through the sale of Notes to fund a potential sale of the Company, which Notes, as described herein, will be eligible to recover certain premiums in the event the proceeds from a sale of the Company are sufficient. Should the Company decide to raise additional funds through the future sale of preferred stock or common stock of the Company in lieu of such sale or in advance of such sale, each holder of a Note may elect to convert all principal and accrued unpaid interest of the Note into shares of preferred stock or common stock of the Company issued in such financing, at a discount, as explained elsewhere in this document. The sale of the Company is and will remain the Company's primary plan unless (a) the Company, its agents, or Opus Bank find a successor bank that reaches an agreement with Opus Bank to purchase the Company's existing loan from Opus Bank, and (b) the Company raises sufficient capital in the Offering or otherwise for the Company to reevaluate and consider on-going operations, as further described in the "Use of Proceeds" section below. *As described throughout this Supplement, investment in the Notes involves significant risks, which risks depend, in part, on the amount of capital raised in the Offering. The Company cannot guarantee any future closings of the Offering. Accordingly, early participation in the Offering comes with heightened risks, as further described below.*

Notwithstanding references to the $10.0 million Minimum Amount in the Memorandum, in addition to changing the terms of the Offering, the Company has reduced the minimum initial closing amount for the Offering in order to ensure a successful close in the timeframe necessary to fund continued operations of the Company. Accordingly, a first closing of the Offering was completed on November 10, 2016, involving the sale of $2.5 million of Notes, including $500,000 of Notes issued upon conversion of an outstanding $500,000 Irrevocable Advance Payment obligation to Essex Capital Corporation (the "Essex Conversion Amount" and such closing, the "Initial Closing"). As further described below, in connection with the Initial Closing, the Company executed a Fifth Amendment and Ratification of its outstanding Credit Agreement with Opus Bank (the "Opus Amendment"), which, among other things, requires that the Company (i) raise a cumulative aggregate of $3.5 million (gross, inclusive of the Initial Closing amounts, including the Essex Conversion Amount) in the Offering on or before November 17, 2016 and (ii) raise a cumulative aggregate of $7.5 million (gross, inclusive of the Initial Closing amounts, including the Essex Conversion Amount) on or before November 30, 2016. Accordingly, regardless of the projected amounts for the next closing outlined in this Supplement, the Company must meet these deadlines or it will be default of its Credit

Agreement with Opus Bank. Accordingly, should the Company miss either of these deadlines, any capital raised in prior closings would be subject to forfeiture to Opus Bank.

The Company hopes that the next closing of the Offering (the "Second Closing") will be for a minimum of $4.5 million, gross, before commissions paid to the Company's placement agent and other Offering expenses (which is equal to a net closing amount of approximately $3.9 million and an aggregate net Offering amount of approximately $6.4 million), which, as further described below, the Company anticipates would provide cash runway to complete a sale of the Company through the end of January 2017, subject to the Company's completion of significant cost reductions efforts as outlined further below with the anticipated effect on sale valuation described further below. The Company's primary placement agent, National Securities Corporation ("NSC"), has been engaged to meet this targeted amount on or before November 17, 2016. However, the Company may decide to close on as little as $1.0 million, gross, in the Second Closing with a select group of sophisticated investors in order to comply with the November 17, 2016 requirements of the Opus Amendment and to provide cash runway to get to an additional closing. However, there is no guarantee that such additional closings would occur. And, as further described below, if the Company does not raise an aggregate of $7.5 million, gross (inclusive of the Initial Closing amounts), on or before November 30, 2016, the amounts invested in prior closings would be subject to forfeiture to Opus Bank.

The Company may, in its sole discretion, hold any number of additional closings in the Offering until $15.0 million, gross, in Notes (which is equal to a net Offering amount of approximately $13.4 million, inclusive of the Essex Conversion Amount) have been sold and issued or such larger principal balance of Notes as determined by the Company should the Company decide to increase or decrease the size of the Offering. The revised Offering is expected to expire on December 31, 2016 or the date on which all available Notes have been sold and issued (or such amount of total Notes as represents the full amount of the increased Offering, if applicable), subject to extension or earlier termination without notice at the option of the Company. Further, if the Company is unable to obtain sufficient investment on or before November 30, 2016 to comply with the deadlines contained in the Opus Amendment, the Company anticipates the Offering would terminate at such time.

==The Notes are being offered on a confidential basis to a limited group of "accredited investors" within the meaning of Rule 501(a) under the Securities Act of 1933, as amended (the "Securities Act"), in a private placement designed to be exempt from registration under the Securities Act, and other applicable securities laws.==

*Use of Proceeds:*

Cash Runway, Sale of Company and Future Funding:

In light of several factors, including the state of the solar market, the delay in closing the Offering and the revised terms of the Offering described herein, the Company is commencing a sale process and intends to use the substantial majority of the proceeds from the Offering to facilitate such sale. Accordingly, the Company is in the process of engaging an investment bank to transact a sale of the Company. ***There is no guarantee that the Company will be able to complete a successful sale in the necessary time and therefore participation in the Offering comes with risk that such sales process will not be completed or will not be completed on successful terms that allow for repayment of the Notes.*** The terms of the Notes have been negotiated to reward participants in the Offering for taking such risks, but it is important for participants in the Offering to understand the risk. As further described below, the size and timing of the Offering will impact the time the Company has to pursue a sale or ongoing operations and therefore the likelihood of a positive outcome. If future closings of the Offering or other capital raising efforts of the Company yield sufficient new capital to significantly extend the Company's runway and the Company, its agents, or Opus Bank find a successor lender or lenders to purchase the Company's existing loan from Opus Bank or otherwise refinance or replace the Company's existing bank debt, the Company may reevaluate this strategy and consider delaying or abandoning the sale process to pursue on-going operations. Were significant additional capital to become available in a timeframe and on terms that the Company believed were in the best interest of optimizing the enterprise value of the Company for existing stakeholders, the Company would consider forgoing or delaying a sale process. However, in light of various factors, the Company anticipates that a sale of the Company is the most likely outcome and is actively pursuing such outcome. Accordingly, investors should consider participation in the Offering in light of a likely sale of the Company, as further described in this "Use of Proceeds" section and the "Risk Factors" outlined below.

NSC000665

Company. A summary of the Management Carve-Out Plan is attached as Appendix 2.

**4.  STOCKHOLDER UPDATE LETTER**

On October 21, 2016, the Company circulated the Update Letter, attached as <u>Appendix 1</u> hereto, to Company stockholders to provide an update on the status of the Company's Series D-1 offering, the Company's market entry strategy and sales update, supply chain information, use of proceeds information, changes to the Board, and the status of certain payments and debts. The Company strongly recommends that you carefully review the Update Letter to understand these changes.

**5.  UPDATED RISK FACTORS**

As described elsewhere in this Supplement, investing in the Notes involves a high degree of risk. Investors should review and carefully consider the risks and uncertainties inherent in an investment in Beamreach and in the Notes, including those described the "Risk Factors" included in the original Memorandum, before making an investment decision. In addition to the previously described risk factors, in light of changes in the Company, the solar market and the terms of the Offering since the preparation of the Memorandum, certain additional risks and uncertainties are described below. If Beamreach cannot address any of the following risks and uncertainties effectively, or any other risks and difficulties that may arise in the future, its business, financial condition, results of operations and ability to achieve a successful sale of the Company could be materially and adversely affected. You should review this Supplement, the entire Memorandum and the definitive Offering documents attached as exhibits hereto. The risks described below and in the original Memorandum are not the only ones Beamreach faces.  Additional risks that the Company currently does not know about or that it currently believes to be immaterial may also impair its business, financial condition, results of operations and or ability to complete a successful sale of the Company.

1. **The primary strategic path of the Company and intended use of proceeds of the Offering, absent the availability of significant additional capital on acceptable terms within a short timeframe and the replacement of the Company's outstanding debt facility with Opus Bank, is a sale of the Company. The terms of the Offering are structured accordingly. However, there can be no assurance that the Company will be able to complete a sale on acceptable terms, in the necessary time frame or at all.**

As further described in this Supplement, the primary strategic path of the Company and the intended use of proceeds of the Offering, absent the availability of significant additional capital on acceptable terms within a short timeframe and the replacement of the Company's outstanding debt facility with Opus Bank, is a sale of the Company. The terms of the Offering are structured accordingly, including a payback of up to 400% of the principal balance of the Notes. However, there can be no assurance that the Company will be able to complete a sale on acceptable terms, in the necessary time frame or at all. While the Company has engaged in exploratory conversations with potential investment banks regarding a potential sale and has identified a list of prospective acquirers to be approached regarding a potential sale of the Company or its assets, the Company has not yet commenced any of the preparations necessary to complete a successful sale process nor has the Company received any offers or indications of interest from prospective buyers. Even in the best scenario, the Company anticipates that a sale process would take many months and require millions of dollars in runway to complete. Even with significant runway, there is no guarantee that the Company would be able to complete an acquisition on favorable terms, in the necessary time frame or at all.

Due in part to extensive overdue payments that needed to be settled in connection with the Initial Closing, the amount raised in the Offering may be insufficient to conduct a successful M&A process that results in acceptable proceeds for stockholders, creditors and other interested parties.  Particularly, if the Company raises only the $7.5 million (gross) required to avoid a default under the Credit Agreement with Opus Bank, as amended by the Opus Amendment, the limited funds available to meet Company expenses during a sale process will make completing a sale of the Company in the required timeframe very difficult and could require the Company to carry out a sale on a very short timeline, which could reduce the value the Company is able to obtain in a sale or result in accepting onerous terms in a sale, such as significant indemnification obligations for stakeholders.

Further, the Company could be very low on money at the time of an acquisition. In addition to reducing the value of the Company, this could also weaken the Company's negotiating power with any prospective acquirers. For

14

the reasons outlined below, it is also possible that the Company may not be able to successfully complete any acquisition process, in which case, the Company would be forced to wind down or commence an Assignment for the Benefit of Creditors (ABC) process.

As described below, the Company currently owes Opus Bank $24.2 million, which is secured by all of the Company's asset and which would have to be paid from the proceeds of any sale (or assumed by an acquirer), in addition to the expenses of such sale, before any proceeds of the sale could be paid to holders of Notes. Accordingly, even if a sale is achieved, there can be no assurance that the proceeds will be sufficient to pay off Opus Bank such that proceeds would be available for the Notes. If not, participants in the Offering could suffer a complete loss of their investment. In the event sale proceeds are in excess of outstanding amounts owed to Opus, repayment of the first, secured 300% payment on the Notes (the "Secured Portion") will be shared pari passu with all other holders of Notes. In the event of a fully subscribed Offering, an additional $45 million in sale proceeds would be required to fully pay the Secured Portion of all outstanding Notes. Further, the Unsecured Portion of the Notes would share pari passu with all other unsecured creditors (including trade vendors, other Notes, any shortfall on the remaining equipment lease amount after the sale of manufacturing equipment, and the Management Carve Out). Obligations to unsecured creditors other than Bridge Loan investors are currently estimated at $6 million, including $2 million of Management Carve-Out, and are likely to exceed $10 million at the time of a sale.

The Company has not yet engaged an investment banker to advise the Company and facilitate a sale transaction. There is no guarantee that the Company will be able to secure the services of an advisor with relevant experience representing solar manufacturers in a sell-side M&A transaction. Further, the Company is launching this sale process in November, right before the six (6) week period consisting of several holidays, which may cause delays in the M&A process that could reduce the value the Company is able to achieve in a sale and/or reduce the likelihood of the Company being able to complete a sale in the necessary timeframe.

2. **The Company will need to reduce operating expenses in order to achieve the best possible outcome for stockholders, which reductions may impact the value of the Company to a future investor or prospective acquirer.**

The anticipated expense reductions required to give the Company runway to a sale transaction as described in this Supplement, as well as any further cost reductions or other adjustments to extend cash runway, may decrease the value or attractiveness of the Company to a prospective acquirer. For example, if the Company is required to significantly or entirely cut back cell engineering and operations efforts, the value of the Company to an acquirer interested in the Company's cell technology may be impaired. Additionally, several solar technologies that Beamreach has developed since its inception (including the monolithic backplane technology that was intended to enable integrated electronics for further performance improvement, particularly when solar panels are shaded or soiled) have been put on hold, due to insufficient funding for further commercialization, which will make it more difficult for the Company to monetize such technology. Notwithstanding the foregoing, the Company does not foresee restarting its development efforts for this monolithic backplane technology that is referenced in the original Memorandum and further expense reductions could further hinder the Company's ability to monetize such technology.

3. **Proceeds from a sale of the Company may result in little or no money being returned to participants in the Offering.**

In the event of a sale of the Company, bankruptcy, liquidation, reorganization or other winding up, no proceeds will be paid to Notes holders until the outstanding balance owed Opus Bank has been paid, unless this liability is assumed by an acquirer, in which case, the Company anticipates the sale price for the Company would be adjusted to reflect such assumption. The Company currently has $24.2 million in outstanding debt to Opus Bank. Given the Company's intention to employ the services of an investment bank to support a sale process, fees and commissions associated with the sale will also likely be paid before any consideration is paid to holders of the Notes. After payment of the Secured Portion of the Notes, available funds will be distributed on a pari passu basis to (i) holders of the Notes up to the Unsecured Amount of all outstanding Notes, (ii) other trade creditors of the Company, including any deficiency under equipment leasing arrangements of the Company, and (iii) a Management Carve-Out Plan. Obligations due to unsecured creditors other than the Bridge Note holders will likely exceed $10 million at the time of a sale. Were the Company to complete a sale following the completion of the Offering, the Company estimates the sale value would need to exceed approximately $25 million before Note holders would receive any consideration

NSC000677

for their interests in the Company. Assuming an Offering size of $10 million, the sale value would need to exceed approximately $55 million before any money could be paid toward the Unsecured Portion of the Notes. Assuming an Offering size of $10 million, unsecured trade creditors at approximately $4 million, a $5 million shortfall from the sale of Essex equipment and a $2 million Management Carve-Out pool, the sale value would need to exceed approximately $76 million before the Note holders could receive the maximum return contemplated under the Offering (the final, Unsecured Portion of the Notes being paid on a pari passu basis with the Management Carve-Out Plan, trade creditors, and any shortfall from the sale of Essex equipment). It is possible that the amount of outstanding liabilities may increase, which would further increase the sale value required to achieve any returns for holders of the Notes. The Company cannot guarantee any specific sale value for the enterprise or any of its assets. It is therefore possible, whether the Company's assets are sold as a single going concern or separate businesses, that participants in the Offering will receive little or no return on their investment.

4. **The Company does not have firm investment commitments for any additional amounts, including the additional $1.0 million and additional $4.0 million (non-cumulative) required to be completed on November 17, 2016 and November 30, 2016, respectively, in order to comply with the Opus amendment. Failure to achieve such milestones will result in an event of default under the Credit Agreement with Opus Bank, unless waived.**

Certain funds were previously placed in an escrow account for the sale of Series D-1 Preferred Stock, while the amounts remain in escrow, such investors are not committed or required to invest such funds in the revised Offering. All investors will need to review the updated terms of the Offering and complete new documentation associated with the Offering, which will take time and which the Company anticipates will lead certain investors to decide not to participate in the Offering. The degree of fallout may be significant, given the significantly different nature of the Offering compared to the security marketed previously, including the near term sale of the Company and increased risk in the revised Offering. Accordingly, there can be no guarantee that there will be sufficient continued or new interest in the Offering to meet the requirements of the Credit Agreement with Opus Bank, as amended by the Opus Amendment, to sell additional $1 million of Notes in the Offering, gross (for an aggregate sale of $3.5 million, gross) on or before November 17, 2016 or to sell an additional $4.0 million of Notes in the Offering, gross (for an aggregate sale of $7.5 million, gross) on or before November 30, 2016. ==If the Company does not meet the additional funding deadlines imposed by Opus Bank, the Company will be in default of the Credit Agreement with Opus Bank, all capital previously invested in the Offering will be at risk and the Company may be forced to pursue an immediately sale or wind down.==

5. **The terms of the Offering are highly dilutive to existing stockholders.**

Without the Offering, existing stockholders sit behind a significant amount of secured and unsecured creditors in the event of a sale of the Company. If the Offering is consummated, the position of existing stockholders worsens, as the Notes will be paid in full (both the Secured Portion and the Unsecured Portion) and all other secured and unsecured creditors will be paid in full, before existing stockholders receive any proceeds.

6. **The Company cannot guarantee any further participation of any of its existing institutional investors in the Offering.**

While the Company has been actively engaged with its existing institutional investors during the course of the Offering and is working hard to maximize the participation from all existing investors, the Company can offer no guarantee that existing institutional investors will participate in the Offering beyond the participation in the Initial Closing. The Company anticipates that the majority of the Offering will be subscribed by individual, accredited investors. This could have negative signaling effects for future investors or lenders.

7. ==**Under the terms of the current agreement with Opus Bank, as amended by the Opus Amendment, the Company will effectively be required to replace the outstanding Opus Bank debt facility, raise significant additional equity or sell the Company on or before March 31, 2017. If the Company is unable to find a new lender, raise such equity or complete a sale, it may have to shut down.**==

As further described above, in connection with the Initial Closing, the Company executed the Opus Amendment to allow the Company flexibility to continue operations without risk of an immediate event of default under the

16

existing Credit Agreement with Opus Bank. However, the terms of the Opus Amendment, as further described above, will require the Company to replace the $24.2 million of outstanding debt with Opus Bank or sell the Company on or before March 31, 2017 (or, in the event the Offering is for less than $10.0 million, to sell the Company on or before February 28, 2017).

The fundraising environment that the Company faces may not be conducive to raising the funds in the amount and time frame required to pay off Opus Bank and fund the Company's future operations. Further, certain terms of the Offering may be unattractive to prospective investors. Specifically, the ability of the Notes to convert to equity at a discount into a future round may impede an investment offer from a future investor or require renegotiation of such term or require total recapitalization of the Company.

These factors in addition to general difficulties in completing a sale of the Company in a short timeline may make future equity or debt financing of the Company in sufficient time to meet the timeline dictated by Opus Bank difficult to achieve, if achievable at all. If the Company is unable to raise such funds or otherwise renegotiate terms with Opus Bank on or before March 31, 2017 (or, in the event the Offering is for less than $10.0, on or before February 28, 2017), the Company would likely be required to proceed to an immediate sale, wind down, bankruptcy or other liquidation. This risk will impact the Company's strategy in advance of such time and will require the Company to begin exploring sale options immediately, even in the event of a fully subscribed Offering.

Further, the Opus Amendment requires the Company to use its best efforts to achieve certain milestones related to a sale of the Company (including engagement of an investment banker and receipt of a term sheet) on specified timelines. Should the bank determine the Company has not used its best efforts to complete such actions on the specified timeframes, the Company risks being in default of the Credit Agreement with Opus Bank.

8. **Conditions in the solar market have deteriorated globally, due to oversupply, a slowdown in sales, and price declines. This deterioration is likely to negatively impact the Company's margins, sales volume projections and may negatively impact future fundraising capacity and the sale value of the Company.**

Conditions in the solar market have deteriorated dramatically over the past sixty (60) days, due to oversupply, a slowdown in sales, and price declines. Further, renewable energy markets in general have deteriorated in response to results of the recent US Presidential election and related uncertainties regarding future energy policies and regulations. These developments, covered widely in both mainstream and trade media, have caused the Company to lower its sales volumes and gross margin projections in 2016 and 2017 significantly, as further described in the Update Letter. The reduced gross profits resulting from reduced margins and sales volumes would decrease the Company's cash flow as well as the value of the Company to prospective investors and acquirers. In addition, the current solar market dynamics have negatively impacted the financial positions of a number of prospective acquirers of all or parts of Beamreach, which may reduce the number of prospective acquirers willing to pursue an acquisition, and the total consideration to be obtained. Further, the current state of the solar industry may negatively impact the Company's ability to raise additional funds or secure additional debt and may negatively impact the sale value the Company is able to achieve and increase the time required to complete any sale process.

9. **Customer relationships may be disrupted, should it become known in the market place that the Company is pursuing a sale, which could adversely affect revenues and gross profit.**

Some of the Company's customers (existing and prospective) may become aware of the Company's intention to pursue a sale of the business, which could make them uncertain about their business relationships with Beamreach as a result, which could have an adverse effect on the Company's business and the value of the Company in a sale process. For example, customers, distributors, suppliers, vendors and others may attempt to negotiate changes in their existing business relationships with the Company or they may consider entering into alternative business relationships with other parties. Some of our customers, distributors, suppliers, vendors and others may have rights to terminate contracts that are triggered upon completion of a change of control event. These disruptions could have an adverse effect on the Company's revenues, financial condition or results of operations, which may negatively impact the valuation in case of a sale.

NSC000679

10. **Due to payment delays to key vendors, the Company has missed key manufacturing milestones, causing the Company to further reduce its 2016 sales volume forecast.**

In light of delays in completion of the Offering, the Company has been forced to delay certain payments to key vendors. As a result, the Company has missed key manufacturing milestones, causing the Company to further reduce its 2016 sales volume forecast. Had the Company completed the Offering in September or October, as originally planned, it could have paid vendors in time to meet critical manufacturing dates. While the Company has made partial payments to these vendors following the Initial Closing, the delayed payments to these key vendors had already contributed to a delay in the manufacture of the Company's first significant batch of solar modules in Asia. Furthermore, the relatively long transit time (approximately 30 days of ocean shipment time for the Company's Sprint$^{TM}$ products from their final assembly location in Asia to either the USA or Europe) makes it increasingly difficult to bring a significant quantity of products into the market place during the remainder of 2016. As a result, the Company is further reducing its 2016 sales volume forecast. This reduction, and any further reduction in either actual or forecasted revenues or profits, is likely to reduce the value of the Company to prospective acquirers.

11. **The Company is manufacturing its product through a third-party manufacturer, while having received purchase orders from customers for only a portion of the volume that is currently being manufactured. There is no guarantee that the Company's prospective customers will submit purchase orders, nor that they will do so in an amount commensurate with the full volume in the current production run.**

As described in the original Memorandum, the Company has outsourced its production to Neo Solar Power Corporation ("Neo Solar Power") in Asia. In order to bring product into the market place, to be able to serve customers within a reasonable time frame, on November 7, 2016, the assembly of the first significant batch of Sprint$^{TM}$ solar modules started at the contract manufacturer's site in Asia, and is expected to be completed by November 21, 2016. This first significant production run is scheduled to deliver 6,000 Sprint$^{TM}$ modules, which represents a volume of approximately 1.7 MW. The Company considers this quantity of modules to be the optimum amount, based on (a) anticipated customer demand within the delivery timeframe for these modules, and (b) the minimum production volume agreed to with the contract manufacturer to ensure product quality. The total value of the order is approximately $800,000, with most of the payment due by the middle of January 2017. The Company currently has purchase orders from customers for approximately 1,000 units out of the 6,000 units of this first batch of products. Even with approximately 200MW of signed master sales agreements over the next three (3) years, there is no guarantee that the Company will be able to sell the entire volume that is currently being produced, before payment to Neo Solar Power is due. This may have significant implications on the Company's working capital position.

12. **Beamreach has missed payments to vendors and equipment lessors.**

In the context of the Company's limited cash position, equipment lease payments due to Essex and its assignees, as well as building rent payments and other vendor payments, have been delayed past the due date and in some cases remain currently outstanding. The Company has brought the lease payments current as of the Initial Closing. The Company also intends to restructure or otherwise renegotiate several lease obligations after the closing (as noted elsewhere herein). Non-payment or delayed payment of vendors may impact credit terms or otherwise impact vendor relationships and may result in a creditor, vendor or trade partner declaring an event of default and taking legal action or asserting other recourse.

13. **Cost and personnel reductions are putting significant strain on remaining members of the team, which may make it difficult to retain key employees, including members of management.**

As previously disclosed, the Company has engaged in extensive cost reductions over the past twelve (12) months, including significant headcount reductions in December 2015, April 2016 and June 2016. Such reductions in force and other cost cutting measures have put significant strain on the remaining team and will likely make retaining the Company's remaining employees, including members of the management team, difficult. Further, any additional cost reductions or personnel reductions would further increase the strain on remaining employees and make retention more difficult. Even with the introduction of a Management Carve-Out Plan, the Company cannot guarantee that it will be

NSC000680

able to properly incentivize remaining employees, including members of the management team, to continue providing service to the Company.

**6.     REVISED OFFERING OMNIBUS SIGNATURE PAGE AND INVESTOR ACKNOWLEDGMENT**

In order to acknowledge your receipt of this Supplement and the appendices and exhibits hereto and to confirm your continued interest in participating in the Offering under the revised terms described in this Supplement, please execute and return the Series E Omnibus Signature Page and Investor Acknowledgment on the following page.

NSC000681

## EXHIBIT E
## OPUS FIFTH AMENDMENT AND RATIFICATON

26167/00013/SF/5585617.4

NSC000707

FIFTH AMENDMENT AND RATIFICATION

dated as of November 10, 2016

between

BEAMREACH SOLAR, INC.,

as the Borrower

and

OPUS BANK,

as Lender

Re Credit Agreement dated as of December 19, 2014

WEST\274176869.4
384985-000005

NSC000708

## FIFTH AMENDMENT AND RATIFICATION

THIS FIFTH AMENDMENT AND RATIFICATION dated as of November 10, 2016 (this "*Amendment*") is by and between **BEAMREACH SOLAR, INC.** (formerly Solexel, Inc.), a Delaware corporation (the "*Borrower*"), and **OPUS BANK**, a California commercial bank, as Lender (the "*Lender*"). All capitalized terms used herein without definition shall have the same meanings herein as such terms are defined in the below defined Loan Agreement.

### WITNESSETH:

WHEREAS, Borrower and Lender entered into that certain Credit Agreement dated as of December 19, 2014 (as amended, the "*Loan Agreement*").

WHEREAS, the parties hereto wish to amend the Loan Agreement as more fully set forth below.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, the parties hereto agree as follows:

*Section 1:   Amendments*. From and after the Fifth Amendment Effective Date (as defined below), the Loan Agreement is hereby amended as follows:

(a)   Section 2.03 of the Loan Agreement is hereby amended by deleting Subsections 2.03(b) and 2.03(c) in their entirety and inserting the following in lieu thereof:

"(b) Borrower shall repay the principal of the Term Loan in equal installments of $500,000 each on each Payment Date, commencing April 1, 2017.

(c) on each Payment Date, commencing April 1, 2017, Borrower shall repay the principal of the Delayed Draw Term Loan(s) in equal installments equal to the amount of 3.3333333% of the aggregate amount of the Delayed Draw Term Loan outstanding as of December 31, 2015; and"

(b)   Section 6.01(c) of the Loan Agreement is hereby amended and restated in its entirety to read as follows:

"(c) (X) as soon as available, but in any event within 30 days after the end of each calendar month, (i) a monthly cash report, monthly accounts receivable and payable reports with agings and monthly inventory report and (ii) for any month ending on or prior to March 31, 2017 (including, without limitation, the month ending on September 30, 2016), a monthly status update on the status of the Subject Leases and overdue payments owed to trade creditors (in each case, including all negotiations and actions related thereto), all in reasonable detail; and (Y) weekly, commencing November 16, 2016 and continuing on each Wednesday through the term of the Loan Agreement, (i) a rolling 13-week cash flow budget, in form and content reasonably acceptable

to Lender, which budget shall indicate for each line item in the prior week's budget the extent to which each projected amount varied from the actual amount; and (ii) a report of any investment banker activity with respect to the Close (as set forth on Annex Y hereto), including but not limited to receipt of term sheets, LOIs, MOUs, IOIs, and similar with respect thereto (copies of which shall be provided to Lender upon receipt thereof); in each case of (X) and (Y), signed by a Senior Officer of Borrower; and"

(c)     Section 6.08 of the Loan Agreement is hereby amended and restated in its entirety to read as follows:

"**6.08.     Inspection Rights.** At any time during regular business hours and as often as reasonably requested upon no less than one (1) days' notice (but not more often than once per week), permit Lender, or any employee, agent or representative thereof, to examine, audit and make copies and abstracts from Borrower's records and books of account and to visit and inspect its properties, including, but not limited to, an collateral field audit on accounts receivable and inventory, and to discuss its affairs, finances and accounts with any of its officers and key employees, and, upon request, furnish promptly to Lender true copies of all financial information and internal management reports made available to their board of directors (or any committee thereof).  Borrower shall furnish to Lender such information concerning Borrower's intellectual property (including, without limitation, application and registration numbers for any filings in connection with such intellectual property) as is reasonably necessary to permit Lender to perfect a security interest in such intellectual property. All Confidential Information (as defined below) shall be dealt with in accordance with Section 9.18 below."

(d)     Section 7.04(d) of the Loan Agreement is hereby amended by adding the following sentence at the end thereof:  "For the avoidance of doubt, nothing permitted or authorized by the Fourth Amendment and Ratification, dated as of July 6, 2016, is prohibited or affected by this Section 7.04."

(e)     Section 7.08 of the Loan Agreement is hereby amended and restated in its entirety to read as follows:

"**7.08.     Change in Nature of Business.** Engage, either directly or indirectly through Affiliates, in any line of business other than the lines of business in which Borrower or such Subsidiary is engaged as of the Closing Date and any other business substantially similar or related thereto (or incidental thereto); or cease to conduct business in the manner conducted by Borrower or such Subsidiary as of the Closing Date.  For the avoidance of doubt, the Lender hereby acknowledges (for purposes of this Section 7.08) that (1) the outsourcing of the production of solar panels, and the sale and license thereof, is substantially similar to the business in which Borrower was engaged as of the Closing Date; and (2) (x) any workforce reduction or (y) any cessation of operations at Borrower's fabrication facility, in each case of

(x) and (y), after the Fifth Amendment Effective Date, shall not violate this Section 7.08."

(f)    Section 7.10 of the Loan Agreement is hereby amended by adding the following sentence at the end thereof:  "Notwithstanding anything to the contrary contained in this Agreement, Borrower may sell obsolete and unneeded Trinity (as defined below) tools in accordance with the Master Lease Agreement and Equipment Schedule No. 1-1, dated as of November 25, 2013, between Borrower and Trinity Capital Fund II, L.P., a Delaware limited partnership ("Trinity") and the Amendment No. 1 thereto, made as of September 1, 2016, and keep 2/3 of the proceeds for Borrower (so long as they are initially deposited or retained in the Designated Deposit Account) and use 1/3 of the proceeds towards the end-of-term payment to Trinity."

(g)    Section 7.11 of the Loan Agreement is hereby amended and restated in its entirety to read as follows:

"**7.11.    [Reserved]**."

(h)    Section 7.15 of the Loan Agreement is hereby amended and restated in its entirety to read as follows:

"**7.15.    Minimum Cash**.  Permit the Borrower (a) on March 31, 2017 to have less than $30,000,000 of Cash in the Designated Deposit Account and (b) thereafter, at all times, to have Cash in the Designated Deposit Account in amount less than the amount of the then Outstanding Obligations."

(i)    Section 8.01(g) of the Loan Agreement is hereby amended and restated in its entirety to read as follows:

"(g) (i) Borrower or any Subsidiary (x) defaults in any payment when due of principal of or interest on any Indebtedness (other than Indebtedness hereunder) having an aggregate principal amount in excess of the Threshold Amount which remains uncured beyond any applicable cure period, or (y) defaults in the observance or performance of any other agreement or covenant relating to any Indebtedness (other than Indebtedness hereunder) or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event shall occur, the effect of which default or other event is to cause, or to permit the holder or holders of such Indebtedness (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, any Indebtedness in excess of the Threshold Amount to become payable or cash collateral in respect thereof to be demanded on account of such default or other event; or (ii) any time after March 31, 2017, Borrower is unable or admits in writing its inability to pay its debts generally as they mature; *provided* that, notwithstanding anything in the foregoing to the contrary, (A) the Borrower's failure to make payments to trade creditors as they become due on or prior to March 31, 2017 shall not constitute a Default or Event of Default under this

Section 8.01(g) so long as the aggregate amount of such trade payable payments that are more than sixty (60) days past their due date and not contested in good faith does not exceed $1,750,000 in the aggregate at any one time and so long as no creditor (or group of creditors) that is owed such a payable that is, individually or in the aggregate, in excess of $250,000 (a "Threshold Payable") takes any Enforcement Action (as defined below) against Borrower with respect to any Threshold Payable; and (B) the Borrower's failure to make payments due under the Trinity Lease, the Essex Leases or its leases for the premises commonly known as 1504 and 1530 McCarthy Boulevard, Milpitas, California 95035 (collectively with the Trinity Lease and the Essex Leases, the "*Subject Leases*") as they become due on or prior to March 31, 2017 shall not constitute a Default or Event of Default under this Section 8.01(g) so long as (1) the aggregate amount of such lease payments past-due does not exceed $6,600,000 in the aggregate at any one time and (2) no lender or creditor takes any of the following actions (each, an "*Enforcement Action*") under or with respect to any Subject Lease: (I) sue for payment under any Subject Lease, or initiate or participate with others in any suit, action or proceeding against Borrower, to (a) enforce payment of or to collect the whole or any liabilities under any Subject Lease or (b) commence judicial enforcement of any of the rights and remedies under any Subject Lease or applicable law with respect to any Subject Lease, (II) accelerate any amounts owed or liabilities under any Subject Lease, (III) apply any security deposit or take from or for the account of Borrower, by set-off or in any other manner, with respect to any liability under any Subject Lease, (IV) take any action under the provisions of any state or federal law, including, without limitation, the Uniform Commercial Code, or under any contract or agreement, to enforce against, foreclose upon, take possession of or sell any property or assets of Borrower, including without limitation the Collateral, or (V) institute any eviction proceeding; or"

*Section 2:*     *Borrower Representations and Warranties.*  Borrower hereby represents and warrants to Lender as follows:

(a)     [Intentionally Left Blank]

(b)     The execution, delivery and performance by the Borrower of this Amendment has been duly authorized by all necessary corporate and other action and do not and will not require any registration with, consent or approval of, or notice to or action by, any Person (including any Governmental Authority) in order to be effective and enforceable.

(c)     This Amendment and each of the other Loan Documents (as amended by this Amendment) constitute the legal, valid and binding respective obligations of the Borrower, enforceable against it in accordance with their respective terms.

(d)     [Intentionally Left Blank]

(e)     The Borrower is entering into this Amendment on the basis of its own investigation and for its own reasons, without reliance upon Lender or any other Person.

(f)     Borrower's obligations under the Loan Agreement and under the other Loan Documents, as applicable, are not subject to any defense, counterclaim, set-off, right of recoupment, abatement or other claim.

*Section 3:    Forbearance*.  Effective as of the Fifth Amendment Effective Date, Lender hereby agrees to forbear from taking any legal action to enforce the Loan Documents with respect to any Default or Event of Default in existence immediately prior to the effectiveness of this Amendment, any Default or Event of Default that occurs or comes into existence as a result of entry into this Amendment and any other Default or Event of Default (if any) that occurred or came into existence prior to the effectiveness of this Amendment (collectively, the "*Existing Defaults*") during the period (the "*Forbearance Period*") commencing on the date of the Fifth Amendment Effective Date and ending on the earlier of (a) March 31, 2017, or (b) that date on which any new Event of Default shall occur or be in existence.  The Borrower acknowledges and agrees that Lender has not waived any Defaults or Events of Default (including any Existing Defaults) or any other covenant, agreement, terms, provisions, benefits or conditions contained in any Loan Document (except as set forth in Section 1 hereof).  The Lender expressly reserves the right to exercise any and all rights and remedies under the Loan Agreement and all other Loan Documents and under applicable law immediately upon the expiration or termination of the Forbearance Period, including, without limitation, any enforcement actions, in respect of all Existing Defaults and any other Defaults and Events of Default then existing.  Except for the forbearance to the extent expressly set forth above, the Lender reserves each and every right and remedy it may have under the Loan Agreement, all other Loan Documents and under applicable law with respect to any Existing Defaults.  In connection with this Section 3, any Compliance Certificate delivered pursuant to the terms of the Loan Agreement and relating to a period of time prior to the Fifth Amendment Effective Date, shall not include any representation by the Borrower regarding compliance with the terms of the Loan Agreement during such time period.

*Section 4:    Acknowledgment*.  Borrower and Lender each acknowledge and agree that that certain Fourth Amendment and Ratification, dated as of June 30, 2016, by and between Lender and Borrower, remains in full force and effect on the date hereof.

*Section 5:    Continuing Effectiveness; Ratification of Loan Documents*.  As herein amended, each of the Loan Documents shall remain in full force and effect and each of the agreements, guarantees and obligations contained therein (as amended hereby) is hereby ratified and confirmed in all respects.  This Amendment constitutes a Loan Document.

*Section 6:    Counterparts*.  This Amendment may be executed in any number of counterparts and by the different parties on separate counterparts, and each such counterpart shall be deemed to be an original but all such counterparts shall together constitute one and the same Amendment.  Signature pages may be detached from multiple separate counterparts and attached to a single counterpart.  Delivery of an executed signature page of this Amendment by facsimile transmission or electronic transmission shall be as effective as delivery of a manually executed counterpart hereof.

**NSC000713**

*Section 7:*     *Governing Law*.  THIS AMENDMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF CALIFORNIA APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED ENTIRELY WITHIN SUCH STATE; PROVIDED THAT LENDER SHALL RETAIN ALL RIGHTS ARISING UNDER FEDERAL LAW.

*Section 8:*     *Successors and Assigns*.  This Amendment shall be binding upon the parties hereto and their respective successors and assigns, and shall inure to the benefit of the parties hereto, and their respective successors and assigns.

*Section 9:*     *Effectiveness*.  The agreements set forth herein shall become effective on the date (the "*Fifth Amendment Effective Date*") when the Lender shall have (a) executed this Amendment, (b) received counterparts of this Amendment executed by Borrower, (c) received an amendment fee paid in cash by Borrower in the amount of $20,000, and (d) received payment of all reasonable fees and expenses of Lender as required by Section 9.03 of the Loan Agreement.

*Section 10:*     *Post-Closing Conditions*

(a)     *Fifth Amendment Subordinated Debt; Closing of M&A Transaction*.  (A) Borrower hereby covenants and agrees that it will receive at least (x) $2,500,000 in gross proceeds in Indebtedness subordinated to Lender on terms and conditions acceptable to Lender in its sole discretion (the "*Fifth Amendment Subordinated Debt*") from and after the date hereof by November 10, 2016, inclusive of $500,000 already invested in Borrower by Essex Capital, and (y) the additional Fifth Amendment Subordinated Debt in the amounts, and by the dates, such that the cumulative amounts reflected on Annex W are received as set forth on Annex W.  Any Fifth Amendment Subordinated Debt shall be (i) subordinated to lender in accordance with a Subordination Agreement (the "*Subordination Agreement*"), executed by each Creditor (as defined therein), in the form attached hereto as Annex X, and (ii) provided the Creditor has executed and delivered to Lender a signature page to the Subordination Agreement, deemed to be Permitted Indebtedness under the Credit Agreement (notwithstanding any limit on the Subordinated Debt in the Agreement) and the Lien of the security interest granted to the investors to secure the Fifth Amendment Subordinated Debt shall a Permitted Lien, and (B) Borrower hereby covenants and agrees that it will achieve the completion of the "Close" as contemplated, and by the date for the Close set forth, on Annex Y hereto.  The failure to comply with this Section 10(a) shall constitute an Event of Default under the Loan Agreement.

(b)     *M&A Milestones*.  Borrower hereby covenants and agrees that it will use it best efforts to achieve the completion of the actions, and by the dates, set forth on Annex Z hereto.  As long as Borrower uses its best efforts to achieve the completion of the actions, and by the dates, set forth on Annex Z hereto, the failure to achieve such actions, by such dates, shall not constitute an Event of Default under the Loan Agreement.

NSC000714

*Section 11:*     *Entire Agreement*.  This Amendment constitutes the entire agreement and supersedes all prior agreements and understandings, both written and oral, among the parties with respect to the subject matter hereof.

*Section 12:*     *Additional Warrants*.  Borrower hereby covenants and agrees that if all Obligations owed to Lender are not repaid in full in cash on or before December 31, 2016, Borrower shall amend the Warrant issued to Lender on the Closing Date to provide that any exercise thereof shall, for no additional consideration, result in the Borrower issuing one share of Common Stock of the Borrower for each share of Series D Preferred Stock acquired under such Warrant, in addition to such shares of Series D Preferred Stock so acquired.

*Section 13:*     *Release of Lender*.  In consideration of the amendments granted by the Lender pursuant to this Amendment, Borrower hereby releases and forever discharges the Lender, and the Lender's agents, servants, employees, officers, attorneys, successors and assigns from all damage, loss, claims, demands, liabilities, obligations, actions and causes of action whatsoever that the Borrower or any of its Affiliates, agents, servants, employees, officers, attorneys, successors or assigns, might now have or claim to have against the Lender, whether presently known or unknown, and of every nature and extent whatsoever on account of or in any way concerning, arising out of or founded on the Loan Documents or any Loan including, without limitation, all such loss or damage of any kind heretofore sustained or that might arise as a consequence of the dealings between the parties (the "*Released Claims*").  The Borrower further covenants not to sue the Lender with respect to any Released Claims and shall consent to the voluntary dismissal of any such suit and/or claims or defenses asserting the Released Claims upon the demand of the Lender.  Borrower acknowledges that it has been advised by legal counsel and is familiar with the provision of California civil code section 1542, which provides as follows:  "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM, MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR." Borrower, being aware of this code section, hereby expressly waives any rights which it may have thereunder as to the Released Claims, as well as under any other statutes or common law principles of similar effect.

**[signature pages follow]**