1
2
3
4
5
6
7
8
9
10

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**

11

12   JAMES GINZKEY, RICHARD
     FITZGERALD, CHARLES CERF, BARRY
13   DONNER, and on behalf of the class
     members described below,
14
                    *Plaintiffs*,
15
16             v.

17   NATIONAL SECURITIES
     CORPORATION, a Washington Corporation
18
                    *Defendant*.
19

**Case No.: 2:18-cv-1773**

NOTE ON MOTION CALENDAR
MARCH 22, 2019

20
21   <u>**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION**
     **TO DISMISS PLAINTIFFS' COMPLAINT PURSUANT TO FEDERAL RULES OF**
     **CIVIL PROCEDURE 12(b)(6)**</u>
22
23
24
25
26
27                                    1
28

Response to Motion to Dismiss
Case No. 2:18-cv-1773

STOLTMANN LAW OFFICES, P.C.
233. S. Wacker 84th Floor
Chicago, Illinois 60603
312-442-3200

# **TABLE OF CONTENTS**

Page

I. INTRODUCTION ............................................................................................... 1

II. LEGAL STANDARD........................................................................................ 2

III. PLAINTIFFS STATE A CLAIM FOR NEGLIGENCE................................. 3

IV. PLAINTIFFS DID NOT ASSUME THE RISK OF NSC FAILING TO INVESTIGATE BEAMREACH AND INSTEAD JUSTIFIABLY RELIED ON NSC'S DUTY TO INVESTIGATE BEYOND WHAT WAS IN THE PPMS WHEN RECOMMENDING THE INVESTMENT. .................................. 12

A. NSC's one-of-a-kind, fact intensive, Motion to Dismiss, based on implied assumption of risk, fails legally because it is wholly unsupported by precedent.......................................................................................................... 12

B. NSC's assumption of risk argument fails factually because NSC knew or should have known facts not disclosed in the PPM and its duty was to advise its clients based on the whole universe of facts, not just the limited disclosures provided by Beamreach.................................................................... 15

VIII. CONCLUSION ............................................................................................ 18

Response to Motion to Dismiss
Case No. 2:18-cv-1773

Stoltmann Law Offices, P.C.
233. S. Wacker 84th Floor
Chicago, Illinois 60603
312-442-3200

## TABLE OF AUTHORITIES

**Cases**                                                                   Page(s)

*ACAP Fin., Inc. v. United States SEC*, 783 F.3d 763 (10th Cir. 2015)................... 14

*Affiliated FM Ins. Co. v. LTK Consulting Servs., Inc.*, 170 Wn.2d 442, 243
P.3d 521 (2010)................................................................................ 4

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ............................................... 2, 3

*Bell Atl. Corp. v Twombly*, 550 U.S. 544 (2007) .................................... 2

*Colbert & Winstead. PC 401(K) Plan v. AIG Fin. Advisors, Inc.*, No. 3:07–
1117, 2008 WL 2704367 (M.D.Tenn. July 8, 2008)................................. 4

*Conley v. Gibson*, 355 U.S. 41 (1957)................................................... 2

*Degel v. Majestic Mobile Manor*, 129 Wn.2d 43, 914 P.2d 728 (1996)................. 4

*Doe v. United States*, 419 F.3d 1058 (9th Cir. 2005)................................... 2

*Dorr v. Big  Creek Wood Prods., Inc.*, 84 Wn. App. 420, 927 P.2d 1148
(1996). ........................................................................................ 13

*Gregoire v. City of Oak Harbor,* 170 Wn.2d 628, 244 P.3d 924 (2010) ................ 12, 13

*Hanly v. Securities and Exchange Commission*, 415 F.2d 589 (2d Cir. 1969) ........ 5, 7, 15

*Harris v. Ivax Corp.*, 182 F.3d 799, 1999 U.S. App. LEXIS 17725 (11th Cir.
1999)............................................................................................ 14

*Jackson v. City of Seattle*, 158 Wn. App. 647, 244 P.3d 425 (Wash. Ct. App.
2010)............................................................................................ 3

*Joyce v. Dep't of Corr.*, 155 Wn.2d 306, 119 P.3d 825 (2005)............................ 5

*Kirk v. Wash. State Univ.*, 109 Wn.2d 448, 746 P.2d 285 (1987) ......................... *passim*

*McGraw v. Wachovia Sec. LLC*, 756 F.Supp.2d 1053 (N.D.Iowa 2010) ............... 4

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Cheng*, 697 F. Supp. 1224
(D.D.C. 1986) ................................................................................ 4

*Mihara v. Dean Witter & Co.*, 619 F.2d 814 (9th Cir.1980)................................ 4

*Piper, Jaffray & Hopwood Inc. v. Ladin*, 399 F.Supp. 292 (S.D.Iowa 1975).......... 4

2

Response to Motion to Dismiss
Case No. 2:18-cv-1773

STOLTMANN LAW OFFICES, P.C.
233. S. Wacker 84th Floor
Chicago, Illinois 60603
312-442-3200

*In re: Prudential Sec. Inc. P'ships Litig*, 930 F. Supp. 68 (S.D.N.Y. 1996)............ 10

*Scott v. Pac. W. Mountain Resort*, 119 Wn.2d 484, 834 P.2d 6 (1992)................... 12, 13

*Shorter v. Drury*, 103 Wn.2d 645, 695 P.2d 116 (1985)........................................ 13, 14

*Starr v. Baca*, 652 F. 3d 1202 (9th Cir. 2011) ........................................................ 3

**Rules and Statutes**

Fed. R. Civ. P. 12(b)(6) .............................................................................................. 2

Fed. R. Civ. P. 8(a)(2) ............................................................................................... 2

FINRA Rule 2111.02 ........................................................................................... *passim*

FINRA Regulatory Notice 10-22........................................................................... 7

NASD NTM 03-71................................................................................................. *passim*

3

Response to Motion to Dismiss
Case No. 2:18-cv-1773

STOLTMANN LAW OFFICES, P.C.
233. S. Wacker 84th Floor
Chicago, Illinois 60603
312-442-3200

## I.      INTRODUCTION

Defendant, National Securities Corporation ("NSC"),  bases its Motion to Dismiss solely on an unprecedented, creative, and fact intensive argument of implied assumption of risk. No dismissal based on implied assumption of risk has ever been affirmed by any Appellate Court or Federal District Court applying Washington Law.  Not once. NSC asks this Court to join them far out on a limb.

NSC's argument that it doesn't owe a duty isn't an affirmative defense. NSC impermissibly argues contradictory facts in a 12(b)(6) motion directly against Plaintiffs' well-pled allegations of a complete disregard of basic duties. This argument fails because on a 12(b)(6) Motion all well-pled facts are assumed true. NSC cites to various disclosure documents purportedly provided by Beamreach Solar, Inc. ("Beamreach") to some Plaintiffs and erroneously claims that since the disclosures mentioned some risk then NSC is completely innocent in recommending the horrible investment despite these risks and many others not disclosed to Plaintiffs that NSC knew or should have known. All of the regulations governing the conduct of brokers in assessing and investigating suitability would be meaningless if NSC's argument is correct and the Motion is granted. This foolhardy argument obviates NSC of any duty and brokers can pass the buck to their clients and not perform any of the required investigation.  NSC knew Beamreach was a flop but didn't disclose this fact because it could reap a huge commission by selling what it knew was worthless.  Now, when NSC  is caught, they try to blame their customers for following NSC's recommendation to invest!

1

1

2

## II.    LEGAL STANDARD

3

4      Federal Rule of Civil Procedure 12(b)(6) allows a party to bring a motion to dismiss for

5 failure to state a claim upon which relief can be granted. Rule 12(b)(6) is read along with Rule

6 8(a), which requires a short, plain statement upon which a pleading shows entitlement to relief.

7 Fed. R. Civ. P. 8(a)(2); *Conley v. Gibson*, 355 U.S. 41, 47 (1957) (holding that the Federal

8 Rules require a plaintiff to provide "'a short and plain statement of the claim' that will give the

9 defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests"

10 (quoting Fed. R. Civ. P. 8(a)(2)).); *Bell Atl. Corp. v Twombly*, 550 U.S. 544, 555 (2007). When

11 evaluating a Rule 12(b)(6) motion, a court must accept all material allegations in the

12 complaint—as well as any reasonable inferences to be drawn from them—as true and construe

13 them in the light most favorable to the non-moving party. *See Doe v. United States*, 419 F.3d

14 1058, 1062 (9th Cir. 2005). "The court need not accept as true, however, allegations that

15 contradict facts that may be judicially noticed by the court." *Shwarz v. United States*, 234 F.3d

16 428, 435 (9th Cir. 2000).

17

18      "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed

19 factual allegations, a plaintiff's obligation to provide the 'grounds' of his" entitlement to relief'

20 requires more than labels and conclusions, and a formulaic recitation of the elements of a cause

21 of action will not do." *Twombly*, 550 U.S. at 555 (citations omitted). Rather, the allegations in

22 the complaint "must be enough to raise a right to relief above the speculative level." *Id.*

23

24      To survive a motion to dismiss, a plaintiff must allege "enough facts to state a claim to

25 relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *Ashcroft v. Iqbal*, 556 U.S. 662,

26 697 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for

27

28                                                          2

---

Response to Motion to Dismiss
Case No. 2:18-cv-1773

STOLTMANN LAW OFFICES, P.C.
233. S. Wacker 84th Floor
Chicago, Illinois 60603
312-442-3200

1
2
3
4
5

more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (*quoting Twombly*, 550 U.S. at 556).

6
7
8
9
10
11
12

The Ninth Circuit has clarified that (1) a complaint must "contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively" and (2) "the factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Starr v. Baca*, 652 F. 3d 1202, 1216 (9th Cir. 2011).

13

### III.   PLAINTIFFS STATE A CLAIM FOR NEGLIGENCE

14
15
16
17
18
19
20
21

NSC misses the point in its Motion. The purported affirmative defense isn't an affirmative defense at all. NSC is attempting to negate the well pled allegations of duty in the Complaint. The real issue here is duty and duty is pled eight ways over in the Complaint. NSC cannot avoid their admitted duties by blaming their clients or claiming their clients are wealthy so they should have known better. That's not the rule. NSC is asking this Court to join them on a limb and start sawing at the well-established rules governing the relationship of broker and client which are the bedrock of the industry.

22
23
24
25
26

In order to discuss how implied assumption of risk doesn't apply here it is necessary to explain the elements of the negligence claim pled in the Complaint and how these factual allegations cannot be negated by any assumption of risk argument considering the clear duties owed by NSC and the interplay of those duties with what NSC tries to blame its clients for.

27
28

3

Response to Motion to Dismiss
Case No. 2:18-cv-1773

STOLTMANN LAW OFFICES, P.C.
233. S. Wacker 84th Floor
Chicago, Illinois 60603
312-442-3200

Let's start with the basics. Under Washington law, to state a claim for negligence, Plaintiffs must adequately allege facts demonstrating "(1) the existence of a duty to the plaintiff, (2) a breach of that duty, (3) a resulting injury, and (4) the breach as the proximate cause of the injury." *Degel v. Majestic Mobile Manor*, 129 Wn.2d 43, 914 P.2d 728, 731 (1996). A duty of care is "an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another." *Affiliated FM Ins. Co. v. LTK Consulting Servs., Inc.*, 170 Wn.2d 442, 243 P.3d 521, 526 (2010) (internal quotation marks omitted). "Duty in a negligence action is a threshold question" and "may be predicated 'on violation of statute or of common law principles of negligence.'" *Jackson v. City of Seattle*, 158 Wn. App. 647, 244 P.3d 425, 428 (Wash. Ct. App. 2010).

Plaintiffs plead duty very clearly based on controlling regulations. It is unquestioned that NSC was a broker-dealer obligated to follow FINRA rules and regulations in connection with the offer and sale of securities including Beamreach. (Cmplt ¶¶ 17, 55). It is well settled precedent in the Ninth Circuit and other Federal Districts that securities industry regulations, such as those referenced in the Complaint and attached hereto, define the common law duties owed by NSC to its customers. *See Mihara v. Dean Witter & Co.*, 619 F.2d 814, 824 (9th Cir.1980) (NASD and NYSE rules "reflect the standard to which all brokers are held"); *McGraw v. Wachovia Sec. LLC*, 756 F.Supp.2d 1053, 1075 (N.D.Iowa 2010) (recognizing duty based on NASD rules); *Colbert & Winstead. PC 401(K) Plan v. AIG Fin. Advisors, Inc.*, No. 3:07–1117, 2008 WL 2704367, at *10 (M.D.Tenn. July 8, 2008) ("the NASD may define the scope of a duty of a broker dealer"); *Piper, Jaffray & Hopwood Inc. v. Ladin*, 399 F.Supp. 292, 299 (S.D.Iowa 1975) (concluding NASD and NYSE rules are "admissible as evidence of negligence"); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Cheng*, 697 F. Supp. 1224, 1227

4

Response to Motion to Dismiss
Case No. 2:18-cv-1773

STOLTMANN LAW OFFICES, P.C.
233. S. Wacker 84th Floor
Chicago, Illinois 60603
312-442-3200

(D.D.C. 1986) (violation of NASD rule was evidence of broker's negligence). NSC's own internal compliance manual and written supervisory procedures supplement the duties owed by NSC. *Joyce v. Dep't of Corr.*, 155 Wn.2d 306, 324, 119 P.3d 825 (2005) ("Internal directives, department policies, and the like may provide evidence of the standard of care and therefore be evidence of negligence.").

Pursuant to FINRA Rule 2111.05(a), FINRA Regulatory Notice 10-22, NASD Notice to Members 03-71, and NASD Notice to Members 05-26, NSC is required to perform reasonable due diligence on a private placement prior to offering it for sale to its customers. (Cmplt ¶ 58). NSC's compliance manuals, supervision manuals, and internal practices and procedures also detail the requirement to perform due diligence when selling private placements. (Cmplt. ¶ 59). This duty established in the various regulations and NSC's internal regulations is not questioned by NSC directly and instead it tries to eliminate its duty by shifting the duty to customers. No rule or regulation allows a broker-dealer to abdicate its responsibilities to clients just because they may be wealthy or review a PPMs. A decision by this Court granting the Motion to Dismiss would gut the regulatory framework established to protect investors from fee-hungry brokers.

The controlling regulations make clear that the duty breached by NSC remains regardless of what is disclaimed. FINRA Rule 2111.02 explicitly states that a broker-dealer cannot disclaim any responsibilities under the suitability rule – which would include what NSC is trying here by attempting to hide behind risk disclosures when accused of failing to discharge

Response to Motion to Dismiss
Case No. 2:18-cv-1773

STOLTMANN LAW OFFICES, P.C.
233. S. Wacker 84th Floor
Chicago, Illinois 60603
312-442-3200

its reasonable-basis suitability obligation. In NASD Notice to Members 03-71[1], NSC's regulator stated:

> [P]erforming appropriate due diligence is crucial to a member's obligation to undertake the required reasonable-basis suitability analysis. A **reasonable-basis suitability determination is necessary to ensure that an investment is suitable for some investors** (as opposed to a customer-specific suitability determination, discussed below, which is undertaken on a customer-by-customer basis). Thus, the reasonable-basis suitability analysis can only be undertaken when a member understands the investment products it sells. Accordingly, **a member must perform appropriate due diligence to ensure that it understands the nature of the product**, as well as the potential risks and rewards associated with the product. Moreover, the fact that a member intends to offer an NCI [non-conventional investment] **only to institutional investors** does not relieve the member of its responsibility to conduct due diligence and a reasonable-basis suitability analysis.

NASD NTM 03-71, November 2003. at 758 (attached hereto as Exhibit "A"[2]) (emphasis added).

In its Motion, NSC deflects responsibility to perform its gatekeeping function as a broker/dealer offering a non-conventional investment to clients by asserting Plaintiffs' status as "accredited investors" as if that has any meaning under these circumstances. It does not. NASD's (NSC's primary regulator for the past decade) position that broker/dealers must perform this function even **if the intended recipients are institutional investors**. (NASD NTM 03-71). Rich or poor, venture fund or pensioner, brokers owe a duty to clients to do their job. This is fundamental. What is NSC earning a multimillion dollar commission for if it has no duty to investigate the suitability of the investment?

---

[1] The NASD and NYSE merged into FINRA on July 26, 2007 after approval by the SEC.
[2] Plaintiffs request that the Court incorporate by reference and/or take judicial notice of the regulations cited in the complaint and attached hereto as Exhibits "A" and "B" *See Branch v. Tunnell,* 14 F.3d 449, 454 (9th Cir. 1994).

6

Response to Motion to Dismiss
Case No. 2:18-cv-1773

STOLTMANN LAW OFFICES, P.C.
233. S. Wacker 84th Floor
Chicago, Illinois 60603
312-442-3200

The broker-dealer must thoroughly investigate the offering and the issuer and make a recommendation based on investigation rather than punt to whatever the PPMs state. *See* (Cmplt. ¶¶ 60-63). Controlling regulations provide, the broker-dealer in a Regulation D offering must, at a minimum, conduct a reasonable investigation concerning: the issuer and its management; the business prospects of the issuer; the assets held by or to be acquired by the issuer; the claims being made; and the intended use of proceeds of the offering. (Cmplt. ¶ 60). Neither NSC nor Plaintiffs could just rely on the materials prepared by Beamreach as is speciously claimed with its long-shot, fact-intensive assumption of risk argument.

NSC's position is illogical. There is no question that Plaintiffs relied on NSC to scrutinize Beamreach beyond the materials provided by Beamreach as required by controlling FINRA regulations. Plaintiffs justifiably relied on NSC to perform its well established duties and render the recommendation based on that investigation rather than based solely on greed for commissions. *See Hanly*, 415 F.2d at 596 ("A securities dealer occupies a special relationship to a buyer of securities in that by his position he implicitly represents he has an adequate basis for the opinions he renders."). How can Plaintiffs be blamed for the entire loss and their claims dismissed because they did not heed a warning when their broker who was supposed to fully investigate and scrutinize the investment recommended it despite receiving the same warnings and purportedly having much greater knowledge of the investment? They can't be blamed.

NSC's defense eliminating its well established duty fails because controlling FINRA regulations set the duty for investigation by NSC that goes far beyond reviewing the materials provided by Beamreach which obviously wasn't done here. As set forth in FINRA Regulatory Notice 10-22 and securities industry standards, a reasonable investigation of Beamreach's

7

Response to Motion to Dismiss
Case No. 2:18-cv-1773

STOLTMANN LAW OFFICES, P.C.
233. S. Wacker 84th Floor
Chicago, Illinois 60603
312-442-3200

assets and facilities should include: (a) Visiting and inspecting a sample of Beamreach's facilities to determine whether the value of assets reflected in the financial statements is reasonable; (b) Carefully examining any reports by third-party experts that may raise red flags; (c) Obtaining an expert opinion from engineers and others as necessary to form a basis for determining the suitability of the investment prior to recommending the security to investors. (Cmplt. ¶ 65)(FINRA Regulatory Notice 10-22 attached hereto as Exhibit "B"). Clearly, Plaintiffs were justified in relying on NSC to look beyond the PPMs and evaluate the investment when it had a clear legal duty to do so. How can NSC successfully argue the PPMs effectively void its duty to adhere to well settled industry standards? It can't because granting Defendant's Motion would gut the regulatory framework and effectively eliminate any duty to brokers selling non-conventional investments so long as the PPM contained some boilerplate warnings.

NSC had a duty to dig deep and scrutinized the investment rendering the boilerplate disclosure of little weight compared to what should have been thorough investigation by NSC. It was up to NSC to determine whether this investment was worth offering and was the gatekeeper. The rule is clear:

> A member may in good faith rely on representations concerning an NCI [non-conventional investment] contained in a prospectus or disclosure document. However, reliance on such materials alone may not be sufficient for a member to satisfy its due diligence requirements where the content of the prospectus or disclosure document does not provide the member with sufficient information to fully evaluate the risk of the product or to educate and train its registered persons for sales purposes. In such **case, the member must seek additional information about the NCI or conclude that the product is not appropriate for sale to the public**. In addition, members should ensure that the persons responsible for conducting due diligence have appropriate training and skill to evaluate the terms of the investment as well as the potential risks and benefits.

NASD NTM 03-71, November 2003. at 758 (Exhibit "A") (emphasis added). NSC's investigation apparently ceased at what the commission rate was instead of following the rule

8

Response to Motion to Dismiss
Case No. 2:18-cv-1773

STOLTMANN LAW OFFICES, P.C.
233. S. Wacker 84th Floor
Chicago, Illinois 60603
312-442-3200

and assessing whether Beamreach was a sound investment. When the investment failed NSC blamed their clients for the entire loss. NSC must be held accountable.

NSC must have a reasonable basis to conclude that a recommendation to purchase, sell or exchange a security is suitable for the customer. (Cmplt. ¶ 66). NSC vigorously and incorrectly argues that all of this risks of Beamreach were disclosed by Beamreach (Mot. at 3-5) but ignores its duties pursuant FINRA Rule 2111.05 to conduct a reasonable investigation of the Beamreach before offering securities to its customers. (Cmplt. ¶ 67). FINRA Rule 2111.05(a) is the source of a broker-dealer's obligation to perform a reasonable investigation of the issuer and offered securities before offering securities in a Regulation D for sale to its clients. (Cmplt. ¶ 67). Reasonable-basis suitability requires that a broker-dealer (1) perform reasonable diligence to understand the potential risks and rewards associated with a recommended security or strategy and (2) determine whether the recommendation is suitable for at least some investors based on that understanding. A broker-dealer can violate reasonable-basis suitability under either prong of the test. (Cmplt. ¶ 67). NSC didn't do this.

In order to comply with FINRA Rule 2111.05, NSC was required to make a decision based on its reasonable due diligence of the company: approve it for sale to its clients, or reject the offering and refuse to sell it. This didn't happen here. NSC's conflicts of interest, in acting as both the primary broker/dealer and placement agent for Beamreach, prevented it from adhering to any sense of reasonableness. Beamreach was a company with such disastrous debt service, with no revenue, and with no legitimate customers or business interests to pursue. Soliciting investors to pour money into the company so that it can pay its creditors was not speculation. Rather, it was deceitful, tantamount to fraud, and at the very least reckless.

FINRA reminded NSC of this obligation multiple times prior to the Beamreach

9

Response to Motion to Dismiss
Case No. 2:18-cv-1773

STOLTMANN LAW OFFICES, P.C.
233. S. Wacker 84th Floor
Chicago, Illinois 60603
312-442-3200

offerings, and provided detailed guidance on what FINRA considered reasonable due diligence in FINRA Regulatory Notice 10-22, NASD Notice to Members 03-71, and NASD Notice to Members 05-26. 58. Indeed, NSC was provided the foregoing disclosures *prior to* approving Beamreach for sale to the Plaintiffs, and *prior to* the Plaintiffs receiving any such disclosures.

This glaring breach is pled clearly in the Complaint. There should be no doubt, especially on a 12(b)(6) Motion, that NSC's duties go beyond just passing along the PPMs and punting to its warnings. Instead, NSC had a duty to investigate Beamreach in connection with each and every securities offering it made while NSC served as its placement agent, and share its findings to Plaintiffs. Ultimately, NSC had the legal obligation under the circumstances to decline the invitation from Beamreach to sell these offerings to the firm's clients. NSC's conflict of interest, however, clearly clouded its judgment and NSC looked to the size of the fees it could earn from selling Beamreach to its clients. Furthermore, while the PPM's disclosed various risks, NSC cannot hide behind them. The limited warning in the PPM compared what NSC knew or should have known is analogous to "someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty the Grand Canyon lies one foot away" *See In re: Prudential Sec. Inc. P'ships Litig*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996). NSC knew Beamreach was a Grand Canyon that money poured into and never came out of and despite this they recommend the investment and took a multi-million dollar fee.

NSC knew or should have known by analyzing the historical financials that Beamreach had burned through more than $200 million in investor money without even having a viable product to sell before engaging NSC to raise additional funds. (Cmplt. ¶ 73). As of February 5, 2015, NSC knew that Beamreach only had a cash runway to continue operations through April

10

---

Response to Motion to Dismiss
Case No. 2:18-cv-1773

STOLTMANN LAW OFFICES, P.C.
233. S. Wacker 84th Floor
Chicago, Illinois 60603
312-442-3200

2016 (even with a fully subscribed offering).  (Cmplt. ¶ 74). NSC also knew that the Beamreach

valuation from the Series B round offered in 2008, had dropped by more than 60% from $625

million to only $250 million for the Series D round. As NSC knew or should have known, a

sharp valuation drop like this is an ominous sign, and could hurt Beamreach in raising additional

funds. NSC knew that Beamreach had trouble raising capital after the Series B round, and that

if it failed to raise capital in the short time frame required, it would have to prepare for the sale

of the company. In other words, NSC knew Beamreach was in a desperate financial condition

at the time of each Beamreach Offering. (Cmplt. ¶ 75). NSC knew that Beamreach had no

revenue. After burning through more than $200 million in investor funds, Beamreach was only

able to secure a handful of non-binding Memoranda of Understanding ("MOUs") with

prospective customers, which expired on December 31, 2014 (prior to the commencement of

the offering). (Cmplt. ¶ 76).

 In connection with evaluating the foregoing red flags for Beamreach investors, a

reasonably prudent broker-dealer firm under the same or similar circumstances would not have

approved the Beamreach Offerings for sale to any investor when considering these risks

because the risk of a complete loss in the short term far outweighed any potential long term

rewards, even for those investors that sought to speculate with their funds.  (Cmplt. ¶ 81). By

approving the Beamreach Offerings for sale to the Plaintiffs and the Class notwithstanding these

red flags, NSC acted in a manner which a reasonably prudent broker-dealer firm under the same

or similar circumstances would not have. (Cmplt. ¶ 82).

 Plaintiffs state a claim for negligence and details the violation of duties owed by NSC

to Plaintiffs. The duties are established by controlling regulations and cannot be eliminated by

11

Response to Motion to Dismiss
Case No. 2:18-cv-1773

STOLTMANN LAW OFFICES, P.C.
233. S. Wacker 84th Floor
Chicago, Illinois 60603
312-442-3200

blaming the client when the broker doesn't to its job. The Motion should be denied and NSC held accountable.

### IV. PLAINTIFFS DID NOT ASSUME THE RISK OF NSC FAILING TO INVESTIGATE BEAMREACH AND INSTEAD JUSTIFIABLY RELIED ON NSC'S DUTY TO INVESTIGATE BEYOND WHAT WAS IN THE PPMS WHEN RECOMMENDING THE INVESTMENT.

#### A. NSC's one-of-a-kind, fact intensive, Motion to Dismiss, based on implied assumption of risk, fails legally because it is wholly unsupported by precedent.

NSC is arguing for dismissal based on implied assumption of risk.  The Washington Supreme Court has never applied it as a bar to recovery in any case and this doctrine should be applied with caution. *Gregoire v. City of Oak Harbor,* 170 Wn.2d 628, 244 P.3d 924, 932 (2010)(Chambers, J. concurring). ("Because the evidentiary standard is so high, this court has never applied implied primary assumption of risk to bar recovery in any case. Implied primary assumption of risk should accordingly be applied with caution and with a proper understanding of the principles underlying the doctrine.") In this case applying the doctrine carefully means not destroying a regulatory framework by allowing brokers to simply blame their clients when the broker greedily fails at its basic duties.

Four varieties of assumption of risk operate in Washington: (1) express, (2) implied primary, (3) implied unreasonable, and (4) implied reasonable assumption of risk. *Kirk v. Wash. State Univ.*, 109 Wn.2d 448, 453, 746 P.2d 285 (1987). The first two types, express and implied primary assumption of risk, arise when a plaintiff has consented to relieve the defendant of a duty—owed by the defendant to the plaintiff—regarding specific known risks. *Id.* The remaining two types apportion a degree of fault to the plaintiff and serve as damage-reducing factors. *Id.* at 453-54, 457-58; *Scott v. Pac. W. Mountain Resort*, 119 Wn.2d 484, 497-99, 834 P.2d 6 (1992). Express and implied primary assumption of risk share the same elements of

12

Response to Motion to Dismiss
Case No. 2:18-cv-1773

STOLTMANN LAW OFFICES, P.C.
233. S. Wacker 84th Floor
Chicago, Illinois 60603
312-442-3200

proof: "The evidence must show the plaintiff (1) had full subjective understanding (2) of the presence and nature of the specific risk, and (3) voluntarily chose to encounter the risk." *Kirk*, 109 Wn.2d at 453. Implied primary assumption of risk is a complete bar to recovery for the risk assumed. *Dorr v. Big Creek Wood Prods., Inc.*, 84 Wn. App. 420, 425, 927 P.2d 1148 (1996). *Gregoire,* 244 P.3d at 928.

The elements of implied primary assumption of risk and express assumption of risk are identical. *Id.; Scott*, 119 Wn.2d at, 496-98. The effect of implied primary assumption of risk and express assumption of risk is also identical—both result in a complete bar to recovery with regard to the specific risk assumed. *Id*. While express assumption of risk requires evidence that the claimant has expressly assumed a specific risk, implied primary assumption of risk requires **evidence** that if the claimant failed to expressly assume a specific risk, the **claimant's actions** were tantamount to expressly assuming a specific risk. *See id*. at 497-98. The requirement of evidence in support of this defense renders it impossible to apply on a 12(b)(6) motion to dismiss. It has never worked before. NSC makes some huge factual leaps that don't work by arguing each Plaintiff read and received the PPM without facts in support of it and that the PPM actually disclosed the specific risks the led to the demise of Beamreach.  This argument has never worked on a motion to dismiss in any reported decision and there's no reason why this case is a unicorn.

Implied primary assumption risk just isn't a proper basis for a motion to dismiss because to the extent injury results from Plaintiffs' implied primary assumption of risk and defendant's negligence, implied primary assumption of risk does not serve as a complete bar to recovery. *See* Kirk, 109 Wn.2d at 454-455. At best, any risk assumed by Plaintiffs is only one factor in their decision to invest in this disaster. The use of implied primary assumption of risk in this

13

Response to Motion to Dismiss
Case No. 2:18-cv-1773

STOLTMANN LAW OFFICES, P.C.
233. S. Wacker 84th Floor
Chicago, Illinois 60603
312-442-3200

1   manner can be seen in *Shorter v. Drury*, 103 Wn.2d 645, 695 P.2d 116 (1985). The court in

2   *Shorter* did not allow express or implied primary assumption of risk to act as a complete bar to

3   recovery by the plaintiff where the defendant's negligence was also a cause of the damages to

4   the plaintiff. *Shorter*, at 657. The court instead treated the assumption of the risk as a damage-

5   reducing factor, attributing a portion of the causation to the plaintiff's assumption of the risk

6   and a portion to the defendant's negligence. *Kirk*, 746 P.2d at 289.

7

8       The Washington Supreme Court observed in *Kirk*:

9           A rigorous application of implied assumption of risk as an absolute defense could
            serve to undermine seriously  the general purpose of a comparative negligence
10          statute to apportion damages on the basis of fault. This is perhaps the reason that
            every commentator who has addressed himself to this specific problem has agreed
11          that plaintiff should not have his claim barred if he has impliedly assumed the risk,
            but rather that this conduct should be considered in apportioning damages under
12          the statute.

13

14  109 Wn.2d 448, 455-456 Quoting  V. Schwartz, Comparative Negligence § 9.5, at 180 (2d ed.

15  1986))

16      Defendant searches for some authority in support of this *unique* basis for dismissal and

17  finds none. NSC erroneously relies on *Harris v. Ivax Corp.*, 182 F.3d 799, 801, 1999 U.S. App.

18  LEXIS 17725, *1 (11th Cir. 1999) which is wholly inapplicable here. *Harris,* unlike this case,

19  is a securities fraud case where Plaintiff investors sued a corporation, not a broker, for making

20  false statements in press releases with forward looking statements rather than a broker's failure

21  to investigate present facts. Rather than framed as an issue of assumption of risk, instead the

22  question was whether a forward looking statement complied with 15 U.S.C. § 78u-5(c)(1)(A)(i)

23  and was sufficient to warn an investor, not working with a broker, of the risk of an investment.

24  *Id.* at 807. *Harris* is apples to oranges with this case and can be disregarded.

25

26                                              14

27

28
_____
Response to Motion to Dismiss                          STOLTMANN LAW OFFICES, P.C.
Case No. 2:18-cv-1773                                  233. S. Wacker 84th Floor
                                                       Chicago, Illinois 60603
                                                       312-442-3200

NSC erroneously relies on *ACAP Fin., Inc. v. United States SEC*, 783 F.3d 763 (10th Cir. 2015) for the following quotation: "[A] company may sell unregistered shares to 'accredited investors' considered sophisticated enough by virtue of their assets and experience that they don't need so much protection. *Id*. §§ 77b(a)(15), 77d(a)(5)" However, NSC ignores the very next sentence… "But, FINRA found, no exception to the registration requirement applied here so the sales of unregistered Greyfield securities violated federal law. And, as securities industry professionals, ACAP and Mr. Hume violated FINRA rules by failing to take sufficient steps to guard against the firm's involvement in the unlawful trading of unregistered shares. *See* NASD Conduct R. 2110, 3010 (rules in effect at the time of the violation)." *Id*. at 765. *See also*, *Hanly,* 415 F.2d at ("The fact that his customers may be sophisticated and knowledgeable does not warrant a less stringent standard"). Thus the 10th Circuit found that regardless of the investor's wealth, the broker was still obligated to meet the standard of care set by FINRA regulations. There is no regulation that says a broker's duties go out the window just because it is dealing with wealthy people. Accredited investors have the same right to rely on a broker to satisfy their basic fundamental duties of investigating an investment before selling it and reaping millions in commissions.

**B. NSC's assumption of risk argument fails factually because NSC knew or should have known facts not disclosed in the PPM and its duty was to advise its clients based on the whole universe of facts, not just the limited disclosures provided by Beamreach.**

Plaintiffs relied on NSC to scrutinize more than just Beamreach's PPM and actually perform the duties required of them as brokers in recommending an investment. This affirmative defense talks past the allegations of the Complaint rather than negating them. The Complaint alleges Plaintiffs relied on NSC to perform research beyond the PPMs. NSC argues the PPMs

15

negates the claim. The two don't match. PPMs cannot negate a claim that NSC failed in its duties of due diligence beyond the PPMs and advised based on that additional information.

NSC erroneously argues the risk of a deteriorating marketplace for solar power was disclosed by Beamreach and therefore shield's it from liability. (Mot. 4). Not so. NSC knew or should have known the Solar market in the United States buckled by 2015 and was not an issue of supply and demand; it was an issue of cheap overseas labor versus expensive American labor. (Cmplt. ¶¶ 33-34). The availability of cheap solar arrays built overseas made it impossible for American companies to compete in the marketplace unless they had an overseas manufacturer with access to cheap labor. NSC had access to information about this market place but chose to rely instead on boilerplate risk disclosures or ignore the risk altogether. As the lead placement agent and broker/dealer selling these offerings to its clients directly, NSC knew or should have known that unless Beamreach had secured an overseas manufacturer for its roof-top arrays and solar cells, the company had no chance at success.

At the time NSC approved and promoted the Beamreach Offerings, Plaintiffs reasonably believed (i) that NSC had conducted thorough due diligence on Beamreach, (ii) that NSC understood the risks and rewards of each Beamreach offering; and (iii) that based on NSC's due diligence and its understanding of the risks and rewards of the Beamreach offerings, NSC concluded that it could approve the Beamreach Offerings for sale to at least some of its clients. (Cmplt. ¶ 81). The PPMs cannot relieve NSC of its duties of due diligence beyond just forwarding materials from the issuer.

NSC erroneously argues it is somehow shielded from liability because Beamreach disclosed its limited cash reserves. (Mot. 4-5). This argument falls flat. NSC was provided the disclosures about Beamreach's short cash runway and limited cash reserves *prior to* approving

16

Response to Motion to Dismiss
Case No. 2:18-cv-1773

STOLTMANN LAW OFFICES, P.C.
233. S. Wacker 84th Floor
Chicago, Illinois 60603
312-442-3200

Beamreach for sale to the Plaintiffs, and *prior to* the Plaintiffs receiving any such disclosures. NSC knew and understood this risk and Plaintiffs justifiable relied on NSC to perform their duties of investigating Beamreach beyond its PPM to make this recommendation regardless.

NSC knew there was a grand canyon ahead and saw it themselves but the PPM only warned of a ditch. The following facts were known to NSC or they should have known had they done a modicum of due diligence beyond simply passing along the PPM:

- Before engaging NSC to raise additional funds Beamreach burned through over $200 million in investor money without before having a viable product to sell. (Cmplt. ¶ 73).

- As of February 5, 2015, Beamreach only had a cash runway to continue operations through April 2016 (even with a fully subscribed offering). (Cmplt. ¶ 74).

- Beamreach's valuation from the Series B round offered in 2008 dropped by more than 60% from $625 million to only $250 million for the Series D round. (Cmplt. ¶ 75).

- After burning through more than $200 million in investor funds, Beamreach was only able to secure a handful of non-binding Memoranda of Understanding ("MOUs") with prospective customers that expired prior to the commencement of the NSC offering. (Cmplt. ¶ 76).

- Beamreach had no actual customers. (Cmplt. ¶ 77).

- The market had little interest in a lightweight panel, and were too expensive compared to a commoditized silicon panel, which has a commercially proven reliability and a better price point. (Cmplt. ¶ 77).

- Asian solar panel manufacturers drove industry pricing below the cost of production, causing many producers to shut plants or cease production entirely. (Cmplt. ¶ 78).

- Sophisticated private equity funds and venture capitalists, which have their own teams of professionals who vet companies like Beamreach prior to investing slowed their investment to a trickle prior to NSC selling to Plaintiffs. (Cmplt. ¶ 80).

- NSC was aware of the terms of the Opus Bank financing not disclosed in the PPM including: (a) Opus Bank had secured their debt financing with a blanket lien against "substantially all" of Beamreach's domestic assets; (b) If there was any bankruptcy or other change in control prior to the repayment of the loan, Opus Bank would have a senior secured claim on the assets; (c) Given that Beamreach's only real asset after all of their fundraising was

17

Response to Motion to Dismiss
Case No. 2:18-cv-1773

STOLTMANN LAW OFFICES, P.C.
233. S. Wacker 84th Floor
Chicago, Illinois 60603
312-442-3200

their "valuable" intellectual property, the equity investors would have nothing left in the event of a default on this loan; (d) Beamreach owed $1.2 million per month just to service debt; and (e) By mid 2016, that debt service would jump to $1.7 million per month. (Cmplt. ¶ 85). This Opus Bank agreement caused the risk of a complete loss in the short term to far outweigh any potential long term reward. (Cmplt. ¶ 86).

• There was little commercial appetite for the IP that Beamreach had spent $250 million developing, and that the valuable IP portfolio was virtually worthless. (Cmplt. ¶ 89).

• The October 2016 Fifth Amendment to the Opus Bank financing essentially placed a terminal date on Beamreach. Beamreach was effectively required to replace or refinance the Opus Bank loan by March 2017 – within six months of the Fifth Amendment. Given their short cash runway, lack of revenue, lack of binding commercial contracts, virtually worthless IP, it would be virtually impossible for them to sell or refinance in such a short timeframe. (Cmplt. ¶ 97).

• Beamreach had retained bankruptcy counsel prior to the November 2016 offering. (Cmplt. ¶ 100).

• On October 19 and October 24, 2016, Beamreach paid its bankruptcy counsel, Pachulski Stang Ziehl & Jones, LLP, for services in connection with restructuring or bankruptcy of the company.. (Cmplt. ¶ 101).

• By November 2016, NSC knew that the company was in dire financial straits, and was being forced to sell the company or refinance the Opus loan by March 2017. Naturally, in conducting reasonable diligence on a company that clearly disclosed heavy short-term obstacles which concern the viability of a company as a going concern, a reasonably prudent broker-dealer in the same or similar circumstances would have inquired into whether or not Beamreach was contemplating bankruptcy in the short term, and if it had retained bankruptcy counsel. Upon information and belief, NSC made no such inquiry. (Cmplt. ¶ 102).

NSC knew or should have known all of this and Plaintiffs didn't. The parties' are not operating on the same plane. The affirmative defense of assumption of risk isn't an affirmative defense and instead negates the allegations of duty in the Complaint rather than negate them by some affirmative fact with outside evidence. Plaintiffs didn't assume any risk of NSC's negligence or release them from their duties. Plaintiffs purportedly received some warning, NSC received many warnings. After receiving the warnings NSC still recommended the investment. NSC, not Plaintiffs, had intimate knowledge of Beamreach and a duty to investigate

18

Response to Motion to Dismiss
Case No. 2:18-cv-1773

STOLTMANN LAW OFFICES, P.C.
233. S. Wacker 84th Floor
Chicago, Illinois 60603
312-442-3200

prior to offering the investment. As detailed above there were numerous undisclosed risks that NSC knew or should have known that rendered the investment dead on arrival. The only purpose of this whole gambit was to generate commissions for NSC and it must be held accountable.

WHEREFORE, for the reasons stated herein, Plaintiffs respectfully request that this Court deny Defendant's Motions to Dismiss in their entirety, and for any and all other relief that this Court deems necessary and appropriate under the circumstances.

Dated:  March 18, 2019

By:  _/s/ David Neuman_____
        Attorneys for Plaintiffs


Alexander Loftus, Esq.
Joseph Wojciechowski, Esq.
*Pro Hac Vice*
STOLTMANN LAW OFFICES, P.C.
233 S. Wacker, 84th Floor
Chicago, Illinois 60603
PH: (312) 332-4200
alex@stoltlaw.com
joe@stoltlaw.com

Joshua B. Kons, Esq.
LAW OFFICES OF JOSHUA B. KONS, LLC
*Pro Hac Vice Pending*
100 Pearl Street, 14th Floor
Hartford, Connecticut 06103
PH: (860) 920-5181
joshuakons@konslaw.com

David Neuman, Esq. (WSB #48176)
ISRAELS NEUMAN PLC
10900 NE 8th Street, Suite 1000
PMB #155
Bellevue, Washington 98004
dave@israelsneuman.com

19

Response to Motion to Dismiss
Case No. 2:18-cv-1773

STOLTMANN LAW OFFICES, P.C.
233. S. Wacker 84th Floor
Chicago, Illinois 60603
312-442-3200