THE HONORABLE RICARDO S. MARTINEZ

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| JAMES GINZKEY, RICHARD FITZGERALD, CHARLES CERF, BARRY DONNER, and on behalf of the class members described below,<br><br>Plaintiffs,<br><br>v.<br><br>NATIONAL SECURITIES CORPORATION, a Washington Corporation,<br><br>Defendant. | Case No.: 2:18-cv-01773-RSM<br><br>**NATIONAL SECURITIES CORPORATION'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS**<br><br>NOTE ON MOTION CALENDAR: MARCH 22, 2019<br><br>WITHOUT ORAL ARGUMENT |

## I.   INTRODUCTION

National Securities Corporation ("NSC") by and through its undersigned attorneys hereby submits its Reply in Support of its Motion to Dismiss. Plaintiffs' Complaint should be dismissed. Reasonable minds cannot differ that Plaintiffs assumed the risk that Beamreach could fail since the risks of the Beamreach investment were fully disclosed to Plaintiffs. Plaintiffs (accredited, sophisticated investors) must have appreciated the risks of the investment, but they chose to invest anyway. Plaintiffs' Response to NSC's Motion to Dismiss is based on numerous false premises. For example, Plaintiffs claim that "[n]o dismissal based on implied assumption of risk has ever been affirmed by any Appellate Court or Federal District Court applying Washington law." Pf.

NATIONAL SECURITIES CORPORATION'S
REPLY IN SUPPORT OF ITS
MOTION TO DISMISS
CASE NO. 2:18-CV-1773

BAKER & HOSTETLER LLP
999 Third Avenue, Suite 3600
Seattle, WA  98104-4040
Telephone:  (206) 332-1380

Resp. at 1. This is directly contradicted by numerous Washington Court of Appeals cases cited below. Relying on outdated law that has since been clarified by the Washington Supreme Court, Plaintiffs also incorrectly argue that implied primary assumption of risk is not a complete bar to recovery. It is a complete bar. Finally, in their Response, Plaintiffs submit a bullet point list of facts about Beamreach that Plaintiffs claim they never knew. Pf. Resp. at 17-18. To the contrary, all of those facts were disclosed to Plaintiffs by NSC.

Ultimately, Plaintiffs' complaint about NSC's conduct is that the Beamreach investments carried a high degree of risk. But Plaintiffs were repeatedly warned that the Beamreach investments had a "<u>high degree of risk</u>." Ex. A at NSC000022; Ex. B at NSC000384; Ex. C at NSC000676 (emphasis added).[1] Plaintiffs did not simply receive "boiler-plate" warnings here. Rather, Plaintiffs were repeatedly warned of the specific risks that Plaintiffs allege in their Complaint ultimately caused Beamreach to fail. If Plaintiffs' lawsuit is allowed to proceed, it would essentially hold brokers liable every time a high-risk investment failed, despite the warnings made to Plaintiffs and the Plaintiffs' own sophistication. Brokers are not and should not be held to be guarantors of high risk investments.

Unfortunately, Beamreach failed. Counter to Plaintiffs' arguments, NSC is not "blaming" Plaintiffs for their failed investment. Rather, NSC is merely stating a fact: that Plaintiffs were well aware of the risks of investing in Beamreach and chose to do so. This was implied primary assumption of risk and Plaintiffs' claims should be dismissed.

## II.   ARGUMENT

**A. Reasonable Minds Could Not Differ that Plaintiffs' Claims are Barred by Implied Primary Assumption of Risk.**

Plaintiffs' claims rely on the premise that NSC allegedly violated FINRA regulations regarding the suitability of investments in Beamreach. *See* Dkt. No. 1. To that end, Plaintiffs argue that FINRA Regulations provide that NSC's suitability duties cannot be disclaimed. *See* Pf.

---

[1] Citation to exhibits in this Reply refer to the PPMs attached as exhibits to NSC's Motion to Dismiss.

NATIONAL SECURITIES CORPORATION'S
REPLY IN SUPPORT OF ITS
MOTION TO DISMISS - 2 -
CASE NO. 2:18-CV-1773

BAKER & HOSTETLER LLP
999 Third Avenue, Suite 3600
Seattle, WA 98104-4040
Telephone: (206) 332-1380

Resp. at 5. However, Plaintiffs' claims are not for violation of FINRA regulations *per se*, of which there is no cause of action. *Grace Fin. Grp., LLC v. Dino,* 138 A.D.3d 644, 645, 31 N.Y.S.3d 472, 473 (N.Y. App. Div. 2016) ("the law is clear that there is no private cause of action for [violation of the rules of FINRA]"). Rather, Plaintiffs' claims are *negligence* claims,[2] which are subject to the common law defense of assumption of risk.

"Implied primary assumption of risks arises when (1) the plaintiff impliedly consents to relieve the defendant of a duty to plaintiff about specific known and appreciated risks; and (2) the plaintiff engages in conduct, from which consent is implied." *Wirtz v. Gillogly*, 152 Wn. App. 1, 8, 216 P.3d 416, 420, *published with modifications at 150* Wn. App. 1053 (2009) (quoting *Scott v. Pac. W. Mountain Resort*, 119 Wn.2d 484, 497, 834 P.2d 6 (1992) and *Erie v. White*, 92 Wn. App. 297, 303, 966 P.2d 342 (1998)) (internal citations omitted). Assumption of risk may be decided as a matter of law where reasonable minds cannot differ. *See id.* Here, reasonable minds cannot differ that Plaintiffs assumed the risk that the Beamreach investment might fail.

Plaintiffs have not objected to NSC's request to have the Court consider the Beamreach PPMs under the doctrine of incorporation by reference or through judicial notice. Accordingly, NSC's request should be granted. Although Plaintiffs allege that the PPMs were provided to "some Plaintiffs," they fail to identify any named Plaintiff who did not receive them. Pf. Resp. at 1. Further, "investors are presumed to have read prospectuses, quarterly reports, and other information related to their investments." *Mathews v. Kidder, Peabody & Co., Inc.,* 260 F.3d 239, 252 (3d Cir.2001). As such, Plaintiffs are presumed to have read the PPMs before deciding to purchase investments in Beamreach.

Reasonable minds could not differ that the type of risk facing Plaintiffs (i.e. the collapse of Beamreach due to various risk factors) was fully described to them in the PPMs. As identified in

---

[2] Plaintiffs have not pled a fraud claim in their Complaint and their Complaint does not meet the heightened pleading standards for fraud required by Federal Rule of Civil Procedure 9. *See* Dkt. No. 1. Plaintiffs have attempted to conflate their negligence claim with a fraud claim by arguing that NSC had a conflict of interest (without citing any supporting authority) and that NSC's actions were "tantamount to fraud," without actually pleading that NSC intentionally misled any investor. Pf. Resp. at 9. Plaintiffs' unsupported hyperbole should be disregarded by the Court.

NATIONAL SECURITIES CORPORATION'S
REPLY IN SUPPORT OF ITS
MOTION TO DISMISS - 3 -
CASE NO. 2:18-CV-1773

BAKER & HOSTETLER LLP
999 Third Avenue, Suite 3600
Seattle, WA 98104-4040
Telephone: (206) 332-1380

detail below, the PPMs described all of the risks Plaintiffs complained about in their Complaint and in their Response brief. Further, reasonable minds could not differ that Plaintiffs, who are accredited investors[3] of high net worth or annual income, must have appreciated the risks of their investment. Accredited investors are "considered sophisticated enough by virtue of their assets and experience that they don't need so much protection [as unsophisticated investors]." *ACAP Fin., Inc. v. U.S. S.E.C.,* 783 F.3d 763, 765 (10th Cir. 2015). There are relaxed rules for selling investments to accredited investors and such securities are not required to be registered with the Securities and Exchange Commission. *Id.* Accredited investors also are presumed to be sophisticated and aware of the risks involved in their investments. *See Davis v. St. Anselm Expl. Co.,* No. 10-CV-883 KG/WPL, 2015 WL 13651012, at *5 (D.N.M. Oct. 8, 2015). While Plaintiffs are correct that FINRA applies its suitability rules to accredited investors (*see* Pf. Resp. at 5-6, 15), their status as accredited investors is relevant here to Plaintiffs' appreciation of the risks of the Beamreach investments.

By purchasing the Beamreach investments with full knowledge and appreciation of their risks, Plaintiffs impliedly consented to accept the inherent investment risks and thereby relieved NSC of its duty.

**B. The Washington Court of Appeals has Repeatedly Affirmed Dismissal of Negligence Claims under the Implied Primary Assumption of Risk.**

Plaintiffs allege that "[n]o dismissal based on implied assumption of risk has ever been affirmed by any Appellate or Federal District Court applying Washington law." Pf. Resp. at 1. This is demonstrably incorrect: the Washington Court of Appeals has repeatedly affirmed dismissal of all claims based on implied primary assumption of risk. *See Pellham v. Let's Go Tubing, Inc.,* 199 Wn. App. 399, 416–18, 398 P.3d 1205, 1216 (2017) (plaintiff assumed risk of injuries involved in river tubing); *Hvolboll v. Wolff Co*., 187 Wn. App. 37, 40, 347 P.3d 476 (2015)

---

[3] Plaintiffs are "accredited investors" because their individual net worth, or joint net worth with that person's spouse, exceeds $1,000,000 or they have an annual income exceeding $200,000 in each of the two most recent years or joint income with their spouse during those years in excess of $300,000. 17 C.F.R. §230.501(a)(5), (6).

NATIONAL SECURITIES CORPORATION'S
REPLY IN SUPPORT OF ITS
MOTION TO DISMISS - 4 -
CASE NO. 2:18-CV-1773

BAKER & HOSTETLER LLP
999 Third Avenue, Suite 3600
Seattle, WA 98104-4040
Telephone: (206) 332-1380

(plaintiff assumed risk of falling on snow and ice); *Reed-Jennings v. Baseball Club of Seattle, L.P.*, 188 Wn. App. 320, 351 P.3d 887 (2015) (plaintiff assumed risk of injuries sustained while spectating a baseball game); *Jessee v. City Council of Dayton*, 173 Wn. App. 410, 415–16, 293 P.3d 1290, 1293 (2013) (plaintiff assumed risk of injury on stairs); *Wirtz v. Gillogly*, 152 Wn. App. 1, 2–3, 216 P.3d 416, 417, *published with modifications at* 150 Wn. App. 1053 (2009) (plaintiff assumed risk associated with felling trees); *Taylor v. Baseball Club of Seattle, L.P.*, 132 Wn. App. 32, 130 P.3d 835 (2006) (plaintiff assumed risk of injuries sustained while spectating a baseball game); *Erie v. White,* 92 Wn. App. 297, 306, 966 P.2d 342, 347 (1998) (plaintiff assumed risk of injuries due to using improper equipment to cut down a tree). Washington trial courts have routinely dismissed claims due to implied primary assumption of risk as a matter of law and Washington appellate courts have routinely affirmed such dismissals. Thus, contrary to Plaintiffs' assertion, NSC is not asking this Court to "join them far out on a limb." Pf. Resp. at 1. NSC is asking the Court to follow the precedents cited above.[4]

### C. Implied Primary Assumption of Risk Negates Defendant's Duty and is a Complete Bar to Recovery Here.

Relying on *Kirk v. Wash. State Univ.*, 109 Wn.2d 448, 746 P.2d 285 (1987), Plaintiffs argue that implied primary assumption of risk does not serve as a complete bar to recovery where the injury results from Plaintiffs' implied primary assumption of risk and Defendant's negligence. Pf. Resp. at 13-14. Plaintiffs instead argue that implied primary assumption of risk should be treated as a damage-reducing factor. Holdings after *Kirk*, however, hold that implied primary assumption of risk acts to negate the Defendant's duty, absolving them of alleged negligence, and acts as a complete bar to recovery. *See Scott By & Through Scott v. Pac. W. Mountain Resort*, 119 Wn.2d 484, 497–99, 834 P.2d 6, 13–14 (1992). Specifically, in *Scott*, the Washington Supreme Court clarified: "This court explained [in *Kirk*] that the basis of both express and implied primary

---

[4] Without citing any authority, Plaintiffs argue that because proving primary assumption or risk requires evidence, it is impossible to apply it in the context of a 12(b)(6) motion. Pf. Resp. at 13. This ignores the Ninth Circuit's guidance that a motion to dismiss under Rule 12(b)(6) can be granted based upon an affirmative defense when that "defense raises no disputed issues of fact." *Scott v. Kuhlmann*, 746 F.2d 1377, 1378 (9th Cir. 1984). Here, for reasons stated in this brief, there are no disputed issues of fact.

NATIONAL SECURITIES CORPORATION'S
REPLY IN SUPPORT OF ITS
MOTION TO DISMISS - 5 -
CASE NO. 2:18-CV-1773

BAKER & HOSTETLER LLP
999 Third Avenue, Suite 3600
Seattle, WA 98104-4040
Telephone: (206) 332-1380

assumption of risk was the plaintiff's *consent* to the *negation of defendant's duty with regard to those risks assumed.* Since implied primary assumption of the risk *negates duty*, it acts as a bar to recovery when the injury results from one of the risks assumed." *Id.* (emphases in original).

Washington Practice has explained this concept as follows: "If the injury results solely from the condition that was expressly or impliedly assumed (e.g., a steep ski slope), it results in a finding of no negligence. On the other hand, if the risk assumed (a steep ski slope) combines with a risk that was not assumed (e.g., substandard lighting of a ski slope at night), then a comparative method should be used." § 9:13.Assumption of risk—Implied primary, 16 Wash. Prac., Tort Law And Practice § 9:13 (4th ed.). In particular, known risks may be assumed, unlike risks that are not known or not voluntarily encountered. *See Kirk*, 109 Wn.2d at 456. Here, as described below, Plaintiffs assumed the known risks inherent in the Beamreach investments by choosing to invest in Beamreach.

The cases relied on by Plaintiffs are inapposite because they involve plaintiffs who did not assume all of the risks at issue. *See Scott,* 119 Wn.2d at 497–99 (discussing that in *Kirk*, the plaintiff cheerleader assumed the risks inherent in the sport of cheerleading, but did not assume the risks caused by the university's negligent provision of dangerous facilities or improper instruction or supervision); *Shorter v. Drury*, 103 Wn.2d 645, 659, 695 P.2d 116, 124 (1985) (plaintiff assumed risk of refusal to permit a blood transfusion, not risk that her surgeon would perform operation negligently). In contrast, Plaintiffs fully assumed the known risk that Beamreach might fail.

**D. Beamreach/NSC Fully Disclosed all the Risks to Plaintiffs, who are Accredited, Sophisticated Investors.**

"The general rule is that for persons to assume a risk, they must be aware of more than just the generalized risk of their activities; there must be proof they knew of and appreciated the specific hazard which caused the injury." *Shorter*, 103 Wn.2d at 657. Here, Plaintiffs knew of the specific hazard that caused their injury. In their response, Plaintiffs list bullet points about Beamreach that NSC knew or should have known had it supposedly done proper due diligence,

NATIONAL SECURITIES CORPORATION'S
REPLY IN SUPPORT OF ITS
MOTION TO DISMISS - 6 -
CASE NO. 2:18-CV-1773

BAKER & HOSTETLER LLP
999 Third Avenue, Suite 3600
Seattle, WA 98104-4040
Telephone: (206) 332-1380

which Plaintiffs were allegedly unaware of with regard to Beamreach. *Id.* But contrary to Plaintiffs' assertion, Beamreach/NSC *did* warn Plaintiffs about all the facts identified in the bullet points, as follows (emphases added):

| Plaintiff's Bullet Points | PPM Disclosures |
|---|---|
| Before engaging NSC to raise additional funds Beamreach burned through over $200 million in investor money without before [sic] having a viable product to sell. (Cmplt. ¶ 73). | "Since inception, [Beamreach] has been operating in 'start-up' mode developing its solar photovoltaic ("PV") technology and has generated substantial net losses." Ex. A at NSC000029. "[Beamreach's] product development effort is ongoing. While major technical milestones have been achieved and functional product prototypes demonstrated, several potential technological hurdles remain, and [Beamreach's] solar modules have only been tested to a limited extent in outdoor environments." Ex. A at NSC000035-37. Financial statements in the PPM identified a more than $200 million Total Stockholders' Deficit. Ex. B at NSC000484. |
| As of February 5, 2015, Beamreach only had a cash runway to continue operations through April 2016 (even with a fully subscribed offering). (Cmplt. ¶ 74). | "These additional funds [from the Series D offering] ($18.5 million in equity and $9.25 million in debt) are needed in order to execute on the Company's HVM (high volume manufacturing) scale-up plan and to extend its cash runway through approximately April 2016." Ex. A at 3 of 54. |
| Beamreach's valuation from the Series B round offered in 2008 dropped by more than 60% from $625 million to only $250 million for the Series D round. (Cmplt. ¶ 75). | "[Beamreach's] Series B Preferred Stock financing was completed in 2008 at a valuation of $625 million. The Company's Series C Preferred Stock Financing was completed at a valuation of $100 million…. While the Series D Preferred Stock valuation of $250 million is higher than the Series C Preferred Stock financing, it is still significantly lower than the Series B Preferred Stock Valuation." Ex. A at NSC000024. |

NATIONAL SECURITIES CORPORATION'S
REPLY IN SUPPORT OF ITS
MOTION TO DISMISS - 7 -
CASE NO. 2:18-CV-1773

BAKER & HOSTETLER LLP
999 Third Avenue, Suite 3600
Seattle, WA 98104-4040
Telephone:  (206) 332-1380

| Plaintiff's Bullet Points | PPM Disclosures |
|---|---|
| After burning through more than $200 million in investor funds, Beamreach was only able to secure a handful of <u>non-binding Memoranda of Understanding ("MOUs") with prospective customers that expired prior to the commencement of the NSC offering</u>. (Cmplt. ¶ 76). | "The Company signed <u>Memoranda of Understanding ("MOUs") with a number of prospective clients.  Most of these non-binding MOUs have expiration dates of December 31, 2014</u>, and the Company is currently in the process of extending them," noting that Beamreach "cannot guarantee that it will be able to secure or retain relationships with any of its targeted customers."  Ex. A at NSC000032 ¶9. |
| Beamreach had no actual customers. (Cmplt. ¶ 77). | "[Beamreach] is a development stage company and has a limited operating history in its current primary business, making it difficult to evaluate its present and future performance." "[Beamreach's] operations to date have consisted largely of product research and development."  Ex. A at NSC000029. |
| The market had little interest in a lightweight panel, and were too expensive compared to a commoditized silicon panel, which has a commercially proven reliability and <u>a better price point</u>. (Cmplt. ¶ 77). | "Technologies developed by [Beamreach's] direct competitors, including crystalline-silicon solar modules, thin-film solar modules, concentrating solar cells, solar thermal electric, and other solar technologies, <u>may provide power at lower costs than [Beamreach's] products</u>."  Ex. A at NSC000042. |
| <u>Asian</u> solar panel manufacturers drove industry <u>pricing below the cost of production</u>, causing many producers to shut plants or cease production entirely. (Cmplt. ¶ 78). | "The increase in the <u>global</u> supply of solar cells and modules, and increasing competition, <u>may cause substantial downward pressure on the prices of such products</u> and cause [Beamreach] to lose sales or market share, resulting in lower revenues, earnings, and cash flows than are currently projected." Ex. A at NSC000041. |
| <u>Sophisticated private equity funds and venture capitalists</u>, which have their own teams of professionals who vet companies like Beamreach prior to investing slowed their investment to a trickle prior to NSC selling to Plaintiffs. (Cmplt. ¶ 80). | "The Company cannot guarantee any further participation of any of its existing <u>institutional investors</u> in the Offering."  Ex. C at NSC000678. |

NATIONAL SECURITIES CORPORATION'S
REPLY IN SUPPORT OF ITS
MOTION TO DISMISS - 8 -
CASE NO. 2:18-CV-1773

BAKER & HOSTETLER LLP
999 Third Avenue, Suite 3600
Seattle, WA 98104-4040
Telephone:  (206) 332-1380

| Plaintiff's Bullet Points | PPM Disclosures |
|---|---|
| NSC was aware of the terms of the Opus Bank financing not disclosed in the PPM including: (a) Opus Bank had secured their debt financing with a blanket lien against <u>"substantially all" of Beamreach's domestic assets</u>; (b) If there was any bankruptcy or other change in control prior to the repayment of the loan, Opus Bank would have a senior secured claim on the assets; (c) Given that Beamreach's only real asset after all of their fundraising was their "valuable" intellectual property, the equity investors would have nothing left in the event of a default on this loan; (d) Beamreach owed <u>$1.2 million per month just to service debt</u>; and (e) By mid 2016, that debt service would jump to <u>$1.7 million</u> per month. (Cmplt. ¶ 85). This Opus Bank agreement caused the risk of a complete loss in the short term to far outweigh any potential long term reward. (Cmplt. ¶ 86). | "[Beamreach's] obligations under the [Opus Bank] credit agreement are secured by a lien against <u>substantially all of [Beamreach's] assets</u>." Ex. A at NSC000024. "As of September 1, 2016, Beamreach Solar's aggregate monthly expense under the Trinity Equipment Lease, the Essex Equipment Leases and the [Opus] Credit Agreement was approximately <u>$1.2 million</u>, and will remain around $1.2 million until November 2016 .... Unless the Credit Agreement is amended or refinanc[ed], starting in January 2017, the aggregate monthly expense under the Essex Equipment Leases and the Credit Agreement will increase to approximately <u>$1.9 million</u>, because of the end of the interest-only period on the Credit Agreement on December 31, 2016." Ex. B at NSC000409. |
| There was little commercial appetite for the IP that Beamreach had spent $250 million developing, and that the valuable IP portfolio was virtually worthless. (Cmplt. ¶ 89). | NSC disclosed two and a half pages detailing the risks related to Beamreach's technology, specifically noting that "[Beamreach's] product development effort is ongoing. While major technical milestones have been achieved and functional product prototypes demonstrated, several potential technological hurdles remain, and [Beamreach's] solar modules have only been tested to a limited extent in outdoor environments." Ex. A at NSC000035-37. |

NATIONAL SECURITIES CORPORATION'S
REPLY IN SUPPORT OF ITS
MOTION TO DISMISS - 9 -
CASE NO. 2:18-CV-1773

BAKER & HOSTETLER LLP
999 Third Avenue, Suite 3600
Seattle, WA 98104-4040
Telephone: (206) 332-1380

| Plaintiff's Bullet Points | PPM Disclosures |
|---|---|
| The October 2016 Fifth Amendment to the Opus Bank financing essentially placed a terminal date on Beamreach. Beamreach was effectively required to <u>replace or refinance the Opus Bank loan by March 2017</u> – within six months of the Fifth Amendment. Given their short cash runway, lack of revenue, lack of binding commercial contracts, virtually worthless IP, it would be virtually impossible for them to sell or refinance in such a short timeframe. (Cmplt. ¶97). | NSC attached the Fifth Amendment with the Supplemental PPM. Ex. C. NSC also disclosed: "Under the terms of the current agreement with Opus Bank, as amended by the Opus [Fifth] Amendment, the Company will effectively be required to <u>replace the outstanding Opus bank debt facility, raise significant additional equity or sell the Company on or before March 31, 2017</u>. If the Company is unable to find a new lender, raise such equity or complete a sale, <u>it may have to shut down</u>." Ex. C at NSC000678 (emphasis added). |
| Beamreach had retained bankruptcy counsel prior to the November 2016 offering. (Cmplt. ¶ 100). | NSC described that "[i]f the Company does not meet the additional funding deadlines imposed by Opus Bank, the Company will be in default of the Credit Agreement with Opus Bank, all capital previously invested in the Offering will be at risk and <u>the Company may be forced to pursue an immediately [sic] sale or wind down</u>." Ex. C at NSC000678 ¶4. |
| On October 19 and October 24, 2016, Beamreach paid its bankruptcy counsel, Pachulski Stang Ziehl & Jones, LLP, for services in connection with restructuring or bankruptcy of the company. (Cmplt. ¶ 101). | *See* above describing that Beamreach may be forced to pursue an immediate sale or wind down. |
| By November 2016, NSC knew that the company was in dire financial straits, and was being forced to sell the company or refinance the Opus loan by March 2017. Naturally, in conducting reasonable diligence on a company that clearly disclosed heavy short-term obstacles which concern the viability of a company as a going concern, a reasonably prudent brokerdealer in the same or similar circumstances would have inquired into whether or not Beamreach was contemplating bankruptcy in the short term, and if it had retained bankruptcy counsel. Upon information and belief, NSC made no such inquiry. (Cmplt. ¶ 102). | *See* above describing that Beamreach may be forced to pursue an immediate sale or wind down. |

NATIONAL SECURITIES CORPORATION'S
REPLY IN SUPPORT OF ITS
MOTION TO DISMISS - 10 -
CASE NO. 2:18-CV-1773

BAKER & HOSTETLER LLP
999 Third Avenue, Suite 3600
Seattle, WA 98104-4040
Telephone: (206) 332-1380

It is plain that the thrust of Plaintiffs' complaints about Beamreach were fully disclosed to them: Beamreach was a financially-distressed company that could be forced to shut down. While in hindsight it is easy for Plaintiffs to cherry-pick NSC's disclosures to make them appear more daunting and menacing and to characterize them as incomplete or palliative, the fact remains that at the time NSC disclosed all known risks inherent in the Beamreach investment and Plaintiffs chose to invest anyway. In fact, Plaintiffs' Complaint appears to be nothing more than a repackaging of the risks disclosed in the PPMs, which Plaintiffs now claim they did not know and use as the basis for this lawsuit. A motion to dismiss may be granted where the allegations in a complaint are contradicted by matters incorporated by reference or properly subject to judicial notice. *Casault v. Fed. Nat. Mortg. Ass'n,* 915 F. Supp. 2d 1113, 1120 (C.D. Cal. 2012), *aff'd sub nom. Casault v. One W. Bank FSB,* 658 F. App'x 872 (9th Cir. 2016) (citing *Daniels-Hall v. Nat'l educ. Ass'n,* 629 F.3d 992, 998 (9th Cir. 2010)); *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir.), opinion amended on denial of reh'g, 275 F.3d 1187 (9th Cir. 2001) ("The court need not … accept as true allegations that contradict matters properly subject to judicial notice or by exhibit.").

"[T]he required knowledge [for implied primary assumption of risk] is of a particular type of risk, not knowledge of every variable that might affect the likelihood or exact mechanism of harm." *Reed-Jennings v. Baseball Club of Seattle*, L.P., 188 Wn. App. 320, 333–34, 351 P.3d 887, 893 (2015). "[W]hen an investor has been warned of risks of a significance similar to that actually realized, [he] is sufficiently on notice of the danger of the investment to make an intelligent decision about it according to [his] own preferences for risk and reward." *Harris v. Ivax Corp.,* 182 F.3d 799, 807 (11th Cir. 1999). Although Plaintiffs argue that *Harris* should not apply to this case because it was a securities fraud case, unlike here, the premise stated above is equally applicable to an assumption of risk defense. *See* Pf. Resp. at 14; *Pellham v. Let's Go Tubing, Inc.,* 199 Wn. App. 399, 416–18, 398 P.3d 1205, 1216 (2017) (affirming dismissal based on implied primary assumption of risk where river-tubing company "warned [plaintiff injured in tubing

NATIONAL SECURITIES CORPORATION'S
REPLY IN SUPPORT OF ITS
MOTION TO DISMISS - 11 -
CASE NO. 2:18-CV-1773

BAKER & HOSTETLER LLP
999 Third Avenue, Suite 3600
Seattle, WA 98104-4040
Telephone:  (206) 332-1380

accident] of the inherent perils attended to tubing and those dangers that led to [plaintiff's] injuries."). Here, reasonable minds could not differ that the type of risk facing Plaintiffs (i.e. the collapse of Beamreach due to various risks factors) was fully described to Plaintiffs in the PPMs and that risk was actually realized. As such, Plaintiffs' claims are barred by implied primary assumption of risk.

### III. CONCLUSION

For the above-stated reasons, Plaintiffs' claims should be dismissed.

DATED this 22nd day of March, 2019.

Respectfully submitted,

**BAKER & HOSTETLER LLP**

*s/ Douglas W. Greene*
*s/ James R. Morrison*
Douglas W. Greene, WSBA #22844
James R. Morrison, WSBA #43043
999 Third Avenue, Suite 3600
Seattle, Washington 98104
Tel: (206) 332-1380
Fax: (206) 624-7317
Email: dgreene@bakerlaw.com
Email: jmorrison@bakerlaw.com

*s/ Daniel J. Buzzetta*
Daniel J. Buzzetta (*pro hac vice*)
45 Rockefeller Plaza
New York, NY 10111
Tel: (212) 589-4236
Fax: (212) 589-4201
Email: dbuzzetta@bakerlaw.com

*Attorneys for Defendant*
*National Securities Corporation*

NATIONAL SECURITIES CORPORATION'S
REPLY IN SUPPORT OF ITS
MOTION TO DISMISS - 12 -
CASE NO. 2:18-CV-1773

BAKER & HOSTETLER LLP
999 Third Avenue, Suite 3600
Seattle, WA 98104-4040
Telephone: (206) 332-1380

## CERTIFICATE OF SERVICE

I hereby certify that on March 22, 2019, I electronically filed the foregoing Defendant NATIONAL SECURITIES CORPORATION'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFFS' COMPLAINT with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

> David P. Neuman, WSBA #48176
> Israels Neuman PLC
> 10900 NE 8th Street, Suite 100
> PMB #155
> Bellevue, Washington 98004
> Tel: (206) 795-5798
> Email: dave@israelsneuman.com
>
> Alexander N. Loftus, *pro hac vice*
> Joseph Wojciechowski, *pro hac vice*
> Stoltmann Law Offices
> 233 S. Wacker, 84th Floor
> Chicago, IL 60606
> Tel: (312) 332-4200
> Email: alex@stoltlaw.com
> joe@stoltlaw.com
>
> *Attorneys for Plaintiffs*

                        *s/ Serita Smith*
                        Serita Smith
                        Assistant to James R. Morrison

NATIONAL SECURITIES CORPORATION'S
REPLY IN SUPPORT OF ITS
MOTION TO DISMISS - 13 -
CASE NO. 2:18-CV-1773

BAKER & HOSTETLER LLP
999 Third Avenue, Suite 3600
Seattle, WA 98104-4040
Telephone: (206) 332-1380