THE HONORABLE RICARDO S. MARTINEZ

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

JAMES GINZKEY, RICHARD FITZGERALD, CHARLES CERF, BARRY DONNER, and on behalf of the class members described below,

          Plaintiffs,

    v.

NATIONAL SECURITIES CORPORATION, a Washington Corporation,

          Defendant.

Case No.: 2:18-cv-01773-RSM

**DEFENDANT NATIONAL SECURITIES CORPORATION'S RESPONSE TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

ORAL ARGUMENT REQUESTED

DEFENDANT NATIONAL SECURITIES
CORPORATION'S RESPONSE TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
(Case No.: 2:18-CV-1773)

BAKER & HOSTETLER LLP
999 Third Avenue, Suite 3900
Seattle, WA 98104-4040
Telephone:  (206) 332-1380

## I.    INTRODUCTION

National Securities Corporation (NSC), a FINRA Registered brokerage firm, fully disclosed to Plaintiffs that they were investing in a high-risk investment in Beamreach (FKA Solexel).  Despite repeated, consistent, written warnings to this effect, Plaintiffs, who are all sophisticated accredited investors,[1] chose to invest in Beamreach in the hopes of obtaining high investment returns.  If the high-risk security had resulted in high profits, Plaintiffs would have "won."  Because the investment failed, however, Plaintiffs now allege that *none* of the Beamreach offerings were suitable for *any* investor, and demand an award of rescission so Plaintiffs can "win" anyway.  Under this "heads we win, tails you lose" proposition, Plaintiffs effectively want NSC to insure the profitability of their investments.

But Beamreach was not some sham company where no investor could possibly have wanted to take a risk on investing with hopes of high profits.  To the contrary, when NSC first offered the Beamreach securities, Beamreach (1) had previously raised $200 million in investor money on the promise of its solar panel technology; (2) had just raised $28 million through another placement agent in the same Series D Offering that NSC sold as its first; (3) had over 200 patents issued and pending; (4) had stable executive management that had little turnover during the four years before NSC started offering Beamreach securities; and (5) had continued development of an exciting new product that was intended to have significant improvements over traditional solar panels, generating considerable demand from customers who had signed memoranda of understanding and later master services agreements with potential customers totaling $100 million.  Plaintiffs' premise that not one investor (not even Bill Gates or another environmentally interested billionaire) would be suitable for investing in Beamreach is a results-driven theory viewed solely through the lens of hindsight.  Further emphasizing the many flaws in their claims, Plaintiffs simultaneously argue that NSC did not conduct proper due diligence while spending pages

---

[1] Indeed, many of these investors meet even higher qualified client or qualified purchaser standards under the Federal securities laws, and several have personal assets worth many millions of dollars.

DEFENDANT NATIONAL SECURITIES
CORPORATION'S RESPONSE TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
(Case No.: 2:18-CV-1773)

-1-

BAKER & HOSTETLER LLP
999 Third Avenue, Suite 3900
Seattle, WA 98104-4040
Telephone:  (206) 332-1380

1   detailing all of the adverse facts NSC knew about Beamreach (presumably through its due
2   diligence).  Certification Motion 8-11.

3        Notwithstanding Plaintiffs' faulty theory of the case, Plaintiffs' motion for class
4   certification should be denied for several reasons.  First, Plaintiffs' theory for class certification
5   requires generalized proof that the Beamreach securities were unsuitable per se, but Plaintiffs have
6   presented nothing other than evidence that Beamreach was a "risky" investment.  Suitability is an
7   inherently individualized analysis that ultimately must be done by NSC's individual brokers.
8   Thus, determining liability on a class basis would require analyzing the due diligence and
9   suitability determination of 27 brokers across five different states not capable of generalized
10  evidence.  Second, even if Plaintiffs could show that Beamreach was unsuitable per se, affirmative
11  defenses such as assumption of risk and contributory fault are highly individualized analyses
12  depending, *inter alia*, on what investors knew, their risk tolerance, what broker they worked with,
13  what they were told, and their own appreciation of Beamreach's risks.  Likewise, the class's
14  negligence damages would have to be a highly individualized determination of what would have
15  been a suitable investment for each investor.

16       Third, Plaintiffs seek certification of a nation-wide class based on state law negligence and
17  unjust enrichment claims.  But, Washington state law should not apply to this action because
18  Washington has no connection to this case other than fortuitously being where NSC's nominal
19  headquarters is located (but where none of its Beamreach brokers or due diligence team operated)
20  and where a small fraction of absent class members (not Plaintiffs) reside.  Because there were
21  investors in 41 different jurisdictions, there are potentially 41 different laws applicable to this
22  action that would separately need to be analyzed and potentially apply to this action.  Just doing
23  this conflicts of law analysis makes this class action unmanageable and defeats predominance and
24  superiority.  For these reasons, Plaintiffs have not shown predominance, superiority, commonality
25  or typicality so their class certification motion should be denied.

26
27

## II.     STATEMENT OF FACTS

NSC is a FINRA-registered brokerage firm. Troccoli[2] Decl. ¶3.  In early 2015, NSC began acting as a placement agent for Beamreach, a solar panel company.  Troccoli Decl. ¶3.  A placement agent's role is to assist a company in raising capital by introducing prospective investors to the company.  *Id.*  NSC made two private placement offerings on behalf of Beamreach.  *Id.*  First, NSC offered Series D preferred stock beginning around February 2015 ("Series D Offering"), which consisted of multiple closings with the last one occurring in April of 2016.  *Id.*  Then, beginning in October 2016, NSC offered a Series D-1 offering of preferred stock ("Series D-1 Offering"), which never closed and ultimately changed in November 2016 to a Series D-2 Offering of a six-month 9% convertible promissory note offering a 300% "principal step up" in the event of an acquisition (Series D-2 Offering") (collectively, the "Beamreach Offerings").  *Id.*

The Series D and D-1 Offerings were presented to investors in Private Placement Memoranda ("PPM").  Troccoli Decl. Exs. A, B.  The Series D-2 Offering was presented as a supplement to the Series D-1 Offering PPM (collectively, the PPMs and its supplements are identified as the "Beamreach PPMs").  *Id.* Ex. C.  Each Beamreach PPM contained extensive warnings to investors about the high-risk nature of investing in Beamreach and expressly described the Beamreach investments as having a "<u>high degree of risk</u>."  Troccoli Decl. Ex. A at NSC000022; Ex. B at NSC000384; Ex. C at NSC000676 (emphasis added).

The NSC Beamreach Offerings were only made to "a limited group of sophisticated 'accredited investors' within the meaning of Rule 501(a) under the Securities Act of 1933 as amended (the 'Securities Act'), in a private placement designed to be exempt from registration under the Securities Act, and other applicable securities laws."  Exs. A, at NSC000001; B at NSC000383; C at NSC000665.  "Accredited investors" means their individual net worth, or joint net worth with that person's spouse, exceeds $1,000,000 or they have an annual income exceeding

---

[2] NSC Director of Technology Investment Banking Carmelo Troccoli.

DEFENDANT NATIONAL SECURITIES
CORPORATION'S RESPONSE TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
(Case No.: 2:18-CV-1773)

-3-

BAKER & HOSTETLER LLP
999 Third Avenue, Suite 3900
Seattle, WA 98104-4040
Telephone:  (206) 332-1380

$200,000 in each of the two most recent years or joint income with their spouse during those years in excess of $300,000.  17 C.F.R. §230.501(a)(5), (6); Fotouhi Report[3] at 4-7.

Accordingly, Plaintiffs were all high net worth, experienced investors.  Each investor had a different risk profile that they provided to NSC.  *See* Morrison Decl. Exs. 2, 4, 5, 7, 8, 10, 11.  Plaintiff Cerf testified that he had "extensive investment experience" and he understood and appreciated that Beamreach was a high-risk investment.  Cerf Dep.[4] 34:11-14;40:24-41:2. Cerf further testified: "I tolerate a lot of risk … [b]ecause I – I have a lot of money, and so I'm willing to venture a small percentage of it in risky investments in the hope of a high reward."  Cerf Dep. 27:3-9.

**A. Beamreach investors resided in 41 jurisdictions and worked with 27 NSC brokers located in five states.**

Beamreach investors through NSC resided in 39 states, Washington, D.C., and Switzerland.  Troccoli Decl. ¶9.  Investments made for the NSC offerings ranged from approximately $12,000 to $5,000,000 from institutional, corporate, and retail investors.  *Id*. ¶10.  None of the Plaintiffs are Washington residents.  To the contrary, Plaintiff Ginzkey resides in Illinois, Cerf resides in Washington, D.C., Fitzgerald resides in Nebraska, and Donner resides in California.  *See* Complaint ¶10.  Each Plaintiff primarily worked with different NSC brokers.  *See* Ginzkey Dep.[5] 18:7-20:7; Fitzgerald[6] Dep. 22:22-23:6; Cerf Dep. 12:5-13;  Donner Dep.[7] 9:7-10:4.  Some Plaintiffs met with their brokers in person at their resident state (Donner), while others did not (Cerf, Ginzkey).  Donner Dep. 9:7-10:4; Cerf Dep. 37:11-14; Ginzkey Dep. 32:15-19.

At the firm-level, NSC conducted due diligence on Beamreach in New York and California.  Troccoli Decl. ¶10.  Twenty-seven individual NSC brokers solicited investors for the Beamreach offerings.  *Id*.  Those brokers were located in Connecticut, Illinois, New York, New

---

[3] The "Fotouhi Report" is attached as Exhibit A to the Declaration of Kamran Fotouhi, NSC's suitability expert.
[4] Excerpts from the deposition of Charles Cerf are attached as Exhibit 6 to the Declaration of James R. Morrison.
[5] Excerpts from the deposition of James Ginzkey are attached as Exhibit 1 to the Declaration of James R. Morrison.
[6] Excerpts from the deposition of Richard Fitzgerald are attached as Exhibit 3 to the Declaration of James R. Morrison.
[7] [7] Excerpts from the deposition of Barry Donner are attached as Exhibit 9 to the Declaration of James R. Morrison.

DEFENDANT NATIONAL SECURITIES
CORPORATION'S RESPONSE TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
(Case No.: 2:18-CV-1773)                    -4-                    BAKER & HOSTETLER LLP
999 Third Avenue, Suite 3900
Seattle, WA 98104-4040
Telephone:  (206) 332-1380

1    Jersey, and California.  *Id.*  None of NSC's brokers who offered Beamreach securities were located

2    in Washington state and none of the Beamreach due diligence occurred in Washington state.  *Id.*

3        NSC is nominally headquartered in Washington state, meaning that its Washington

4    headquarters is mainly an administrative office.  *Id.* ¶11.  However, major policy decisions are

5    generally done through NSC's New York office.  *Id.*

6    **B. Suitability determinations are ultimately done by NSC's individual brokers, not firm-
         wide, before investments are sold to customers.**

7        FINRA regulates brokers and brokerage firms.  FINRA's suitability rule 2111.05 has three

8    components.  Fotouhi Report at 3-4.  First, a broker must have a reasonable basis to believe, based

9    on reasonable diligence, that the recommendation is suitable for at least some investors (reasonable

10    basis suitability).  *Id.*  Second, customer-specific suitability requires that a broker, based on a

11    particular customer's investment profile, has a reasonable basis to believe that the recommendation

12    is suitable for that customer.  *Id.*  Third, quantitative suitability requires that a broker's series of

13    recommended transactions are not excessive and unsuitable for the customer together in light of

14    the customer's investment profile.  *Id.*

15        In accordance with its own policies and FINRA suitability rule 2111.05, NSC performs

16    due diligence and makes a firmwide-level suitability determination for each investment to

17    determine whether it is suitable to be sold to any investor before NSC's individual brokers may

18    offer it for sale.  Troccoli Decl. ¶5, Ex. D.  However, FINRA suitability rule 2111.05 applies not

19    just to NSC as a whole, but to its individual brokers.  *See* Fotouhi Report 5-6.  Accordingly, while

20    NSC provides its brokers with the results of its firm-level due diligence and suitability

21    determination, no securities actually are sold to customers based solely on the firm-level due

22    diligence.  Troccoli Decl. ¶5, Ex. D.  Rather, each broker must make his or her own suitability

23    determination based on his or her own reasonable due diligence.  *Id.*; *see also* Troccoli Dep. 15:21-

24    16:11.

DEFENDANT NATIONAL SECURITIES                                      -5-
CORPORATION'S RESPONSE TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
(Case No.: 2:18-CV-1773)

BAKER & HOSTETLER LLP
999 Third Avenue, Suite 3900
Seattle, WA 98104-4040
Telephone:  (206) 332-1380

Individual NSC brokers did not just rely on the firmwide due diligence when making their own suitability decisions for Beamreach.  *See* Troccoli Dep. 108:19-111:1[8]; Troccoli Decl. ¶5. For example, one broker visited Beamreach's pilot plant in California separate from the firmwide due diligence while another NSC broker chose not to offer the Series D-2 Offering.  *Id.*

**C. Beamreach was a promising company at the time of the Series D Offering.**

When NSC made the Series D Offering in early 2015, Beamreach was not a distressed company.  Troccoli Dep. 129:20-131:7.  Beamreach had promising solar technology being developed, with more than 200 patents issued or pending.  Troccoli Decl. ¶7.  Beamreach's product was a new type of solar panel that was to have substantial improvements over conventional solar technology.  *Id.*  By the time NSC began offering its securities, Beamreach already had raised over $200 million on the promise of that technology.  *Id.*  Like many developing companies, Beamreach was reliant on investor money to fund its operations and product development.  *Id.*  Beamreach had stable executive management, with no significant turnover over the previous four years. *Id.* Furthermore, just before NSC began offering the Series D, Beamreach had $25 million in cash reserves.  Troccoli Dep. 101:21-102:4.

NSC was not the only placement agent for Beamreach's Series D Offering.  Troccoli Dep. 142:25-143:12.  Indeed, prior to NSC being retained as a placement agent, Beamreach already had raised $28 million in the same Series D Offering.  *Id.*

    *i.    NSC conducted substantial due diligence for the Series D Offering.*

NSC conducted substantial due diligence on Beamreach prior to offering the Series D.  This diligence was conducted in California and New York and included but was not limited to (1) site-visits to a Beamreach pilot plant in 2014 and 2015; (2) reviewing Beamreach's memoranda of understanding with customers, lease documentation, lending documentation, audited financial statements, bank statements, projections, current cash, and intellectual property filings; (3) direct conversations with Beamreach's lender Opus Bank, which had itself done substantial diligence on

---

[8] Excerpts of the September 16, 2020 deposition of Carmelo Troccoli are attached as Exhibit H to Troccoli's declaration.

DEFENDANT NATIONAL SECURITIES
CORPORATION'S RESPONSE TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
(Case No.: 2:18-CV-1773)

-6-

BAKER & HOSTETLER LLP
999 Third Avenue, Suite 3900
Seattle, WA 98104-4040
Telephone: (206) 332-1380

1    Beamreach including contacting Beamreach's potential customers; (4) hiring Dr. Tom Surek, an

2    independent engineer, to re-opine on the feasibility of Beamreach's technologies and operations;

3    (5) conversations with in-house intellectual property counsel about Beamreach's technology; and

4    (6) meetings with Beamreach's CEO, CFO, and CPO.  Troccoli Dep. 107:10-119:15, 128:17-25.

5          NSC's due diligence is ongoing throughout the placement.  Troccoli Dep. 84:19-85:2.

6    Thus, NSC became a Beamreach board observer after starting the Series D Offering and continued

7    to monitor Beamreach's operations.  Troccoli Dep. 168:25-169:12.

8          ii.      *The Series D PPM contained substantial risk disclosures.*

9          Plaintiffs allege that NSC did not do proper due diligence on Beamreach picking certain

10   details NSC did not know or individual entities that NSC did not contact.  In fact, NSC was well

11   aware of the overall condition of Beamreach and that it was a high-risk investment at the time of

12   the Series D Offering.  Troccoli Decl. ¶8; *see also* Fotouhi Report at 6-7.  Simply because an

13   investment is high risk does not make it an unsuitable investment under FINRA's rules as higher

14   risk securities are offered and sold daily with higher risk premiums.  *See* Fotouhi Report at 6.

15         While Beamreach had promising technology, it had a high debt load and had not yet

16   brought its product to market.  Troccoli Decl. ¶8.  These risks were known to NSC and clearly

17   disclosed to investors in the PPM.  *Id.*  The Series D Offering PPM included 23 pages of "Risk

18   Factors," detailing the state of Beamreach's business.  *See* Troccoli Decl. Ex. A at NSC000022-

19   45.  These risk factors were robust and disclosed, *inter alia*, the following facts about Beamreach:

20   (1) Beamreach is a developing-stage company whose operations have largely consisted of research

21   and development; (2) Beamreach leased most or all of its equipment; (3) increased competition

22   might cause substantial downward pressure; (4) substantially all of Beamreach's assets were

23   secured by the Opus Bank loan; (5) Beamreach faced risks related to its technology; (6)

24   Beamreach's valuation had dropped from $625 million to $250 million; (7) fundraising had been

25   difficult for Beamreach; and (8) Beamreach had never generated revenues and did not expect to

26   generate significant revenue until the fourth quarter of 2016.  *Id.*  Finally, Beamreach's financial

27

condition at the time of the Series D Offering, including its debt-load, was well described in audited financial statements and balance sheets provided in the PPM.  *Id.* at NSC000063, NSC000064, NSC000091-116.

       *iii.*      *Corporate, institutional, and retail investors invested in the Series D Offering.*

Despite the many warnings, institutional, corporate and retail investors chose to invest $28 million in the Beamreach Series D Offering through NSC.  Troccoli Dep. 101:21-102:14.  The Series D Offering was led by an investment from GAF,[9] North America's largest roofing manufacturer.  Troccoli Dep. 7:17-8:2.  Other major investors in the Series D Offering were Kleiner Perkins (described by the New York Times as "perhaps Silicon Valley's most famous venture firm"[10] and by the Wall Street Journal as one of the "largest and most established" venture capital firms),[11] and DAG (a private equity firm that backed such successful ventures such as Yelp, Glassdoor, Grubhub, Nextdoor, and WeWork).[12]  Troccoli Dep. 142:25-143:12.  One investment firm invested $5,000,000 in the Series D Beamreach Offering by NSC.  Troccoli Dep. 102:15-22. The NSC Series D Offering ran from February 2015 through April 2016.  Troccoli Decl. ¶8. Plaintiffs Fitzgerald, Cerf, and Donner chose to invest in the Beamreach Series D Offering. Complaint ¶118-123.  Each investor, including Plaintiffs Fitzgerald, Cerf, and Donner, acknowledged that they received the PPM and had the opportunity to review the risks disclosures. *See* Morrison Decl. Ex. 4 at 15, Ex. 7 at 15, Ex. 10 at 15.

In total, NSC's Series D Offering had 359 investors.  Troccoli Decl. ¶10. Of those 359 investors, only nine were Washington residents.  *Id.*

**D. The Series D-1 Offering never closed and was converted to the Series D-2 Offering.**

It was known to NSC and disclosed to investors that Beamreach was going to require more investor money to fund its operations following the Series D Offering.  Troccoli Decl. ¶8.

---

[9] https://www.gaf.com/en-us/about-us.
[10] https://www.nytimes.com/2005/07/13/business/colin-powell-joins-venture-capital-firm.html.
[11] https://www.wsj.com/articles/BL-VCDB-4755.
[12] https://www.linkedin.com/company/dag-ventures/about/.

DEFENDANT NATIONAL SECURITIES
CORPORATION'S RESPONSE TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
(Case No.: 2:18-CV-1773)

-8-

BAKER & HOSTETLER LLP
999 Third Avenue, Suite 3900
Seattle, WA 98104-4040
Telephone:  (206) 332-1380

Accordingly, in October 2016, Beamreach began offering a Series D-1 to investors.  Troccoli Decl. ¶3

While Beamreach was having struggles at the time of the D-1, there was still hope the company could have a successful result for investors.  *See* Troccoli Dep. 212:14-213:11. Beamreach officially launched its product at two industry meetings in Munich and San Francisco around July 2016.  Troccoli Dep. 185:21-186:11.  At that time, Beamreach had $100 million in signed Master Services Agreements with customers.  Troccoli Dep. 188:24-190:1.  However, Beamreach was running out of money.  Troccoli Dep. 211:17-212:8.  Given this demand for Beamreach's product, there was hope that additional investor money could save the company and, in the interim, Beamreach could start looking for a potential sale of the company and/or its intellectual property.  *See* Troccoli Dep. 212:14-213:11.

However, the solar market shifted around the time of the Series D-1 Offering.  Troccoli Dep. 187:6-188:14.  As such, Beamreach had a difficult time raising funds under the Series D-1 Offering.  *Id.*  Investors placed money into escrow for the D-1 but Beamreach was not able to meet its minimum raise to close on the D-1.  *Id.*  Accordingly, the D-1 was converted to a six-month D-2 nine percent interest Convertible Promissory Note, which featured a 300 percent premium if the company was sold.  *See id.*; Troccoli Decl. ¶3.  Investors were given the option to withdraw their money if they were not interested in the D-2 Offering.  Troccoli Dep. 187:6-188:14.

       i.    *NSC conducted substantial due diligence for the D-1/D-2 Offering.*

For the D-1 and D-2 Offerings, NSC conducted substantial due diligence on top of the diligence already done for the Series D Offering.  Specifically, NSC (1) attended the official launch of Beamreach's product in San Francisco in or around July 2016; (2) reviewed financials and internal audit controls; (3) evaluated Beamreach's credit history and credit worthiness, including a balance sheet review (4) reviewed management expertise; (5) performed its own assessment of price points, price analyses, and understanding of where Beamreach's price points were in comparison to other viable products; (6) observed board meetings; (7) had weekly discussions with

DEFENDANT NATIONAL SECURITIES
CORPORATION'S RESPONSE TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
(Case No.: 2:18-CV-1773)

-9-

BAKER & HOSTETLER LLP
999 Third Avenue, Suite 3900
Seattle, WA 98104-4040
Telephone:  (206) 332-1380

Beamreach management; and (8) had discussions with Opus Bank and Beamreach's equipment lessor Essex.  Troccoli Dep. 200:4-205:12.

ii.    *Risks of investing in the Series D-2 were thoroughly disclosed to investors.*

As with the Series D PPM, the Series D-1 PPM and its Supplemental Series D-2 PPM disclosed substantial risks of investing in Beamreach.  The Series D-1 PPM details many of the same risks as the Series D PPM: (1) Beamreach leased most or all of its equipment; (2) there was a deteriorating marketplace for solar technology; (3) substantially all of Beamreach's assets were secured by the Opus Bank loan; (4) Beamreach was a developing-stage company whose operations have largely consisted of research and development; (5) Beamreach faced risks related to its technology; and (6) Beamreach's valuation had dropped from $625 million to $250 million. Troccoli Decl. Ex. B at NSC000408 ¶4; NSC000409 ¶5, ¶6; NSC000415 ¶3; NSC000424-427. Beamreach's financial condition at the time of the Series D-1 Offering was well described in detailed financial statements and balance sheets provided in the PPM.  Troccoli Decl. Ex. B at NSC000450-451, NSC000505, NSC000477-503.

On November 14, 2016, NSC issued the Supplement to its Series D-1 Offering PPM detailing the change in the investment.  Troccoli Decl. Ex. C.  This Series D-2 PPM disclosed that the revised offering was made because of "delays in completion of the initial closing of the [Series D-1] Offering, reduced cash runway, developments at the Company, developments in the solar market and discussions with prospective participants in the Offering."  *Id.* at NSC000664.  The Series D-2 PPM Supplement detailed that the Company's primary plan was the sale of the Company.  *Id.*

As with the prior two PPMS, many of the deteriorating problems at Beamreach were disclosed in over five pages of new Risk Factors.  The PPM made clear that Beamreach may have to shut down due to its agreement with its lender: "Under the terms of the current agreement with Opus Bank, as amended by the Opus [Fifth] Amendment, the Company will effectively be required to replace the outstanding Opus bank debt facility, raise significant additional equity or sell the

DEFENDANT NATIONAL SECURITIES
CORPORATION'S RESPONSE TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
(Case No.: 2:18-CV-1773)

-10-

BAKER & HOSTETLER LLP
999 Third Avenue, Suite 3900
Seattle, WA 98104-4040
Telephone:  (206) 332-1380

Company on or before March 31, 2017.  If the Company is unable to find a new lender, raise such equity or complete a sale, <u>it may have to shut down</u>."  Troccoli Decl. Ex. C at NSC000678 (emphasis added). The PPM further described that "If the Company does not meet the additional funding deadlines imposed by Opus Bank, the Company will be in default of the Credit Agreement with Opus Bank, all capital previously invested in the Offering will be at risk and the Company may be forced to pursue an immediately [sic] sale or wind down." *Id.* at NSC000678 ¶4.

Despite these many warnings, Plaintiff Barry Donner placed money into escrow for the D-1 Offering (which never closed and ultimately changed to the D-2 Offering).  Complaint ¶123.  Plaintiffs Ginzkey also ultimately invested in the Series D-2 Offering.  Complaint ¶112.

In total, NSC's Series D-2 Offering had 118 investors.  Troccoli Decl. ¶9.  Only 7 of those 118 investors were from Washington state, most of whom had previously invested in the Series D Offering.  *Id.*

### E.  Beamreach failed and plaintiffs and other investors filed claims against NSC.

Facing a mounting debt load and cash shortage, Beamreach filed for Chapter 7 bankruptcy on February 9, 2017.  Complaint ¶47.  Plaintiffs then filed suit on December 10, 2018, on behalf of themselves and a putative class.  Plaintiffs seek to represent the following defined class:

> **Beamreach Class**
> All persons who invested in Beamreach Offerings … through the Defendant, at any time between February 6, 2015 and February 9, 2017 inclusive (the "Class Period")

Certification Motion at 2.

Plaintiffs also seek to represent three subclasses, consisting of Series D, Series D-1, and Series D-2 investors respectively. *Id.* at 3.

Relying on FINRA rules, Plaintiffs claim that NSC was negligent by (1) not conducting adequate due diligence on Beamreach; and (2) failing to understand the risks and rewards of the Beamreach offerings or consciously ignoring the risks presented by those red flags.  Complaint p. 29-34.  Plaintiffs also have made a claim for unjust enrichment.  *Id.* at 35.

DEFENDANT NATIONAL SECURITIES
CORPORATION'S RESPONSE TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
(Case No.: 2:18-CV-1773)

-11-

BAKER & HOSTETLER LLP
999 Third Avenue, Suite 3900
Seattle, WA 98104-4040
Telephone:  (206) 332-1380

Five other investors have filed three separate FINRA arbitrations against NSC about its Beamreach offerings.  Troccoli Decl. ¶12.

### III.     ARGUMENT

#### A. Rule 23 Standard.

Rule 23 is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700-01 (1979)).  Plaintiffs seeking to certify a class must "affirmatively demonstrate" compliance with each of the Rule 23(a) requirements and at least one provision of Rule 23(b). *Comcast Corp.*, 569 U.S. at 33 (citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)); *see also Smith v. First Am. Title Ins. Co.*, C11-2173-TSZ, 2014 WL 2511621, at *2 (W.D. Wash. June 4, 2014) ("The prerequisites of Rule 23 are not mere pleading standards, but rather are evidentiary thresholds . . . .").  This analysis is "rigorous" and may "entail some overlap with the merits of the plaintiff's underlying claim." *Dukes*, 564 U.S. at 351.

Courts analyze requests to certify a class under Rule 23 using a two-part test, beginning with Rule 23(a)'s requirements and continuing with Rule 23(b)'s requirements if the Plaintiff establishes compliance with Rule 23(a).  Hence, a party seeking certification must first establish the four prerequisites of Rule 23(a), which require proof that: (1) the class is so numerous that joinder of all members is impracticable; (2) questions of law or fact common to the class exist; (3) the representative's claims are typical of the claims of the class; and (4) the representative will "fairly and adequately" protect the interests of the class. Fed. R. Civ. P. 23(a).

If a party seeking class certification can establish all of Rule 23(a)'s requirements, courts then determine whether the party can satisfy at least one of Rule 23(b)'s requirements. *Comcast*, 569 U.S. at 33.  Here, Plaintiffs seek to certify a class under only Rule 23(b)(3) for damages classes. *See* Certification Motion at 20.  Courts may certify a class under Rule 23(b)(3) only where the Plaintiff proves that common questions of law or fact predominate over individualized issues and that a class action is the superior method for "fairly and efficiently adjudicating the

DEFENDANT NATIONAL SECURITIES
CORPORATION'S RESPONSE TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
(Case No.: 2:18-CV-1773)

-12-

BAKER & HOSTETLER LLP
999 Third Avenue, Suite 3900
Seattle, WA 98104-4040
Telephone:  (206) 332-1380

controversy."  Courts should deny certification unless they are fully satisfied that Rules 23(a) and (b)'s requirements are met. *See Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982) (requiring "actual, not presumed, conformance" with Rule 23's requirements).  Plaintiffs here cannot satisfy predominance, superiority, commonality, and typicality for the nationwide class and subclasses.

**B. The Court should deny class certification because Plaintiffs cannot satisfy Rule 23(b)(3)'s predominance requirement.[13]**

Rule 23(b)(3)'s predominance inquiry is "far more demanding" than Rule 23(a)'s commonality requirement. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 624, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). "[A] court has a 'duty to take a close look at whether common questions predominate over individual ones,' and ensure that individual questions do not 'overwhelm questions common to the class.' " *Comcast Corp.*, 569 U.S. at 34). "The main concern of the predominance inquiry under Rule 23(b)(3) is 'the balance between individual and common issues.' " *Wang v. Chinese Daily News, Inc.*, 737 F.3d 538, 545–46 (9th Cir. 2013) (*quoting In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 571 F.3d 953, 959 (9th Cir. 2009)).  "[I]f the main issues in a case require the separate adjudication of each class member's individual claim or defense, a Rule 23(b)(3) action would be inappropriate." *Zinser v. Accufix Research Inst., Inc.,* 253 F.3d 1180, 1189 (9th Cir.), *opinion amended on denial of reh'g,* 273 F.3d 1266 (9th Cir. 2001) (emphasis added) (quoting 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1778 at 535-39 (2d ed. 1986)).

i.    *Predominance is not met because suitability is a highly individualized inquiry, even for the product-level.*

Plaintiffs argue that predominance is satisfied because the central focus of this litigation is NSC's due diligence of Beamreach, and subsequent approval of Beamreach for sale to its

---

[13] Although the Court need not address predominance and superiority until it is satisfied that the Rule 23(a) factors are met, NSC presents the 23(b)(3) factors first because of the many significant predominance and superiority issues that preclude a class from being certified here.

DEFENDANT NATIONAL SECURITIES
CORPORATION'S RESPONSE TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
(Case No.: 2:18-CV-1773)

-13-

BAKER & HOSTETLER LLP
999 Third Avenue, Suite 3900
Seattle, WA 98104-4040
Telephone:  (206) 332-1380

customers.  Certification Motion at 22.  But this is a substantial over-simplification of how due diligence actually works at NSC and how FINRA's rules apply.

First, NSC's firm-wide due diligence and suitability determinations are only one part of the analysis for NSC.  FINRA Rule 2111 and NSC's own policies require that NSC's individual brokers conduct their own due diligence and make their own "reasonable basis" suitability determination before a product can be recommended to an investor.  Troccoli Decl. ¶5, Ex. D; Fotouhi Report. 3-6.  Thus, no class member purchases Beamreach securities based solely on NSC's firm-wide due diligence and suitability determination.  As such, to adjudicate this matter as a class action, there would need to be an analysis of what each of the 27 individual NSC brokers who sold to different investors did for due diligence and how they made their suitability determinations about Beamreach.

Second, Plaintiffs' claims fail if the Beamreach investment was suitable for even one investor.  *Fernandez v. UBS AG,* No. 15-CV-2859 (SHS), 2018 WL 4440498, at *13 (S.D.N.Y. Sept. 17, 2018).  This is an individualized issue that would require analyzing all of the investors in Beamreach (even those who had invested the $200 million before NSC was retained) and determining whether the Beamreach investment was suitable for *any* of them.

The Southern District of New York refused to certify a class where a plaintiff similarly attempted to have a class certified by stating that an investment was unsuitable per se.  *Fernandez*, 2018 WL 4440498 at *15.  In *Fernandez*, the plaintiffs argued that a mutual fund of Puerto Rico assets allegedly recommended by defendant UBS was unsuitable per se.  *Id.*  The court, however, held that plaintiffs had not presented any generalized proof that the investment could be unsuitable per se.  *Id.*  In particular, the Court noted that while the plaintiffs had generalized proof that individuals within UBS had concerns about the riskiness of the funds and recommended them anyway, the plaintiffs' experts admitted that even "'riskier investments … make sense,' as long as 'there is a commensurate expectation of greater returns'" and that "Even a so called 'junk' (high yield) bond, for example, can be a rational investment because investors are compensated for

DEFENDANT NATIONAL SECURITIES
CORPORATION'S RESPONSE TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
(Case No.: 2:18-CV-1773)

-14-

BAKER & HOSTETLER LLP
999 Third Avenue, Suite 3900
Seattle, WA 98104-4040
Telephone:  (206) 332-1380

taking greater risk by a higher expected return."  *Id.* at *15-16.  Similarly, all that Plaintiffs'

evidence here shows is that Beamreach was a high risk investment (as disclosed to Plaintiffs), not

that it was unsuitable for even a single investor.  *See* Fotouhi Report at 6 ("Higher risk securities

are offered and sold daily with higher risk premiums").

       ii.     *Predominance is not met because affirmative defenses and damages are individualized inquiries.*

The *Fernandez* court also refused to certify a class because the individualized issues of

affirmative defenses and damages predominated over common issues, as they do here.  *Fernandez*,

2018 WL 4440498 at *20-22.  For example, NSC has asserted assumption of risk and comparative

fault as defenses.  Answer (Dkt. 31) at 19 ¶5, 6.  These are highly individualized defenses that will

depend on what each investor knew, what they were told by their broker, what independent

research they had done, what they individually knew about Beamreach or the solar market, their

risk tolerance, their investing history, whether they appreciated the risks of investing in Beamreach

(including the substantial risk disclosures contained in the PPMs), among other factors.  Indeed,

some of the class members were corporate and institutional investors who are more likely than

retail investors to conduct their own due diligence before investing.  Accordingly, the defenses

here will be highly individualized.

Furthermore, the damages in this action are highly individualized.  While Plaintiffs attempt

to avoid the individualized inquiry by focusing on whether Beamreach was unsuitable per se, even

if they could present such evidence, each class member's damages would have to be individualized

based on a suitable investment for each class member.  As the *Fernandez* court recognized when

denying certification of a similar class, "to the extent the Funds were *not* actually suitable for

members of the proposed class, plaintiffs' model does not attempt to measure … what clients

would have received if UBS had performed a suitability analysis and recommended a suitable

investment."  *Fernandez*, 2018 WL 4440498 at *22.  "[A] suitability analysis requires

consideration of many client-specific factors including, without limitation, the client's age, assets,

DEFENDANT NATIONAL SECURITIES
CORPORATION'S RESPONSE TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
(Case No.: 2:18-CV-1773)

-15-

BAKER & HOSTETLER LLP
999 Third Avenue, Suite 3900
Seattle, WA 98104-4040
Telephone:  (206) 332-1380

tax status, annual income, net worth, investment objectives, risk tolerance, liquidity needs, investment time horizon, and concentration of investments – all as of the date of the recommendation." *Id.* Here, Plaintiffs have presented no model for how to measure the class' damages that would avoid this individualized mini-trial on what a suitable investment would be for each class member as a measure of their damages.

> *iii. Individual issues predominate because potentially 41 jurisdictions' laws apply to the class's claims.*

"Courts routinely deny class certification where the laws of multiple states must be applied...." *Grayson v. 7–Eleven, Inc.*, No. 09–cv–1353, 2011 WL 2414378, at *3 (S.D. Cal. June 10, 2011) (decertifying class due to difficulty in applying varying state conversion laws). "[W]here the applicable law derives from the law of the 50 states, as opposed to a unitary federal cause of action, differences in state law will 'compound the [ ] disparities' among class members from the different states." *Id.* (*quoting Chin v. Chrysler Corp.*, 182 F.R.D. 448, 453 (D.N.J.1998) (*quoting Amchem Prods., Inc.*, 521 U.S. at 624). A party seeking certification of a nationwide class for which the law of several states potentially applies bears the burden of demonstrating "a suitable and realistic plan for trial of the class claims." *Zinser*, 253 F.3d at 1189 (quoting *Chin*, 182 F.R.D. at 454); *see also Valentino*, 97 F.3d at 1234 (district court abused its discretion certifying class because plaintiffs did not show how class trial could be conducted); *Am. Med. Sys.*, 75 F.3d at 1085 (when more than a few state laws differ, court would be faced with impossible task of instructing jury on relevant law). Because there are 41 jurisdictions with potential interests in this litigation, predominance is not satisfied.

> (a)  <u>Washington law cannot constitutionally apply to all class members' claims</u>.

Washington's law cannot apply simply because it is the forum state in this nationwide class action. Rather, to satisfy constitutional due process, Washington state must have a "significant contact or significant aggregation of contacts" to the claims asserted by *each* member of the plaintiff class, contacts "creating state interests," in order to ensure that the choice of [Washington]

DEFENDANT NATIONAL SECURITIES
CORPORATION'S RESPONSE TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
(Case No.: 2:18-CV-1773)

-16-

BAKER & HOSTETLER LLP
999 Third Avenue, Suite 3900
Seattle, WA 98104-4040
Telephone:  (206) 332-1380

law is not arbitrary or unfair." *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 821–22, 105 S. Ct. 2965, 2979, 86 L. Ed. 2d 628 (1985)(emphasis added).

Washington has no connection to this action other than the fact that NSC's nominal headquarters are located here (but not any of their employees who were primarily involved in the Beamreach offering) and ten absent class members reside here (not the Plaintiffs). For the claims asserted just by the four Plaintiffs , their claims have no relationship to Washington state other than the fortuitous fact that NSC's nominal headquarters are here. *Maniscalco v. Brother Int'l (USA) Corp.*, 709 F.3d 202, 208 (3d Cir. 2013) (declining to apply forum state New Jersey's laws where "Nothing else about the relationship between the parties other than the fortuitous location of [the defendant's] headquarters, took place in the state of New Jersey."). NSC's nominal headquarters could have been in any state besides Washington and it would have had no bearing on Plaintiffs' transactions. Accordingly, there is not significant contact or aggregation of contacts to each member of the class as would be required to satisfy constitutional due process.

> (b)      There is a conflict of laws between Washington and other jurisdictions.

Even if applying the forum state's law is constitutionally permitted, the Court still must conduct a conflicts of law analysis to determine what law applies to class members' claims. *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 590 (9th Cir. 2012) (recognizing that constitutional contacts were met but declining to apply a single law to all nationwide class members when applying state conflicts of law test). A federal court sitting in diversity must look to the forum state's choice of law rules to determine the controlling substantive law. *Zinser*, 253 F.3d at 1187.

As a preliminary matter, when choice of law is disputed under Washington law, there must be an actual conflict between the laws or interests of Washington and the laws or interests of another state before the court will engage in a conflict of laws analysis. *FutureSelect Portfolio Mgmt., Inc. v. Tremont Grp. Holdings, Inc*., 180 Wn.2d 954, 967, 331 P.3d 29, 36 (2014). Here, Plaintiffs' only claims are for state law negligence and unjust enrichment. But there are substantial difference between states negligence and unjust enrichment laws. *See Haley v. Medtronic, Inc.*,

DEFENDANT NATIONAL SECURITIES
CORPORATION'S RESPONSE TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
(Case No.: 2:18-CV-1773)

-17-

BAKER & HOSTETLER LLP
999 Third Avenue, Suite 3900
Seattle, WA 98104-4040
Telephone:  (206) 332-1380

169 F.R.D. 643, 653 (C.D.Cal.1996) ("[N]o matter how similar—or comparable—each state's law on negligence may be, it is clear—despite plaintiffs' argument—that the negligence laws of the fifty states have some differences."); *Bresson v. Thomson McKinnon Sec. Inc.,* 118 F.R.D. 339, 344 (S.D.N.Y.1988) ("The state laws governing [negligence] claims do vary significantly" and "are therefore unsuited to class treatment."); *Thompson v. Bayer Corp.,* No. 4:07CV00017 JMM, 2009 WL 362982, at *3–4 (E.D. Ark. Feb. 12, 2009) (analyzing the "significant" differences between states in unjust enrichment law, including disparate burdens of proof, different remedies, and some states barring these claims when there is an adequate remedy at law).

These significant differences in the laws of interested states will dramatically impact this action.  Below are some examples of differences in Washington laws versus the laws of states where Plaintiffs reside:

- In Washington, FINRA rules may set the standard of care for a negligence action.  *See Ives v. Ramsden,* 142 Wn. App. 369, 391, 174 P.3d 1231, 1242 (2008).  By contrast, in Washington, D.C. (where Plaintiff Cerf resides) FINRA rules are merely a factor the jury can weigh in deciding whether a broker is negligent.  *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Cheng,* 697 F.Supp. 1224, 1227 (D.C.1988).[14]  Illinois (where Ginzkey resides) applies a five-factor test for determining whether a regulation applies as the standard of care.  *Pierce v. Chicago Rail Link, L.L.C.,* No. 03 C 7524, 2005 WL 599980, at *11 (N.D. Ill. Mar. 15, 2005).

- In Washington, implied primary assumption of risk is a complete defense to a negligence action.  *Gregoire v. City of Oak Harbor,* 170 Wn.2d 628, 636–37, 244 P.3d 924, 928 (2010).  In Illinois (where Plaintiff Ginzkey resides), implied primary assumption of risk merely results in a reduction of damages.  *Duffy v. Midlothian Country Club,* 135 Ill. App. 3d 429, 435–36, 481 N.E.2d 1037, 1043 (1985)

---

[14] In *Ives,* the court recognized the difference between a court finding that a FINRA rule may be the standard of care versus a factor in determining negligence when citing the *Merrill Lynch* case.  *See Ives,* 142 Wn. App. at 391, 174 P.3d at 1242.

- In Washington, fault is always apportioned comparatively. By contrast, in Nebraska (where Plaintiff Fitzgerald resides), a plaintiff that is 51 percent at fault is completely barred from recovery. Neb. Rev. Stat. §§ 25-21, 185.11.

Notably, these are just some examples of differences in the law of Washington compared to the laws of the states where Plaintiffs reside. This does not consider the differences in all of the 41 jurisdictions that have class members, which would be impractical to do in this brief.

        (c)    <u>Because there is a conflict of law, the Court would need to apply the "most significant relationship" test for 41 forums based on a factual record.</u>

To settle choice of law questions, Washington uses the most significant relationship test as articulated by *Restatement (Second) of Conflict of Laws* § 145 (1971); *FutureSelect,* 180 Wn.2d at 967. Thus, the Court applies the following test:

> (1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties.
>
> (2) Contacts to be taken into account to determine the law applicable to an issue include:
>
> > (a) the place where the injury occurred,
> >
> > (b) the place where the conduct causing the injury occurred,
> >
> > (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and
> >
> > (d) the place where the relationship, if any, between the parties is centered.
>
> These contacts are to be evaluated according to their relative importance with respect to the particular issue.

*Johnson v. Spider Staging Corp.,* 87 Wn.2d 577, 580–81, 555 P.2d 997, 1000 (1976). Washington's approach is not merely to count contacts, but rather to consider which contacts are most significant and to determine where these contacts are found. *Id.* In addition, a court must consider "the interests and public policies of potentially concerned states and a regard as to the manner and extent of such policies as they relate to the transaction in issue." *Id.*

DEFENDANT NATIONAL SECURITIES
CORPORATION'S RESPONSE TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
(Case No.: 2:18-CV-1773)

-19-

BAKER & HOSTETLER LLP
999 Third Avenue, Suite 3900
Seattle, WA 98104-4040
Telephone: (206) 332-1380

Just applying the conflicts of law analysis presents significant manageability issues precluding class certification. The Ninth Circuit has directed that at the choice of law analysis must be conducted *separately* for each forum with an interest in the litigation and for each claim. *See Zinser*, 253 F.3d at 1188 (reversing class certification and refusing to apply single negligence law of state where manufacturer was headquartered to nationwide class).

Here, 41 jurisdictions must be individually analyzed because the Washington Supreme Court has recognized that each state has a "strong interest" in applying its own laws to protect in-state investors. *See FutureSelect*, 180 Wn.2d at 969–71 ("Washington has a strong interest in giving Washington investors the benefit of Washington law and in requiring the sellers of securities to comply with it."). The Washington Supreme Court views this strong interest of protecting Washington investors as outweighing a foreign state's interest in deterring its own residents from harming other state's investors. *Id.* ("Washington has a more compelling interest in protecting its investors from fraud and misrepresentation than New York does in regulating sellers of securities that may have perpetrated fraud or misrepresentation in another state.") Applying the reasoning of *FutureSelect*, each forum with investors in Beamreach has an interest in its laws applying to this action. However, the contacts with each forum were not necessarily the same for each state with investors. For example, some investors, such as Cerf, met with their individual brokers in person in their resident jurisdiction. By contrast, other investors never did. In addition, certain jurisdictions have more contacts than just investors. NSC's firm-level due diligence occurred in California and New York, and its 27 individual brokers were located in Connecticut, Illinois, New York, California, and New Jersey. Troccoli Decl. ¶10. Beamreach itself was located in California.

For the court to grant class certification, it would need a way to analyze these conflict of law issues for each forum and determine the appropriate law or laws based on an evidentiary record. *See FutureSelect*, 180 Wn.2d at 969, (conflict of law analysis can only be resolved with a record that is sufficiently developed to enable the court to undertake the factual analysis). Because

DEFENDANT NATIONAL SECURITIES
CORPORATION'S RESPONSE TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
(Case No.: 2:18-CV-1773)

-20-

BAKER & HOSTETLER LLP
999 Third Avenue, Suite 3900
Seattle, WA 98104-4040
Telephone:  (206) 332-1380

of the challenges of even analyzing so many choice of law issues, many courts have rejected class certification under similar circumstances. *See Castano v. Am. Tobacco Co.,* 84 F.3d 734, 743 n. 15 (5th Cir.1996) (reversing grant of class certification "'because we must apply an individualized choice of law analysis to each plaintiff's claims, the proliferation of disparate factual and legal issues is compounded exponentially ....'") *(quoting Georgine v. Amchem Prods., Inc*., 83 F.3d 610, 626 (3d Cir.1996)); *Ayala v. U.S Xpress Enterprises, Inc.,* No. EDCV 16-137-GW, 2016 WL 7586910, at *3–6 (C.D. Cal. Dec. 22, 2016).

Predominance is not met because of these choice of law issues.

### C. The Court should deny class certification because Plaintiffs cannot satisfy Rule 23(b)(3)'s superiority requirement.

Under Rule 23(b)(3), courts consider the following factors in evaluating whether a class action is a superior method of fairly and efficiently adjudicating the controversy: (1) the class members' interests in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already begun by or against class members; (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (4) the likely difficulties in managing a class action. Courts weigh the factors, and no single factor is necessarily dispositive. *Zinser*, 253 F.3d at 1190; *Morrison*, 2020 WL 583824, at *6 (denying class certification on superiority grounds finding that factors one and four weighed against certification without relying on the other two factors). A class action is not superior here because potential class members have substantial incentive to pursue individual claims, litigation had already begun by absent class members, there is no reason to concentrate this litigation in Washington with its few connections to this case, and the conflicts of law issues make a class action not manageable. Each factor of the superiority test is discussed below.

> i.    *The Class members have an interest in individually controlling the prosecution or defense of separate actions.*

This superiority factor weighs against class certification where individual damages "run high" such that individual class members have a strong interest "in making individual decisions

DEFENDANT NATIONAL SECURITIES
CORPORATION'S RESPONSE TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
(Case No.: 2:18-CV-1773)

-21-

BAKER & HOSTETLER LLP
999 Third Avenue, Suite 3900
Seattle, WA 98104-4040
Telephone:  (206) 332-1380

on whether and when to settle." *Woods v. Vector Mktg. Corp.*, No. C-14-0264 EMC, 2015 WL 5188682, at *13 (N.D. Cal. Sept. 4, 2015)(citing *Amchem Prods.,* 521 U.S. at 616-17). Here, the claims are high dollar amounts for many of the class members (running from $12,000 invested to $5,000,000), who likely would have an interest in controlling the prosecution of separate actions. Troccoli Decl. ¶10. To grant class certification would give Plaintiffs control over these substantial claims, even over the claims of corporate and institutional investors that invested far more than them.

ii.      *The extent and nature of any litigation concerning the controversy already begun by or against class members.*

"If the court finds that several other actions already are pending and that a clear threat of multiplicity and a risk of inconsistent adjudications actually exist, a class action may not be appropriate since, unless the other suits can be enjoined, ... a Rule 23 proceeding only might create one more action.... Moreover, the existence of litigation indicates that some of the interested parties have decided that individual actions are an acceptable way to proceed, and even may consider them preferable to a class action." *Zinser*, 253 F.3d at 1191 (quoting 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1780 at 568–70 (2d ed.1986)). There have been three FINRA arbitrations already filed against NSC about the Beamreach investment. Troccoli Decl. ¶12. Because other class members already have chosen to adjudicate their claims through arbitration, this factor weighs against class certification.

iii.      *The desirability or undesirability of concentrating the litigation of the claims in the particular forum.*

For this factor, the Ninth Circuit has stated that it is persuaded by the reasoning of *Haley v. Medtronic, Inc.,* 169 F.R.D. at 653:

> In this case, where the potential plaintiffs are located across the country and where the witnesses and the particular evidence will also be found across the country, plaintiffs have failed to establish any particular reason why it would be especially efficient for this Court to hear such a massive class action lawsuit.

DEFENDANT NATIONAL SECURITIES
CORPORATION'S RESPONSE TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
(Case No.: 2:18-CV-1773)

-22-

BAKER & HOSTETLER LLP
999 Third Avenue, Suite 3900
Seattle, WA 98104-4040
Telephone: (206) 332-1380

1    *Zinser*, 253 F.3d at 1191-92.  The same is true here.  This forum has no connection to the plaintiffs

2    or the witnesses in this litigation and it does not make sense to concentrate this action in this forum.

3    There is no reason to concentrate these claims in this forum.

4              iv.     *The likely difficulties in managing the class actions.*

5         Because of the choice of law issues discussed above, there are substantial difficulties in

6    managing a class action here just in determining what forum's or forums' laws should apply.  As

7    the Ninth Circuit has explained in a similar case involving choice of law issues: "In view of the

8    formidable complexities here inherent in trying claims of negligence … with differing state laws,

9    [the plaintiff] does not persuade us that class treatment is superior to individual adjudication."

10   *Zinser,* 253 F.3d at 1192.  For these reasons, a class action is not superior.

11   **D. The Court should deny class certification because Plaintiffs cannot satisfy Rule**
     **23(a)'s commonality requirement.**

12
         Plaintiffs also fail to meet their burdens under Rule 23(a).  For example, Plaintiffs cannot

13
     satisfy commonality.  Plaintiffs allege that common questions of fact and law in this matter include:

14
     (1) whether NSC breached its duty to conduct reasonable due diligence on Beamreach; (2) whether

15
     NSC failed to understand the risks and rewards of offering securities in Beamreach in considering

16
     whether to approve Beamreach for sale to NSC customers; (3) whether NSC was negligent in

17
     approving each of the Beamreach Offerings for sale to its customers; (4) whether NSC failed to

18
     act as a reasonably prudent broker-dealer would have under the same or similar circumstances in

19
     connection with its due diligence and approval of the Beamreach offerings; and (5) whether NSC

20
     was unjustly enriched thereby.  Certification Motion at 17.

21
         "What matters to class certification is not the raising of common questions—even in

22
     droves—but rather the capacity of a classwide proceeding to generate common *answers* to drive

23
     the resolution of the litigation." *Dukes*, 564 U.S.at 349 (emphasis in original) (citation omitted).

24
     Here, because of the conflicts of law issues discussed above, common answers are not possible for

25
     answering the legal questions framed by questions 3 and 5.  Questions 1, 2, and 4 likewise are not

26
     capable of common answers.  Because NSC was continually conducting due diligence over time,

27

making different offerings at different times, with different brokers doing their own analysis for their own investors (each of whom had their own risk tolerance, knowledge of investing, and appreciation of risks), the answers to these questions cannot be commonly decided the same for the entire class.  *See Dukes*, 564 U.S. at 350 (questions satisfying the commonality requirement "must be of such a nature that [they are] capable of classwide resolution—which means that determination of [their] truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."); *see also Fernandez*, 2018 WL 4440498 at *10 (for suitability-related negligence claims, common questions of whether broker breached duties to class members and damages were not capable of class-wide resolution).  Accordingly, commonality is not met here.

**E. The Court should deny class certification because Plaintiffs cannot satisfy Rule 23(a)'s typicality requirement.**

"The test of typicality 'is whether other members have the same or similar injury, whether the action is based on conduct, which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.'" *Hanon v. Dataproducts Corp.*, 976 F.2d 497 (9th Cir. 1992) (quoting Schwartz v. Harp, 108 F.R.D. 279, 282 (C.D. Cal. 1985)).  Here, typicality is not met because class members all have injuries different from the named Plaintiffs.  Specifically, every class member's injury will vary depending on what would have been a suitable investment to them, their risk tolerance, the disclosure to them, the brokers they worked with, and their own diligence, among many other reasons.  *See Fernandez*, 2018 WL 4440498 at *10-11 (for suitability-based negligence claims, typicality not met because suitability analysis is different for each class member and suitability failures were far from uniform).  Typicality is not met.

## IV.    CONCLUSION

For the above stated reasons, Plaintiffs class certification motion should be denied.

DEFENDANT NATIONAL SECURITIES
CORPORATION'S RESPONSE TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
(Case No.: 2:18-CV-1773)

-24-

BAKER & HOSTETLER LLP
999 Third Avenue, Suite 3900
Seattle, WA 98104-4040
Telephone:  (206) 332-1380

DATED this 8ᵗʰ day of December, 2020.

Respectfully submitted,

**BAKER & HOSTETLER LLP**

_s/ Douglas W. Greene_
_s/ James R. Morrison_
Douglas W. Greene, WSBA #22844
James R. Morrison, WSBA #43043
999 Third Avenue, Suite 3900
Seattle, Washington 98104
Tel: (206) 332-1380
Fax: (206) 624-7317
Email: dgreene@bakerlaw.com
Email: jmorrison@bakerlaw.com

_s/ Daniel J. Buzzetta_
Daniel J. Buzzetta (_pro hac vice_)
45 Rockefeller Plaza
New York, NY 10111
Tel: (212) 589-4236
Fax: (212) 589-4201
Email: dbuzzetta@bakerlaw.com

_Attorneys for Defendant_
_National Securities Corporation_

DEFENDANT NATIONAL SECURITIES
CORPORATION'S RESPONSE TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
(Case No.: 2:18-CV-1773)

-25-

BAKER & HOSTETLER LLP
999 Third Avenue, Suite 3900
Seattle, WA 98104-4040
Telephone:  (206) 332-1380

1

## CERTIFICATE OF SERVICE

I hereby certify that on December 8, 2020, I electronically filed the foregoing DEFENDANT NATIONAL SECURITIES CORPORATION'S RESPONSE TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

David P. Neuman, WSBA #48176
Israels Neuman PLC
10900 NE 8th Street, Suite 100
PMB #155
Bellevue, Washington 98004
Tel: (206) 795-5798
Email: dave@israelsneuman.com

Alexander N. Loftus, *pro hac vice*
Joseph Wojciechowski, *pro hac vice*
Sara Hanley, *pro hac vice*
Stoltmann Law Offices
233 S. Wacker, 84th Floor
Chicago, IL 60606
Tel: (312) 332-4200
Email: alex@stoltlaw.com
joe@stoltlaw.com
sara@stoltlaw.com

Joshua B. Kons, *pro hac vice*
Law Offices of Joshua B. Kons, LLC
92 Hopmeadow St., Lower Level
Weatogue, Connecticut 06089
Tel: (860) 920-5181
Email: joshuakons@konslaw.com

*Attorneys for Plaintiffs*

s/ Andre Gougisha
Andre Gougisha
Assistant to James R. Morrison

DEFENDANT NATIONAL SECURITIES
CORPORATION'S RESPONSE TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
(Case No.: 2:18-CV-1773)                                      -26-                                      BAKER & HOSTETLER LLP
999 Third Avenue, Suite 3900
Seattle, WA 98104-4040
Telephone:  (206) 332-1380