# EXHIBIT A



# EXPERT REPORT

**JAMES GINZKEY, RICHARD FITZGERALD, CHARLES CERF, BARRY DONNER, and on behalf of the class members described below**

**vs.**

**National Securities Corporation**

DECEMER 8, 2020
Prepared by: Kamran Fotouhi

CONFIDENTIAL

**Purpose and Scope**

Capital Forensics, Inc. ("CFI") and Kamran Fotouhi have been retained by Baker & Hostetler LLP ("Counsel") to provide an opinion in connection with its representation of National Securities Corporation ("National").

The scope of the CFI review is limited to analyzing the plaintiffs' main allegations regarding private placement securities offerings made by Beamreach Solar, Inc. ("Beamreach") through National Securities Corporation.

**Qualifications**

My background and experience are described in my Curriculum Vitae attached as Appendix A.

I, Kamran Fotouhi have more than 25 years of experience covering regulatory, brokerage, advisory, risk and compliance disciplines. I currently serve as Managing Director of Regulatory and Advice for Capital Forensics Inc. I provide regulatory, risk and compliance guidance to the financial services industry including expert analysis and testimony in litigation matters.

Prior to joining Capital Forensics, I served as Surveillance Director for Financial Industry Regulatory Authority (FINRA) in the Texas District Office. I was responsible for the compliance oversight of broker dealers in the State of Texas (approximately 265) utilizing surveillance and data capture techniques to analyze and assess broker dealers' finances, controls, and systems. The reviews also included the onsite examinations of broker dealers and representatives targeting sales practices, products, risk controls, and operational adequacy. I spent extensive time on the reviews of non-traded public securities and private placement reviews including appropriate due diligence, disclosures, and suitability standards for investors.

Prior to rejoining FINRA, I was the Vice President Compliance Liaison for First Clearing (Wells Fargo & Co. clearing affiliate). I served as subject matter expert on regulatory, compliance, and risk programs and was the direct point of contact for chief compliance officers and principals for over 100 introducing broker-dealers. I was responsible for training and implemented new

compliance technology solutions, including automated and customized AML and comprehensive supervisory surveillance systems, to correspondent introducing broker-dealers.

Formerly, I was a Compliance Auditor for USAA Investment Management Company where I designed and conducted audits to ensure compliance with the SEC Investment Advisors Act and other regulations covering discretionary separate managed programs, mutual fund wrap programs and financial planning. I also collaborated with USAA's legal counsel covering SEC disclosure requirements and developing performance presentation calculations.

Earlier in my career, I served as a Senior Compliance Examiner for NASD Regulation (n/k/a/ FINRA) where I monitored and analyzed the financial operational condition of broker dealers, including all applicable business lines of various clearing and non-clearing firms.  I conducted routine and special on-site audits of member firms, including sales practice, operations, risk and financial reviews.

I began my career as a Financial Consultant for Merrill Lynch where I provided customized financial solutions to a diversified client base including high net worth clients, business owners, retirees and young professionals.

I possess extensive knowledge and experience with broker / dealer rules and regulations including the Securities Exchange Act of 1934 and the Self-Regulatory Rules of FINRA, the Investment Advisers Act of 1940, Anti Money Laundering Rules, fraud identification and industrywide business practices and due diligence standards.

I hold a Bachelor's of Science degree in Finance from San Diego State University.  I also hold the Chartered Financial Analyst (CFA) designation.  I previously held securities licenses including the General Securities Representative (Series 7), General Securities Principal (Series 24), Uniform Securities Agent State Law Examination - (Series 63), and Investment Adviser Law Examination - (Series 65).

**Compensation**

I am being compensated for my time at a rate of $495 per hour. My compensation is not contingent upon the outcome of this case.

**Materials Reviewed**

In forming my opinion, I have reviewed the documents provided by counsel. I have reviewed the Statement of Claim, due diligence files, interviewed investment bankers, and reviewed Private Placement Memorandums covering Beamreach Solar Inc. (Beamreach) offering through National. I also reviewed publicly available information and articles covering the solar industry, competitors, and articles covering Beamreach.

**Opinion**

Plaintiffs allege that, *"NSC BREACHED THE DUTY IT OWED THE PLAINTIFFS AND THE CLASS BY RECOMMENDING THE INVESTMENT INTO BEAMREACH DESPITE NUMEROUS RED FLAGS. Proper due diligence would have made it apparent that Beamreach was a failed startup on the verge of collapse, and that it had only engaged NSC to try to avoid its inevitable demise."*

National had a sound and reasonable due diligence program in place meeting the reasonable basis suitability standard under FINRA Rule 2111. FINRA Rule 2111 has three components of suitability that cover an appropriate recommendation to investors. They include: reasonable-basis suitability, customer-specific suitability, and quantitative suitability. Customer-specific suitability covers a specific recommendation to a particular customer based upon that customer's investment profile, including but not limited to, risk tolerance, liquidity needs, investment objective, and time horizon. Quantitative suitability pertains to a member or associated person having a reasonable

basis in recommending a series of transactions. These transactions may be viewed suitable in isolation when considering the customer's investment profile. Excessive activity does not consist of a single test, but considers factors such as, turnover rate, cost-equity ratio, and short-term trading. These factors, taken in totality with consideration of the client's objectives and risk tolerance, may be considered a violation of the quantitative suitability obligation.

The plaintiffs allege that the defendant did not meet its reasonable-basis of suitability obligations by approving the placement of Beamreach securities to certain investors.

The FINRA Rule book defined the standard for the reasonable-basis of suitability in FINRA 2111.05(a) as follows:

*"The reasonable-basis obligation requires a member or associated person to have a reasonable basis to believe, based on reasonable diligence, that the recommendation is suitable for at least* some *investors. In general, what constitutes reasonable diligence will vary depending on, among other things, the complexity of and risks associated with the security or investment strategy and the member's or associated person's familiarity with the security or investment strategy. A member's or associated person's reasonable diligence must provide the member or associated person with an understanding of the potential risks and rewards associated with the recommended security or strategy. The lack of such an understanding when recommending a security or strategy violates the suitability rule."*

The Beamreach securities distributed through National were offered as a Private Placement under Rule 506 Regulation D of the 1933 Securities Act. The Regulation D exemption allows issuers to offer securities without having to register the offering with the SEC as a public offering. Specific standards have to be met to raise capital in this format to not violate the exemption being used including the types of investors allowed to invest in the offering. In the case of Beamreach, only "accredited investors" as defined by the SEC invested in the securities. During the time of the offering, the SEC defined accredited investors as meeting certain thresholds for both entities and individuals. Individual accredited investors were defined in the following manner:

- The individual must have earned income exceeding $200,000, or $300,000 when combined with a spouse, during each of the previous two full calendar years, and a reasonable expectation of the same for the current year;
- The individual must have a net worth greater than $1 million (either alone or combined with a spouse), excluding the person's primary residence.

The Beamreach offerings were distributed with a Private Placement Memorandum (PPM) disclosing important factors including but not limited to: company risks, industry risks, products risks, and financial/liquidity risks.

FINRA Regulatory Notice 10-22 specifically identifies the standards for due diligence that would be covered under Regulation D offerings.

"In order to ensure that it has fulfilled its suitability responsibilities, a BD in a Regulation D offering should, at a minimum, conduct a reasonable investigation concerning:

- the issuer and its management;
- the business prospects of the issuer;
- the assets held by or to be acquired by the issuer;
- the claims being made; and
- the intended use of proceeds of the offering."

National, through its investment banking department, conducted due diligence inclusive of the above components.

Individual registered representatives of National also had an obligation to conduct due diligence on the securities prior to making recommendations. Individual registered representatives had to understand the risks and other attributes of the recommended transaction which includes an investigation concerning the security. These investigations conducted at the individual

representative level is in addition to the due diligence conducted by the investment banking department of National. These obligations are outlined in Notice to Members 11-25 and addressed in Q11- compliance with the reasonable-basis obligation. My reviews identified individual representatives conducting investigations covering reasonable basis of suitability with inquiries to the investment banking department and other sources of information. Certain representative(s) also conducted due diligence to include on-site visits to Beamreach facilities with direct inquiries of Beamreach personnel.

National Securities had in place a sound and reasonable due diligence program supported by research and appropriate inquiries. Their due diligence incorporated months of reviews, research, and interviews before signing the placement agent agreement with Beamreach in the first quarter of 2015. Due diligence included but was not limited to industry trends, risks, and hiring of engineer commissioned by National. Due diligence included validations and reviews of firm history, its management, inclusive of on-site visits of Beamreach facilities. Due diligence included the history of capital raises including very well-known institutions that invested millions in the company. Inquiries were made into assets and intellectual property including the due diligence conducted by intellectual property counsel. There were inquiries and reviews covering use of proceeds and represented estimates. Risks of the underlying securities were disclosed in the Private Placement Memorandums inclusive of industry risks associated with the emerging solar industry. Unfortunately, the downturn in the solar industry had a significant negative impact on the securities in the solar sector during relevant time period.

The plaintiffs are alleging that if a security possesses certain risks, they should never be offered to any investor. This implies that such a security would not be suitable for any single investor. This allegation is contrary to the realities of the securities markets and regulatory standards. Higher risk securities are offered and sold daily with higher risk premiums. They may encompass the underlying risks of issuers with stretched balance sheets, industries with higher cash usage rates with the need to raise more capital as in biotechnology companies and companies operating in new high growth industries like solar. Regulators have reflected and provided notices to the public on their views as reflected in SEC Release Nos. 33-10734; 34-87784; File No. S7-25-19; *"Unregistered offerings conducted under Regulation D, particularly those under Rule 506(b), play*

*a significant role in capital formation in the United States. In 2018, the estimated amount of capital (including both equity and debt) reported as being raised in Rule 506 offerings was $1.7 trillion, compared to $1.4 trillion raised in registered offerings. Of the $1.7 trillion, $1.5 trillion was raised by pooled investment funds, and $228 billion was raised by non-fund issuers. As noted in the 2015 Staff Report, and as discussed further in Section VII below, accredited investors are critical to providing capital for the Regulation D market. There may be investment opportunities, particularly with respect to early stage and high growth firms, in the Regulation D market that are not available to investors in registered securities offerings."* These investments can garner higher returns but also exhibit higher levels of risk and loss of original invested capital. Investors dedicate capital to newly formed companies, new technologies and industries routinely. This is part of capital formation and the regulators have not limited the ability to raise capital given appropriate due diligence, disclosure of risks and appropriate suitability.

# APPENDIX A

# Kamran Fotouhi
Kamran@Capitalforensics.com


Capital Forensics, Inc.

**SUMMARY OF EXPERTISE**
- 20 plus years of experience in the financial industry advising on compliance and supervisory related matters.
- Expertise working with both regulators and financial service firms to include: traditional top-tier wire house firms, large national full-service broker-dealers, investment management firms, governmental and self-regulatory organizations, insurance companies, banks, large correspondent clearing firms, and over 100 introducing broker-dealers.
- Proficient in the regulatory oversight of broker-dealer finances, operations, risk controls and sales practice conduct.
- Extensive experience with due diligence standards and broker-dealer examinations covering product onboarding including private placements and alternative investments.

**PROFESSIONAL EXPERIENCE**

**Capital Forensics Inc**                                          September 2014 – Present

**Managing Director of Regulatory and Advice**
- Coordinate directly with broker-dealer, advisory, and legal experts related to compliance, risk, and regulatory matters.
- Assist clients with industry, compliance, and supervisory challenges.
- Provide independent expert opinion, expert testimony and case consultation in legal matters including suitability, due diligence, excessive trading, supervision, and AML topics.
- Participate as a speaker in conferences, meetings, and events for the investing public, broker-dealer, and advisory community covering timely topics of interest for investors, legal, risk and compliance officers.

**FINRA**                                                 November 2011 – September 2014

**Surveillance Director for the Dallas District office of FINRA**
- Responsible for ensuring regulatory programs identified and addressed current and emerging risks.
- Managed compliance oversight of 265 broker-dealer firms utilizing surveillance and data capture techniques to analyze and assess broker-dealers' finances, operations, sales practices, controls, and systems.
- Conducted extensive oversight and reviews of broker dealer product due diligence including complex products and private placements.
- Organized and participated in district and regional compliance meetings to educate the broker-dealer community regarding emerging and timely regulatory topics.
- Conducted joint presentations with the SEC in annual regional multi-state regulatory events.

- Evaluated new broker-dealer products and sales practices to ensure that material changes in firms' products, business lines, business expansions and mergers/acquisitions were noted, and that the impact on each firms' risk profile was continually assessed.
- Regularly reviewed and evaluated new and continuing firm applications for FINRA membership.
- Administered the development of a tailored risk based initial examination scope/focus and planning package that addressed and identified unique risks utilized by FINRA examiners for the execution of onsite examinations.
- Participated in the onsite examination of member firms as well as evaluating the adequacy of a member firm's corrective actions related to regulatory findings.

**First Clearing LLC. (Wells Fargo & Co. clearing affiliate)**             **June 2004 – October 2011**

**Vice President, Compliance Liaison**
- Served as subject matter expert on compliance and risk programs and was the direct point of contact for chief compliance officers and principals of introducing broker-dealers regarding compliance and risk matters.
- Assisted introducing broker-dealers during regulatory audits in coordination with First Clearing internal resources.
- Responsible for training introducing broker-dealers in the utilization of compliance and risk surveillance management tools.
- Implemented new compliance technology solutions, including automated and customized AML and comprehensive supervisory surveillance systems, to correspondent introducing broker-dealers.
- Prepared due diligence reports of prospective introducing broker-dealers by analyzing comprehensive data and background information for New Business Committee.
- Represented First Clearing in various corporate committees.

**Wachovia Securities, LLC.**                                  **November 2001 – June 2004**

**Assistant Vice President, Senior Compliance Analyst**
- Provided consulting services to product and regional managers, training departments, as well as brokers covering packaged products, investment advisory, trading, insurance, and alternative investments.
- Provided guidance regarding firm policies, regulatory issues and industry best practices.
- Coordinated responses to regulatory inquiries and participated in the supervision and preparation of prevailing applicable materials.
- Presented on timely regulatory topics to large groups of financial advisors, branch managers, and regional presidents.
- Participated in the preparation of responses to regulatory inquiries covering routine examinations, special examinations, and regulatory sweeps.
- Developed and executed reviews to monitor compliance standards and controls. This included the revision of branch and associate policies, procedures and forms in compliance with new regulatory initiatives and requirements.

**USAA Investment Management Company**                    January 2001 – November 2001

### Compliance Auditor
- Provided guidance regarding regulatory implications of firm initiatives.
- Designed and conducted audits to ensure compliance with the SEC Investment Advisors Act and other regulations covering discretionary separate managed programs, mutual fund wrap programs, and financial planning.
- Jointly managed regulatory examinations and inquiries.
- Coordinated with USAA's legal counsel covering SEC disclosure requirements and developing performance presentation calculations.

**NASD Regulation n/k/a FINRA**                    January 1997 – January 2001

### Associate Compliance Examiner / Senior Compliance Examiner
- Monitored and analyzed the financial and operational condition of 30 broker-dealers, including all applicable business lines of various clearing and non-clearing firms.
- Responsible for performing routine and special on-site audits of NASD member firms, including sales practice, operations, risk, and financial reviews.
- Provided regulatory guidance to the broker-dealer community.

**Herman Group Inc. (Non-Registered Capacity)**                    August 1996 – December 1996

### Analyst
- Analyzed and provided guidance related to timely proxy matters.

**Merrill Lynch**                    February 1994 – October 1995

### Financial Consultant
- Provided customized financial solutions to a diversified client base including high net worth clients, business owners, retirees and young professionals.

**LICENSES**
General Securities Representative - (Series 7) **Inactive**
General Securities Principal - (Series 24) **Inactive**
Uniform Securities Agent State Law Examination - (Series 63) (NASAA) **Inactive**
Investment Adviser Law Examination - (Series 65) (NASAA) **Inactive**

**CERTIFICATION**    Chartered Financial Analyst (**CFA**)                    **(1999)**

**EDUCATION**
Bachelor of Science in Business Administration
San Diego State University Major in Finance                    **(1994)**

**MEMBERSHIPS**
CFA Institute;  CFA Society South Florida (Director)
Securities Industry and Financial Markets Association