# EXHIBIT 1



Sign In          EN



# Battle of the Planets

TV Series    1978–1980    TV-Y7    30m

IMDb RATING                   YOUR RATING

⭐ **7.6**/10                ☆ **Rate**
    1.9K

**Episode guide**  85



Animation      Action      Adventure

A five-member superhero team called G-Force fights to defend Earth and its space colonies from the threat of the planet Spectra.

Top credits

▶ **Available on Amazon** ↗
   buy on DVD from $75.99

Add to Watchlist

EXHIBIT EXCERPT







**Casey Kasem**

Mark  …

85 eps • 1978−1980

⌄

**Alan Dinehart**

Tiny Harper  …

85 eps • 1978−1980

⌄





**Alan Oppenheimer**

Additional Voices

85 eps • 1978−1980

**Takayo Fischer**

Additional Voices  …

85 eps • 1978−1980

EXHIBIT EXCERPT

# EXHIBIT 2

**ACADEMIC CERTIFICATION (continued)**

The student is not currently enrolled.  Last term attended was  .
Student withdrew on  .

The student's past enrollment is shown on the enclosed
supplements.

X     University Major is:  Speech

X     Degree(s) awarded and date(s): Bachelor of Arts – June 14, 1958

No degree awarded.  Expected graduation is  .  Successful completion
is the student's responsibility.

The student's class level is:

Units Completed:

**UNDERGRADUATE CLASS LEVELS**

Undergraduate students are classified according to the number of units
completed, calculated as follows:

| Lower Division | Units Completed |
|---|---|
| Freshman | 0 – 45 |
| Sophomore | 46 – 90 |

| Upper Division | Units Completed |
|---|---|
| Junior | 90 – 134 |
| Senior | 135+ |

Grade Point Average:    CSLA Overall:

**GRADE POINT AVERAGE**

The Grade Point Average (GPA) is determined by division of total  grade points by
units attempted.  CSLA grades of CR, NC, SP, W, and IP are not included in the
calculation.  Grading is on a four point scale.

| | |
|---|---|
| 4.00 = A | 2.00 = C |
| 3.00 = B | 1.00 = D |

Joan V. Woosley
**Joan V. Woosley**
Director of Admissions &
University Registrar

EXHIBIT EXCERPT

# EXHIBIT 3



BrokerCheck Report

# SILBER BENNETT FINANCIAL, INC.

CRD# 156435

| Section Title | Page(s) |
| --- | --- |
| Report Summary | 1 |
| Registration and Withdrawal | 2 |
| Firm Profile | 3 - 6 |
| Firm History | 7 |
| Firm Operations | 8 - 12 |
| Disclosure Events | 13 |

 Please be aware that fraudsters may link to BrokerCheck from phishing and similar scam websites, trying to steal your personal information or your money. Make sure you know who you're dealing with when investing, and contact FINRA with any concerns.
For more information read our investor alert on imposters.

EXHIBIT EXCERPT



**Allegations:** FIRM REVOKED FOR FAILURE TO PAY ANNUAL RENEWAL FEES CCC SECTION 25242(C)(1)

**Initiated By:** CALIFORNIA

**Date Initiated:** 01/31/2019

**Docket/Case Number:**

**URL for Regulatory Action:**

**Principal Product Type:** No Product

**Other Product Type(s):**

**Principal Sanction(s)/Relief Sought:** Revocation

**Other Sanction(s)/Relief Sought:**

**Resolution:** Order

**Resolution Date:** 01/31/2019

**Does the order constitute a final order based on violations of any laws or regulations that prohibit fraudulent, manipulative, or deceptive conduct?** No

**Sanctions Ordered:** Revocation/Expulsion/Denial

**Other Sanctions Ordered:**

**Sanction Details:** INVESTMENT ADVISER CERTIFICATE SUMMARILY REVOKED

©2021 FINRA. All rights reserved.   Report about SILBER BENNETT FINANCIAL, INC.

EXHIBIT EXCERPT

# EXHIBIT 4



BrokerCheck Report

# BOARDWALK CAPITAL CORPORATION

CRD# 10279

Report # 550826 generated on Thursday, June 28, 2007.

EXHIBIT EXCERPT

www.finra.org/brokercheck



## Regulatory - Final

This section provides information regarding any final, regulatory action as reported by the firm and/or a securities regulator to CRD as part of the securities industry registration and licensing process. Such event may include a final, formal proceeding initiated by a regulatory authority (e.g., a state securities agency, a self-regulatory organization, a federal regulator such as the U.S. Securities and Exchange Commission (SEC) or the Commodity Futures Trading Commission (CFTC), or a foreign financial regulatory body) for a violation of investment-related rules or regulations. In addition, a revocation or suspension of the authority of a firm's control affiliate to act as an attorney, accountant or federal contractor, if any, will appear here.

**Disclosure**

| | |
|---|---|
| **Reporting Source:** | REGULATOR (U6) |
| **Current Status:** | FINAL |
| **Allegations:** | |
| **Initiated By:** | NATIONAL ASSOCIATION OF SECURITIES DEALERS, INC. |
| **Date Initiated:** | |
| **Docket/Case Number:** | |
| **Principal Product Type:** | |
| **Other Product Type(s):** | |
| **Principal Sanction(s)/Relief Sought:** | |
| **Other Sanction(s)/Relief Sought:** | |
| **Resolution:** | DECISION |
| **Resolution Date:** | 9/27/1991 |
| **Sanctions Ordered:** | |
| **Other Sanctions Ordered:** | |
| **Sanction Details:** | COMPLAINT NO. LA-4321 (DISTRICT NO. 2S) FILED SEPTEMBER 28, 1990 AGAINST RESPONDENTS BOARDWALK CAPITAL CORPORATION AND MASON ALLAN DINEHART III ALLEGING VIOLATIONS OF ARTICLE III, SECTION 1 OF THE RULES OF FAIR PRACTICE IN THAT RESPONDENT MEMBER, ACTING THROUGH RESPONDENT DINEHART, ENGAGED IN A GENERAL SECURITIES BUSINESS |

©2007 FINRA. All rights reserved. FINRA is a trademark of the Financial Industry Regulatory Authority, Inc. Report# 550826 generated on Thursday, June 28, 2007 about BOARDWALK CAPITAL CORPORATION

EXHIBIT EXCERPT

www.finra.org/brokercheck



WHEN IT FAILED TO MAINTAIN SUFFICIENT NET CAPITAL.

AMENDED COMPLAINT NO. C02900008 (LA-4321) FILED FEBRUARY 4, 1991 ADDING RESPONDENT DANA JOSEPH WELCH ALLEGING VIOLATIONS OF ARTICLE III, SECTION 1 OF THE RULES OF FAIR PRACTICE IN THAT RESPONDENT MEMBER, ACTING THROUGH RESPONDENT WELCH, ENGAGED IN A GENERAL SECURITIES BUSINESS WHILE FAILING TO MAINTAIN  SUFFICIENT NET CAPITAL; ON A SEPARATE OCCASION, RESPONDENT  MEMBER, ACTING THROUGH RESPONDENTS DINEHART AND WELCH, FAILED  TO MAINTAIN SUFFICIENT NET CAPITAL; AND, WELCH, WITH THE  KNOWLEDGE AND CONSENT OF RESPONDENT MEMBER, ACTIVELY ENGAGED  IN THE MANAGEMENT OF A SECURITIES BUSINESS WITHOUT PROPER  REGISTRATION WITH THE NASD.

DECISION RENDERED MARCH 22, 1991 WHEREIN RESPONDENT MEMBER IS CENSURED, EXPELLED FROM MEMBERSHIP IN THE NASD, AND ASSESSED COSTS OF $350; RESPONDENT DINEHART IS CENSURED, FINED $7,500, SUSPENDED FROM ASSOCIATION WITH ANY MEMBER OF THE NASD AS A GENERAL SECURITIES PRINCIPAL AND FINANCIAL AND OPERATIONS PRINCIPAL FOR 60 DAYS AND THEREAFTER MUST REQUALIFY AS A  FINANCIAL AND OPERATIONS PRINCIPAL, AND ASSESSED COSTS OF $350;  AND, RESPONDENT WELCH IS CENSURED AND BARRED FROM ASSOCIATION  WITH ANY MEMBER OF THE NASD IN ANY CAPACITY. IF NO FURTHER  ACTION, DECISION IS FINAL MAY 6, 1991.

APRIL 1, 1991 - APPEALED TO THE BOARD OF GOVERNORS.

BOARD OF GOVERNORS DECISION RENDERED AUGUST 28, 1991, WHEREIN THE FINDINGS MADE AND SANCTIONS IMPOSED ARE AFFIRMED. IN  ADDITION RESPONDENT DINEHART IS ASSESSED APPEAL COSTS OF $1,225.20. IF NO FURTHER ACTION, DECISION IS FINAL SEPTEMBER  27, 1991.

SEPTEMBER 27, 1991 - DECISION IS FINAL.

©2007 FINRA. All rights reserved. FINRA is a trademark of the Financial Industry Regulatory Authority, Inc. Report# 550826 generated on Thursday, June 28, 2007 about BOARDWALK CAPITAL CORPORATION

EXHIBIT EXCERPT

www.finra.org/brokercheck



## Regulatory - Final

This section provides information regarding any final, regulatory action as reported by the firm and/or a securities regulator to CRD as part of the securities industry registration and licensing process. Such event may include a final, formal proceeding initiated by a regulatory authority (e.g., a state securities agency, a self-regulatory organization, a federal regulator such as the U.S. Securities and Exchange Commission (SEC) or the Commodity Futures Trading Commission (CFTC), or a foreign financial regulatory body) for a violation of investment-related rules or regulations. In addition, a revocation or suspension of the authority of a firm's control affiliate to act as an attorney, accountant or federal contractor, if any, will appear here.

**Disclosure**

| | |
|---|---|
| **Reporting Source:** | REGULATOR (U6) |
| **Current Status:** | FINAL |
| **Allegations:** | |
| **Initiated By:** | NATIONAL ASSOCIATION OF SECURITIES DEALERS, INC. |
| **Date Initiated:** | |
| **Docket/Case Number:** | |
| **Principal Product Type:** | |
| **Other Product Type(s):** | |
| **Principal Sanction(s)/Relief Sought:** | |
| **Other Sanction(s)/Relief Sought:** | |
| **Resolution:** | DECISION |
| **Resolution Date:** | 7/8/1991 |
| **Sanctions Ordered:** | |
| **Other Sanctions Ordered:** | |
| **Sanction Details:** | COMPLAINT NO. LA-4285 (DISTRICT NO. 2S) FILED FEBRUARY 15, 1990 AGAINST RESPONDENTS BOARDWALK CAPITAL CORPORATION, MASON ALLAN DINEHART, III, DANA JOSEPH WELCH AND JOAN MATWEYEW ALLEGING VIOLATIONS OF ARTICLE III, SECTION 1 OF THE RULES OF FAIR PRACTICE IN THAT RESPONDENT MEMBER, ACTING THROUGH RESPONDENTS DINEHART, |

©2007 FINRA. All rights reserved. FINRA is a trademark of the Financial Industry Regulatory Authority, Inc. Report# 550826 generated on Thursday, June 28, 2007 about BOARDWALK CAPITAL CORPORATION

EXHIBIT EXCERPT

www.finra.org/brokercheck



WELCH AND MATWEYEW CONDUCTED A SECURITIES BUSINESS WHILE FAILING
TO MAINTAIN SUFFICIENT NET CAPITAL; ON A SEPARATE OCCASION,
RESPONDENT MEMBER, ACTING THROUGH, RESPONDENTS DINEHART AND
WELCH, ENGAGED IN A SECURITIES BUSINESS AND FAILED TO MAINTAIN
SUFFICIENT NET CAPITAL; AND, RESPONDENT WELCH WITH THE KNOWLEDGE
AND CONSENT OF RESPONDENTS MEMBER AND DINEHART, WAS ACTIVELY
ENGAGED IN THE MANAGEMENT OF THE FIRM'S SECURITIES BUSINESS
WITHOUT BEING QUALIFIED OR REGISTERED AS A GENERAL SECURITIES
PRINCIPAL.

DECISION RENDERED JULY 31, 1990, WHEREIN RESPONDENT MEMBER IS
CENSURED, FINED $3,000 AND ASSESSED COSTS IN THE AMOUNT OF $405.67,
RESPONDENT WELCH IS CENSURED, FINED $10,000 AND ASSESSED COSTS IN
THE AMOUNT OF $405.67; AND, RESPONDENT DINEHART IS CENSURED, FINED
$6,000 AND ASSESSED COSTS IN THE AMOUNT OF $405.67. THE FIRST CAUSE
OF COMPLAINT CONCERNING FAILURE TO MAINTAIN SUFFICIENT NET CAPITAL
WAS DISMISSED AS TO RESPONDENT MATWEYEW IN THAT THE COMMITTEE
DETERMINED THAT SHE DISCHARGED HER DUTIES ADEQUATELY. SHE HAD NO
RESPONSIBILITIES TO OBTAIN THE NECESSARY CAPITAL INFUSION AND THERE
WAS NO EVIDENCE THAT SHE FAILED TO PROPERLY PERFORM HER DUTIES
WITH RESPECT TO CALCULATING THE FIRM'S FINANCIAL POSITION. IF NO
FUTHER ACTION, DECISION IS FINAL SEPTEMBER 13, 1990.

AUGUST 30, 1990 - APPEALED TO THE BOARD OF GOVERNORS BY
RESPONDENT DINEHART; CALLED FOR REVIEW IN REGARD TO REMAINING
RESPONDENTS.

BOARD OF GOVERNORS DECISION RENDERED JUNE 6, 1991, C02910021 (LA-
4285) WHERIN THE FINDINGS MADE AND SANCTIONS IMPOSED ARE MODIFIED;
THEREFORE, RESPONDENT MEMBER IS CENSURED, FINED $3,000 AND
ASSESSED DBCC COSTS OF $405.67; RESPONDENT WELCH IS CENSURED;
RESPONDENT DINEHART IS CENSURED, FINED $6,000 AND ASSESSED DBCC
COSTS OF $405.67; AND RESPONDENT MATWEYEW IS CENSURED, FINED
$1,500, REQUIRED TO REQUALIFY BY EXAMINATION AS A FINANCIAL AND
OPERATIONS PRINCIPAL, AND ASSESSED DBCC COSTS OF $405.67. THE
DBCC'S DISMISSAL OF RESPONDENT MATWEYEW IN CAUSE ONE OF
COMPLAINT WAS REVERSED IN THAT THE BOARD DETERMINED THAT, AS THE
FINANCIAL AND OPERATIONS PRINCIPAL, SHE MUST BE HELD RESPONSIBLE
FOR THE FIRM'S OPERATING WHILE NOT IN NET CAPITAL COMPLIANCE AS SHE
WAS CLEARLY FUNCTIONING IN THAT CAPACITY AT THE TIME OF THE
VIOLATION. IN ADDITION, THE DBCC'S FINDING AS TO RESPONDENT DINEHART
WITH RESPECT TO THE THIRD CAUSE OF COMPLAINT WAS DISMISSED IN THAT

@2007 FINRA. All rights reserved. FINRA is a trademark of the Financial Industry Regulatory Authority, Inc. Report# 550826 generated on Thursday, June 28, 2007 about BOARDWALK
CAPITAL CORPORATION
EXHIBIT EXCERPT

# EXHIBIT 5



**BrokerCheck Report**

# MASON ALAN DINEHART III

CRD# 68314

| Section Title | Page(s) |
| --- | --- |
| Report Summary | 1 |
| Broker Qualifications | 2 - 3 |
| Registration and Employment History | 5 - 6 |
| Disclosure Events | 7 |

 Please be aware that fraudsters may link to BrokerCheck from phishing and similar scam websites, trying to steal your personal information or your money. Make sure you know who you're dealing with when investing, and contact FINRA with any concerns.

For more information read our investor alert on imposters.



## Customer Dispute - Award / Judgment

This type of disclosure event involves a final, consumer-initiated, investment-related arbitration or civil suit containing allegations of sales practice violations against the broker that resulted in an arbitration award or civil judgment for the customer.

### Disclosure 1 of 1

| | |
|---|---|
| **Reporting Source:** | Regulator |
| **Employing firm when activities occurred which led to the complaint:** | BOARDWALK CAPITAL CORPORATION |
| **Allegations:** | MATERIAL MISREPRESENTATION AND FRAUD. |
| **Product Type:** | Other |
| **Other Product Type(s):** | STOCK |
| **Alleged Damages:** | $30,000.00 |

## Arbitration Information

| | |
|---|---|
| **Arbitration/Reparation Claim filed with and Docket/Case No.:** | NASD - CASE #90-00337 |
| **Date Notice/Process Served:** | 01/31/1990 |
| **Arbitration Pending?** | No |
| **Disposition:** | Award |
| **Disposition Date:** | 08/12/1992 |
| **Disposition Detail:** | RESPONDENT DINEHART SHALL BE AND HEREBY IS LIABLE FOR AND SHALL PAY TO THE CLAIMANT THE SUM OF $5,000.00. |

| | |
|---|---|
| **Reporting Source:** | Broker |
| **Employing firm when activities occurred which led to the complaint:** | BOARDWALK CAPITAL CORPORATION |
| **Allegations:** | THIS CASE INVOLVED A CUSTOMER COMPLAINT CLAIMING MISREPRESENTATION OF THE SALE OF $30,000 OF STOCK IN THE BOARDWALK GROUP, INC. (PARENT) OF ONE OF BOARDWALK CAPITAL COMPS. (SUBSIDIARY) REGISTERED REPS, [OTHER FIRM EMPLOYEE],  A REG PRINCIPAL OF NASD.  I WAS NAMED AS AN OFFICER OF B.C.C. THE |

◆2021 FINRA. All rights reserved. Report about MASON A. DINEHART III.

EXHIBIT EXCERPT

# EXHIBIT 6

## FRCP 26(a)(2)(B) WRITTEN REPORT
### Mason Alan Dinehart III, RFC

### INTRODUCTION

I am celebrating my 50th year in the securities industry. Currently, I am licensed as a Registered Principal Outside Business Activities Compliance for LightPath Capital, Inc. in Southlake TX. Since 1999, I have served as a member of the FINRA Board of Arbitrators and have served as an arbitrator on ten panels. While six of those cases settled, I have entered four arbitration awards. During my career in the securities field, I became extremely familiar with corporate finance along with asset allocation models and modern portfolio theory. I have supervised, lectured and provided direct financial planning advice to dozens of clients (personal, corporate and trust) regarding diversified and balanced securities portfolio implementation. My work in the securities industry, as well as in my consulting experience includes without limitation (i) organization of various issuers of securities including corporations, limited partnerships and limited liability companies; (ii) the issuance of equities, debentures, partnership interests and membership interests in the issuers (iii) capitalization of the issuer of securities including the risk assessment and underwriting of the respective securities instrument (iv) evaluation of business plans and related financing and forecasting, and (v) corporation and corporate governance, including conflicts of interest. Early in my career, I spent two years in the Acquisition and Mergers Division of Corporate Finance at Bank of America. In December 2018, I was designated as the securities expert witness for the California State Bar.

### SCOPE OF ASSIGNMENT AND COMPENSATION

In this case, I have been asked to review and opine on the following issues:

1. The duties owed by a FINRA member broker-dealer when conducting due diligence on a Regulation D private placement securities offering.

2. The duties owed by a FINRA member broker-dealer when approving a Regulation D private placement securities offering for sale to its customers.

3. The adequacy of the due diligence conducted by National Securities Corporation (NSC) of several Regulation D private placement securities offerings in Beamreach Solar, Inc. f/k/a/ Solexel, Inc. by National Securities Corporation (NSC). The Beamreach securities offerings I have been retained to opine on are Beamreach Series D Preferred Stock Offering, Beamreach Series D1 Preferred Stock Offering, and Beamreach Convertible Secured Promissory Note Offering ("D-2") (collectively, the "Beamreach Offerings").

4. The adequacy of NSC's approval of the Beamreach Offerings to NSC's customers.

5. Risks not assumed by investors in Regulation D private placement offerings, and risks not assumed by NSC's customers in the Beamreach Offerings.

6. The damages to the Plaintiffs and the Class.

EXHIBIT EXCERPT

I reserve the right to supplement and amend my opinions to consider information learned up to and throughout the trial. I am being paid on an hourly basis for this engagement and my billing rate is $375 per hour for preparation of this report, deposition testimony, and for trial testimony. My compensation is not contingent on the outcome of this litigation.

## SUMMARY OF OPINIONS

**In this report I will discuss the following opinions:**

1. NSC had a duty of care under the FINRA Suitability Rule.

2. NSC had a duty of care to conduct adequate due diligence.
   a. The standard of care in the securities industry is compliance with FINRA Regulatory Notice 10-22 and other applicable FINRA notices.

3. NSC had a duty to only approve those offerings with a reasonable risk-reward proposition.

4. The due diligence performed by NSC did not meet the industry standard of care.

5. In light of the risk-reward proposition the Beamreach Offerings presented, the Beamreach Offerings should not have been approved for sale by NSC.

6. The Plaintiffs and the Class did not assume the risk of inadequate due diligence or approval.

7. The damages for the Plaintiffs and the Class.

Consistent with FINRA Regulatory Notice 10-22, in order to ensure that it has fulfilled its suitability responsibilities, a broker-dealer in a Regulation D offering should, at a minimum, conduct a reasonable investigation concerning the issuer and its management; the business prospects of the issuer; the assets held by or to be acquired by the issuer; the claims being made; and the intended use of proceeds of the offering. NSC had these obligations for each Beamreach Offering it sold. Furthermore, FINRA Regulatory Notice 10-22 states that NSC should have conducted a reasonable investigation concerning the following areas:

1. The issuer and its management.

   a. Examining Beamreach's governing documents including any charter, bylaws and partnership agreement, noting particularly the amount of its authorized stock and any restrictions on its activities. Since Beamreach is a corporation, NSC should inquire whether it has perpetual existence or is obligated to operate with a long term strategy for growth i.e. a Delaware corp. Investigation might reveal that the corporation might have a stipulation in its charter limiting the life of the company such as an expiration or liquidation date. Finally no investigation was made in the Beamreach corporate bylaws that could have shown it to have adopted a resolution to dissolve after a vote by the shareholders. The point is that NSC made no effort to investigate these

Page | 2

statements was reasonable and that management's assertions concerning the condition of Beamreach's physical plant and the adequacy of its equipment were accurate. Beamreach never obtained high volume manufacturing in Malaysia as it projected and which was necessary for the company to scale-up. In a change of strategy, Beamreach abruptly switched to possible contract manufacturing before collapsing. In the final analysis, Beamreach had no real manufacturing relationship to scale whatsoever. NSC should have rejected the Offerings.

r.   NSC should have carefully examined any engineering or other reports by third-party experts that might have raised red flags. Dr. Surek was hired again after formerly giving positive reports on Beamreach's technology. It was a ==conflict of interest== and not truly independent for him to be asked again to analyze the technology after giving glowing reports in the past. Conflicted expert reports could have caused the rejection of these offerings.

s.   NSC should have obtained, independent expert opinions from engineers and others necessary as a basis for determining the suitability of the investment prior to recommending the security to investors. None of these opinions were obtained by NSC during due diligence and is yet another reason for rejecting the offerings.

t.   NSC should have conducted a reasonable investigation concerning Beamreach's claims that it could continue as a going concern. NSC should have challenged this assertion and claim in light of the facts that the Company had no revenues in nine years; the Company had no government certification for its product; the Company had no binding contractual commitments for revenue; the Company had no manufacturing capability, foreign or domestic; the auditors of Beamreach reflected three continuing years of negative net worth and mounting operational losses; the Company had no verifiable value of its equipment or IP; the Company was surviving only by raising investor capital; and the intended use of proceeds of the Beamreach offerings.

u.   NSC should have conducted a reasonable investigation concerning the cash runway for Beamreach which was very short and the intended use of the funds raised was not for further research and development of its solar technology. In reality, the use of the proceeds from investor capital was used for Beamreach just to stay alive in the short term. Operational losses of Beamreach were continuing. The cash raised in the D-2 round was used for a bankruptcy or fire sale of the supposed valuable intellectual property. This was a huge red flag.

In addition to the analysis under FINRA Regulatory Notice 10-22, I have assessed the following additional factors and opine on them and on the adequacy of Defendant NSC's due diligence, the reasonable basis suitability of the offerings to the Plaintiffs and the class along with the adequacy of the disclosures in the Series D, Series D-1 and D-2 PPM's concerning the following:

Securities Risk
Lender Credit Risk

EXHIBIT EXCERPT

dating back to the 1990's and early 2000's which "remind" members, supervisors and brokers of their long-standing due diligence obligations. In my opinion, NSC violated FINRA Conduct Rule 2110, which states "a member, in the conduct of his business, shall observe high standards of commercial honor and just and equitable principles of trade". NCS further violated FINRA Conduct Rule 2210 which requires all public communications to uphold fair dealing with customers with no material fact or qualification to be omitted.

## DOCUMENTS REVIEWED:

Complaint against NSC
Defendant's Answer
PPM (Series D Preferred Stock) dated February 2015 and subscription agreement
PPM – February 2015 Subscription Agreement
Series D capital raise brochure – February 2015
PPM - Series D-1 Units of preferred and common stock – June 2016
PPM Supplement for $15 Million of convertible secured promissory notes – November 2016
Subscription Agreement for the PPM – November 2016 Offering
Investor update letter for the third quarter 2015
Form D's filed by Beamreach with the Securities and Exchange Commission
FINRA Broker Check for National Securities Corporation
Deposition of Carmelo Troccoli
FINRA OTR (On the Record) of Carmelo Troccoli
FINRA OTR (On the Record) of Sagiv Shiv
Plaintiffs' deposition transcripts
Spreadsheets provided by NSC reflecting Beamreach investors and amounts of each investment
Defendant's Expert Report attached to their opposition to the motion to certify
Due Diligence notes, letters, emails, industry data, and numerous case documents
FINRA NTM'S/Regulatory Notices 96-60, 03-71, 05-26, 10-22

## DAMAGES

Based upon my review of NSC records as set forth in various spreadsheets, the compensatory damages for the plaintiffs/class are as follows:

| | |
|---|---|
| For Solexel, Inc. 2015 - | $28,726,686.97 |
| For Solexel, Inc. 2016 - | $10,915,417,79 |
| For Beamreach D-1 & D-2 - | $ 5,355,760.20 |

| | |
|---|---|
| Total | $44,997,864.96 |

I have seen no documents indicating that any class member received any interest, dividend, or distribution payments in connection with Solexel/Beamreach. I have seen no records indicating any class member received a return of any amount invested in Beamreach/Solexel.

I reserve the right to supplement and amend my damages opinions to consider information learned up to and throughout the trial.

# EXHIBIT E

EXHIBIT EXCERPT

*MASON ALAN DINEHART III, RFC*
Financial Education Network Development (FEND)
**FINRA Arbitrator #A30388**
**www.fend.com**

## *BUSINESS SPECIALTY*

**Expert witness**/Consultant in arbitration/litigation since 1991, involving securities, insurance
and annuities, nationwide.  Testifying in 356 arbitrations (700 retentions) before FINRA/
NASD/AAA/NYSE/PSE/ JAMS with 98 mediations in CA, OR, AK, AZ, HI, TX, IL, KS, KY,  LA, MA,
MI, MN, MO, NM, NV, OH, NY, GA, TN, UT, WA  WV & FL. (No charge for direct/non-stop air flight
time).  Mr. Dinehart, RFC, has been qualified and has testified as a Securities Industry Expert Witness
before Federal and State Courts in CA plus as an Insurance Industry Expert in the State Court of NV and
serves as a FINRA Arbitrator.  Services are provided for both claimants (65%) and respondents (35%).

## *AREAS OF STRENGTH*

Common/preferred  stocks, bonds, IPO's, mutual funds, variable/fixed index annuities, private placements,
life insurance/VUL's, L.P.'s, LLC's, hedge funds, REITS, TIC's, options, REMICS, mortgage backed
securities  & private stock offerings.  P&L's and damage calculations provided (Investment View -
Thomson Reuters).  Testifying as to suitability, fiduciary duty, due diligence, underwriting & supervision,
overreaching, churning, selling away, over-concentration/asset- allocation, modern portfolio theory
analysis, stock manipulation, best execution, margin, options, mark-ups, mark-downs, on-line trading,  RIA
activities, control person liability, "financial suicide", reverse churning, standard-of-care, industry custom
and practice plus compliance.

## *PROFESSIONAL LICENSES*

**MEMBER, FINRA REGULATION, INC. BOARD OF ARBITRATORS #A30388 - Panel Chairman
- NASD # 99-03001-April '00.**   CA Life and Health Insurance License # 0643601
Series 7, 24, 27*, 63, 65, 79 & 99, variable contracts, real estate*.   *previously held

## *EDUCATION*

California State College at Los Angeles (B/A - Speech & Communication)
American Institute of Banking School of Finance & Taxation - Graduate - Los Angeles District Chapter

## *AFFILIATIONS*

12/18- State Bar of California–Designated Securities Expert Witness (Akili Nickson -  Sr. Trial Counsel)
Thomson Reuters (TREWS); FindLaw.com, Jurispro.com. Pro/Counsel, TASA, C.C.C., CA-Experts.com ,
Infofaq.com, Exify.com, Forensics Group & Member - Securities Experts Roundtable; Panelist – Speaker -
Practising Law Institute - L.P. Marketing & Compliance - 1972 -  R/E Syndication; **Money Magazine -
January, 2006**; Real Estate Review - Published article - Fall - 1972; The Register (IARFC) Summer 2002;
The Advisors Network, Winter 2002; Panelist & Speaker-Annual Seminar for Securities Brokers 2000-
2003, sponsored by  Registered  Rep. Magazine and On Wall Street Magazine; Speaker-Panelist & Article,
PIABA Conventions, 10 '03 & 2 '04; KFWB Radio, November, 2003 – RFC Member - International Assn.
of Registered Financial Consultants (IARFC), AAII; Life Member - American Institute of Banking -
Pasadena District Chapter (AIB), and Adjunct Faculty Member -Westlaw Round Table Group.  2004;
Palos Verdes Tennis Club;  Published articles – www.expertlaw.com.; PIABA Bar Journal Volume 21, No.
2 -  2014 – "A Checklist for Reasonable Due Diligence – The ScoreCard";  PIABA Bar Journal Volume
24, No. 3 – 2017 – "The Challenge of Due Diligence of a Variable Annuity-The ScoreCard Method".

*BUSINESS EXPERIENCE*

*Securities*

Carlsberg Securities Corporation - 1969-1982
- V.P. Marketing - Securities - Insurance - R/E syndication - Branch Mgr. & Member of Bd. of Directors
- Registered Principal Due Diligence and Compliance Director

Westfield Capital Corporation - 1982-1986
- V.P. Marketing - Securities - R/E syndication - Branch Manager, Due Diligence & Compliance

Boardwalk Capital Corporation - 1987-1990* – National Sales Director.
- Marketing Compliance Officer - Full service, independent financial planning broker/dealer
- Chairman of due diligence committee, licensing and recruiting for 200 registered representatives.
- **President - Registered Investment Advisor**

Financial Education Network Development
- 1990-2001 - Owner & founder of a financial planning firm providing educational retirement, financial.
planning seminars for 401-K participants (and spouses) of corporations, nationally.  From 1995 to the
present, the firm has added an emphasis upon expert witness activities, along with 10 arbitrator assignments
since 1999, including 4 awards.

- 1991-1999 - Eric Equities, Inc. - Securities, Annuities & Insurance - Branch Supervisor

- 1999 – 2000 – Locust Street Securities, Inc. - Life Insurance and Annuity sales

- 2000 - 2010 - Empire Securities Corp. - Home Office Supervisor/Director of Advertising Compliance

- 2010 – 7-31-2011 – AISG - Compliance Consultant – Due Diligence

- 8-1-2011 – 12-28-18  – Silber Bennett Financial, Inc. – Home Office Supervisor; Registered Principal
-  Due Diligence and Director of Advertising compliance.

- 01-2019 –10-20-20–Financial Education Network Development  - Securities Expert Witness and FINRA
.  Arbitrator.

-  10-20-20  - Present – LightPath Capital, Inc. – Registered Principal -  Outside Business Activities
Compliance.

*Commercial Banking*

Bank of America - 1959-1965 - AVP - Corporate Finance – National Division
Union Bank - 1965-1969 - VP - Manager of Business Development - So. California.

*Taxes & Insurance*

L. E. Cooper & Associates 1959-1965 - Tax Accountant
Carlsberg Insurance Agency - 1975-1982 - President

*  During the period 02/1990 – 04/1990, I was dually licensed with Nilcorp Securities Company and
Promontory Capital Corporation to market and wholesale their sponsored products.

**EXHIBIT 7**

# FRCP 26(a)(2)(D)(ii) WRITTEN REBUTTAL REPORT
## Mason Alan Dinehart III, RFC

### REBUTTAL TO OPPOSING EXPERTS' REPORTS

**1. The qualifications and opinions National Securities' Expert Witnesses:**

**A. Both Experts rely extensively on the opinion of Dr. Thomas Surek. This reliance is misplaced for several reasons**. It's important to remember that initially Dr. Surek was hired by the issuer to opine on the validity of the solar technology of Beamreach in September 2011. Irrespective of subsequent assignments, he cannot be considered a 3rd party objective source in his reporting.  Further, a true objective third party report is presumed to be fair and balanced. However, in his 4th report on Beamreach technology he is anything but objective.   99% of his report is positive with only 1% being negative. Furthermore, one item was delayed in the port of entry in Los Angeles (the item is not specified so we don't know how important it was).  He uses words like "spectacular", "valid", "relevant" and "on-track". He comments that production start-up would be slated in the next couple of months. This report is dated February 2015, and centers thoroughly on the high-volume manufacturing (HVM) of solar panels in pilot production in Milpitas, CA.

As discussed in my original report, many news articles after February 2015 discussed the collapse of many solar companies and the technological advancement in solar by Asian companies. The significant declines in the U.S. solar market happened between 2015 and 2016 and are not addressed by Dr. Surek.

It is important to note that in March of 2016, Beamreach changed its company production structure entirely to the extent of going to a Contract Manufacturing basis in Asia, mainly Malaysia, but also in Taiwan and Vietnam.  His report fails to discuss or consider or verify contract manufacturing in Malaysia where the manufacturing plant in Milpitas, CA was to be duplicated. Finally, and this is most important, Dr. Surek was charged with opining on the validity and function of the Beamreach technology only. He never was charged with valuation of the Beamreach intellectual property in terms of worth or protection.  Any suggestion that Surek did this is wrong and National Securities failing to understand the actual value of the Beamreach IP at any time is below the standard of care.

In conclusion, I feel that Dr. Surek's reports should be discounted greatly since he is biased in favor of the issuer, he opined on the technology only (not the IP), and discussed production at the pilot plant only in Milpitas and in no way relative to the change to contract manufacturing in 2016 (applicable to both the D-1 PPM and Supplement (D-2)). Instead, in their reports, Both Mr. Fotouhi and Mr. Purcell put great weight on Dr. Surek's report, which I find to be inappropriate.

1

EXHIBIT EXCERPT

As to the other experts, I feel that they ignored key obligations of NSC due diligence by rationalizing away their importance. To justify the negligence of NSC's failure to demand an independent appraisal of the Beamreach IP is well below the standard of care.  It was also negligent of NSC to continue to raise money for this dying company from 2015 on when it knew the D-2 offering was a "Hail Mary".  NSC knew that Beamreach's survival was only made possible by NSC's raising money and not from any production or sales efforts on Beamreach's part. Its decision to abrogate the $10 million minimum to go effective in D-2 was a clear sign that NSC's motivation was really the compensation it could garner from D-2 sales, being selected to act as broker of the sale of the company and/or IP assets, and becoming the lead investment banker for Beamreach.  These important breaches were ignored by both experts.

Further, both experts ignored the commission disparity in the D-2 offering, the missing risk disclaimer, the conflicts of interest and the balance sheet disparity between the auditor and the company rendering Beamreach preferred stock to have no value.  Finally, NSC's bring-down due diligence was rationalized as thorough and effective when it clearly was ineffective and deficient as opposed to looking at D-1 and D-2 as a new and stand-alone offering totally apart and distinct from Series D.

Both experts failed to recognize that combining them was below the standard of care and only inured to NSC's benefit in being compensated. Finally, the value of Mr. Purcell's report was diminished significantly by citing language that came directly from the issuer and not from any due diligence investigation.  That practice was directly in violation of FINRA Regulatory Notice 10-22.  I can only conclude that NSC was negligent, and its due diligence was below the standard of care.

### Additional Documents Relied on in Formulating This Rebuttal Opinion

- Expert Report submitted by Kamran Fotouhi, along with documents referenced and identified therein;
- Expert Report submitted by William Purcell, along with documents referenced and identified therein.

10

I declare under penalty of perjury that the foregoing is true and correct, and if called as a witness would testify competently thereto.

Mason A. Dinehart III, RFC

December 15, 2021

11

# EXHIBIT 8







**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

JAMES GINZKEY, RICHARD
FITZGERALD, CHARLES CERF, BARRY
DONNER, and on behalf of the class
members described below,

        Plaintiffs,

v.                 Case No. 2:18-cv-01773-RSM

NATIONAL SECURITIES CORPORATION,
A Washington Corporation,

        Defendant.
_____

**DEPOSITION OF**

**MASON ALAN DINEHART III**

**TAKEN ON**
**WEDNESDAY, JANUARY 5, 2021**
**10:09 A.M.**

**BAKER HOSTETLER**
**600 MONTGOMERY STREET, SUITE 3100**
**SAN FRANCISCO, CALIFORNIA  94111**

```
 1                        APPEARANCES

 2

 3   Appearing on behalf of the Plaintiffs:

 4   JOSHUA B. KONS, ESQUIRE (via videoconference)

 5   Law Offices of Joshua B. Kons, LLC

 6   92 Hopmeadow Street, Lower Level

 7   Weatogue, CT  06089

 8   (860) 920-5181

 9   (860) 920-5174 (Fax)

10   joshuakons@konslaw.com

11

12   JOSEPH WOJCIECHOWSKI, ESQUIRE (via videoconference)

13   Stoltmann Law Offices, P.C.

14   161 North Clark Street, 16th Floor

15   Chicago, IL  60601

16   (312) 332-4200

17   (312) 332-4201 (Fax)

18   joe@stoltlaw.com

19

20

21

22

23

24

25
```

EXHIBIT EXCERPT

1              **APPEARANCES CONTINUED BY VIDEOCONFERENCE**

2

3    **Appearing on behalf of the Defendant:**

4    CURT R. HINELINE, ESQUIRE

5    ALEXANDER VITRUK, ESQUIRE (via videoconference)

6    **Baker & Hostetler, LLP**

7    999 Third Avenue, Suite 3900

8    Seattle, WA  98104

9    (206) 332-1380

10   (206) 624-7317 (Fax)

11   chineline@bakerlaw.com

12   avitruk@bakerlaw.com

13

14   **Also Present:**

15   Mark Smoot, Paralegal, Baker & Hostetler

16   Colin Scott, Paralegal, Baker & Hostetler

17   William H. Purcell, Defense Expert Witness

18   Vincent Guerrera, Videoconference Technician

19

20

21

22

23

24

25

NAEGELI
DEPOSITION & TRIAL

CELEBRATING 40 YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

EXHIBIT EXCERPT

Mason Dinehart III   January 5, 2022   NDT Assgn # 54864

```
 1        Q.    Did you spend all 4 years of your college at the
 2   California State College in Los Angeles?
 3        A.    I did.
 4        Q.    And the American Institute of Banking School of
 5   Finance & Taxation, what is that?
 6        A.    In 1963, while I was at Bank of America, the
 7   American Institute of Banking offered a college level course
 8   in Taxation and Finance.  It was a two-year program; it had
 9   the accounting work of Meigs and Johnson.  It was an
10   advanced class in taxation and finance.  I did it nights and
11   weekends over 2 years, and then I received a graduate
12   certificate at the conclusion of that training and that
13   course, from the American Institute of Banking.
14        Q.    And what's the timing of your graduation in, what
15   --
16        A.    1958.  I started the BA in 1959.
17        Q.    Okay.  And when did you graduate from AIB, or
18   American Institute of Banking?
19        A.    '65.  1965.
20        Q.    Did you take any finance classes while you were
21   going to college?
22        A.    I don't believe so.  It was a liberal arts
23   education.
24        Q.    In Speech?
25        A.    Yes.  And Communications, yes.
```

EXHIBIT EXCERPT

1    Q.    And you identify, "Home Office Supervisor/Director

2 of Advertising Compliance."

3    A.    Yeah.  The due diligence, I did not do at Empire

4 Securities.  That was done in another city.  I was in

5 Sherman Oaks, California.  The due diligence was done in San

6 Diego, California.  I was in charge of advertising

7 compliance at Empire Securities.

8    Q.    Did you do scorecards for any of the Reg D

9 offerings while you were at Empire Securities?

10    A.    I may have done a few that got into trouble,

11 afterwards.

12    Q.    After, you mean ...?

13    A.    After due diligence approved them.  But I did not

14 do them prior to them being sold.  I was not in that role at

15 Empire Securities.

16    Q.    When you say after, when they got in trouble, was

17 this in connection with litigation at all?

18    A.    Or arbitration claims, yes.  In one of those, I

19 actually appeared as an expert witness on the defense side,

20 and we got no award against us.

21    Q.    Locust Street Securities, you worked there from

22 1999 to 2000; right?

23    A.    Yeah.  That was a small firm that offered

24 insurance products.  Index annuities, fixed annuities,

25 things like that.  That was a business that I wanted to

EXHIBIT EXCERPT

1   learn more about, so I took my broker's license and joined

2   them, and they were hoping that I would bring retail

3   securities business to them.  I only was interested in

4   learning about their annuity products, and so I didn't have

5   any securities production and they terminated me after a

6   year.  But I did at least get to know some of the best

7   insurance carriers and begin to understand the annuity

8   business through them.  I did not, at that firm, act in a

9   due diligence capacity at all.

10       Q.   Can you just quickly give us an overview of the

11  difference between annuity business and the securities

12  business?

13       A.   Well, annuities is life insurance.  And it's not a

14  security, in terms of index annuities and fixed annuities,

15  immediate annuities.  They were not into variable annuities,

16  which is a security, but it's a totally separate field.  It

17  would be an outside business activity, which I wanted to

18  build, because I happen to believe annuities are good

19  products, so I wanted to learn them through Locust Street

20  Securities.  That learning experience terminated when I

21  didn't bring them any securities business.  I wasn't

22  interested in that.

23       Q.   Okay.  And the prior firm to that was Eric

24  Equities from 1991 to 1999, and it says you were doing

25  Securities, Annuities & Insurance as a Branch Supervisor.

EXHIBIT EXCERPT

1  in the financial industry?

2       A.    Yes.

3       Q.    What other work have you done?

4       A.    I was a child actor.

5       Q.    Okay.  When you say child actor, what do you

6  consider a child?  How old were you when you were doing

7  acting?

8       A.    I was 12 years old when I did a Roy Rogers movie.

9       Q.    Okay.  And how old were you during your last

10  acting?

11      A.    Well, it was 1960 was my last role as an actor

12  before I -- actually, right after I joined Bank of America

13  in 1959, my last role was in a film with Mickey Rooney

14  called, I can't even remember the name of it.

15      Q.    So how old you were in 1960?

16      A.    Well, that's why I brought my calculator.  1960

17  from 1936.  24.  Is that right?  Yup.

18      Q.    Okay.  So from the time you were 12 to 24 years

19  old, you were an actor?

20      A.    Among other things.  I sold a lot of things.  Did

21  a lot of things during those young years.

22      Q.    How many films were you in, in the 1958 to 1960

23  time period, as an actor?

24      A.    Well, my main role during those years, I was the

25  sidekick of Hugh O'Brian.  I played Bat Masterson on The

EXHIBIT EXCERPT

1  **solicitated for sale, that would cause you to rate Microsoft**

2  **a 1 point?**

3       A.   No, it wouldn't.  Not when you -- you're

4  discounting their experience.  I would look at their

5  experience in addition to their years in this company.

6  That's why I have the word experience there.

7       Q.   **I'm talking about 2 to 5 years or less of**

8  **experience.**

9       A.   No.  The 2 to 5 years relates to, yeah, the

10  experience or the time at the company.  Or both.  Experience

11  is just as important as time at this company.  I might have

12  a guy that's been CEO of another computer firm, and now he

13  joins a brand-new firm.  I'm not going to discount his 5 or

14  6 years at that other firm and the experience he has in the

15  same industry.  It's a combination of both.

16       Q.   **Are you aware -- let me start over.**

17            **I asked you earlier if you knew, if you've ever**

18  **seen anybody use the scorecard as an adverse expert in**

19  **arbitrations.**

20       A.   Right.

21       Q.   **And you said you're aware of none?**

22       A.   None.

23       Q.   **Are you aware of other plaintiffs' experts, or**

24  **securities experts that use their scorecard as part of their**

25  **expert analysis and testimony?**



NAEGELI
DEPOSITION & TRIAL    (800)528-3335
NAEGELIUSA.COM

EXHIBIT EXCERPT

1    A.   Not in this form, but many experts have --

2    Q.   **What do you mean, not in this form?**

3    A.   Because it's my proprietary item.  They don't use

4    my ScoreCard.  They use the deal points.

5         Q.   And what is that?

6         A.   The deal points are the same deal points when they

7    evaluate a deal.  Mason, how did you come up with this idea.

8    They want to know what the deal points are, and how they

9    weight them.  So they question me on it, and they use that

10   same analysis, they just don't call it a scorecard, any more

11   than PLI does.  They use the same deal points, the same

12   analysis when they evaluate a deal, they just don't call it

13   a scorecard.  I put a mathematical equation to it.  That's

14   all I've done.

15        Q.   **Are you aware of anybody else that has put that**

16   **mathematical equation to it, other than yourself?**

17        A.   No.  That's why it's somewhat unique, yeah.

18        Q.   **So in this country of 350 million people, the only**

19   **person you believe that are doing the scorecards, that are**

20   **putting a mathematical number into this analysis is you?**

21        A.   No.  I didn't say that.

22             **MR. KONS:**  Objection.  Argumentative.  I think it

23   misstates his testimony.  He testified that the scorecards

24   are a vetting tool.  I don't think that's a fair

25   characterization.

EXHIBIT EXCERPT

**EXHIBIT 9**

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
## AT SEATTLE

------------------------------------------------------

**JAMES GINZKEY, RICHARD
FITZGERALD, CHARLES CERF,
BARRY DONNER, and on**
behalf of the Class members

**Plaintiffs,**

**v**

**NATIONAL SECURITIES**                              Case No. 2:18-cv-1773
**CORPORATION,**
a Washington Corporation

**Defendant**

------------------------------------------------------

## REBUTTAL EXPERT REPORT OF
## WILLIAM H. PURCELL

**December 15, 2021**

EXHIBIT EXCERPT

1.      I have been retained by Baker & Hostetler LLP, counsel to the Defendant, National

Securities Corporation ("NSC"), in this litigation to serve as an investment banking, private

placement, due diligence and financial expert in opining about a number of issues including the

professional conduct of NSC in acting as a retained private placement agent for Beamreach Solar,

Inc., f/k/a Solexel ("Beamreach" or the "Company") in attempting to solicit for sale the Company's

equity-related and debt-related securities to investors, including the Plaintiff investors, during 2015

and 2016. In this regard, I submitted an expert report dated as of November 10, 2021 (the "Purcell

Report"). My professional background, experience, and qualifications were set forth in the Purcell

Report at pages 10 through 14.[1]  An updated list of documents I have considered is attached as

Exhibit 6 to this report.

2.      I have now been asked by counsel to submit a report rebutting the opinions set forth

in the expert report submitted on November 10, 2021 by Mason Alan Dinehart III, the "Dinehart

Report".

3.      I have thoroughly reviewed the Dinehart Report and none of his views or opinions

have changed in any way my conclusions and opinions as set forth in the Purcell Report.

4.      In addition, I disagree with the opinions set forth in the Dinehart Report. My

disagreements with Dinehart and my comments about the Dinehart Report are set forth below.

## **OVERVIEW**

5.      To begin, and very important from an investment banking and due diligence point of

view, in order for one to be able to professionally opine or comment on the reasonableness of a due

diligence investigation undertaken by an investment bank for a company in regard to a private

---

[1] In addition to my experience and qualifications as set forth in the Purcell Report, and relevant to this matter, I have
also had much experience in both the areas of venture capital and private equity having been on the internal Dillon
Read advisory boards of Concord Partners (a Dillon Read fund specializing in venture capital investments) and
Saratoga Partners (a Dillon Read fund specializing in private equity investments).

1

EXHIBIT EXCERPT

list of NSC due diligence evidence that was available and reviewed as set forth in the Purcell Report (Exhibit 2 in the Purcell Report, encompassing 18 pages).

14.     In this regard, although one of the items listed in Mr. Dinehart's "Documents Reviewed" list merely stated: "Due diligence notes, letters, emails, industry data, and numerous case documents", Mr. Dinehart and Plaintiffs' counsel, after having received the Purcell Report, now contend that this short phrase relating to documents reviewed was meant to really include voluminous additional documents not specifically listed.

15.     Because Dinehart's numerous criticisms are so broad and unfounded, I will continue to list and discuss the various so-called inaccurate and misleading statements alleged by Dinehart in categories as set forth below:

     a.   The "Due Diligence Score Card";

     b.   Alleged "Red Flags";

     c.   Alleged failure to conduct adequate Due Diligence;

     d.   Dinehart's Claims about record keeping;

     e.   Areas where Dinehart displays a complete lack of understanding

**Category 1:   <u>The Use of a So-Called Due Diligence Score Card</u>**

16.     Dinehart, in forming some of his negative opinions about NSC's actual due diligence, used a so-called "Score Card" (referred to in all of the Exhibits A, B, C and D in the Dinehart Report) "to grade his assessment" of the allegedly low quality of Beamreach's equity-related securities – *even though all of the Private Placement Memorandums issued by NSC, including the Supplement thereto, clearly set forth in bold print that the Beamreach securities were speculative in nature and, accordingly, that investors might or could lose their entire investment if they invested in the Company.*

5

EXHIBIT EXCERPT

17.     This "Score Card" in my opinion, from an investment banking point of view, is an amateurish attempt by Dinehart to deceive any prospective jury by putting forth low numbers for one to observe in order to improperly influence jury members – that in reality meant nothing of substance related to the case at hand. Based on my investment banking experience of over 50 years – including as an investment banking expert in numerous due diligence litigation matters, I have *never* seen or heard anything about this so-called "Score Card", nor have I ever heard it even mentioned by any other investment banker, lawyer, or otherwise.

18.     Dinehart discloses the following about the "Score Card", which he discusses in 4 of the 5 Exhibits attached to his report:

a.  In Exhibit B of the Dinehart Report, it is stated that this Score Card was published by the Financial Education Network Development organization – where it happens that Dinehart was employed twice during his career based on his CV, i.e., in 2019-2020 and 1990 to 2001.

b.  In addition, Exhibit B states that: "A minimum of 35 [score] point (70%) is required for due diligence consideration." I have two comments about this statement. First, from an investment banking point of view, the statement is totally incorrect because due diligence is always required by an investment bank for 100% of financing transactions – whether private placements or public offerings. Second, the statement is a meaningless statement from an investment banking point of view in regard to an early-state venture company because the Score Card list of issues to be graded includes (based on Exhibit A, the Preferred Stock Score Card) categories *not* relevant to an analysis of many privately-held venture companies, such as, "History of Trading", "Dilution", "Load Factors", i.e., fees to be paid for a financing; "Percentage of Supply/Demand", and "Financial Track Record".

c.  Dinehart allocates points on the Score Card in a very subjective manner to most likely, in my view, create an artificially low score to support a predetermined opinion. Dinehart, in addition, seemed to place much importance on the Score Card as he utilizes over 20 pages (i.e., all of Exhibits A-D) of the Dinehart Report discussing these meaningless "Score Cards".

6

# EXHIBIT 10



Capital Forensics, Inc.

# EXPERT REBUTTAL REPORT

**JAMES GINZKEY, RICHARD FITZGERALD,
CHARLES CERF, BARRY DONNER,
and on behalf of the class members described below
vs.
National Securities Corporation**

**(W.D. WA, Case No. 2:18-cv-1773)**

DECEMBER 15, 2021

Prepared by: Kamran Fotouhi

EXHIBIT EXCERPT

Mr. Dinehart supports his expertise pertaining to due diligence by utilizing what he refers to as the "ScoreCards method of due diligence." On page 24, he states:

> *"I was directly responsible for the marketing and licensing compliance of the firm. I participated in the due diligence function as chairman of the corporate finance committee and utilized the ScoreCards method of due diligence, an industry recognized evaluation technique specifically designed for analyzing securities including common stocks, IPO's, private common and preferred stock offerings, bonds, limited partnerships and real estate based offerings such as real estate limited partnerships and REITS along with direct participation programs, mutual funds and variable annuities."*

Mr. Dinehart remarkably conducts his own "scoring" of Beamreach using his "ScoreCards method."  I have been in the securities industry for over 20 years and have served as a regulator for many of those years.  I have conducted over 300 examinations, participated and presented at conferences, and was responsible for the oversight of approximately 265 broker dealers.  *I have not seen a single firm use the "ScoreCards method" that Mr. Dinehart has unilaterally defined as an industry recognized evaluation technique.*

That is not surprising. I find Mr. Dinehart's novel "ScoreCards" technique as very limiting and narrow in its purported function of evaluating due diligence.  Moreover, his "ScoreCards method" does not meet the reasonable due diligence standard as defined by FINRA Rule 2111 because, among other problems, it does not allow for allocations or weightings to certain elements that may be more material than others.  The method is based merely on a snapshot in time and ignores many other factors that may be material to an enterprise's valuation.  Mr. Dinehart's method therefore also violates FINRA Regulatory Notice 10-22, which clarifies that the scope of any "reasonable investigation" by the broker-dealer must depend on the various "facts and circumstances," not a one-dimensional scoring system that can also be manipulated by the "grader" to satisfy any desired result (as was done here).

Under Mr. Dinehart's self-serving and one-dimensional "ScoreCards method," many if not most emerging companies in the technology and biotechnology sectors—*i.e.*, companies that receive multiple rounds of financing before bringing any product to market or realizing any revenues—would *not* be suitable for a private offering and would *never* receive financing.  However, those and many other emerging companies raise billions of dollars each year and are a central part of advancement and innovation.  These capital raises occur with due diligence being conducted by many different broker-dealers and institutions conducting their own independent analysis, as was the case here.  Accordingly, Mr. Dinehart's unrecognized "ScoreCards" method is not tethered to market reality, much less any applicable FINRA standard.

EXHIBIT EXCERPT

Signed: _____

Printed: _____**Kamran Fotouhi**_____

Date: _____**12/15/2021**_____

EXHIBIT EXCERPT

**EXHIBIT 11**

**Award**
**FINRA Dispute Resolution**

In the Matter of the Arbitration Between:

**Claimants**                                    Case Number: 09-03602
Janet Garcie
Walter Grosskopf
Sharon Grosskopf
The Janet K. Garcie Revocable Trust
The Walter and Sharon Grosskopf Trust

    vs.

**Respondents**                                  Hearing Site: San Diego, California
Arque Capital, Ltd.
Empire Securities Corporation
Audrey Mari Kuwabara
James Thomas Nagle
Michael Cheng Ning

Nature of the Dispute:  Customers vs. Members and Associated Persons

## REPRESENTATION OF PARTIES

Claimants Walter Grosskopf, Sharon Grosskopf, The Walter and Sharon Grosskopf Trust, Janet Garcie and The Janet K. Garcie Revocable Trust, hereinafter collectively referred to as "Claimants": Richard A. Nervig, Esq., Richard A. Nervig, PC, Fallbrook, California and A. Thomas Tenenbaum, Esq., The Tenenbaum Law Firm, Highlands Ranch, Colorado.

Respondent Empire Securities Corporation ("Empire"): Michael Ning, CEO, Empire Securities Corporation, Torrance, California.

Respondent James Thomas Nagle ("Nagle"): Jared R.B. Hutton, Esq., Attorney at Law, Los Angeles, California.

Respondents Arque Capital, Ltd. ("Arque"), Michael Cheng Ning ("Ning") and Audrey Mari Kuwabara ("Kuwabara"): Shirley Hayton, Esq., Gartenberg, Gelfand, Wasson & Selden LLP, Los Angeles, California.

## CASE INFORMATION

Statement of Claim filed on or about: June 15, 2009

**CONFIDENTIAL**
EXHIBIT EXCERPT

FINRA Dispute Resolution
Arbitration No. 09-03602
Award Page 2 of 8

Amended Statement of Claim filed on or about: May 13, 2010

Claimants signed Submission Agreements: May 8, 2009

Joint Statement of Answer filed by Respondents Empire and Nagle on or about:
September 10, 2009

Respondents Empire and Nagle signed Submission Agreements: October 6, 2009

Joint Statement of Answer filed by Respondents Arque, Ning and Kuwabara on or
about: August 23, 2010

Respondents Arque, Ning and Kuwabara signed Submission Agreements: August 23,
2010

## CASE SUMMARY

Claimants asserted the following causes of action in the Statement of Claim and
Amended Statement of Claim: breach of fiduciary duty; fraud; violation of California
Corporate Securities law; and negligence.  In Claimants' Amended Statement of Claim
they added Ning, Kuwabara and Arque as Respondents.  The causes of action relate to
Claimants' investment in DBSI New Hampstead, LLC.

Unless specifically admitted in their Answer, Respondents Empire and Nagle denied the
allegations made in the Statement of Claim and asserted various affirmative defenses.

Unless specifically admitted in their Answer, Respondents Arque, Ning and Kuwabara
denied the allegations made in the Amended Statement of Claim and asserted various
affirmative defenses.

## RELIEF REQUESTED

In the Statement of Claim and Amended Statement of Claim, Claimants requested:
1. Statutory rescission of the investments in question or alternatively for all
   damages incurred in an amount to be proven at the hearing and no less than
   $904,780.00;
2. Statutory interest;
3. Costs and attorneys' fees;
4. Punitive damages; and
5. Any other relief the Panel deems appropriate.

In their Answer, Respondents Empire and Nagle requested:
1. Claimants' claims be dismissed in their entirety;
2. Costs and other expenses;
3. Expungement of this matter from Respondents Empire and Nagle's Central
   Registration Depository ("CRD") records; and
4. Such other relief as the Panel deems appropriate.

In their Answer, Respondents Arque, Ning and Kuwabara requested:

CONFIDENTIAL
EXHIBIT EXCERPT

1. Claimants' claims be dismissed in their entirety;
2. Costs and other expenses;
3. Expungement of this matter from Respondents Arque, Ning and Kuwabara's CRD records; and
4. Such other and further relief as the Panel deems appropriate.

## OTHER ISSUES CONSIDERED AND DECIDED

The Arbitrators acknowledge that they have each read the pleadings and other materials filed by the parties.

On May 13, 2010, Claimants filed a Motion to Submit an Amended Statement of Claim. On May 20, 2010, Respondent Empire submitted a response objecting to Claimants' motion. On May 25, 2010 and June 3, 2010, Claimants submitted replies in further support of their motion. By order dated June 8, 2010, the Panel granted Claimants' motion.

On or about November 5, 2009, Respondent James Thomas Nagle filed for bankruptcy under the United States Bankruptcy Code. In accordance with these filings, all claims against Respondent James Thomas Nagle were indefinitely stayed. On April 13, 2011, the United States Bankruptcy Court for the Central District of California issued an order granting Claimants Walter Grosskopf and Sharon Grosskopf's motion for relief from the automatic stay. Accordingly, the Panel heard and decided Claimants Walter Grosskopf and Sharon Grosskopf's claims against Respondent James Thomas Nagle.

On or about January 31, 2012, Respondent Empire Securities Corporation filed for bankruptcy under the United States Bankruptcy Code. In accordance with these filings, all claims against Respondent Empire Securities Corporation are indefinitely stayed. Therefore, the Panel made no determination with respect to the claims against Respondent Empire Securities Corporation.

On January 18, 2012, Respondent Nagle submitted a request to appear telephonically at the evidentiary hearing and a request that the Panel determine the effect of Respondent Nagle's bankruptcy filing on Claimants Janet Garcie and The Janet K. Garcie Revocable Trust's claims. On January 25, 2012, Claimants submitted a response opposing Respondent Nagle's request to appear telephonically. On January 31, 2012, Respondent Nagle submitted a reply in further support of his request to appear telephonically. The Panel denied Respondent Nagle's request to appear telephonically. The Panel deferred its ruling on Respondent Nagle's request for a determination of the effect of his bankruptcy filing on Claimants Janet Garcie and The Janet K. Garcie Revocable Trust's claims.

After Claimants presented their case-in-chief, Respondents Arque, Ning, Kuwabara and Nagle made a motion to dismiss. Claimants objected to the motion. After due deliberation, the Panel determined to deny Respondents Arque, Ning, Kuwabara and Nagle's motion to dismiss.

On or about April 1, 2012, Respondent Nagle notified FINRA Dispute Resolution that he intended to have an expert witness testify at the hearing on his expungement request. On April 11, 2012, Claimants filed an objection to Respondent Nagle's notice. The

CONFIDENTIAL
EXHIBIT EXCERPT

FINRA Dispute Resolution
Arbitration No. 09-03602
Award Page 4 of 8

Panel deferred its decision on Claimants' objection. At the expungement hearing, Mason Dinehart appeared as an expert for Respondent Nagle.

The Panel conducted a telephonic hearing on May 9, 2012 so the parties could present oral argument and evidence on Respondents Nagle, Arque, Ning and Kuwabara's requests for expungement. The telephonic hearing was not recorded due to an administrative error. Claimants attended the hearing and opposed the requests for expungement. The Panel considered the pleadings and the parties' testimony during the evidentiary hearing and the hearing on the expungement requests.

The parties have agreed that the Award in this matter may be executed in counterpart copies or that a handwritten, signed Award may be entered.

## AWARD

After considering the pleadings, the testimony and evidence presented at the evidentiary hearing and hearing on the expungement requests, the Panel has decided in full and final resolution of the issues submitted for determination as follows:

1. Claimants Walter Grosskopf, Sharon Grosskopf and The Walter and Sharon Grosskopf Trust's claims against Respondent Nagle are denied in their entirety since they did not establish their claims against Respondent Nagle by a preponderance of the evidence.

2. The Panel made no determination with respect to Claimants Janet Garcie and The Janet K. Garcie Revocable Trust's claims against Respondent Nagle because of his discharge in bankruptcy.

3. Claimants Janet Garcie and The Janet K. Garcie Revocable Trust's claims against Respondent Arque are denied since they did not establish their claims against Respondent Arque by a preponderance of the evidence.

4. Claimants Walter Grosskopf, Sharon Grosskopf and The Walter and Sharon Grosskopf Trust's claims against Respondent Arque are denied in their entirety since they did not establish their claims against Respondent Arque by a preponderance of the evidence.

5. Claimants' claims against Respondents Kuwabara and Ning are denied in their entirety.

6. The Panel recommends the expungement of all references to the above captioned arbitration from Respondents Arque Capital, Ltd. (CRD # 121192), Audrey Mari Kuwabara (CRD # 5007219) and Michael Cheng Ning's (CRD # 1229733) registration records maintained by CRD, with the understanding that pursuant to Notice to Members 04-16, Respondents Arque Capital, Ltd., Audrey Mari Kuwabara and Michael Cheng Ning must obtain confirmation from a court of competent jurisdiction before CRD will execute the expungement directive.

CONFIDENTIAL
EXHIBIT EXCERPT

Dinehart Subpoena Response 000331

Unless specifically waived in writing by FINRA, parties seeking judicial confirmation of an arbitration award containing expungement relief must name FINRA as an additional party and serve FINRA with all appropriate documents.

Pursuant to Rule 12805 of the Code, the Panel has made the following Rule 2080 affirmative findings of fact: The claim, allegation or information is factually impossible or clearly erroneous; the registered persons were not involved in the alleged investment-related sales practice violation, forgery, theft, misappropriation or conversion of funds; and the claim, allegation or information is false.

The Panel has made the above Rule 2080 findings based on the following reasons: Claimants' allegations of Respondents Arque Capital, Ltd., Audrey Mari Kuwabara and Michael Cheng Ning's involvement or affiliation with Respondent Empire Securities Corporation in the sale of securities to Claimants in 2007 is clearly erroneous. In 2007, there was no evidence of Respondents Arque Capital, Ltd., Audrey Mari Kuwabara and Michael Cheng Ning's involvement with any sales or affiliation with Respondent Empire Securities Corporation and that their alleged control of Respondent Empire Securities Corporation, if any, did not occur until 2009.

7. The Panel recommends the expungement of all references to the above captioned arbitration from Respondent James Thomas Nagle's (CRD # 4897449) registration records maintained by CRD, with the understanding that pursuant to Notice to Members 04-16, Respondent James Thomas Nagle must obtain confirmation from a court of competent jurisdiction before CRD will execute the expungement directive.

Unless specifically waived in writing by FINRA, parties seeking judicial confirmation of an arbitration award containing expungement relief must name FINRA as an additional party and serve FINRA with all appropriate documents.

Pursuant to Rule 12805 of the Code, the Panel has made the following Rule 2080 affirmative finding of fact: The claim, allegation or information is false.

The Panel has made the above Rule 2080 finding based on the following reasons: Claimants and Respondent Nagle testified that Respondent Nagle gave several options to the Claimants over a period of time during which they rejected many but accepted and selected the one which they purchased, being the vacant property in Atlanta. Respondent Nagle went to Idaho to interview the DBSI principals and advised Claimants of his findings. There is no evidence that his representations were not truthful, adequate and appropriate at the time that they were made. The property selected is still owned by the Claimants and appears to be a safe, unencumbered parcel requiring no payments of Claimants. The Claimants have not yet suffered any provable damages.

8. Any and all relief not specifically addressed herein, including punitive damages, is denied.

**CONFIDENTIAL**
EXHIBIT EXCERPT

## FEES

Pursuant to the Code, the following fees are assessed:

### Filing Fees
FINRA Dispute Resolution assessed a filing fee* for each claim:

| | |
|---|---|
| Initial Claim Filing fee | =$ 1,575.00 |

*The filing fee is made up of a non-refundable and a refundable portion.*

### Member Fees
Member fees are assessed to each member firm that is a party in these proceedings or to the member firm(s) that employed the associated person(s) at the time of the event(s) giving rise to the dispute.  Accordingly, as a party, Arque Capital, Ltd. is assessed the following:

| | |
|---|---|
| Member Surcharge | =$ 2,250.00 |
| Pre-Hearing Processing Fee | =$   750.00 |
| Hearing Processing Fee | =$ 4,000.00 |

### Adjournment Fees
Adjournments granted during these proceedings for which fees were assessed:

| | |
|---|---|
| June 21- 24, 2010, adjournment by Claimants | =$ 1,200.00 |
| April 25 – 29, 2011, adjournment by Parties | =$ 1,200.00 |
| October 3 – 7, 2011, adjournment by Claimants | =$ 1,200.00 |
| **Total Adjournment Fees** | =$ 3,600.00 |

1. The Panel has assessed $2,400.00 of the adjournment fees jointly and severally to Claimants.
2. The Panel has assessed $1,200.00 of the adjournment fees jointly and severally to Respondents Arque, Kuwabara, Nagle and Ning.

### Discovery-Related Motion Fees
Fees apply for each decision rendered on a discovery-related motion.

| | |
|---|---|
| One (1) Decision on a discovery-related motion on the papers with one arbitrator @ $200.00 | =$   200.00 |
| Claimants submitted (1) discovery-related motion | |
| **Total Discovery-Related Motion Fees** | =$   200.00 |

The Panel has assessed $200.00 of the discovery-related motion fees jointly and severally to Respondents Arque, Nagle, Ning and Kuwabara.

### Hearing Session Fees and Assessments
The Panel has assessed hearing session fees for each session conducted. A session is any meeting between the parties and the arbitrator(s), including a pre-hearing

FINRA Dispute Resolution
Arbitration No. 09-03602
Award Page 7 of 8

conference with the arbitrator(s), that lasts four (4) hours or less.  Fees associated with these proceedings are:

| Four (4) Pre-hearing sessions with the Panel @ $1,200.00/session | | =$ 4,800.00 |
|---|---|---|
| Pre-hearing conferences: | December 3, 2009 | 1 session | |
| | June 7, 2010 | 1 session | |
| | November 1, 2010 | 1 session | |
| | September 27, 2011 | 1 session | |

| Eleven (11) Hearing sessions @ $1,200.00/session | | =$13,200.00 |
|---|---|---|
| Hearing Dates: | February 1, 2012 | 2 sessions | |
| | February 2, 2012 | 2 sessions | |
| | February 3, 2012 | 2 sessions | |
| | February 6, 2012 | 2 sessions | |
| | February 7, 2012 | 3 sessions | |

| One (1) Hearing session on expungement request @ $1,200.00/session | | |
|---|---|---|
| Hearing Date: | May 9, 2012 | 1 session | =$ 1,200.00 |
| Total Hearing Session Fees | | | =$19,200.00 |

1. The Panel has assessed $9,600.00 of the hearing session fees jointly and severally to Claimants.
2. The Panel has assessed $9,000.00 of the hearing session fees jointly and severally to Respondents Arque, Kuwabara and Ning.

All balances are payable to FINRA Dispute Resolution and are due upon receipt.

**CONFIDENTIAL**
EXHIBIT EXCERPT

**Dinehart Subpoena Response 000334**

FINRA Dispute Resolution
Arbitration No. 09-03602
Award Page 8 of 8

## ARBITRATION PANEL

| | | |
|---|---|---|
| Mandel E. Himelstein | - | Public Arbitrator, Presiding Chairperson |
| Kevin K. Forrester | - | Public Arbitrator |
| D. Brad Callen | - | Non-Public Arbitrator |

I, the undersigned Arbitrator, do hereby affirm that I am the individual described herein and who executed this instrument which is my award.

Concurring Arbitrators' Signatures

_____          5/30/2012
Mandel E. Himelstein                      _____
Public Arbitrator, Presiding Chairperson  Signature Date


_____          _____
Kevin K. Forrester                        Signature Date
Public Arbitrator


_____          _____
D. Brad Callen                            Signature Date
Non-Public Arbitrator


June 1, 2012
_____
Date of Service (For FINRA Dispute Resolution office use only)

FINRA Dispute Resolution
Arbitration No. 09-03602
Award Page 8 of 8

## ARBITRATION PANEL

| | | |
|---|---|---|
| Mandel E. Himelstein | - | Public Arbitrator, Presiding Chairperson |
| Kevin K. Forrester | - | Public Arbitrator |
| D. Brad Callen | - | Non-Public Arbitrator |

I, the undersigned Arbitrator, do hereby affirm that I am the individual described herein and who executed this instrument which is my award.

**Concurring Arbitrators' Signatures**

Mandel E. Himelstein
Public Arbitrator, Presiding Chairperson

Signature Date

Kevin K. Forrester
Public Arbitrator

5/31/12

Signature Date

D. Brad Callen
Non-Public Arbitrator

Signature Date

June 1, 2012

Date of Service (For FINRA Dispute Resolution office use only)

**CONFIDENTIAL**
EXHIBIT EXCERPT

**Dinehart Subpoena Response 000336**

FINRA Dispute Resolution
Arbitration No. 09-03602
Award Page 8 of 8

## ARBITRATION PANEL

| | | |
|---|---|---|
| Mandel E. Himelstein | - | Public Arbitrator, Presiding Chairperson |
| Kevin K. Forrester | - | Public Arbitrator |
| D. Brad Callen | - | Non-Public Arbitrator |

I, the undersigned Arbitrator, do hereby affirm that I am the individual described herein and who executed this instrument which is my award.

## Concurring Arbitrators' Signatures

_____
Mandel E. Himelstein
Public Arbitrator, Presiding Chairperson

_____
Signature Date

_____
Kevin K. Forrester
Public Arbitrator

_____
Signature Date

_____
D. Brad Callen,
Non-Public Arbitrator

5/30/2012
_____
Signature Date

June 1, 2012
_____
Date of Service (For FINRA Dispute Resolution office use only)

**CONFIDENTIAL**
EXHIBIT EXCERPT

**Dinehart Subpoena Response 000337**

TIC REAL ESTATE LLC SCORECARD

Name of Offering – DBSI New Hampstead LLC          PPM Date – 11-26-2007
Size – Up to $4,667,362 –  Min. purch. – 3.21% interest ($150,000 of equity, with
no assumed debt).  The Company is also offering a maximum of 138 Units at a
purchase price of $50,000 per Unit.  The Company is also offering a maximum of
93 Units at a p urchase price of $50,000 per Unit.  Closing is scheduled for 5-15-
08 but may be extended until 8-15-08, at the sole discretion of the Co.
Objectives – 1.  Acquire an interest in the Project.  2.  Preserve and protect the
investors' capital.  3.  Within three to four years, provide investors with the
potential to obtain capital appreciation from the sale of the Project. 4.  Make
quarterly payments to the investors under the Option Agreement and   5.
Provide land management services to the investors.  There is no assurance that
Company will achieve any or all of these objectives.  Accredited Investors only
per Rule 501 of Reg. D.

Description – DBSI New Hampstead LLC, a newly formed Idaho LLC, which is
wholly-owned by DBSI Housing Inc. has been formed to acquire, operate an
Interest, and sell undivided tenant in common interests in New Hampstead, an
undeveloped real property made up of a 49.79-acre parcel located within
Chatham County, Georgia.  The Project is zoned Planned Unit Development,
allowing for office and retail use.  The Project is a commercial component of a
4,505-acre planned community that has been approved for 10,185 single-family
residences and 1.091 multi-family units.  There are also 7 commercial lots in the
development and the Project is the closest one to Interstate 16, putting it in a
unique position to serve the office and retail needs of both residents and visitors.
The Project will combine office space and a variety of retail uses from movie
theaters and a grocery store to restaurants and banks.  The Project will be
acquired by the Company from an unrelated third-party seller for $3,501,055 and
the Company will market the Project to investors at $4,667,362 ($2.15/sq.ft.)
After accountable reserves of $221,022, the net mark-up to the investors is
945,285 or 20.25% of the TIC investors' equity.

1. LLC MGR. Experience – The sponsor, DBSI New Hampstead LLC, is a newly
formed entity and the Land Manager (2006) are both wholly-owned and managed
by DBSI Housing, Inc. an Idaho Corp.  DBSI Housing, Inc. the sole member and
manager of the Company. is a member of the DBSI Group of Co.'s.  Since 1980,
DBSI and its Affiliates have grown to more than 400 employees and raised $1.5
billion in capital.  DBSI currently manages assets valued at over $2.65 billion.
Douglas L. Swenson is president of DBSI Housing, Inc. and also the founder and
current Pres. of the other DBSI companies.  He is a CPA (inactive) a real estate
licensee (inactive) and a registered principal and majority shareholder of the
Managing Broker-Dealer.  He holds a Master of Accountancy degree from BYU.
                                             Score _____5_____

**CONFIDENTIAL**
EXHIBIT EXCERPT                                    **Dinehart Subpoena Response 000338**

2.Net Worth Consideration – No financial statements are shown for DBSI New Hampstead LLC, a newly formed company.  DBSI Housing Inc. (Exhibit F) the sole member and manager of the Co., shows an unaudited net worth of $105.9 million as of June 30, 2007.  The Co. shows net income (after depreciation and amortiz. of $1.7 million) of $14.7 million for the period ending 6-30-2007.

Score _____5_____

3. Resale Activity – DBSI Housing Inc. has done offerings that have included 60 traditional real estate offerings (41 limited partnerships completed), 15 debt offerings (150 loans with 40 satisfied) and numerous commercial real estate projects.  This includes more than 75 TIC offerings in 33 states.  In terms of commercial properties, it has gone full cycle on 6.  Out of 28 undeveloped land deals, none have gone full cycle.          Score _____4_____

4. Compensation – The Land Manager, DBSI Asset Management LLC, an Affiliate of the Co., will receive $500 per month, unsubordinated, for the term of the Land Management Agreement.  In connection with any sale (excluding a sale in accordance with the Option Agreement), exchange or other disposition of the Land, or any portion thereof, Affiliates of DBSI Housing Inc. may receive a portion of a sales commission (unsubordinated) estimated to be between 2.00% and 5.00% of the sales price of the Land, if only if approved at such time by the Tenants in Common.  The Company projects annual expenses of $44,205 which consist of management fees ($6,000 as stated above), annual real estate taxes ($37,462) insurance ($212) and miscellaneous expenses ($531).  The accountable reserves ($221,022) appear to be adequate for the projected expenses over the holding period of 3 – 4 years.     Score _____4_____

5.Load Factors – Sales commissions and expenses total 9.75% of the TIC investment equity.  Of the 9.75%, 6.75% is allocated to outside or selling broker-dealer commissions, 0.5% is provided to selling broker-dealers for non-accountable due diligence expense requirements and 0.5% is provided as a non-accountable marketing allowance.  Further, DBSI is utilizing its existing broker-dealer, DBSI Securities Corp. to distribute the TIC interests and is receiving a marketing and due diligence allowance of the remaining 2.0% of gross proceeds for wholesaling and marketing costs, a portion of which may be re-allowed to selling group members.  Additional Sponsor compensation included in the "Non-Accountable Offering and Closing Costs" and "Property Cost and Fees" is $465,217 or 9.97% of equity.  Including the 2% non-accountable DBSI marketing allowance ($93,347) and the $25,000 line item for non-accountable acquisition related expenses, the sponsor load is approximately 20.75% of the TIC equity.

Score _____4_____

6. Guarantees – The Project is subject to a Land Management Agreement with DBSI Asset Management LLC.

**CONFIDENTIAL**
EXHIBIT EXCERPT

This structure is necessitated by Rev. Proc. 2002-22, in that any future purchase arrangement between DBSI and TIC owners would have to be an option, rather than a "put" or enforceable contract to buy on particular terms. There is in fact an Option Agreement to be executed by DBSI which will be assumed by the TIC owners. The Option Agreement provides that DBSI and/or its assigns may exercise the option and acquire the Project at any time during the three-year option period for a purchase price of $4,999,000. As compensation to the TIC owners for the Option Agreement, DBSI will make quarterly payments of an annual amount of $326,715 (which equates to a 7.0% simple annual return). The Option Agreement also includes two six-month periods for which DBSI will pay $163,375.50 per each 6 month extension in advance and further, DBSI's purchase price is increased to $5,229,000 during the second 6 month extension period. The Option Agreement purchase price of $4,999,000, which is above the TIC Investment Cost, equates to a sale value of $2.30 per sq. ft. (purch. price – $2.15 per sq. ft.) while the first extension purchase price of $5,091,000 equates to a sale value of $2.35 per sq. ft. and the second extension purchase price of $5,229,000 equates to a sale value of $2.41 per sq. ft. DBSI projects that TIC owners will receive an annual return of 10.0% if DBSI purchases the Project at the end of the option or at the end of either of the option extension periods. Should DBSI choose not to exercise its option to purchase the Project, the TIC owners will be free to sell the Project at market value. With respect to the Offering complying with the 15 requirements of IRS Revenue Procedure 2002-22, the PPM contains, at Exhibit H, an opinion from tax counsel, Foley and Lardner LLP dated November 26, 2007, which indicates that the TIC Interests "should" be treated as undivided interests in real estate, and not as partnership interests, under both the Rev. Proc. and Section 1031 of the IRC of 1986, as amended.                                                                    Score _____4_____

7. Self-Dealing (Conflicts of Interest) 1. The Manager and affiliates of the Manager are acting as the manager of other LLC's, and/or as general partner of limited partnerships and may form other business entities. 2. The Manager and its Affiliates may also buy Interests. As a result, conflicts of interest between the Company and the various roles, activities and duties of the sponsor and its affiliates may occur.
Conflicts are (i) the Manager or such Affiliate may have an interest in selling or otherwise disposing of Company assets at an earlier date than would other investors so that the Manager or such Affiliate may receive its investment in the Units, and (ii) the Manager or such Affiliate may obtain voting power over matters subject to a vote of the Members. 2. The Managing Broker Dealer is an Affiliate of the Company, DBSI Housing Inc. As such, the due diligence investigation of the company and this Offering is not an independent review. 4. DBSI Housing Inc. has not developed and does not expect to develop any formal process for resolving conflicts of interest. 5. DBSI Housing Inc. and its Affiliates, including the Land Manager may engage for their own account, or for the account of others, in other business ventures. Some may compete directly with this Company.

**CONFIDENTIAL**
EXHIBIT EXCERPT                                                          **Dinehart Subpoena Response 000340**

6. DBSI Housing Inc. and its affiliates may acquire additional properties in the future that compete with the Project.  7.  The 20.25% mark-up on this property to the TIC investors on a property, newly acquired.       Score _____ 4_____

8.Members Rights –Unanimous approval, consent or other action of the Tenants in Common shall be required to approve: (a) The Land Management Agreement and all amendments and renewals thereof; (b) Any other management or brokerage agreements; (c) All leases and amendments; (d) all financing and refinancing of the Land; and (e) Sale of the Land (other than a sale pursuant to the Call Option).  All other actions requiring approval of the Tenants in Common may be taken by the Tenants in Common holding more than 50% of the undivided tenant in common interests in the Land.  Whenever the consent or approval of the Tenants in Common is required or otherwise requested, each Tenant in Common generally shall have 30 days after the date on which the request for consent or approval is submitted to it by Land Manager in which to approve or disapprove of the matter in writing.  A Tenant in Common who does not disapprove of the matter in writing within such 30 day period, shall be deemed to have approved the matter.

     Consenting TIC owners receive a favorable pro-rata purchase in the event a dissenting TIC owner objects to a sale or refinancing of the Project or fails to take action to prevent or cure an event or default under secured loan documents approved by 70% or more or the TIC owners, rather than a purchase option by the syndicator at a price determined by the syndicator's appraiser.
 In the case of a specific lease that is outside of the leasing parameters and requires the unanimous approval of the Tenants in Common, the lease will be deemed approved unless the Tenants in Common provide written notice of disapproval within 72 hours of the date on which the request for approval was submitted to them by the Land Manager.  The Land Manager shall have no obligation hereunder to comply with any requests or direction made by less than all of the appropriate percentage of the Tenants in Common.

     Pursuant to Section 8.2 of the Operating Agreement, the Manager may be removed for cause (i.e. gross negligence or fraud, malfeasance, misconduct or willful breach of the Operating Agreement, a felony conviction, or bankruptcy) by a Majority Vote (greater than 50%).  Except for cause, the Manager must be removed by Super Majority Vote (greater than 75%) for any reason.  Further, the Manager or any affiliate that owns a membership interest will not be entitled to vote on any vote to terminate the Manager and in this case, Majority Vote and Super Majority Vote shall be based upon all other membership interests, not including the Manager and/or its affiliate's membership interests.

Score _____ 3_____

9. Leverage – The property is being marketed to the TIC investors without debt i.e. on an all cash basis.                              Score_____ 5_____

**CONFIDENTIAL**
EXHIBIT EXCERPT

10. Financing – The project will not be subject to any construction or permanent financing. The Offering is an all-cash investment and, therefore, is only suitable for Section 1031 exchange clients who l(1) do not have debt associated with their relinquished property, (2) are subject to an equivalent amount of aggregate debt on alternative I.D. replacement properties, which they close, or (3) provide additional outside cash consideration equal to the relinquished property debt.

Score _____5_____

11. Valuation Ratio – While DBSI did not do a complete appraisal on the property, recent sales and listings of commercial sites in the immediate area were analyzed and ranged from \$2.59/sq. ft. to \$5.74/sq. ft. Further, the comparable most similar in size to the project (30.0 acres) sold in January 2006 for \$5.74/sq. ft. Further, DBSI obtained and provided 3 additional sale comparables from Gilbert Realty Company, LLC of Savannah, GA, a firm familiar with the real estate market around Chatham County, GA. The sales were made in 2006 and 2007 with commercial parcels ranging from 16.64 acres to 95.12 acres and prices from \$2.65/sq. ft. to \$5.74/sq. ft. It appears that the New Hampstead Project is priced considerably less than the sale price for each of the above-mentioned comparables and that the TIC Investment Cost appears to be within the range of current market value for land in the vicinity of the Project.

Score _____4_____

12. Assumptions – DBSI believes that the Project is well positioned in the path of population growth and commercial development activity. It is located on the east side of Little Neck Ro9ad just south of its interchange with Interstate 16 in Savannah, GA. Little Neck Road will be the main ingress to the Project making it an easily accessible development. Little Neck Road is currently two lanes and serves as a thoroughfare to the immediate area. Plans are to turn it into a five-lane road within the next 5 years. The Project lies within the Westside sub-market. Savannah's Westside sub-market continues to grow and attract new retail developers. The growth was initiated a few years ago by the construction of a Super Wal-Mart and Home Depot in conjunction with apartment complexes and single-family residential developments along Pooler Parkway at Interstate 95. Recently announced projects along Pooler Parkway and Benton Blvd. include a 35-acre, first phase development of a 240-acre tract for big-box retail by Edens & Avant, as well as Phase 1 of a 140-acre development by the Goodman Companies. Based on the fair price paid at the time of purchase and the growth potential of the area, it is reasonable to project a 7% per year interim cash flow and a 10% per year total return potential for the TIC investors.

Score _____5_____

13. Supply and Demand Considerations - The Savannah metropolitan area population grew 20% between 1990 and 2000. The population of the metropolitan area is estimated to be 801,052 in 2006 and is expected to reach 839,472 in 2011. In 2006, the number of households in the metropolitan area is estimated to be 290,794.

The number of households within the metropolitan area in 2000 was 276,394 and the number of households is expected to reach 302,123 in 2011.  The number of households in the metropolitan area grew by 24.2% between 1990 and 2000.  In 2006, the average household income in the Savannah metropolitan area is estimated to be $55,206, compared with an estimated average household income in 2000 of $49,473.  The median household income in the Savannah metropolitan area is $41,110 per year and is projected to be $45,278 by 2011.

Score_____5_____

14. LLC Consideration vs. Competition –120.75%     Score _____2_____

15. Risk Factors (% of Normal Risk)  1.  There is no certainty that an investment in a TIC Interest will be profitable.   2.  Interests are illiquid and have limited transferability.  3.  There is no guarantee that DBSI Development Services LLC will exercise its option to purchase the Land under the Option Agreement providing the TIC investors with a 10% annualized return.  4.  Owning undeveloped land is subject to innumerable risks.  5.  Risk of national, regional and local economic downturn.  6.  Risk of regional construction projects competing with ours.  7.  Environmental liabilities.  8.  There are significant tax risks for Purchasers acquiring interests as replacement property in a Section 1031 tax-deferred exchange, including without limitation, that there is no debt assoc. with a Purchaser's acquisition of Interests and risks relating to the Identification of the Land pursuant to Section 1031.  9.  This is a "best efforts" offering with no minimum or escrow requirements.  10.  The Land is concentrated in one area and hence, not a diversified investment.
11.  There are various conflicts of interest among the Company, DBSI Housing Inc., the Land Manager, DBSI Securities Corp. and its Affiliates.  12.  The Tenants in Common will rely on the Land Manager to manage, operate and sell the Land.                                           Score _____3_____

Total Score – 62 of 75 = 83%
(Minimum Consideration Acceptable to enter the due diligence process – 52 of 75 – 70%)
**October 12, 2009**

**CONFIDENTIAL**
EXHIBIT EXCERPT

THE HONORABLE RICARDO S. MARTINEZ

**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON**

JAMES GINZKEY, RICHARD
FITZGERALD, CHARLES CERF, BARRY
DONNER, and on behalf of the class
members described below,

Plaintiffs,

v.

NATIONAL SECURITIES
CORPORATION, a Washington Corporation

Defendant.

Case No.: **2:18-cv-1773**

RESPONSE TO SUBPOENA BY NON-
PARTY – MASON DINEHART

I, Mason Alan Dinehart, III, declare under oath, that I have, to the best of my ability, produced all documents in my possession, custody, or control, that are responsive to Section 3 – Documents Requested – in the subpoena served upon me. As I am not under document retention requirements, in the ordinary course, I destroy records and delete files related to closed cases in which I am retained, whether I provide testimony or a report. As such, at one time there likely existed more records responsive to this subpoena, but those records no longer exist.

Dated: December 30, 2021

By: /s/ *Mason Alan Dinehart III*

Mason Alan Dinehart, III

1

**EXHIBIT 12**

# A CHECKLIST FOR "REASONABLE" DUE DILIGENCE "THE SCORECARD"

*Mason Alan Dinehart III, RFC[1]*

Broker/Dealer due diligence on private placements, direct participation programs, real estate syndications and Tenant-In-Common (TIC) interests is a critical and fundamental step necessary for brokerage firms to determine whether to offer a security to its clients. Unlike publicly traded securities, there are no analyst or ratings agency reports available for review. Further, unlike publicly traded securities, rarely are there any standard corporate filings publicly made with the Securities and Exchange Commission. As such, when an investor is solicited to invest in a private offering by a broker/dealer, it is the obligation of the broker/dealer to have performed reasonable and independent due diligence on the offering. Whether the offering is a "non-conventional investment,"[2] a hedge fund,[3] TIC,[4] or Regulation-D private placements,[5] due diligence is an obligation advisors and their firms have to the investing public.

In 1972, I had been with a real estate syndication firm known as Carlsberg Securities, Inc. for three years. I was the Branch Manager and Director of Due Diligence and Compliance. We syndicated all forms of real estate. Publicly, we specialized in mobile home parks and distributed our offerings through well-known wire-houses including Walston & Co. and Francis I. Dupont & Co. We were, in fact, the second real estate syndicator on Wall Street, preceded only by Pacific Plan in Northern California and immediately followed by Con-Cap and Prudential Bache. Privately, we

---

1. Mason Dinehart, III, RFC has been a securities industry professional since 1969. He has served as a FINRA/NASD arbitrator on ten cases and has also been retained as an expert witness by both investors and securities industry member firms in hundreds of FINRA/NASD, JAMS, AAA, NYSE, and PSE arbitrations. He has also been retained as an expert witness in California state and federal court. Mason currently holds the Series 7, 24, 63, 65, 79, and 99 licenses, and previously held the Series 27 license.

2. *See* FINRA NOTICE TO MEMBERS 03-71.

3. *See* FINRA NOTICE TO MEMBERS 03-07.

4. *See* FINRA NOTICE TO MEMBERS 05-18.

5. *See* FINRA REGULATORY NOTICE 10-22.

EXHIBIT EXCERPT

*PIABA BAR JOURNAL*

simply is no substitute for a promoter's direct experience dealing with acquisition and financing of properties in a packaged program where investors pool their capital and receive tax-deferred cash flow, equity buildup, and growth of principal. Further, it is helpful to know whether the syndicator has had experience dealing with a large number of investors and reporting on the program's progress from an investor services perspective. Specifically, it is very important to know how the sponsor has handled problems in the past.

Important to this analysis are the number of years a sponsor or manager has in syndicating, acquiring, financing, managing and selling direct participation programs for investors. This kind of experience rises well above merely buying and selling properties. It takes twenty years to earn five points in Question Number 1. One point can be added to the score of this deal point with some extensive personal real estate acquisition and management experience of one or more of the key principals of the company.

## QUESTION 2 – FINANCIAL STRENGTH

With this deal point, the tangible net worth of the sponsor or manager backing the deal is examined. It is important to note, little credit should be given to would-be sponsors who are undercapitalized affiliates of a separate, main company sponsor, or parent company, which is not backing the deal but has simply loaned money to the affiliate in the form of a note to inflate the would-be sponsor's net worth. Again, what is measured here is the tangible net worth of a sponsor on a GAAP basis, where 20% or more of its assets are liquid and not an empty shell number. To meet this requirement, many sponsors provide financial statements that are not audited. This is true especially in private placements. However in the mid-2000's when deals by the carload were being offered, several large sponsors did provide audited financials during that time period. Examples include American Realty Capital, Vertical Financial Group (Mortgage Funds), DMMS and Argus. Interestingly enough, noted Ponzi schemes like Provident (Shale Royalties), Medical Capital and DBSI provided unaudited financials only. While audited, certified or reviewed financial statements help, they are no guarantee against fraudulent activities. But audited financials are better to have than not, and it should be mandatory for sponsors raising millions of dollars to provide them. Note that it takes $15 million of tangible net worth to obtain five points on the ScoreCard. As a rule of thumb, the sponsor should have a net worth of no less than 10% of the sum it has raised in outstanding deals to date, including the one under consideration.

EXHIBIT EXCERPT

A score of 30 is 19 points below the minimum needed to be qualified to enter the due diligence process.  Finally, since this program fails to meet reasonable basis suitability, it should not be recommended to any investor.


Mason A. Dinehart III, RFC
Securities Expert Witness
FINRA Arbitrator # A30388
Register Principal Due Diligence
Silber Bennett Financial, Inc.

# EXHIBIT 13

# PREFERRED STOCK OFFERING SCORE CARD

Name of Offering
Description:

Names of Officers:

*The following information is only intended for review by representatives of Broker Dealers and is not authorized for distribution to the public*

1. Company/Officers
   Experience : # of yrs. in bus. ____

   a. More than 10 yrs.    (5 pts)
   b. 8 - 10 years         (4 pts)
   c. 6 - 7 years          (3 pts)
   d. 4 - 5 years          (2 pts)
   e. 1 - 3 years          (1 pts)

2. Net Worth Consideration: ____

   a. $5,000,000+                      (5 pts)
   b. $2,500,000-$4,999,999            (4 pts)
   c. $1,000,000-$2,499,999            (3 pts)
   d. $500,000 - $999,999             (2 pts)
   e. $Negative net worth             (1 pts)

3. Financial Track Record/Litig. ____
   (Hist. of operating losses/Def. Wk. Cap.)

   a. Oper. gains from incept.(5 pts)
   b. Oper. gains-most rec. yr(4 pts)
   c. Break-even - curr. yr.  (3 pts)
   d. Oper. losses - curr. yrs (2 pts)
   e. Oper. losses from incep(1 pts)

4. Load Factors :($5-10MM offer.)____

   a. Less than 10%        (5 pts)
   b. 10% - 11.9.%         (4 pts)
   c. 12% - 12.9%          (3 pts)
   d. 13% - 19.9%          (2 pts)
   e. 20% or more          (1 pts)

5. History of Trading ____
   a. Low vol/ bid-ask        (5pts)
   b. Stabilizing             (4 pts)
   c. Mild volatility         (3 pts)
   d. Mid-hi vol/wd.spd.      (2 pts)
   e. Little or no trading    (1 pts)

6. Self Dealing/Conflicts:____

   a. All "arms length"    (5 pts)
   b. Pay self - 1 area    (4 pts)
   c. Pay self - 2 areas   (3 pts)
   d. Pay self - 3 areas   (2 pts)
   e. Pay self in 4+areas(1 prs)

7. Dilution:

   a. Less than 25%        (5 pts)
   b. 25% - 50%            (4 pts)
   c. 50% - 65%            (3 pts)
   d. 65% - 75%            (2 pts)
   e. More than 75%        (1 pts)

8. Percentage of Supply/
   Demand:

   a. 90%                  (5 pts)
   b. 95%                  (4 pts)
   c. 100%                 (3 pts)
   d. 110%                 (2 pts)
   e. 120%                 (1 pts)

EXHIBIT EXCERPT

SCORECARD (Page 2)

9. Assumptions: _____

    a. Very conservative criteria & safeguards (5 pts)
    b. Semi-conservative criteria with many
       safeguards              (4 pts)
    c. Semi-aggressive criteria w/ safeguards  (3 pts)
    d. Aggrressive criteria with few safeguards (2 pts)
    e. Aggressive criteria with virtualy no safe-
       guaros                (1 pts)

10. Risk Factors
   (% of Normal Risk)

    a. 80%              (5 pts)
    b. 90%              (4 pts)
    c. 100%            (3 pts)
    d. 110%            (2 pts)
    e. 120%            (1 pts)

TOTAL POINTS _____

Note: A minimum of 35 points (70%) is required for
       due diligence consideration.  Further, a score
       of one (1) in any one category may cause the
       offering (IPO) to be rejected

SCORECARDS

Reproduction, photocopying or incorporation into any information retrieval
system for external or internal use is prohibited unless permission is obtained
from the publisher, Financial Education Network Development (FEND).

Ex 13 pg 002
EXHIBIT EXCERPT

Two Scorecards for Beamreach Solar, Inc. (Formerly Solexel, Inc.)

Beamreach Solar, Inc. ("Beamreach") had three securities offerings in February 2015, September 2016 and November 2016. The placement agent for all three offerings was National Securities, Inc. ("NSC") a registered broker dealer. Using proprietary scorecard methodology to evaluate securities offerings, these are scorecards on the first two Offerings.

OVERVIEW

Beamreach was formed in 2007 to develop photovoltaic modules ("PV") to generate solar energy for residential and commercial users. The PV modules are placed on rooftops to capture solar energy. Solar energy generation is a growing segment of the energy generation market and has attracted a number of companies anxious to participate in this market. Beamreach seeks to develop more energy at a lower cost than the competition. The company attracted industry veterans and venture capital investors to develop the PV modules. By 2015 the Company had 90-plus employees and had raised more than $200 million from venture capital investors by using various securities, including common stock and a series of preferred stocks. It also borrowed $25 million in debt.


Beamreach and its employees used this capital to develop superior PV modules to compete in the market place. It was building a test plant at its headquarters in California. It had over 280 patents. It had not yet manufactured or sold any of its modules. It needed more capital to continue its operations.

1. <u>FEBRUARY 2015 OFFERING SCORECARD</u>

This offering was for 12,338,268 shares of Series D Preferred stock for sale at $1.499 to raise $18.5 million. The offering was to be issued through NSC.

    1. <u>Company/Officers — Experience</u>
        Beamreach executive team has an average of more than 25 years' experience in building high technology, large-scale businesses in rapidly evolving industries.

        ● Chief Executive Officer: Michael Wingert has 32 years of industry experience. Mr. Wingert was formerly EVP at Seagate Technology LLC, and as President and COO of Maxtor Corporation, he drove operational profitability and a significant increase in the company's valuation prior to an acquisition by Seagate Technology LLC.

        o Chief Technology Officer: Mehrdad Moslehi has 29 years of industry experience. He holds nearly 300 patents, helped lead one former company through an initial public offering and helped liquidity events for two other companies (CVC completed an initial

1

EXHIBIT EXCERPT

public offering and was subsequently acquired by Veeco: Semizone also achieved a successful merger exit).

o Chief Financial Officer and Chief Sales & Marketing Officer: Mark Kerstens has 20 years of industry experience. Mr. Kerstens was formerly VP of Global Sales and Marketing for BP Solar (part of BP Plc.), and was a VP in a range of businesses at BP Plc., in Europe and the United States, in Business Development, Sales, Marketing, Strategy and Finance.

o Vice President of Cell & Process Engineering: Pawan Kapur has 17 years of industry experience, and has authored over 45 patents and provisional patent applications. Dr. Kapur was consulting professor in Stanford's Electrical Engineering department and founded IntegraLight.

Score:_____4_____

2. <u>Net Worth Consideration</u>

The Private Placement Memorandum ("PPM") included audited financial statements for 2013 and 2012 from Price Waterhouse. ("PW") The auditor's opinion mentioned the Company is recurring losses and negative cash flow from operations and the need for additional financing. The PPM also included unaudited operations for 2014. The Company sustained losses of ($33 million) in 2012, ($23 million) in 2013 and ($26 million) in 2014. The Company has had no revenues for 9 years.  The losses continued into 2015 and the Company stated that the proceeds from the offering would enable the Company to continue finance these losses until April 2016 when it would need additional financing to continue its operations and until it could start manufacturing and selling its PV modules.

The Company had a negative net worth (excluding its preferred stock) of ($151.4 million) at the end of 2014 and the continuing losses were mounting. The auditors did not include preferred stock in stockholders equity, giving it no value.

Score:_____1_____

3. <u>==Financial Track Record/==Litigation History of Operating Losses (Def.) Working    Capital</u>

Beamreach never left its development stage. It had no revenue and sustained losses throughout its history. It lost $24 million in 2013 and $33 million in 2012. It loses about $2 million per month. Even the Company's independent auditors commented in their opinion about the Company suffering recurring losses from operations and negative cash flow since inception, it had an accumulated deficit and would require additional financing to continue to fund its operations.

2

Completion of this offering combined with other sources of funds from a bank would enable the Company to continue its operations until April 2016. No revenue was expected until April 2016 and even then, it would continue to lose money, so additional financing was critical for the Company to survive.

Score:_____1_____

## 4. Load Factors

Certain of the Shares covered by this Memorandum are being offered on a "best efforts" basis by National Securities Corporation ("NSC") and by certain other placement agents. Pursuant to the agreement of the Company and NSC, the Company will pay to NSC a fee equal to 10% of the aggregate cash proceeds of each purchase of Shares in the Offering by non-institutional investors for which NSC was the procuring cause; if non-institutional investors procured by NSC purchase more than $10.0 million in Shares in the Offering, NSC's fee will increase to 11% of the aggregate cash proceeds. NSC's fee for sales of Shares to institutional investors procured by NSC will equal 5% of the aggregate cash proceeds of such purchases. There is no breakdown of load percentages netting to an amount that will "go into the Company". This is omitted and below the standard in the securities industry.

The Company will also issue to NSC a warrant to purchase a number of shares of Common Stock equal to 5.0% of the number of Shares purchases in the Offering for which NSC was the procuring cause. These warrants will be exercisable at the $1.4994 per share, will have a term of five (5) years and will be in the Company's standard form. In addition, pursuant to the Engagement Letter, the Company previously paid NSC a one-time legal counsel fee of $15,000 and will reimburse NSC for reasonable travel expenses and attorney fees (not to exceed $45,000) incurred in connection with the Offering.

Score:_____3_____

## 5. History of Trading

Beamreach is a privately held company so there is no history of trading. However, there were valuations for the Company as it obtained various rounds of financing. At one time the Company was valued at $650 million. In 2013, however the Company issued Class C shares with a purchase price of $1.178. This price valued the Company only at $100 million. This lower valuation reflected some concern and impatience from investors.

The present offering values the Company at $250 million. The purchase price for the Series D preferred stock is $1.499 per share or 27% more than the Series C offering in 2013. This is one explanation for this increase.

Score:_____1_____

3

6.  Self-Dealing /Conflicts of interest

After the offering, the major venture capital investors and executive officers would own a significant majority of Beamreach's voting securities. Several of these venture capital investors were also board members. These investors would have the ability to significantly influence most corporate actions including financing transactions, a merger with another company or a sale of the Company. These decisions could well conflict with the interests of other shareholders.

Aside from other equity investors, there are outstanding stock options to officers and employees of up to 10% of the total capitalization of the Company. These options were a further source of dilution and possible conflicts with existing stockholders.

Score:_____3_____

7. Dilution

Beamreach issued its Series D Preferred Stock that allowed the holder to convert its stock into common stock at an exercise price of $1.499 per share. The effect of this price is to value the entire Company at $250 million. In 2013, the Company issued Class C shares with an exercise price of $1.1784. This price valued the Company at $100 million. This lower value indicated the difficulty Beamreach was having in obtaining additional financing. Since the Company was so dependent on additional financing the Series C financing was alarming.

Because the Company simply had to have more capital, it is inevitable that the Series D Preferred stock would be diluted. Dilution means that the stockholders of Series D stock will have a smaller share of the corporation.

Score:_____1_____

8. Percentage of Supply/Demand

Solar energy demand was an expanding industry because of a demand for clean energy. Initially Solar PV modules or solar panels were not competitive with other sources of energy. The government helped to reduce the cost of solar energy by offering subsidies to buyers of PV modules. Because of the increased demand for solar energy, the industry attracted many competitors to Beamreach. These competitors had operation generating revenues. They were much larger than Beamreach with sizeable financial resources. Beamreach had not even begun to compete.

Another development in the industry was a significant decline in the price of PV modules. In 2007 when Beamreach was formed, the price for a solar generated PV module was $4.45 per watt of energy. By 2015, the price had declined to $0.59 per watt. Therefore, even though the demand for modules was growing, the price kept declining because of innovations in

4

technology and manufacturing productivity. It was in this market that Beamreach competed.

Score: _____1_____

9. <u>Assumptions</u>

Management at Beamreach's most fundamental assumption was a vastly over-optimistic estimate of the timing to start production of its PV modules so it could generate some revenues. Management estimated that minimum manufacturing could start in September 2015 when its test facility was completed. It was only about 50% completed by in February 2015. It then assumed that a manufacturing plant in Indonesia would be open by September 2016 when significant revenues would be generated. They then contemplated an initial public offering in December 2016.

Another assumption was that the industry would stabilize after a very tumultuous period when solar panels prices declined significantly. The lower prices were due to new more powerful modules manufactured in Asia and in particular, China. Domestic manufacturing was really not economical.

Completion of the financing outlined in this PPM contemplated that the Company would have enough funds to sustain its operations through April 2016 or only 14 months from the start of the offering. The Company was already planning a Series E Preferred stock offering in September 2015 for $30 million.

These assumptions were reckless and could only have been made by people sensing disaster forcing them to make unrealistic assumptions to obtain additional financing so the Company could continue to exist. There was simply no way an Indonesian plant could be in operation much less even under construction. There was no contract, only what could be called a memorandum of understanding. Any agreement with a foreign country requires extensive negotiations and in Asia the process took even more time. Furthermore, the Company could only last 14 months without financing and the Series E financing had not even been started. All of these financing assumptions were made in spite of the warning signs about the difficulty of financing after the Series C financing in 2013.

Meanwhile, the assumption about the market stabilizing was also wishful thinking. While solar energy was a growing industry, it had attracted competition, better financed and much further advanced in manufacturing and many more were generating significant revenue.

Beamreach may have been developing a better module buy, but it was running out of time to have a successful product for its business.

Score: _____1_____

5

10. Risk Factors

The PPM outlines 54 different risk factors covering 23 pages. Many of these risk factors are far-fetched and reflect many PPMs who insert so many risk factors that the reader will not be able recognize the key risks with an offering. Key parts about this offering are as follows:

1) The Company had only 14 months to survive even if the offering was completely vested.

2) Financing was becoming more and more difficult so that the only way to stay alive was to raise more capital.

3) The PV modules developed by Beamreach were not fully developed or tested in a manufacturing environment. Beamreach was not even sure its product would be competitive in a very difficult market.

Score:_____1_____

The score for Beamreach Series D totals 17 points. A minimum reserve of 35 points (70%) is required for due diligence consideration. This low score is one-half the number necessary to be qualified to even go into the due diligence process.

This offering fails reasonable basic suitability and should not be recommended to any accredited investor.

II. **September 15, 2016, Offering**

The first offering closed on April 2016. It took much longer than the Company expected. The first offering estimated that a fully funded offering would provide enough funds to April 2016 so there was urgency for a new round of financing. Originally a new round was planned for a Series E Preferred stock offering for $30 million. The offering was reduced to $15 million, possibly because of increased difficulty in receiving new funds.

This new offering consisted of a new Preferred stock called D-1 plus one share of common stock. The price remained the same as the first offering so the difference between the two offerings was the addition of one share of Common stock to the Series D-1 Preferred stock. NSC was the key placement agent for the Company.

1. Company Officer— Experience
   The management is almost the same except that Mark Kerstens formerly Chief Financial Officer and Chief Sales and Marketing Officer, became the

6

Chief Executive Officer on June 30, 2016. He replaced Michael Wingert who moved to Chairman of the Board of Directors. Otherwise, Management remains the same.

Score:_____4_____

2. Net Worth Consideration

The financial statements for 2014 and 2015 are available and included in the PPM. The Company's auditors, PricewaterhouseCoopers, changed its opinion to raise doubt that the Company could continue as a going concern. Beamreach's financial condition continued to deteriorate in 2015 and it lost $48 million. Its net worth, excluding the Preferred stock, was ($208.1 million) as the losses exceeded the capital raised in 2014 and 2015. Finally, the Company stated in the PPM that even with a full purchase of the offering it would run out of money by February 2017, eight months from the present offering.

Score:_____1_____

3. Financial Track Record

(History of operating losses/Deficit Working Capital)

The financial condition of the Company had deteriorated so much that now the Company's independent auditors commented in their opinion that it raised substantial doubt about the Company's ability to continue as a going concern. The Company lost $27 million in 2014 and $49 million 2015, an increase of 81%.

Even if the Company fully funded the offering, it would only have enough cash to fund its losses March 2017, or six months from the date of the present offerings. It also had to attempt to refinance Its Opus Bank debt with a new lender which would inherit the $25 million loan amount by December 2016. It also had to sign-up the manufacture of its PV module with an Asia-based manufacturer. While there was in fact a Technology Park in Malaysia, there is no evidence that Beamreach ever had a production facility there.

The Company was in a very perilous condition.

Score:_____1_____

4. Load Factors

The load factors for the offering are the same as for the first offering. However, there was still the omission of a breakdown of costs and fee/commissions,

7

EXHIBIT EXCERPT

netting out to the amount that would actually go into the Company.  This is and was below the standard of card.

Score:_____3_____

5. History of Trading

The Company was still privately held so there was no trading activity. However, the terms of this new offering of a D-I Preferred stock plus a share of Common stock at the same price of $1.499 per share had the effect of reducing the Company's value to $189 million from the valuation of $250 million in the February 15 offering. There was no explanation for the Reason for this reduced and revised valuation.

Score:_____1_____

6. Conflict of Interest — Self-Dealing

It is increasingly clear that the interests of management and the corporation are in conflict. Management was to raise money to continue operations and pay officer's and employees salaries Even as the losses continued to mount and consume what capital remained for the creditors, lenders and stockholders. The Company was in a tight box with no realistic chance of turning a profit or even generating any revenue. The venture in Malaysia has fallen apart and the Company only hoped to hire a third party international manufacturing company. The Company was dying and management refused to accept it and was ignoring the stockholders of the corporation

Score:_____1_____

7. Dilution

As mentioned earlier, this offering reduced the value of the Company to $189 million. The lower valuation will require anti-dilution adjustments for the Series B, Series C and Series D Preferred stock. The adjustment increases the number of common shares that each of the above Series can receive upon conversion of that stock into common stock and therefore reduced the share of the corporation for the investor in this offering.

Score:_____1_____

8. Percentage of Supply/Demand

The description of the market in the offering memorandum remained the same as the prior offering in February 2015 except for one key addition on page 48 of their offering in PM. In the February 2015 PPM management stated that industry

8

EXHIBIT EXCERPT

charges <u>may</u> result in substantial downward pressure in the price of PV modules. In the present offering management stated the recent industry changes <u>have resulted</u> in substantial downward pressure on the price of PV modules. Furthermore, the situation may worsen in the coming months. The market was getting worse.

Score:_____1_____

9.  <u>Assumptions</u>
The assumptions in the recent offering were about the same as in the first offering except that the time horizon is much shorter and therefore even more unrealistic than before. The assumptions were overreaching and unrealistic.

Score:_____1_____

10. <u>Risk Factors</u>
The risk factors remain the same as the first offering except for the second paragraph of the first page of the second offering which states that the Company would run out of money in eight months even if the second offering was fully subscribed. No need to read further.

Score:___1_____

The score for the second offering is 15 points. A minimum score of 35 points (70%) is required for due diligence consideration. This number is 20 points below the minimum and does not even qualify to enter the due diligence process. This offering fails reasonable basic sustainability and should not be recommended to any accredited investor.

<u>Conclusion</u>

Beamreach, beginning in 2015 was in dire financial condition and its management could not deal with reality. Every month that went by, management deluded itself with more and more unrealistic assumptions until finally no one except apparently NSC gave them any credibility whatsoever.  More than $20 million was wasted and investors lost everything. How could NSC have continued as a placement agent. NSC's management read the PPMS. It is not credible that they did not realize that Beamreach was doomed beyond salvage and they were major contributors to keeping this fraud alive.

9

Mason A. Dinehart III RFC
Securities Expert Witness
FINRA Arbitrator #A30388


September 30, 2021

10

EXHIBIT EXCERPT

# CONVERTIBLE SECURED PROMISSORY NOTE OFFERING SCORE CARD

Name of Offering                              Name of Sponsor
Description:

*The following information is only intended for review by representatives of*
*Broker Dealers and is not authorized for distribution to the public*

1. Company/Officers ____
   Experience : # of yrs. in bus.

   a. More than 20 yrs.    (5 pts)
   b. 15 -19 years         (4 pts)
   c. 10 -14 years         (3 pts)
   d. 6 - 9 years          (2 pts)
   e. 2 - 5 years          (1 pts)

2. N/W Consideration-Sponsor: ____
   (neg. debt to worth ratio = 1)

   a. $15,000,000+         (5 pts)
   b. $10 - $15,000,000    (4 pts)
   c. $5 - $10,000,000     (3 pts)
   d. $2.5 - $5,000,000    (2 pts)
   e. $1 - 2,500,000       (1 pts)

3. Valuation of Invest.Assets ____
   (Independent eval. or app.)

   a. Certified indep. eval.    (5 pts)
   b. Qualified indep. estim.   (4 pts)
   c. Estab. formula/app. bkup  (3 pts)
   d. Mgmt. valuation only..    (2 pts)
   e. No eval./formula at all   (1 pts)

4. Load Factors ____

   a. Low/No load          (5 pts)
   b. Low/Medium load      (4 pts)
   c. Ave load/No hidden chg (3 prs)
   d. Mark-up + hidden chgs.(2 pts)
   e. High load/mk.-up     (1 pts)

5. Liquidity inc. any Guar. ____
   a. Hi Liq./Guarantees(5 pts)
   b. Med. Liq/Guarant. (4 pts)
   c. Ave. liq./No Guar. (3 pts)
   d. Low Liq./No Guar. (2 pts)
   e. No Liq./No Guar.  (1 pts)

6. Leverage: ____

   a. Aud. D/S cov.1.5-1  (5 pts)
   b. Aud. D/S cov. 1.4-1 (4 pts)
   c. Ver. D/S cov. 1.3-1 (3 pts)
   d. Mgt. D/S cov.1.2-1  (2 pts)
   e. D/S cover. of 1-1   (1 pts)

7. Financing Terms: ____

   a. Curr. Py.Ln-15 yr+  (5 pts)
   b. Curr. Py.Ln-11-15   (4 pts)
   c. Def. Pay Ln.-6-10   (3 pts)
   d. Def. Pay Ln.-5-8   . (2 pts)
   e. Def. Pay Ln.less/5  (1 pts)

8. Conflicts of Interest ____
   Self Dealing
   a. Arms length trans. (5 pts.)
   b. Low self dealing   (4 pts.)
   c. Med/Ave. conflicts (3 pts.)
   d. Med-Hi self dealing(2 pts.)
   e. High conflicts/int. (1 pts.)

EXHIBIT EXCERPT

SCORECARD (Page 2)

9. Assumptions: _____

    a. Very conservative criteria & safeguards (5 pts)
    b. Semi-conservative criteria with many
       safeguards                      (4 pts)
    c. Semi-aggressive criteria w/ safeguards  (3 pts)
    d. Aggrressive criteria with few safeguards (2 pts)
    e. Aggressive criteria with virtualy no safe-
       guards                         (1 pts)

10. Risk Factors:
    (% of Normal Risk)

    a. 80%                 (5 pts)
    b. 90%                 (4 pts)
    c. 100%              (3 pts)
    d. 110%              (2 pts)
    e. 120%              (1 pts)

TOTAL POINTS _____

Note: A minimum of 35 points (70%) is required for
      due diligence consideration. Further, a score
      of one (1) in any one category may cause the
      offering (IPO) to be rejected.

SCORECARDS

Reproduction, photocopying or incorporation into any information retrieval
system for external or internal use is prohibited unless permission is obtained
from the publisher, Financial Education Network Development (FEND).

**CONVERTIBLE SECURED PROMISSORY NOTE OFFERING SCORECARD**

**Name of Offering** – BEAMREACH SOLAR, INC. PPM Supplement dated November 14, 2016 Original  PPM dated September 15, 2016.  Also included is Appendix 1 (10-21- 2016 Update Letter) and Appendix 2 (Updated Disclosure  Schedule).  This is a Private Offering under Rule 506 (b) under the Securities Act. Beamreach, a development stage company to date, has raised approximately $250 million in equity. through prior successive rounds of fundraising (A – D).

**Size of Offering** – Up to a maximum of $15,000,000 of Convertible Secured Promissory Notes. Note, This Supplement replaces and supersedes all previously distributed  supplements or similar distributions containing information related to the Memorandum of the Offering. The Co. previously issued the Memorandum describing an offering of Equity Units.  In light of various factors, including delays in completion of the initial closing of the Offering, reduced cash runaway, developments at the Company, developments in the solar market and discussions with prospective participants in the Offering, the Co. as revised the terms of the Offering as described in this section.  The Update letter disclosed to all stockholders  (Appendix 1), describes the market conditions and recent developments at the Co. that are factors contributing to the revised offering.

*Summary of the Offering* –The Company's business was to compete in the solar industry by developing solar photovoltaic modules that would generate more electricity at a lower cost than competitors. Investors were being sold a 9% 6 month bond that had a feature to give the bondholder a 300% premium to the original principal at the end of 6 months or when the Company was sold.

The Offering has been revised or amended for the sale and issuance of up to $15.0 million of convertible secured promissory notes of the company on the terms described in the Supplement. The Offering will no longer involve the direct issuance off equity securities as contemplated in the prior Memorandum. Instead, the Co. is raising money through the sale of Notes to fund a potential sale of the Company, which Notes, as described herein, will be eligible to recover certain premiums in the event the proceeds from a sale of the Company are sufficient.  Should the Company decide to raise additional funds through the future sale of preferred stock or common stock of the Company, in lieu of such sale or in advance of such sale, each holder of a Note may elect to convert all principal and accrued unpaid interest of the Note into shares of preferred stock or common stock of the Company issued in such financing, at a discount. The sale of the Company is and Will remain the Company's primary plan unless (a) the Company, its agents, or Opus Bank find a successor bank that that reaches an agreement with Opus bank to purchase the Company's existing loan from Opus Bank, and (b) the Company raises sufficient capital in the Offering or otherwise for the Company to reevaluate and consider on-going operations.

ANY INVESTMENT IN OUR SECURITIES IS SPECULATIVE, INVOLVES A HIGH DEGREE OF RISK AND SHOULD BE CONSIDEERED ONLY BY SOPHISTICATED INVESTORS WHO ARE PREPARED TO BEAR THE ECONOMIC RISK OF SUCH INVESTMENT FOR AN INDEFINITE PERIOD AND ARE ABLE TO WITHSTAND A TOTAL LOSS OF SUCH INVESTMENT.

Initial closing of at least $2.5 million, including the $500,000 advanced by Essex Capital Corporation on or about October 12, 2016. Total potential loan facility of up to $15,000,000, subject to increases as described below. The revised Offering is expected to expire on 12-31-2016, subject to extension or earlier termination without notice at the option of the company.

Each holder of capital stock that is an accredited investor will have the opportunity to participate in the purchase of bridge notes over a period of time to be determined following the initial closing of the bridge loan, and the Board will be empowered to increase the facility to allow for participation of such holders. Certain existing large investors in the Company; other stockholders that are accredited investors that elect to participate in the financing.  Company lenders and equipment lessor's; and other parties approved by the Board.

Use of Proceeds – The invested proceeds shall be used to fund the Company's existing operations, including engaging an investment bank to identify opportunities
for a sale of the Company.

Interest and Premiums – The Notes will bear interest on all outstanding principal at Interest rate of 9.0 % compounded annually, which shall accrue daily and be payable together with the principal amount of the Notes, on the Maturity Date.  If an Event of default has occurred, and is continuing, the Notes will bear interest at the default rate of interest equal to the sum of the Interest Rate plus an additional 10.0% per annum.

Term – All of the outstanding principal of, interest on, fees and all other amounts outstanding under the Notes shall be due and payable in full on the date that is six months from November 10, 2016. which shall be extendable at the option of the Holder to twelve months from November 10, 2016.  The initial Maturity Date and the Extended Maturity date, as applicable, shall be referred to generally as the "Maturity  Date", provided that the accrued interest shall be paid in cash at the time of such extension.

Event of Default – Customary for similar transactions, including without limitation payment defaults, misrepresentations, judgments, and cross-defaults.

Security – The Notes shall be secured by a security interest in all of the Company's tangible and intangible assets and other property, including its accounts receivable and intellectual property, which interest shall be subordinate to the interest of Opus Bank.

Seniority – The bridge lenders, Opus and other parties as required to effect the waterfall provided below will enter into an inter-creditor agreement providing for the priority of payment of proceeds in the event of a Corporate Transaction as follows:
*First, Liquidation Proceeds shall be paid to Opus Bank until all of the Company's Obligations under its loan agreements with Opus Bank have been paid in full.
*Second, If after satisfying the foregoing obligations, Liquidation Proceeds remain, such Liquidation Proceeds shall be paid next to the holders of Notes, pari passu, until all such holders have received an amount (in addition to their principal and (interest) equal to 20% of the original principal amount of their Notes (Such amounts the "Secured Premium").
*Lastly, if after satisfying the foregoing obligations, Liquidation Proceeds remain,  Such Liquidation Proceeds shall be paid next, pari passu (on an unsecured basis) to (i) holders of the Notes until all such holders have received an amount (in addition to their principal and interest and the Secured Premium) equal to 100% of the original principal amount of their Notes (the amounts described in this clause (i) the "Unsecured Premium" (ii) other trade creditors of the Company, including any deficiency under equipment leasing arrangements of the Company and (iii) The Management Plan (described below)  As a condition of participation in the acquisition of a Note, investors will be required to become a party to the Subordination Agreement with Opus Bank to provide for the lien

2

EXHIBIT EXCERPT

priority among the holders of the Notes and Opus Bank that mirrors the first and second tranches of the above waterfall. Any remaining Liquidation Proceeds will be distributed in accordance with the Company's charter and Applicable law.

<u>Conversion</u> – At any time prior to a Deemed Liquidation Event or repayment of the Notes by the Company, a holder of Notes may convert its Notes into either (i) Common Stock at $0.75 per share (as adjusted for any stock dividend, stock split, reverse stock split, distribution or similar transaction) or (ii) if the Company completes a nest equity financing in which it issues and sells at least $10 million in preferred stock or common stock (the "Next Round Stock"), the Holder may elect at the Holder's option to convert all principal and accrued unpaid interest of the Note into shares of Next Round stock.  The price at which Next Round Stock is sold to investors for cash (and not by conversion of Notes) in such equity financing shall be called the "Next Financing Price."  The conversion price for the Note shall be calculated at a discount to the Next Financing Price: If the closing of such equity financing occurs (i) no later than three months after the initial Closing, the discount shall be 10% of the Next Financing Price; (ii) more than three months but no later six months after the Initial closing, the discount shall be 15% of the Next financing Price or (iii) if more than six months after the Initial closing (and provided the Note is extended by the Holder, the discount shall be 20% of the Next Financing Price.

<u>Mandatory Prepayment</u> – In the event that (i) the company enters into an agreement pertaining to (a)  a sale, lease or other disposition of all or substantially all of its assets or (b) a consolidation or merger of the Company with or into any other corporation or other entity or person, or any other corporate reorganization in which the stockholders of the Company immediately prior to such consolidation, merger or reorganization own less than 50% of the voting power of the surviving entity immediately after such consolidation, merger or reorganization (each such event being referred to herein as a ("Corporate Transaction") and (ii) the Notes have not been paid in full or converted as provided above, then, the Notes will be satisfied in the amounts and according to the seniority described above.

<u>No Prepayment</u> – Optional prepayments by the Company shall not be allowed  without the prior written consent of holders of Notes representing at least a majority of the outstanding principal amounts of outstanding Notes ("Majority Holders")

<u>Opus Agreements</u> – As a condition to the initial closing, the amendment of the Opus loan agreements (which includes the Company's commitment to use best efforts to achieve specified transactional timelines concerning a sale of the Company and milestones to raise additional funding through issuance of Notes which the Company is contractually obligated to achieve) was executed and delivered and in full force and effect as of such closing.

<u>D&O Obligations</u>  - Adequate provision will be made for payment of full coverage on the Company's D & O Insurance, as well as payment for payroll, PTO and other items deemed advisable by the Board.

<u>Management Carve-Out Plan</u> – A management carve-out plan acceptable to the Investors, Opus and the Company's management team has been approved in substance by the Company's Board (the "Management Plan" and is anticipated to be implemented shortly.

<u>Revised Plan of Placement</u> – Certain of the Notes covered by this supplement are being offered on a "best efforts" basis by a placement agent, National Securities Corporation.  Pursuant to the engagement agreements with such placement agent, The Company will pay certain fees to

3

EXHIBIT EXCERPT

placement agents based on the aggregate cash proceeds in the Offering placed by such placement agents and will also issue to certain placement agents, warrants to purchase shares of Common Stock based on the principal amount of Notes placed by such placement agents. These warrants will be exercisable at $1.4994 per share, will have a term of five (5) years and will be on the company's standard form. The Offering is only open to accredited investors as defined in rule 501(a) under the Securities Act. Investors will be direct signatories to the Transaction Documents. Each investor must execute an investor acknowledgment immediately prior to the closing of the Offering in which they intend to participate in forms to be delivered by the Co. to prospective investors prior to each such closing. The Company, at its sole discretion, reserves the right to require the Investors sign additional documents. To the extent an Investor executed the previous Transaction Documents and Investor Acknowledgment under the initial Memorandum contemplating the sale of Series D-1 Units, the investor will need to execute new versions of these forms for the revised Offering of Notes.

As of the PPM Supplement date of Nov. 16, The Co. only raised $2.5 million. Irrespective of this stated minimum to go effective of $2.5 million per the PPM, the Company needs to raise certain amounts with successive closings as required by Opus bank. In fact, if the Company does not raise an aggregate of $7.5 million gross (inclusive of the Initial Closing Amounts) on or before November 30, 2016, the amounts invested in prior closings would be subject to forfeiture by Opus Bank as the Co. would be in default of the bank's Credit Agreement. With only 16 days left to raise $5 million, the company is really under the gun. Beamreach can make no assurances that the Offering will be fully subscribed or any additional Closings of the Offering will occur. However, the Company anticipates that the next Closing of the Offering will be for an additional $4.5 Million (gross) of Notes, before NSC commissions and other Offering expenses (which is equal to a net closing amount of approximately $3.9 million and aggregate net Offering proceeds of $6.4 million, inclusive of the Essex Conversion Amount) and that such proceeds would sufficient to fund the Company's operations until the end of January 2017, subject to significant cost reductions. However, for each $500,000 reduction in the gross amount of the above mentioned closing of $4,5M, the company anticipates that the runway to a sale would be reduced by approximately one week, unless the Company were able to quickly complete additional closings of the Offering, which reduction will decrease the likelihood of a successful completion of a sale process and repayment of the Notes. The Company has only one demonstration field after 9 years of operation. The company's solar modules have not been certified by the Federal Govt.for commercial use. The cash runway projection described above will require significant operating expense reductions in order to maximize the amount of runway available for a sale of the Company, which reductions may decrease the value of the Company in consideration of a sale. Regardless of the amount raised in the Offering, the Co. is actively pursuing a sale process, including engaging the services of an investment bank. While a sale effort is the Company's primary strategy, the Co. will consider alternative funding options if available, and, to the extent it is able to do so without hindering the sale process, intends to pursue a financier or financiers that could purchase, refinance or replace the Company's loan with Opus Bank to provide the Co. with additional runway to a sale or, if significant additional capital investment is achieved, to consider ongoing operations. In order to continue operations beyond April, 2017 sales deadline imposed by Opus Bank, the company expects that it would need to raise an additional $45 million in equity and/or debt financing on or before April, 2017 on top of a fully subscribed Offering ($25 million of such funding is expected to be used to replace or refinance the outstanding loan with Opus Bank and $20 million of such funds are expected to be used for operations. The required capital number assumes that the Company is able to realize

4

the current revenue forecast, which, as described in the Memorandum and elsewhere in this Supplement, is subject to a number of risks.  There is no guarantee that future funding will be available, that a successor lender or lenders  can be secured or that a sale of the Company would result in any payments to holders of the Notes.

 In terms of the company's technologies and intellectual property include:

*Sprint tm* – The Company's integrated lightweight frame/rack system for ultra-fast installation on commercial industrial rooftops.  This product has attained industry certification in both the US  (UL) and globally (IEC) , has begun generating revenue, and is being considered by a wide range of customers for projects.  The Company has signed six (6) Master Sales Agreements (MSA's) with customers which could generate over $120 million of demand for Sprint *tm (*at  current prices)  over the next three  (3) years (in aggregate).  These MSA's outline quarterly volumes, pricing terms, warranties and other commercial terms, and are non-binding. The Company has ramped up commercial-scale production with a third party manufacturer, enabling a capital-light means of production.

*Beamreach Solar Cell Technology* – The Company's proprietary next-generation solar PV cell technology that delivers higher efficiency than most of the currently available solar cell technologies.  This Interdigitated Back-Contact (IBC) cell technology delivers 19.1% module efficiency, equating to 316 Watt (320 Watt when transitioning to slightly larger cells).  The 316 Watt output lvel, which compares very favorably with the 260-270 Watt output level for similar- sized solar panels using mainstream technology has been verified by a third-party Renewable Energy Test Center (RETC) in California on August 31, 2016. If Sufficient capital is raised in the Offering to allow the Company to continuing investment in this technology, the Company expects to attain US (UL) and globally (IEC) certification in the first quarter of 2017.

*Beamreach Patent Portfolio* – The company has developed multiple other standalone patented technology "clusters" which are not used in the two (2) primary technologies above.  The company intends to market these groupings of patents to specific buyers by a well-respected IP  brokerage firm.   These patent clusters relate to the following technologies:

- Epitaxial Silicon/Porous Silicon/Epitaxial Lift-Off (ELO) technology
- Backplane architecture Monolithic Module and iCell *tm* technology
- Smart Module electronics technology
- Thin wafer manufacturing, handling and processing
- Three dimensional solar cell structures
- Passivation structure
- Front surface active bypass

The monetization of these technologies will be difficult, time consuming and costly, particularly if technologies are sold in asset clusters.  Further, the monetization of the above assets might not occur simultaneously and thus early monetization may be used to fund monetization of the remaining technologies. Further, the Company currently owes Opus Bank $24,2 million, which is secured by all of the Company's assets and which would have to be paid before any proceeds of sale could be paid to holders of the Notes.  Then,

5

EXHIBIT EXCERPT

of the 300% return on capital that the Notes are eligible to receive, one fourth of such return is unsecured and would share, pari passu with all other unsecured liabilities of the Company. Currently, the Company has approximately $17.5 million of other outstanding obligations.  Of the $17.5 million of Trade Debt, $13.5 million is comprised of amounts owed to Essex, which will be reduced in connection with such monthly lease payment made to Essex and its assignees.

Any cost reductions will likely involve additional headcount reduction, from the current level of 46 full-time employees, down to 20 and will involve reductions in operating expenses that will slow the company's previously anticipated commercialization process in order to provide runway for a sale or additional funding (there were 95 employees at the end of the first quarter of 2016). Further, the Company would need to renegotiate rent reductions with the landlord or sublease unused space in the Company's Milpitas facility, reducing investment in cell engineering, operations and module development to focus primarily on efforts the Company believes necessary to maximize value of the Company for a sale, slowing previously anticipated production timelines and volumes for third-party manufactured solar-cells, reduction in marketing spend and elimination of all non-essential general and administrative expenses. Finally if the Offering raises less than $15 million, the Company plans to halt its solar cell fabrication operations and R & D effort.  This along with laying off the vast majority of the Cell Engineering and Operations staff (retaining only a small team for equipment upkeep and safety, and to facilitate the due diligence process with prospective acquisition candidates) will have a significant negative impact on the valuation that the Company may be able to obtain in the sale of its proprietary cell business and assets. To make it worse in addition attempting to reduce its monthly lease payments due to Essex and its assignees. Furthermore, the Co. hopes to be able to extend the maturity dates on certain outstanding equipment leases.  Then, financial forecasts shown in this document assume that Opus Bank  will agree to a deferral of interest payments between December 2016 and March 2017.  This deferral represents approximately $500,000 in expense reductions During the course of such deferral period.  Opus Bank has not agreed to this deferral.  Opus bank has instructed Beamreach to find a successor bank or non-bank lender and, in connection with the negotiation of the loan amendment and effectively requires the Company to replace or refinance Opus Bank or sell the Company on or before March 31, 2017 (or on or before February 28, 2017 in the Event the Offering raises less than $10,000,000.  If the Opus Bank loan is not Replaced or repaid or the Company sold on or before March 31, 2017, (i) the Company will be required to have $30 million in cash in an account with Opus Bank at such time.(ii) the limited forbearance on events of default occurring before the Opus Amendment will lapse and (iii) the requirement that the Company be solvent and stay current on all other payments will be reinstated.  Even in the event of a fully subscribed Offering and the availability of additional equity or debt capital, if the Company is unable to replace or pay off the Opus Bank loan on or before March 31, 2017, the Company will be required to complete a sale of the Co. before such date or risk an event of default, which could result in Opus Bank calling its $24.2 million loan for immediate payment and if such funds are not available, could result in an immediate wind down of the Company.  Without additional funds, the Company does not expect to be able to continue operations into November 2016.

1. <u>Company/Officers</u> – Experience and no. of years in business – The Company was formed as a start-up materials science company in 2007, 9 years.  Its officers /directors are:

   a. Mark Kerstens, Chief Executive Officer/Director – He joined Beamreach Solar in Aug. 2010 as Chief Sales and Marketing Officer and also served as its CFO.  He

6

served for 16 years with another global solar company. He is also an MBA. This is a transition from  Michael Wingate as CEO in June 2016.

b. Mehrdad Moslehi, Ph.D and Founder, Director and Chief Technology Officer and Chief Strategy Officer. He served as the Company's President *and* CEO until 2009. Dr.Moslehi is a Fellow of the Institute of Electrical and Electronics Engineers (IEEE), Lifetime Member of America's Registry of Outstanding Professionals, and holds nearly 300 patents.

c. Stephen Shea, Ph.D. VP of Manufacturing Engineering – is a 40 year veteran in all aspects of photovoltaic device design and manufacturing covering the entire value chain.

d. Abbay Maheshwari, Ph.D and SR. VP of Module Engineering – He joined Beamreach Solar in November 2014.  He is a recognized semiconductor and solar executive with  20 years of industry experience in research and development and large scale manufacturing operations in the US and offshore locations.  He is the author and coauthor of more than 11 research papers in peer reviewed technical journals and holds 7 patents in areas of semiconductor and solar.

e. David Beaver, Head of Supply Chain – He joined in 2015 with 30 years of management experience in the high tech industry.

f. Matt Lugar. VP of Sales and Marketing – He joined in April 2016 with a 20 year career in the solar and clean energy industry.

g. Nathan McOmber, VP of Corporate Development.  He joined in Aug. 2016, bringing 15 years of corporate and project finance, fundraising, strategic planning and business development experience.

Outside Directors:

a. Jan van Dakkum, Operating Partner - KPCB
b. Ira Ehrenpreis, General Partner, Technology partners
c. Greg Willians, Managing Director, DAG Ventures
d. Les Vadasz, Retired, former Executive VP of Intel Corporation
e. Reyad Fezzani, Chairman and CEO, Regenerate power
f. Michael R. Cannon, Retired, former President, Global Operations of Dell Inc. Former CEO of Solectron and Maxter.  He resigned on September 29, 2016.
g. Michael Wingert, former  President and CEO of Beamreach from June 2009 – June 2016  He had 27 years of experience in the disk drive category at IBM. He also serves as Chairman of the Board.

Note, The Company has agreed that should National Securities Corporation, (the Company's placement agent in the Offering) place $10 million in the Offering, National Securities Corporation will be entitled to appoint a director to the Board (non-voting observer), such appointment to be subject to approval of a majority of the other members

7

of the Board.  Should such amount be achieved, the Company will promptly coordinate with the Board and the stockholders of the Co. to amend the company's then effective Restated Certificate of Incorporation and the Company's then effective Amended and restated Voting Agreement to provide for a new director subject to appointment by National Securities Corporation.

Score:_____3_____

2.  <u>Net Worth Consideration</u> - There are no audited or accountant reviewed consolidated financial statements provided on Beamreach Solar, Inc. ==The financial statements are company prepared without independent review== but the Company believes that the financial statements in the PPM are presented in accordance with GAAP (although they do not contain all footnotes required by GAAP).  For the years ending December 31, the following unaudited Stockholders Equity numbers are shown:  2013 – $16,101,000; for 2014 - $20.368,000 and for 2015 - $8,586,000, a decline of ($11,782.000) of 58%.  Of great concern is the fact that there is an Consolidated Audited balance sheet for Beamreach Solar, Inc. (F/K/A Solexel, Inc. for the year ended December31,2014 and 2015 by PricewaterhouseCoopers LLP  It shows a negative stockholders equity of ($151,372,000) for 2014 and ($208,084,000) for 2015!  These differ dramatically with the company prepared statements showing positive net worth numbers for these same two years.  The difference between the two calculations stems from the Auditors giving no value to the company's preferred stock in the net worth calculation.  This may in fact have come from the auditor's belief, and I agree, that with the Company's          raising of millions in preferred stock just to stay alive along with continuing warnings of the Company being unable to function as a going concern, the auditors gave credit only to the Common stock in calculating stockholders equity.

The Company shows no revenues for the years 2013 – 2015 and reflects comprehensive losses from Operations as follows:   2013 – ($23,732,000); 2014 ($27,563,000) and for 2015 ($48,593,000).   For a company with no revenues, mushrooming operating expenses and mounting losses that increased 176% in 2015, over 2014, the Company is no candidate for any sale, bridge financing or investment by any accredited investor. While the net worth is substantially the same in the Audit, the identical comprehensive loss is shown as ($48,592,000). The company prepared an unaudited P&L for the 6-month period ending June 30 2016 and shows EBITDA (Operating losses) of ($12,499,000) for the one-half year period. Its Unaudited net worth at 6-30-2016 is shown at ($10,515,000). Misrepresentations in the Company prepared number compared to the audited ones are very concerning along with the difference in load amounts stated.  PricewaterhouseCoopers, the Company's auditors warn that the company's financial condition "**raises serious doubts as to the Company's ability to continue as a going concern".**

Score:_____1_____

3.  <u>Valuation of Investment Assets</u> (independent evaluation or appraisal) The net worth disparity of the Company showing positive numbers that are Company prepared, compared to the audited numbers in the negative make it nearly impossible to evaluate the true value of the Company. In 2008, Beamreach's own valuation had dropped by 60% from $650 million to $250 million.

Ex 13 pg 022
EXHIBIT EXCERPT

Score:_____1_____

4.  Load Factors – Placement Agents are scheduled and entitled to receive (i) commissions on all units placed by such placement agent in the Offering, (ii) warrants to purchase shares of stock an (iii) reimbursement of certain fees and expenses.   Commissions, fees and expense reimbursements translate into a projected load of $1,375,000 of 9% if the full $15,000,000 is raised.  However, warrants for the purchase of Common Stock of the Company are as follows:

National Securities Corporation and its affiliates may receive warrants for the sale of these securities.  It currently holds warrants for Common Stock of the Co. which in the aggregate, are exercisable for up to 1,321,940 shares of Common Stock, which were received in connection with its role as a placement agent in the Series D Stock financing in 2015 and 2016. NSC continues to serve as a placement agent for the Company.  Naseba communications Fz LLC holds a warrant exercisable for up to 40,016 shares of Common Stock and Naseba is serving as a placement agent for the Company. These warrants will be exercisable at $1,4994 per share, will have a term of five (5) years and will be on the Company's standard form.  The Pricewaterhouse Coopers Audit however, differs with this statement in the PPM.  It states that the Company issued ten-year warrants to purchase 363,994 shares of common stock at an exercise price of $1,4994 per share, for its efforts in 2016 as placement agent for Series D equity raise.
There is no breakdown as to how the $13,625 million would be spent If the $15 million is raised, Page 22 of the PPM states that the Offering costs are $1,281,000 (9.0%) while page 6 of the PPM indicates a cost of $1,375,000 (9.3%, one of many inconsistencies in this Offering. The proceeds of $13,625 million could be reasonably allocated as follows:  (1) Capital Expenditures $425K; (2) Debt and Lease payments $3.75 million; (3) Salaries/Personnel $2.75 million; (4) Other SG&A – $5.5 million. (5) Disbursements to Venders – only $1,200,000.of the $2,747000 owed to outside vendors.   Clearly, money raising has and will be the ongoing plan for the company to support itself internally.  **By October 2016, the Company was burning cash at the rate of $3,200,000 per month.**

Score:_____2_____

5.  Liquidity Including any Guarantees – There are no guarantees whatsoever. Further, investors must be willing to hold the securities for an indefinite period of time   One should not disregard the auditors warning that there is serious doubt the Company's ability to continue as a going concern.

Score:_____1_____

6.  Leverage – The Company currently owes Opus Bank $24,2 million, which is secured by all of the Company's assets and which would have to be paid before an proceeds of sale could be paid to holders of the Notes.   Currently, the Company has approximately $17.5 million of Trade Debt obligations, without revenues, and mushrooming operating losses the company is in default of its debt Obligations, behind on its lease payments and below even a 1-1 debt service coverage ratio.

Score:_____1_____

9

7.  <u>Financing Terms</u> -  The Company is in default with its loan to Opus Bank and the loan is past Due. i.e. due within 5 years with certain conditions and restrictions.

Score<u>:            1        </u>

8.  <u>Conflicts of Interest</u> -  a.  National Securities Corporation as Placement Agent has existing relationships with current Beamreach Solar stockholders as does Naseba Communications Fz LLC, another Placement Agent.  b.  There are retention incentive letters with the following two executive officers and directors:  Meherdad Meslehi and Mark Kerstens that, under any change in control, give them six months of continuing salary for termination without cause or resignation for good reason.  If such termination occurs within six months prior to the closing date of such change in control, they will receive a lump sum of 2.025 times their 2013 salaries, plus health insurance reimbursement if terminated without cause or resignation for good reason.  Mr. Kerstens, for termination or resignation for the same reasons also would receive full acceleration of all unvested equity awards then outstanding.  If the Kerstens Change of Control payable to Mr. Kerstens is zero, he will also receive an amount equal to his 2013 salary and unpaid target bonus.  c.  The Company also entered into a similar agreement with former CEO, Michael Wingert, on May 2014.  In connection with Mr. Wingert's resignation as CEO and transition to Chairman of the Board, such agreement was terminated.  At such time, Mr. Wingert entered into an agreement with the Company relating to his appointment as Chairman of the Board, which provides that 75% of the vested shares subject to any Outstanding options held by Mr. Wingert as of his transition to Chairman of the Board on June 30, 2016 shall remain exercisable during his tenure as chairman of the Bd., subject to a standard post-termination exercise period. d.  The company should consider renegotiating the employment terms for the executive management team, including the terms of the outstanding executive management retention incentives. e.  In addition, the Company has entered into change of control agreements with other key employees.  Those eligible would receive 1. a severance payment equal to (i)  twelve months salary plus (ii) 100% of any unpaid target incentive bonuses, and  2.  Acceleration of 50% of all unvested equity awards then outstanding.  f.  three of the Company's outside Directors will benefit from the anti-dilution adjustments triggered by the Offering.  g.  In connection with their roles as outside directors, Beamreach Solar has granted non-qualified stock options to each of Les Vadasz, Reyad Fezzani & Mike Cannon.  All of the unvested shares subject to these options would immediately vest in the event of a sale of Beamreach Solar. h.  Certain members of the Board are affiliated with current stockholders of Beamreach Solar.  NSC was the key placement agent with few other B/D's in the selling group.  No independent due diligence.

Score<u>:          2      </u>

9.  <u>Assumptions</u> – The company has been in business 9 years without any revenues.  Operating expenses are mounting ad the Company's in default on its debt and trade payables.  Clearly the Company has survived only by money raising in round after round of equity and now debt offerings.  The total money raised by the company, prior to this debt Offering is $250 million, yet the proceeds of the instant Offering go mainly to working capital and salaries for the Company along with debt repayment. Clearly Opus Bank is unlikely to get refinanced out, and further is clearly and incontrovertibly opposed and unwilling to agree to the unrealistic assumptions of

10

EXHIBIT EXCERPT

reduction, delay or forgiveness as expressed by the Company in its aggressive projections. The Company has misrepresented its Net Worth when audited numbers are compared to company prepared balance sheets i.e. from positive to negative. Then, prior to the promissory note holders receiving any return of capital, the Opus Bank would have to be fully paid and the obligations to the officers, directors and key employees satisfied prior to any note distributions upon sale of the Company. In the 2/2021 PPM, the Company states on page 41 that global solar cell and modular production capacity has stabilized.  The decrease due to industry consolidation is expected to Increase again in the future, potentially at a faster pace than growth in demand. However, just 7 months later by 9/2021, on page 48 the Company reverses course and states, "The current oversupply situation may worsen in the coming months, which could lead to further price reductions". Under the same heading, this line was added in the September PPM, an assumption which is totally inconsistent.  The Co.'s plan is unworkable and proof that National Securities Corporation is not assisting in this impossible endeavor to assist long-time friends who are executive officers and directors of Beamreach in order to gain sizeable commissions, fees and warrants of the Company's stock is gravely needed. Probably the most disturbing assumption is the assumption that the multitude of Beamreach patents were valued in the millions of dollars.  NSC, as early as 2015 should have required Beamreach to seek a valid appraisal from an independent third party to value the patents. NSC did not demand it and the value of such intellectual property went unverified and unknown.

Score:_____1_____

10.  <u>Risk Factors</u> – The Company's auditor has warned that there is serious doubt that the Company has the ability to continue as a "going concern".  In addition, there are additional significant risk factors to consider:

1. The inability to fully subscribe this convertible note offering.
2. The need for additional funds to stay alive.
3. The company lacks a clear path for positive cash flow.
4. The Co.'s inability to meet lease obligations
5. The Co, is in default with Opus Bank. without hope of amendment or takeout.
6. Likelihood of the Company's rising expenses
7. The Co. has a nine year history without any revenues.
8. The lack of any market for Beamreach Solar's noteholder and securities holders will be forced to hold their securities for years if not indefinitely.
9. Illiquidity indefinitely for Beamreach Stockholders
10. The unlikelihood of any IPO in the future of the Co.
11. Risk of Dilution.
12. Spending of the proceeds of the Note Offering is not to the benefit of the note holders.
13. Conflicts of Interest.
14. The interests of Beamreach Solar's controlling stockholders will conflict with Beamreach Solar's interest and the interests of other stock and note holders.

Ex 13 pg 025
EXHIBIT EXCERPT

15.  Upon dissolution or sale of Beamreach Solar or its assets, investors may not recoup all or any portion it their investment.

16.  Liquidation preferences of Beamreach Solar's management team along with other key Employees would decrease or eliminate the amount of noteholder consideration.

17.  Beamreach Solar has limited cash reserves and expects to continue to incur substantial losses and have negative operating cash flow for the foreseeable future.

18.  The likelihood that only a portion of the needed funds will be raised in this Note Offering.

19.  Beamreach Solar is a development stage company and has a limited operating history in its current primary business, making it difficult, if not impossible to evaluate its present and future performance.

20.  The inability of Beamreach Solar to procure needed solar cells and laminates from third-party cell manufactures due to payment delinquency and shortages of funds.

21.  The unlikelihood for Beamreach to outsource the manufacturing of proprietary solar cells and modules to a solar cell or contract manufacturer under a partnership agreement.

22.  Beamreach Solar is unlikely to be able to access he benefits available under the Malaysian government incentive package planned for.

23.  With no revenues and the unlikelihood of the Company being able to make any significant additional investments.

24.  It is unlikely that projections by the Company can ever be achieved.

25.  Credit restrictions by Opus Bank limit the company's flexibility in operating its business and using its cash resources.

26.  The Company may incur unexpected warranty claims that could materially and adversely affect its financial condition.

27.  Having its business adversely affected by seasonal trends and construction cycles.

28.  Relying on a small number of distributors and product developers and Beamreach's inability to secure a relationship with major customers.

29. Lack of market acceptance in the Company's products.

30. International production risk.

31. The Co. entering into agreements that require exclusivity limiting the Company's business.

32.  The Company's continuing failure to manage growth.

33.  Inability to overcome technological challenges.

34.  Inability to achieve its targeted solar module at the 320 Watt level.

35.  The Co. has not yet received UL or IEC certification for international markets.

36.  The Co. has failed to receive US and International certification for long term field reliability.

37.  There are claims that Beamreach Solar has infringed on third-party intellectual rights which could result in significant expenses or restrictions in its ability to sell its products.

38.  Reliance in part on intellectual property licenses from third parties for certain advanced technologies could curtail access to certain technology.

12

39.  The Company's high-volume manufacturing process has not been proven at large scale.
40.  Reliance on a number of equipment and component vendors to provide essential tools could delay market launch.
41.  The primary strategic path of the company and intended use of proceeds of the Offering is in jeopardy given the unavailability of significant additional capital or acceptable terms within a short timeframe and replacement of the Company's outstanding debt with Opus Bank. Also in jeopardy and unlikelihood is the sale of the Company since there is no assurance the Company will be able to complete it in an acceptable or necessary timeframe or at all i.e. without the ability to replace debt or find a buyer,
42.  The inability of the Company to reduce operating expenses in its projections.
43.  Proceeds from a sale of the Company may result in little or no money returned to investors in the Offering.
44.  The company has no firm investment commitments to complete the Offering. Failure to achieve it will result in an event of default under the Credit Agreement with Opus Bank, unless waived, a totally unlikely prospect.
45.  The Company cannot guarantee any further participation of any of its existing institutional investors in the Offering.
46.  Under the terms of the current agreement with Opus Bank, as amended, the Company will be required to reduce the outstanding Opus debt, raise significant additional equity or sell the Co. on or before March 31, 2017 (4 mos.). If the Co. is unable to find a new lender, raise such equity or complete a sale, it would have to shut down.
47.  Conditions in the solar market have deteriorated globally, due to competition and oversupply, a slowdown in sales and price declines. This along with other aforementioned factors would reduce or eliminate the sale value of the company.
48.  Consumer relationships may be disrupted if it became known that the company was pursuing a sale, which could adversely affect achieving any revenues and gross profit.
49.  Due to payment delays to key vendors, the Co. has missed key manufacturing milestones causing the Company to further reduce its 2016 sales volume forecast.
50.  Beamreach has missed payments to vendors and equipment lessor's.
51.  Cost and personal reductions are putting significant strain on remaining members of the team which make it difficult to retain key employees, including members of management.

Score:_____1_____

Total Points:_____14_____

A minimum score of 35 points (70%) is required for due diligence consideration. 14 points is 21 points below the minimum threshold.  With no possible hope of achieving the Company's plans or

13

projections, this Offering fails reasonable basis suitability and should not be recommended to any accredited investor.


Mason A. Dinehart III, RFC       Securities Expert witness
September 27, 2021               FINRA Arbitrator #! 30388

EXHIBIT EXCERPT

**EXHIBIT 14**

**FRCP 26(a)(2)(B) WRITTEN REPORT**
**Mason Alan Dinehart III, RFC**

## INTRODUCTION

I am celebrating my 50th year in the securities industry. Currently, I am licensed as a Registered Principal Outside Business Activities Compliance for LightPath Capital, Inc. in Southlake TX. Since 1999, I have served as a member of the FINRA Board of Arbitrators and have served as an arbitrator on ten panels. While six of those cases settled, I have entered four arbitration awards. During my career in the securities field, I became extremely familiar with corporate finance along with asset allocation models and modern portfolio theory. I have supervised, lectured and provided direct financial planning advice to dozens of clients (personal, corporate and trust) regarding diversified and balanced securities portfolio implementation. My work in the securities industry, as well as in my consulting experience includes without limitation (i) organization of various issuers of securities including corporations, limited partnerships and limited liability companies; (ii) the issuance of equities, debentures, partnership interests and membership interests in the issuers (iii) capitalization of the issuer of securities including the risk assessment and underwriting of the respective securities instrument (iv) evaluation of business plans and related financing and forecasting, and (v) corporation and corporate governance, including conflicts of interest. Early in my career, I spent two years in the Acquisition and Mergers Division of Corporate Finance at Bank of America. In December 2018, I was designated as the securities expert witness for the California State Bar.

## SCOPE OF ASSIGNMENT AND COMPENSATION

In this case, I have been asked to review and opine on the following issues:

1. The duties owed by a FINRA member broker-dealer when conducting due diligence on a Regulation D private placement securities offering.

2. The duties owed by a FINRA member broker-dealer when approving a Regulation D private placement securities offering for sale to its customers.

3. The adequacy of the due diligence conducted by National Securities Corporation (NSC) of several Regulation D private placement securities offerings in Beamreach Solar, Inc. f/k/a/ Solexel, Inc. by National Securities Corporation (NSC). The Beamreach securities offerings I have been retained to opine on are Beamreach Series D Preferred Stock Offering, Beamreach Series D1 Preferred Stock Offering, and Beamreach Convertible Secured Promissory Note Offering ("D-2") (collectively, the "Beamreach Offerings").

4. The adequacy of NSC's approval of the Beamreach Offerings to NSC's customers.

5. Risks not assumed by investors in Regulation D private placement offerings, and risks not assumed by NSC's customers in the Beamreach Offerings.

6. The damages to the Plaintiffs and the Class.

EXHIBIT EXCERPT
Ex.14 pg. 001

I reserve the right to supplement and amend my opinions to consider information learned up to and throughout the trial. I am being paid on an hourly basis for this engagement and my billing rate is $375 per hour for preparation of this report, deposition testimony, and for trial testimony. My compensation is not contingent on the outcome of this litigation.

## SUMMARY OF OPINIONS

**In this report I will discuss the following opinions:**

1. NSC had a duty of care under the FINRA Suitability Rule.

2. NSC had a duty of care to conduct adequate due diligence.
   a. The standard of care in the securities industry is compliance with FINRA Regulatory Notice 10-22 and other applicable FINRA notices.

3. NSC had a duty to only approve those offerings with a reasonable risk-reward proposition.

4. The due diligence performed by NSC did not meet the industry standard of care.

5. In light of the risk-reward proposition the Beamreach Offerings presented, the Beamreach Offerings should not have been approved for sale by NSC.

6. The Plaintiffs and the Class did not assume the risk of inadequate due diligence or approval.

7. The damages for the Plaintiffs and the Class.

Consistent with FINRA Regulatory Notice 10-22, in order to ensure that it has fulfilled its suitability responsibilities, a broker-dealer in a Regulation D offering should, at a minimum, conduct a reasonable investigation concerning the issuer and its management; the business prospects of the issuer; the assets held by or to be acquired by the issuer; the claims being made; and the intended use of proceeds of the offering. NSC had these obligations for each Beamreach Offering it sold. Furthermore, FINRA Regulatory Notice 10-22 states that NSC should have conducted a reasonable investigation concerning the following areas:

1. The issuer and its management.

   a. Examining Beamreach's governing documents including any charter, bylaws and partnership agreement, noting particularly the amount of its authorized stock and any restrictions on its activities. Since Beamreach is a corporation, NSC should inquire whether it has perpetual existence or is obligated to operate with a long term strategy for growth i.e. a Delaware corp. Investigation might reveal that the corporation might have a stipulation in its charter limiting the life of the company such as an expiration or liquidation date. Finally no investigation was made in the Beamreach corporate bylaws that could have shown it to have adopted a resolution to dissolve after a vote by the shareholders. The point is that NSC made no effort to investigate these

EXHIBIT EXCERPT
Ex.14 pg. 002

areas.

b.  Examining historical financial statements of Beamreach and its affiliates, with particular focus, if available, on financial statements that had been audited by an independent certified public accountant and auditor letters to management which expressed "going concern" opinions, compared to the company prepared financial statements, which should have been a red flag to NSC. NSC should have determined that the preferred stock (the exact difference in stockholders' equity or net worth) was apparently given no value by the auditors and the offerings should not have been approved.

c.  Looking at trends indicated by the financial statements should have uncovered the known fact that Beamreach had a permanent cash burn rate problem. Beamreach had a constant short cash runway with no forward momentum or growth in the business. This alone should have caused NSC to reject the offerings. Beamreach had a cash burn rate of between $2 million and $3 million per month, with no ability to support itself beyond raising more investor capital. This fact should have also caused the offerings to be rejected by NSC.

d.  NSC should have made reasonable inquiries concerning Beamreach's management. A broker-dealer might inquire about such issues as the expertise of the management of Beamreach's business and the extent to which management has changed or is expected to change. For example, a broker-dealer might inquire about any regulatory or disciplinary history on the part of management and any loans or other transactions between the issuer or its affiliates and members of management that might be inappropriate or might otherwise affect the issuers business.

e.  NSC had an obligation to inquire about the forms and amounts of management compensation, who determines compensation, and the extent to which the forms of compensation could present serious conflicts of interest. A broker-dealer might make similar inquiries concerning the qualifications and integrity of any board of directors or similar body of Beamreach. NSC did not fully evaluate the salaries and stock options of key employees for conflict of interest purposes. No credit, litigation or conflict checks were made on any board members even though the results of these verifications could have led to the rejection of the offerings.

f.  NSC had a duty to inquire about the industry in which Beamreach conducted its business, the prospects for that industry, and any existing or potential regulatory restrictions on that business and the competitive position of Beamreach. The solar industry was in severe decline. Many solar firms went out of business as shown in numerous Wall Street Journal articles between 2010 and 2016 when the Chinese were flooding the market with below cost of production parts, and it was difficult if not impossible for Beamreach to compete with that reality. Intense competition should have caused the rejection of the offerings. During this period, numerous articles reported that the price of solar panels declined by 30% and toward the end of it, the Chinese were

EXHIBIT EXCERPT
Ex.14 pg. 003

selling solar panels at below their own cost, supported by government subsidies. (Washington Post, March 23, 2013; Dallas Business Journal, November 1, 2013, and Christian Science Monitor, March 20, 2012).

g.   NSC should have requested business plans, business models, or other description of business intentions of Beamreach and its management and their expectations for the business and analyzed management's assumptions upon which any business forecast was based. NSC should have tested these models with information from representative assets to validate projected returns, break-even points and similar information provided to investors. Solexel was floundering due to the short cash runway which was increasing. It floundered also due to the necessity of continually having to change its business model along with the name change to Beamreach. This should have caused a rejection of the offerings by NSC.

h.   NSC should have requested financial models used to generate projections or targeted returns. Beamreach produced no revenues for nine years as a development stage company. It had mounting operational losses. Now, as a late-stage development company its projections (a 300% premium on original principal at the end of 6 months in D-2) were meaningless in that there were no government approvals and no production facility. Further, its auditors had questioned its standing as a "going concern". The Offerings should not have been approved by NSC

i.   NSC had an obligation to maintain in the broker-dealer's files a summary of the analysis that was performed on financial models provided by Beamreach that detailed the results of any stress tests performed on Beamreach's assumptions and projections. Little or no analysis of this kind was done by NSC. The Offerings should have been rejected by NSC.

j.   NSC should have inquired about internal audit controls of Beamreach. Had NSC taken this step, the examination would have revealed that after $250 million being raised, the cash burn was accelerating and Beamreach was surviving only through raising additional capital. A proper review would have demonstrated how there was little, if any, management mechanism in place to control the cash burn and the offerings should have been rejected.

k.   NSC failed to contact customers and suppliers regarding their dealing with Beamreach. NSC was unaware of the extent of vendor debt and impending collection problems. NSC was also unaware of the fact that there were no firm orders from customers, only memorandums of understanding (MOU's) which were never verified. Knowledge of these facts should have caused NSC to reject the offerings.

l.   NSC should have reviewed Beamreach's contracts, leases, mortgages, financing arrangements, and contractual arrangements between Beamreach and its management, employment agreements and stock option plans. This investigation would have shown delinquencies and collections, conflicts with its key employees and focus on the non- binding MOU's that were not firm

EXHIBIT EXCERPT
Ex.14 pg. 004

orders for Beamreach. ==This discovery also should have caused the Offerings to be rejected.==

m.  ==NSC had an obligation to inquire about past securities offerings by Beamreach and the degree of success while keeping in mind that simply because a certain product or sponsor historically met obligations to investors, there are no guarantees that it will continue to do so.== This is particularly true since Beamreach had been dependent on continuously raising new capital. This inquiry may be especially important for any blind pool or blank-check offering. NSC continued to earn fees and commissions with the continuing hope that it would be chosen to be the investment banking firm for the Beamreach IPO or the investment broker for the sale of the Company or its IP. What NSC failed to realize was that Beamreach was only being propped up after 8-9 years through rounds and rounds of capital raising as a result of its increasing cash burn and total failure to generate revenue and business prospects. Recognition of these facts should have replaced greed with reality and the offerings would have been summarily rejected.

n.  NSC should have inquired about the previous or potential regulatory or disciplinary problems of Beamreach. Furthermore, NSC should have run a credit check of Beamreach. Severe credit collection problems were in the offing and had a credit check been conducted by NSC the firm would have known of this red flag. Aside from the $24.2 million Beamreach owed to Opus Bank, NSC would have learned of $17.2 million of vendor debt along with $380K of collections that had just been filed. This knowledge should have caused rejection of the Offerings.

o.  ==NSC had an obligation to inquire about the length of time that Beamreach had been in business and whether the focus of its business was expected to change. In its 9 years of existence, Beamreach had raised nearly $600 million dollars in venture capital and should have been considered as a late stage venture firm.== However, NSC knew that there was virtually no interest from institutional investors. This fact alone should have caused a rejection of the offerings by NSC.

p.  NSC should have inquired about the assets held or to be acquired by the issuer. NSC should have done its due diligence on the viability of any patent or other intellectual Property (IP) rights held by Beamreach. Beamreach never did a formal valuation of the actual intellectual property. Instead, NSC relied on the repeatedly glowing evaluations of the purported technology. When it came to actual valuation of the IP - which became the company's core asset and was material and outcome determinative to investor return - NSC relied on "back of the napkin math" on Beamreach's IP as various NSC employees testified to before FINRA. NSC therefore had no understanding of the viability or value of Beamreach's intellectual property. This should have caused a rejection of the offerings.

q.  ==NSC should have visited and inspected a sample of Beamreach's assets and facilities to determine whether the value of assets reflected in the financial==

EXHIBIT EXCERPT
Ex.14 pg. 005

2.    LENDER CREDIT RISK.

Beamreach owed Opus Bank $24.2 million which was secured by all of the Company's assets and which had to be paid before any proceeds of sale could be paid to holders of the Notes. Under the terms of the 5th Amended Agreement with Opus Bank, the Company was required to reduce the outstanding Opus debt, raise significant additional equity or sell the Company on or before March 31, 2017 (4 months). Further, the Company had approximately $17.5 million of debt obligations to vendors. Without revenue and with mushrooming operating losses, the company was in default of its debt obligations, behind on its lease payments and far below even a 1-1 debt service coverage ratio.

On November 3, 2016, Laurie Relos of Beamreach sent an email to RMU Credit/ Collections agency confirming that the Company was in arrears on vendor assigned debt in the sum of $377,969. She offered to make payments of $34,497 per week beginning November 4, 2016 to satisfy this obligation. This was only eleven days before the effective date of the D-2 Offering being sold to NSC investors. NSC failed to run a litigation or credit check on Beamreach during this period. Thus, while Carmelo Troccoli (NSC com-com due diligence) was emailing Beamreach CEO Mark Kerstens asking for a rundown of debt owed by Beamreach, he was leading the offering of these promissory notes to NSC clients. Two weeks before the note went live, Mr. Troccoli had no handle on the Company's debt, which was unfathomable.

        a. CREDIT ANALYSIS:

The credit issues addressed above are in fact the most basic concerns of credit analysis. Lenders are taught at the introductory level to evaluate the credit worthiness of the source of repayment first. Broker dealers are responsible to make sure that this element is performed. There is no indication or evidence of NSC or the Commitment Committee ("Com-Com") ever ordering a litigation or credit check on Beamreach which is again, well below the standard of care.

3.    LIQUIDITY RISK:

The risk legend that states that an investment in Beamreach would be for an indefinite period of time clearly indicates the uncertain nature of how long one would expect to hold this investment.  There was all the talk of an IPO or sale of the IP as an exit strategy but no verification of either one whatsoever.  There was no institutional interest and no 3rd party appraiser ever evaluated the value of the patents.  These strategies were unrealistic and illusory.  Clearly, there was no liquidity and the likelihood that Beamreach could survive, let alone pay back these notes with a 300% reward for the D-2 bridge loan round, was highly in doubt. The illiquidity of this investment is mentioned as a risk factor, but leaves great unanswered questions in one's mind as to the true nature of the uncertain holding period for the notes.

4.    COSTS AND FEES RISK:

In the Beamreach Convertible Secured Promissory Note Program there is no breakdown of commissions, fees and organizing costs of the Offering. In fact, there is an inconsistency in the amounts of front-end load. In one place, the PPM indicates that the load

EXHIBIT EXCERPT
Ex.14 pg. 006

is $1,281,000 while in another, the load number is $1,375,000. The load averages about 9% of the $15,000,000 cash raised, meaning that 91% of the proceeds would go into the Company. However, the Use of Proceeds section does not break it down by percentage as is the usual custom and practice in the securities industry.

Also, when reviewing the Regulation D filing with the SEC for the Note Offering dated November 22, 2016, the numbers are quite different. This document reflects sales commissions of $1,800,000 on cash raised to date or $8,055,797. That amount of commissions would be 22.4% of the cash raised which would mean that the company would only be getting 77.6% of the cash raised or $6,251,298. If the NSC compensation were broken down with 12% cash[1] and 10% warrants, this may have been why the Reg. D numbers are so much higher than what is stated in the PPM. If this is an accurate disclosure and breakdown (the SEC requires the numbers submitted on Reg. D to be "truthful"), the load is much higher than most private debenture Offerings sold in the securities marketplace. Normally such an offering as this would have a load in the range of 8% - 10%.[2]

The responsibility for this front-end load breakdown and clarification falls squarely on National Securities Corporation, the Company's Placement Agent. When the Reg. D was filed, NSC should have held Beamreach's feet to the fire and demanded a breakdown of the 22.4% front-end load in the amount of $1,800,000.

5.      DUE DILIGENCE RISK:

FINRA Rule 2111.05 (a) explains the Reasonable Basis suitability obligation. It states, "The reasonable-basis obligation requires a member or associated person to have a reasonable basis to believe, based on reasonable diligence, that the recommendation is suitable for at least some investors. In general, what constitutes reasonable diligence will vary depending on, among other things, the complexity of and risks associated with the security or investment strategy and the member's or associated person's familiarity with the security or investment strategy. A member's or associated person's reasonable diligence must provide the member or associated person with an understanding of the potential risks and rewards associated with the recommended security or strategy. The lack of such an understanding when recommending a security or strategy violates the suitability rule". Section 11(c) of the Securities Exchange Act of 1933 defines reasonable as follows, "The standard of reasonableness is that of a prudent man in the management of his property".

Now, let me define due diligence in my own words since FINRA only requires a "reasonable investigation". It is the process of reasonable investigation that independently evaluates an issuer's integrity, accuracy, competency, financial strength, and organizational depth. It is adversarial in nature and utilizes quantitative and intuitive means. Due diligence includes a comprehensive analysis that challenges the deal points, assumptions, and

---

[1] To make things more confusing, there is a Flow of Funds Memorandum dated November 16, 2016 which indicates the cash NSC received from commissions that equaled 12% ($666,665.06 - $5,565,766,20 = 12%) which is not the commission stated in the PPM Supplement.

[2] To make things more confusing, there is a Flow of Funds Memorandum dated 11-16-2016 which indicates the cash NSC received from commissions that equaled 12% ($666,665.06 -: $5,565,766,20 = 12%) which is not the commission stated in the PPM Supplement.

EXHIBIT EXCERPT
Ex.14 pg. 007

projections in each offering examined. The process evaluates and determines the probability of the transaction achieving its stated objectives.

As the NASD states in Notice to Members 03-71, "Among the issues highlighted are members' responsibilities to: 1) conduct appropriate due diligence; 2) perform a reasonable-basis suitability analysis; 3) perform customer specific suitability analysis for recommended transactions; 4) ensure that promotional materials used by the member are fair, accurate and balanced; 5) implement appropriate internal controls; and 6) provide appropriate training to registered persons involved in the sale of these products".

I have previously noted the standards for due diligence that FINRA Regulatory Notice 10-22 specifically identifies for due diligence that would be covered in a Reg D Offering. While FINRA states that the brokerage firm must complete a reasonable investigation on each Offering, the SEC requires brokerage firms to retain records documenting both the process and results of its investigation.

On August 14, 2020, FINRA's Department of Enforcement issued a Letter of Acceptance, Waiver and Consent (AWC) No. 2018057457101 against CFD Investments (CRD No. 25427) and Mathew Bahrenburg, General Securities Principal (CRD No. 529566). In November 2014, CFD, through Bahrenburg approved an oil and gas private placement offering for sale to its customers.  The issuer, Payson Petroleum, Inc. was the subject of an April 2014 jury verdict in excess of $9 million and was in financial distress.  From March 2015 to February 2016, CFD sold interests in Payson to 31 of its retail customers without conducting reasonable due diligence into the Payson offering.  In addition, CFD sold interests in Payson to its customers without having a reasonable basis for making recommendations to purchase this private placement.  CFD customers who invested in Payson lost their investments when Payson filed for bankruptcy just four months after CFD's last sale of the offering.   As FINRA wrote, "a firm that has failed to conduct reasonable due diligence of a private placement may thus lack a reasonable basis to make the recommendation in that security to any customer, regardless of the customer's wealth, willingness to bear risk, age, or other individual characteristics".  On November 23, 2016, the SEC filed a complaint against the principals of Payson, alleging fraud, including misrepresentations and omissions to investors in connection with various Payson offerings sold between November 2013 and July 2014.  The principals thereafter consented to the facts as alleged in the complaint and were ordered to pay approximately $7.7 million in fines, disgorgement and interest.

Bahrenburg, Registered Principal Due Diligence, did not comply with the firm's written procedures pertaining to due diligence.  Instead, in November 2014, he approved the Payson offerings for sale to the firm's accredited investors, based only on a review of documents provided by Payson and interviews of Payson personnel.  This due diligence process was not reasonable for the following reasons:  First, CFD, through Bahrenburg, did not reasonably assess Payson's financial condition.  The financial documents that Payson provided to CFD painted a bleak picture, and showed that the company had substantial liabilities and negative net income of more than $1.5 million in 2013.  In addition, due to incurring recurring losses from operations and pending litigation, the firm's independent auditor included a note that these facts raised substantial doubt about its ability to continue as a "going concern". FINRA wrote in its AWC that Bahrenburg did not reasonably investigate the circumstances of the 2012 investor lawsuit, failed to review Payson's prior offerings, failed to conduct any independent review or assessment of the current project generally and

Page | 10

instead simply accepted the information and representations provided by the issuer.  Finally, Bahrenrug and CFD failed to conduct any ongoing due diligence, despite that it was required by CFD's written procedures.  For example, CFD did not request, obtain or review Payson's 2014 audited financial information. CFD continued to sell the offering until February, 2016.  Because of its failure to conduct reasonable due diligence of the Payson offerings, CFD failed to make a reasonable determination as to whether Payson was suitable for any class of investor.  Therefore, CFD had no reasonable basis to recommend the Payson offerings to its customers, even accredited investors, and violated FINRA Rule 2111 and 2010 by recommending and selling these offerings to 31 customers.

CFD Investments, Inc. consented to the following sanctions:

1) Censure; 2) a 45 calendar day suspension of any and all private placement activities, and: 3) Partial restitution to affected customers in the total amount of $750,000. Mathew Bahrenrug consented to the following sanctions; 1) a 45 calendar day suspension from association with any FINRA member firm in a principal capacity, and 2) a $5,000 fine.

National Securities Corporation (NSC) itself has also been the recipient of a FINRA AWC, No. 2009019068201 which was issued in May of 2011 and stated the following. "National Securities did not have reasonable grounds to believe that certain private placements offered by Medical Capital Holdings, Inc. (MedCap) and Provident Royalties, LLC (Provident_ pursuant to Regulation D were suitable for any customer.  Additionally, NSC, acting through its Director of Alternative Investments/Director of Syndications, Mathew G. Portes, (i) failed to conduct adequate due diligence of the private placements offered by MedCap and Provident pursuant to Regulation D, and (ii) failed to establish, maintain and enforce sufficient supervisory system reasonably designed to achieve compliance with applicable securities laws and regulations and NASD Rules in connection with applicable securities laws and regulations and NASD Rules in connection with the sale of the private placements offered by MedCap and Provident pursuant to Regulation D. Accordingly, NSC violated NASD Conduct rules 2310, 3010, 2110 and FINRA Rule 2010 and Portes violated NASD Conduct Rules 2010, and 2110 and FINRA Rule 2010.

NSC, acting through Portes, failed to adequately enforce its supervisory procedures to conduct adequate due diligence as it relates to MPFC VI.  Beyond reviewing the MPFC VI private placement memorandum and reading a 9/3-/2008 due diligence report prepared by Buttonwood Investment Services, LLC, in October 2008, some 2 months after it had begun selling MPEC VI, Portes, and thereby NSC, did not perform sufficient due diligence for MPEC VI.  Portes, and thereby NSC did not question the above-referenced use of proceeds section of the MPEC VI private PPM, did not review any financial statements for MedCap or MPEC VI, and did not sufficiently follow up or otherwise investigate concerns noted in either the 9/2008 Buttonwood Due Diligence Report or a revised due diligence report prepared by Buttonwood Investment Services, LLC dated 12/2/2008.  From early October 2008 through March 2009, Portes and thereby NSC, became aware of multiple red flags regarding MedCap, including liquidity concerns, missed interest payments and defaults that should have put them on notice of possible problems with the offering.  Nevertheless, the Firm continued to sell the MPFC VI offering to customers through March 2009.   Then with respect to Provident, between July 23, 2008 and January 10, 2009, NSC sold $1,755,000 in Provident offerings numbered 16, 17 and 19 to thirty customers.  Again, NSC, acting through Portes, failed to enforce the Firm's supervisory procedures to conduct adequate due diligence relating to these

EXHIBIT EXCERPT
Ex.14 pg. 009

offerings.  Without adequate due diligence NSC and Portes could not identify and understand the inherent risks of these offerings.  The high interest payments of the Provident Offerings were themselves red flags.  However, Portes, and thereby the Firm, did not take the necessary steps, through obtaining financial information or otherwise, to ensure that these rates of return were legitimate, and not payable from the proceeds of later offerings, in the manner of a Ponzi scheme.

NSC was 1) censured; 2) fined in paying restitution of $81,427.50 to Provident investors and $93,572.50 to MedCap investors and 3) a suspension of Portes for 6 months along with a $10,000 fine.

Let me now begin with the Solexel, Inc. Series D Preferred Stock Offering which was marketed by NSC between February 2015 and June 2016 or almost 1.5 years. Did NSC fully investigate the issuer and management as required by 10-22? In my opinion, they showed little concern for this company which was eight years old and produced no revenues. It had no government approvals for its products, had no production of any kind beyond a demo-facility in California, and had mounting operational losses.

Did the Com-Com (the NSC due diligence committee) thoroughly investigate the business prospects of the issuer? In my opinion, Solexel's position in the solar market was declining rapidly. The Chinese were flooding the market with cheaper solar technology. While the company projected a lighter and more efficient solar panel, there was no evidence of a production facility in Malaysia to produce such a product to allow the company to scale-up.

Did due diligence explore and verify the assets held by the issuer? Many positive valuation opinions were promulgated by Com-Com but no 3rd party appraisal was suggested or accomplished by NSC. This was critically important since the intellectual property was the asset that its investors could fall back on if the company was imperiled. The verification responsibility of NSC failed for certain in this area.

Next, did NSC investigate and verify the use of proceeds of the offering? The Company's cash runway was problematic to say the least. Its cash burn climbed during this period from $2 million per month to nearly $3 million without any offsetting revenues. It should have been obvious that the Company was surviving only from the capital being raised in rounds of financing, mainly through NSC with no positive results forthcoming from the Company Com-Com approved the Series D Preferred Stock offering and the D-2 note offering. The D-1 preferred stock offering was never formally approved, even though NSC was well aware that its brokers were selling it and that its investors were investing in it, in clear violation of NSC's internal processes and procedures. The Scorecards on these offerings (Exhibit B and Exhibit D) demonstrate unequivocally that all three failed "reasonable basis suitability" in my opinion.

While NSC did provide records of meetings and dates along with questionnaires filled out by the issuer with basically yes or no answers, it failed to document the results of its investigation, list the specific tasks performed, along with who performed them and summarize the results of such reviews. It had no records of visits to the Company, beyond receipts of hotel stays and airfare, no notes exist from these meetings. There are no documents establishing any visit to a foreign production facility. There was no patent

Page | 12

verification by an independent third party. Questionnaires and phone interviews only were insufficient. Direct face to face contact with the issuer at its locations was essential. There were no records of contact with suppliers or customers or any verification of sales orders. There were opinions, but no lists of documents reviewed or summaries of the results of such reviews. Documentation of results and verification is vital in order to conduct a reasonable investigation.

Solexel changed its name to Beamreach commensurate with the D-1 offering. Then Beamreach launched the Series D-2 round as a supplement to the D-1 offering. NSC failed to conduct a reasonable investigation in the following areas. First, Sagiv Shiv, Managing Director of NSC and Carmelo Troccoli, Investment Banking, were the two respective heads of the Commitment Committee (Com-Com) for Due Diligence. This was NSC's due diligence committee for due diligence and was comprised of eight members of which four voted. The PPM and Supplement were the primary source documents for com-com's memos in relation to the Beamreach Reg. D Offerings. Mr. Troccoli testified that a majority ruled, but was uncertain what happened if the vote was 2-2. Then, there was no formal vote to approve the D-2 offering despite a litany of red flags. This was far below the standard of care in the securities industry.

Second, memo notes reflected a failure of due diligence with respect to vetting the value of the intellectual property of Beamreach. The company had 79 patent families including 122 granted/allowed patent assets and 112 pending patent applications. The value of the IP was the basis of all Beamreach Offerings. Beamreach's position was that it was worth so much that, worst case, it could sell for enough to cover all debts and still pay a return. NSC due diligence did not actually determine the value of the IP.

The Com-Com notes were very revealing. On October 13, 2016, one member of the committee stated that Beamreach was "attempting to monetize its IP". On October 19, 2016, another committee member stated, "The Company had a lot of intellectual property". Then on October 26, 2016 just nineteen days before the D-2 Offering was being sold, a member stated, "The Company has $24 - $30 million of IP". Finally, on that same date, a member stated, "We continue to discuss that the cushion of the investment portfolio and value of the Company's IP Portfolio". In his OTR, Mr. Shiv stated, "It was always my belief that the value of Beamreach's IP was worth realistically in a range from $50 million to $250 million at a 'fire sale'." However, he supplied no basis for that belief. The fact is that they did not have any idea of its value. A reasonable investigatory due diligence team would have demanded that a third-party appraiser be engaged by Beamreach to provide an independent appraisal of the Company's IP. Later on, when they stood before Beamreach with a presentation to become its lead Financial Advisor/Investment Banker, they were sent back to the drawing board harshly for not offering a third-party appraisal of its IP. While it was true that the IP was pledged to Opus Bank under its credit line of $24 million, a firm value of the IP should have been determined with first monies going to pay down Opus Bank. No independent valuation was demanded, and none was obtained by NSC which is below the standard of care in the due diligence area. NASD Notice to Members 03-71 states that for all Non-Conventional Investments, which I conclude Beamreach's securities to be, due diligence requires the verification of the "creditworthiness and value of any underlying collateral". NSC failed to conduct reasonable due diligence on the Beamreach IP.

Third, a due diligence standard of care is to communicate with customers to question

EXHIBIT EXCERPT
Ex.14 pg. 011

orders and suppliers to determine payment history and experience. This would have been especially true of Beamreach which for nine years had no revenue, had no production facility and was without government certification for its product. In his deposition, Mr. Troccoli testified that the com-com deferred to Opus Bank and its second-hand due diligence of customers and suppliers. One email/letter from Walmart indicated that solar cells on its many facility rooftops were far down on their to-do list and on slow burn for its locations at present.

Then, in its due diligence notes, it states "the Company has received $12.5 million in venture debt from Fortress". In his deposition, Mr. Troccoli indicated that this was bogus and untrue, as Fortress just vanished, never to be heard from again. Probably the most egregious revelation of something NSC knew or should have known is that on November 3, 2016, eleven days before the Supplemented D-2 offering went effective, debt of Beamreach venders in the amount of $377,969 was turned over to RMV Credit Collections and required payment immediately. This impending event was unknown to com-com and again is below the due diligence standard of care. Why wasn't a Beamreach legal and credit search done prior to the D-2 Offering being recommended to accredited investors?

The fourth lapse of due diligence occurred when com-com never mentions or discusses the tremendous disparity between the audited net worth (stockholders equity) numbers and the company prepared balance sheet. The Company in the PPM states that its net worth as of December 31, 2013 was $16.1 million, for December 31, 2014 was $20.4 million and for December 31, 2015 was $8.6 million. However, if we look at the PricewaterhouseCoopers audited numbers, who warned of Beamreach not being a "going concern", it reported for December 31, 2014 a negative net worth of ($151.4 million) and for December 31, 2015 a negative net worth of ($208.1 million). The difference in these numbers is the company's preferred stock holdings which normally are a part of stockholders equity. However, with no revenues, mounting operating losses, no government certification for its products, default with its lending bank and the fact of the Company's survival through $250 million of fundraising only, without any production facility, the auditors apparently gave no credit for the preferred stock of this development stage company. The financial net worth discrepancy was never compared or discussed, never brought up or looked at in com-com meetings, and that is simply below the standard of care in the due diligence process. A call to the auditors could have confirmed this disparity, but was never undertaken.

The fifth failing of Com-Com, was not verifying the Company's claim that it had lined-up a production facility in Malaysia, an area of low-cost labor which would have made Beamreach more competitive in its products. No one verified this or visited such a facility to determine its existence. In late 2016, talk of Malaysia and how the Company was setting up an Asian production facility in Taiwan or Thailand began. This assertion was critical to com-com and greatly served as a basis for its approving of the D Round. Furthermore, to buttress its position for support of its technology, Beamreach provided an engineering report from the same "expert" that had issued a glowing report on its technology previously. This expert had no experience in international engineering.

The sixth and final due diligence failure was the fact that NSC knew or should have known that Beamreach was seeking advice from counsel to declare bankruptcy before the D-2 supplement dated November 14, 2015. Com-Com sent out a questionnaire to the issuer, Beamreach and asked if they had retained bankruptcy counsel. This fact was revealed in the Com-Com due diligence notes on October 26, 2016 in Part 3 (NSC155-156). The answer

was, "No one yet". The "No one yet" should have raised a red flag to drill down on the subject face to face with legal counsel at Beamreach to determine if in fact, a possible bankruptcy was being discussed and planned with bankruptcy counsel. In fact, in two meetings dated October19, 2016 and October 24, 2016, Beamreach was meeting and seeking advice and retention from bankruptcy counsel, Pachulski Stang for legal services in connection with its restructuring in bankruptcy. Again, no pin-pointed discussions or obtaining a legal or credit check were undertaken by NSC's com-com whatsoever. According to its CA Client Trust account wiring instructions, Beamreach engaged Pachulski Stang on October 20, 2016, prior to the date of the D-2 PPM, which was dated November 14, 2016.

There were no visits to the purported Malaysian plant, no direct calls to suppliers, trade creditors, or customers. Opus Bank was left to do that. There were no demands to convert MOU's to actual binding revenues. There were no records following up on tasks performed, summaries of the results of such reviews and analysis, demonstrating that the firm followed through and did not simply gather documents and place them in a file with no analysis. The only documents provided were questionnaires along with meeting notes by date and a checklist of items with notes and comments attached.

NSC's due diligence was below the standard of care and in violation of FINRA rules (Violation of FINRA Conduct Rule 2010 – Just and Equitable Principals of Trade) as well as its own WSP which sets a structure for com-com reporting to Chief Oversight, Jonathan Rich, head of Investment Banking along with NSC Compliance to monitor and approve the activities of NSC's com-com. In the final analysis, NSC and the com-com failed to uphold its responsibility of being a gatekeeper required to vet and approve only reasonable based suitable offerings for recommendation to its accredited investors. In late October 2016, when members of com-com refused to add additional necessary material disclosures, I'm reminded of something I learned long ago: Reg D private placement offerings are exempt from registration, not disclosure.

6.    INVESTOR ASSUMPTIONS RISK:

In this case, defendant argued that all facts and risks were disclosed to investors. Further, they said that by subscribing to the investment, the investor agreed to assume all the risks of the investment. Defendant went on to state that if that was not true, the trier of fact would hold every brokerage firm and/or its broker liable every time a speculative investment failed. In other words, despite all the warning made, knowledgeable accredited investors assumed the risk and lost. Finally, the defendant points to a multitude of investors went into this speculative deal, were willing to speculate by consenting to accept the risk in order to get the reward. This last point comes under the headline of "So What"?

These speculative securities were recommended and implemented by NSC to NSC's captive clients as opposed to being sought out for their purchase. In other words, they were "sold" not "bought". Both institutional and retail investors were sold the Series D, D-1 and D-2 Offerings by super salesmen who demonstrated with style how Beamreach would mitigate these risks and conflicts. It should be pointed out that NSC was not an "A" list investment banking firm. It was a "B-" brokerage firm at best. Finally, a multitude of sales to accredited investors doesn't make it right, when in the final analysis the Offerings failed reasonable basis suitability and shouldn't have been recommended or sold to even one accredited investor. The fact that NSC's customers were sophisticated and knowledgeable does not

EXHIBIT EXCERPT
Ex.14 pg. 013

obviate NSC's duty to investigate and disclose all material facts to these accredited investors. In my opinion, investors did not assume all the risks. For example, consider the following, NSC's investors did not assume the risk of worthless patents because this wasn't disclosed. They did not assume the risk of the investor's own credit impairment converting a liquid cash asset to a worthless, illiquid and ultra-speculative security which no lender would give any credit to because credit impairment was not disclosed. This was a material red flag.

Furthermore, they did not assume the risk that NSC was waiving any fiduciary duty to them because NSC was acting as an independent contractor and was putting NSC's interests ahead of the investors. They did not assume the risk that NSC failed to provide and perform reasonably adequate due diligence on the offering. Furthermore, the obligation to perform adequate due diligence was at no times waived. They did not assume the risk of Beamreach vendor debt in the amount of $377,065 that was assigned to a collection agency as of November 3, 2016, eleven days before the Supplement D-2 PPM. They did not assume the risk of the issuer they were investing in retaining bankruptcy counsel on October 20, 2016, three weeks before the Supplemented D-2 offering went effective. Again, this was a highly material red flag.

Investors did not assume the risk that Beamreach was in full default of its Opus bank loan and it was set to foreclose on the Company. Instead, they were given the hopeful assumption that somehow, there could be a work-out or moratorium on this debt. Investors did not assume that risk because it was not fully disclosed to them. Investors did not assume the risk that Beamreach never had any production facility or production contract in Asia. No one went there or verified the purported plant in Malaysia that through lower labor cost would allow Beamreach to compete with the strong and well financed competitors in the solar field. Investors did not assume the risk that Beamreach produced company prepared financial statements showing positive net worth, while for the same years its auditors showed negative and declining net worth numbers because this disparity was not questioned or clearly documented or explained to them in the PPM.

Did they really assume the risk as an accredited investor who was prepared to bear the economic risk of holding the investment for an indefinite period and was able to withstand a total loss of this investment? I would be surprised if the investors even saw this as it was not in bold type alone, setting it apart, but rather not on page one but on page two, which was all caps and totally in bold. Most investors would skim through, skipping this page as it appears to be boilerplate language in repetitive large cap and just prior to the Table of Contents section. It should have been set apart in bold on page one so no one reading the PPM can miss its meaning and implications.

In the D-2 Offering Supplement, this risk legend does not appear at all. Since there was great concern over money raising in the D-1 preferred stock offering. Some investors could have been investing for the first time and had to press a link in the Supplement PPM to see the original D-1 PPM. The risk legend should have been reprinted in the D-2 Supplement PPM. It is reasonable to assume that many of these new investors did not see the risk legend at all. The investors did not assume this risk unless it was pointed out to them or they were careful enough to find it and carefully read through it. The investors did not assume the risk of NSC raiding the impounds escrow to withdraw $2.5 million before the required $10 million was raised in the D-1 offering. Without permission they changed the requirement in the supplement PPM to break impounds prior to raising the required capital. The investors did

EXHIBIT EXCERPT
Ex.14 pg. 014

not assume this risk because they did not approve it.

Proof of this was the selling agreement it signed to be placement agent for a potential E Offering following the completion of the offerings at issue. NSC knew internally that there was little to no chance for this Company to survive without its raising millions of dollars and was compensated generously for doing so. In addition, by pressing on, the warrants the Company held by at least one member of com-com (Carmelo Troccoli) and selected NSC brokers would be worth something. Finally, it was not surprising that no other broker-dealers joined NSC in the selling group.

7.     BEAMREACH CORPORATION RISK (See the Beamreach Scorecards – Exhibits B & D).

## <u>RED FLAGS</u>

"Red Flags" surrounding the due diligence and risk management of the Beamreach securities Offering's abounded and were not effectively acted upon by NSC. SIFMA, which is comprised of securities defense lawyers, in its Compliance and Legal Division Seminar of 2013, supplied materials on written supervisory procedures which stated that, "any supervisor who learns of an indication of impropriety ("a red flag") must investigate with reasonable diligence and must pursue the matter to closure. Inadequate investigation and follow-up is an invitation to regulatory scrutiny to be followed by enforcement action". Furthermore, FINRA Regulatory Notice 10-22 required NSC to follow up on any red flags it encountered, as well as investigate any "substantial adverse information" about Beamreach. FINRA also stated that NSC was required to do more than "simply rely upon representations by issuer's management, the disclosure in an offering document or even a due diligence report of issuer's counsel."

Beamreach presented the following, which were not adequately investigated by NSC:

1.  The solar industry was experiencing a steep decline, and between 2009 and 2013 more than 100 solar companies were sold or liquidated.

2.  No independent valuation of Beamreach's intellectual property by a qualified third party.

3.  Beamreach was a 9-year old company with no revenues.

4.  Beamreach's operating losses exceeded the capital raised in 2014 and 2017.

5.  Despite previously raising more than $250 million, Beamreach was unable to attract further investment by institutional or venture capital firms – forcing it to seek capital from retail investor.

6.  Its operating losses were ($27 million) in 2014 and ($49 million) in 2015 (81% increase.)

7.  There was a going concern warning from PricewaterhouseCoopers for 2014 and 2015.

EXHIBIT EXCERPT
Ex.14 pg. 015

8. Beamreach misinterpreted its net worth as positive when it was negative in 2014 and 2015 per its auditor.

9. Beamreach was in default with Opus Bank and its vendor creditors.

10. The company had raised over $250 million in securities offerings and was surviving only through capital raised by rounds of financing.

11. The Company was never able to get the high volume production facility in Malaysia up and running, and Beamreach had only one demonstration production field by 2015 after 8 years.

12. The Company's solar modules had not been government certified for commercial use.

13. By February 2015, the Company was burning cash at $2 million per month with no committed revenue to offset the cash burn.

14. By October 2016, the Company was burning cash at the rate of $3.2 million per month with no committed revenue to offset the cash burn.

15. The Company withdrew $2,500,000 from the escrow impounds without investor disclosure or approval when the required minimum to go effective under the original D-1 PPM was $10,000,000.

16. In the convertible debt offering, when it dramatically changed from a preferred stock Offering to one with Convertible Promissory Notes the investors were given no opportunity for recertification and/or were given no rescission offer.

17. The timing leading up to and including the convertible note Offering was in violation of the standard of care.

18. November 10, 2016 – NSC allows Beamreach to withdraw $2.5 million from escrow when the PPM dated November 10, 2016 required $10 million to have it released.

19. November 14, 2016 – The date of the Convertible Promissory Note PPM for D-2.

20. November 22, 2016 – Form D filed with the SEC indicated the Note Offering raised only $8.055 million.

21. The conflict between significantly cutting expenses and staff versus the needs of key employees and executive officers who have individual incentive programs.

22. The motivation for NSC to remain as the key placement agent through the three Offerings was to (a) remain loyal to friendships with Beamreach officers and directors; (b) to earn sizable fees and commissions; (c) to be selected as the Financial Adviser/Investment Banker for Beamreach and earn future commissions and fees for its IPO and/or sale.

23. Any future revenues would come only from a small number of distributers in the form

EXHIBIT EXCERPT
Ex.14 pg. 016

of non-binding MOU's (memorandums of understanding).

24. Beamreach's product was not commercially tested and it changed its product midstream from manufacturing ultra-thin wafers to its "sprint" racking system for commercial rooftops. (No one was installing them because it was cheaper and far simpler to just buy green power from the utilities to achieve green quotas.)

25. By summer of 2016, Beamreach had changed its strategy several times (along with its name) and was not performing up to budget and not meeting their internal projections.

26. NSC did not demand more strict internal controls on Beamreach to curb its spending.

27. Dr. Surek was hired by Beamreach to evaluate its international solar technology. Early on he gave it glowing reports, however he had no experience in industrial engineering. NSC enlisted and paid him later on to opine on their production manufacturing capability. He was not an unbiased independent source having already given positive technology reports on Beamreach.

28. A change in foreign production from Malaysia to Thailand or Taiwan was a late and unproven change in market strategy that was more illusion than reality.

29. Beamreach continually adjusted its milestones and timelines.

30. No one at com-com spoke with any customer who actually signed a Master Sales Agreement as opposed to a non-binding MOU.

31. The company was running out of cash and could only be propped up by monies raised by NSC.

32. The Company in the PPM Supplement discusses selling some obsolete equipment, but all of its equipment was leased. Any equipment owned was pledged under lien to Opus Bank.

33. Beamreach became financially distressed in late 2013 and cultivated new placement agents.

34. By late 2016, Beamreach had little to no chance of an IPO or sale.

35. By late 2016, the Company's valuation would have been cut by more than half.

36. The D-2 Offering was to save the Company helping it secure a game-changing client or sell the Company or its IP, all unrealistic goals by NSC. The only thing it could have achieved realistically was to pay down Opus debt.

37. Beamreach's only LOI was on a non-binding term sheet

38. Whatever proceeds that came about from a fire sale of the IP would go to Opus Bank.

39. Beamreach was in discussions to retain bankruptcy counsel, but they claimed they had

EXHIBIT EXCERPT
Ex.14 pg. 017

of non-binding MOU's (memorandums of understanding).

24. Beamreach's product was not commercially tested and it changed its product midstream from manufacturing ultra-thin wafers to its "sprint" racking system for commercial rooftops. (No one was installing them because it was cheaper and far simpler to just buy green power from the utilities to achieve green quotas.)

25. By summer of 2016, Beamreach had changed its strategy several times (along with its name) and was not performing up to budget and not meeting their internal projections.

26. NSC did not demand more strict internal controls on Beamreach to curb its spending.

27. Dr. Surek was hired by Beamreach to evaluate its international solar technology. Early on he gave it glowing reports, however he had no experience in industrial engineering. NSC enlisted and paid him later on to opine on their production manufacturing capability. He was not an unbiased independent source having already given positive technology reports on Beamreach.

28. A change in foreign production from Malaysia to Thailand or Taiwan was a late and unproven change in market strategy that was more illusion than reality.

29. Beamreach continually adjusted its milestones and timelines.

30. No one at com-com spoke with any customer who actually signed a Master Sales Agreement as opposed to a non-binding MOU.

31. The company was running out of cash and could only be propped up by monies raised by NSC.

32. The Company in the PPM Supplement discusses selling some obsolete equipment, but all of its equipment was leased. Any equipment owned was pledged under lien to Opus Bank.

33. Beamreach became financially distressed in late 2013 and cultivated new placement agents.

34. By late 2016, Beamreach had little to no chance of an IPO or sale.

35. By late 2016, the Company's valuation would have been cut by more than half.

36. The D-2 Offering was to save the Company helping it secure a game-changing client or sell the Company or its IP, all unrealistic goals by NSC. The only thing it could have achieved realistically was to pay down Opus debt.

37. Beamreach's only LOI was on a non-binding term sheet

38. Whatever proceeds that came about from a fire sale of the IP would go to Opus Bank.

39. Beamreach was in discussions to retain bankruptcy counsel, but they claimed they had

EXHIBIT EXCERPT
Ex.14 pg. 018

not retained one yet. No follow up with Company counsel occurred.

40. Beamreach depended heavily on Opus Bank thereby outsourcing its due diligence responsibility to learn about customers and suppliers.

41. NSC red-lined out a provision in its Placement Agent Agreement which stated, "It's not in default or a breach of the agreement".

42. Beamreach further limited the inspection rights that NSC could inquire about for the D-2 Offering.

43. NSC did no due diligence on what rights the placement agent had under the Placement Agent Agreement.

44. Investors had to affirm that all discussions and materials provided to them and the marketing materials that were utilized to raise capital [from them] were firm, fair, factual and complete.

45. NSC was advised that Opus Bank was going to foreclose on Beamreach sometime in the January 2017 timeframe. NSC sought no communication with Opus about the status of its credit facility.

46. A report generated in November 2016 in Project RA by Ocean Tomo indicated that it would be "hard to sell the company or its IP".

47. Carmelo Troccoli lead banker of com-com held Beamreach warrants.

48. There were no other broker dealers that joined NSC in the selling group.

49. NSC due diligence, under Sagiv Shiv, used other distressed technology companies to forecast the hypothetical value of the Beamreach IP. None had solar patents.

50. The one Solar company NSC projected to acquire the Beamreach IP, was Sunpower but NSC never spoke with them before presenting the idea to Beamreach.

51. In comparing a median value of IP in non-solar technology companies Mr. Shiv came up with a value of $16,000,000 ($47,000 x 342 Beamreach patents). This comparison was unrelated to solar companies with patents. Even Jonathan Rich, head of Investment Banking and Compliance looked the other way and let com-com stand alone and fail in upholding its due diligence responsibility. Because NSC abrogated its due diligence duties to fully and thoroughly investigate these red flags, it is clear that the firm was in violation of FINRA Rule 2010 and 2090 along with FINRA NTM's 03-71 and 10-22. FINRA Notice to Members 10-22 "reminds" FINRA members and their associated person's (brokers) that "As a general matter, any reference in this notice to the (due diligence) obligations of a BD firm is also intended to cover the concomitant responsibilities of any registered representative who recommends a Regulation D Offering to his/her customers and any registered principal who is charged by his/her firm with supervising this registered representative". It is important to note that in the Endnotes, there are case law cites

EXHIBIT EXCERPT
Ex.14 pg. 019

dating back to the 1990's and early 2000's which "remind" members, supervisors and brokers of their long-standing due diligence obligations. In my opinion, NSC violated FINRA Conduct Rule 2110, which states "a member, in the conduct of his business, shall observe high standards of commercial honor and just and equitable principles of trade". NCS further violated FINRA Conduct Rule 2210 which requires all public communications to uphold fair dealing with customers with no material fact or qualification to be omitted.

## DOCUMENTS REVIEWED:

Complaint against NSC
Defendant's Answer
PPM (Series D Preferred Stock) dated February 2015 and subscription agreement
PPM – February 2015 Subscription Agreement
Series D capital raise brochure – February 2015
PPM - Series D-1 Units of preferred and common stock – June 2016
PPM Supplement for $15 Million of convertible secured promissory notes – November 2016
Subscription Agreement for the PPM – November 2016 Offering
Investor update letter for the third quarter 2015
Form D's filed by Beamreach with the Securities and Exchange Commission
FINRA Broker Check for National Securities Corporation
Deposition of Carmelo Troccoli
FINRA OTR (On the Record) of Carmelo Troccoli
FINRA OTR (On the Record) of Sagiv Shiv
Plaintiffs' deposition transcripts
Spreadsheets provided by NSC reflecting Beamreach investors and amounts of each investment
Defendant's Expert Report attached to their opposition to the motion to certify
Due Diligence notes, letters, emails, industry data, and numerous case documents
FINRA NTM'S/Regulatory Notices 96-60, 03-71, 05-26, 10-22

## DAMAGES

Based upon my review of NSC records as set forth in various spreadsheets, the compensatory damages for the plaintiffs/class are as follows:

|  |  |
| --- | --- |
| For Solexel, Inc. 2015 - | $28,726,686.97 |
| For Solexel, Inc. 2016 - | $10,915,417,79 |
| For Beamreach D-1 & D-2 - | $ 5,355,760.20 |
|  |  |
| Total | $44,997,864.96 |

I have seen no documents indicating that any class member received any interest, dividend, or distribution payments in connection with Solexel/Beamreach. I have seen no records indicating any class member received a return of any amount invested in Beamreach/Solexel.

I reserve the right to supplement and amend my damages opinions to consider information learned up to and throughout the trial.

EXHIBIT EXCERPT
Ex.14 pg. 020

charges <u>may</u> result in substantial downward pressure in the price of PV modules. In the present offering management stated the recent industry changes <u>have resulted</u> in substantial downward pressure on the price of PV modules. Furthermore, the situation may worsen in the coming months. The market was getting worse.

Score:_____1_____

9.  <u>Assumptions</u>
The assumptions in the recent offering were about the same as in the first offering except that the time horizon is much shorter and therefore even more unrealistic than before. The assumptions were overreaching and unrealistic.

Score:_____1_____

10. <u>Risk Factors</u>
The risk factors remain the same as the first offering except for the second paragraph of the first page of the second offering which states that the Company would run out of money in eight months even if the second offering was fully subscribed. No need to read further.

Score:___1_____

The score for the second offering is 15 points. A minimum score of 35 points (70%) is required for due diligence consideration. This number is 20 points below the minimum and does not even qualify to enter the due diligence process. This offering fails reasonable basic sustainability and should not be recommended to any accredited investor.

<u>Conclusion</u>

Beamreach, beginning in 2015 was in dire financial condition and its management could not deal with reality. Every month that went by, management deluded itself with more and more unrealistic assumptions until finally no one except apparently NSC gave them any credibility whatsoever.  More than $20 million was wasted and investors lost everything. How could NSC have continued as a placement agent. NSC's management read the PPMS. It is not credible that they did not realize that Beamreach was doomed beyond salvage and they were major contributors to keeping this fraud alive.

9

10.  Risk Factors

The PPM outlines 54 different risk factors covering 23 pages. Many of these risk factors are far-fetched and reflect many PPMs who insert so many risk factors that the reader will not be able recognize the key risks with an offering. Key parts about this offering are as follows:

1)  The Company had only 14 months to survive even if the offering was completely vested.

2)  Financing was becoming more and more difficult so that the only way to stay alive was to raise more capital.

3)  The PV modules developed by Beamreach were not fully developed or tested in a manufacturing environment. Beamreach was not even sure its product would be competitive in a very difficult market.

Score:_____1_____

The score for Beamreach Series D totals 17 points. A minimum reserve of 35 points (70%) is required for due diligence consideration. This low score is one-half the number necessary to be qualified to even go into the due diligence process. This offering fails reasonable basic suitability and should not be recommended to any accredited investor.

II.  **September 15, 2016, Offering**

The first offering closed on April 2016. It took much longer than the Company expected. The first offering estimated that a fully funded offering would provide enough funds to April 2016 so there was urgency for a new round of financing. Originally a new round was planned for a Series E Preferred stock offering for $30 million. The offering was reduced to $15 million, possibly because of increased difficulty in receiving new funds.

This new offering consisted of a new Preferred stock called D-1 plus one share of common stock. The price remained the same as the first offering so the difference between the two offerings was the addition of one share of Common stock to the Series D-1 Preferred stock. NSC was the key placement agent for the Company.

1.  Company Officer— Experience
The management is almost the same except that Mark Kerstens formerly Chief Financial Officer and Chief Sales and Marketing Officer, became the

6

## CONCLUSION

Based on the foregoing, NSC's due diligence of the various Beamreach Offerings was inadequate based on the standard of care in the securities industry. In addition, none of the Beamreach offerings (Series D, D-1, or D-2) should have been approved for sale would not have had a grasp on the true risk-reward proposition for any of the offerings based on the multitude of red flags and items discussed above. In my opinion, NSC did not have a reasonable basis for offering to sell any of the Series D, D-1, or D-2 rounds of Beamreach securities to any NSC customer.

In the final analysis, NSC was really engaged to help the Beamreach avoid its inevitable demise as opposed to giving it needed capital to achieve its goals of growth and expansion. After $250 million had already been raised, Beamreach continued to have a short cash runway (burning through $3.2 million per month by late 2016) that could only be met by continued money raising to keep them alive. In his depo, Mr. Troccoli was asked if the com-com discussed Beamreach's cash runway in their October meetings and he did not recall. In simple point of fact, no one at NSC could answer for or justify the liberties and latitude that Beamreach was permitted to take advantage of. NSC raised the capital and Beamreach spent it. In a com-com meeting on October 27, 2016, Carmelo Troccoli stated "We raise money for the Company to keep it alive so it can continue in business. $7 million will put the Company into liquidation, but orderly liquidation instead of a fire sale". He was then asked "how desperate was Beamreach to raise capital to survive?" and  "Very" he said.   He went on to say that, "by the fall of 2016, there was no chance of an IPO. It was a distressed Company and its value was cut in half". Sagiv Shiv said, "The Company is going out of business more likely (than not) if we don't do something". Later, when asked by FINRA in his OTR, he responded concerning questions about the value of the Beamreach IP and he told them, "It was hard to value a house on fire". In his deposition, Mr. Troccoli was asked if the com-com ever evaluated the liquidation value of other solar companies that went under. The answer was, "No, we did not". He was also asked if NSC considered the risk a 9 out of 10? He responded, "A Hail Mary is a good nomenclature". Finally, Mr. Troccoli was posed with the question "So at this point in time, NSC would agree that the risk of loss in the short term for the D-2 round outweighed any long-term benefit that might come from the D-2 Offering"? His answer was "You're right". He went on to say, "we were trying to save the Company so that their (the investor's) money was not a complete loss". He was asked if he was doubling down and responded "Sure".

Finally, I was quite surprised to read in Mr. Troccoli's deposition that irrespective of the com-com notes reflecting its uncertainty of the IP value of Beamreach, he told FINRA that the IP assets of Beamreach could be worth somewhere within the range of $89 million to $895 million. After reading all the contemporaneous com-com notes, I have no idea where those numbers came from. The late October final days of hope for Beamreach were best summarized in the FINRA OTR of NSC Managing Director Sagiv Shiv when he told them, "The company really had no business and all it had was an IP portfolio. The company should last only 3 – 6 months in distress, and this would be, 'a fire sale'." This was really a simple strategy (referring to the D-2 Offering), "it was a Hail Marty pass". He concluded, "This company was burning cash and was quickly reaching its end of life".

In the end, it is clear that the Beamreach Offering Supplement was dead upon arrival since nothing could save the Company. Without question the outlandish and illusory reward

Page | 22

EXHIBIT EXCERPT
Ex.14 pg. 023

reduction, delay or forgiveness as expressed by the Company in its aggressive projections. The Company has misrepresented its Net Worth when audited numbers are compared to company prepared balance sheets i.e. from positive to negative. Then, prior to the promissory note holders receiving any return of capital, the Opus Bank would have to be fully paid and the obligations to the officers, directors and key employees satisfied prior to any note distributions upon sale of the Company. In the 2/2021 PPM, the Company states on page 41 that global solar cell and modular production capacity has stabilized.  The decrease due to industry consolidation is expected to Increase again in the future, potentially at a faster pace than growth in demand. However, just 7 months later by 9/2021, on page 48 the Company reverses course and states, "The current oversupply situation may worsen in the coming months, which could lead to further price reductions". Under the same heading, this line was added in the September PPM, an assumption which is totally inconsistent.  The Co.'s plan is unworkable and proof that National Securities Corporation is not assisting in this impossible endeavor to assist long-time friends who are executive officers and directors of Beamreach in order to gain sizeable commissions, fees and warrants of the Company's stock is gravely needed.  Probably the most disturbing assumption is the assumption that the multitude of Beamreach patents were valued in the millions of dollars.  NSC, as early as 2015 should have required Beamreach to seek a valid appraisal from an independent third party to value the patents. NSC did not demand it and the value of such intellectual property went unverified and unknown.

Score:_____1_____

10.  <u>Risk Factors</u> – The Company's auditor has warned that there is serious doubt that the Company has the ability to continue as a "going concern".  In addition, there are additional significant risk factors to consider:

1. The inability to fully subscribe this convertible note offering.
2. The need for additional funds to stay alive.
3. The company lacks a clear path for positive cash flow.
4. The Co.'s inability to meet lease obligations
5. The Co, is in default with Opus Bank. without hope of amendment or takeout.
6. Likelihood of the Company's rising expenses
7. The Co. has a nine year history without any revenues.
8. The lack of any market for Beamreach Solar's noteholder and securities holders will be forced to hold their securities for years if not indefinitely.
9. Illiquidity indefinitely for Beamreach Stockholders
10. The unlikelihood of any IPO in the future of the Co.
11. Risk of Dilution.
12. Spending of the proceeds of the Note Offering is not to the benefit of the note holders.
13. Conflicts of Interest.
14. The interests of Beamreach Solar's controlling stockholders will conflict with Beamreach Solar's interest and the interests of other stock and note holders.

11

**2. Kamran Fotouhi –** The first thing that I noticed in Mr. Fotouhi's background is that 7 of the 21 cases where he has been retained as a securities expert were for NSC or one of its subsidiaries or corporate owners. That's 33%, so I would say he should not be considered totally objective in his opinions where NSC is concerned. First, he accords the condition in the solar industry and validity of the Beamreach IP by quoting Dr. Surek (already covered) and then by IP counsel of the issuer. Again, this is not a 3rd party objective valuation by a law firm retained and paid by the issuer. Then he opines that investors that want to speculate in high risk investments should be allowed to do so. That might be appropriate for institutional investors that invest 1%-2% of their respective net worth's to take a bite of a private placement with the knowledge that 4 out of 5 will fail.

In my original report, I cited FINRA AWC No. 2018057457101 that stated that just because retail investors are rich and sophisticated does not make a speculative investment like Beamreach suitable for any of them. FINRA stated, "A firm that had failed to conduct reasonable due diligence of a private placement may then lack a reasonable basis to make the recommendation in that security to any customer, regardless of the customer's wealth, willingness to bear risk, age or other individual characteristics". My opinion is that not only did this happen with Beamreach but the reward in no way merited the risk the investors were taking. I believe the Beamreach offerings had an impossible risk to reward ratio. I believe that Mr. Fotouhi was not only biased, but failed to grasp the significance of a company that survived only by money raised for its continuing existence. For a due diligence team not to put a halt to this travesty by 2016 was below the standard of care.

**3. William Purcell –** He is a gentleman with 50 years of experience as an Investment Banker. He has never worked for a FINRA broker dealer or even held any securities licenses. He has never served in the role of a gatekeeper for investors by running a due diligence department of a broker dealer. If he had done so, he would have had to face FINRA audits where he would have had to answer for all the securities procedures, rules, and regulations that the auditors claim to have been bent or broken. His feet would have been held to the fire in upholding the standard of care in the securities industry. Within the securities broker dealer world that I have been a part of for 50 years, private placements are sold differently than in the investment banking community. Strong broker dealers require that an issuer of private placements have a managing broker dealer which stands objectively apart from the inner workings of the issuer (by Chinese Wall). This adds a layer of protection to the investors as the Managing Broker Dealer ("MBD") is usually separate from the issuer. The MBD brings the due diligence binder to numerous members that the MBD forms as a selling group for the offering. It is made up of if other broker dealers who each agree to sign a selling agreement with the issuer and join the selling group which will sell the offering to investors. The issuer also is typically asked by the MBD to enlist the services of a third-party due diligence firm who, for a fee, issues a due diligence report both on the issuer and on the offering which can be distributed to members of the selling group, but not the investors. This report is "for dealer use only". This 3rd party due diligence report is prepared by companies like Mick &

2

Associates, FactRight, Robert A. Stanger & Co., Buttonwood, or Snyder Kearney, LLC, whose fees are paid without promise of that independent firm's approval of the offering.

It is unusual to see an issuer agree to sell a multimillion dollar private placement offering through one broker dealer which will sell the offering to only its own investors and without any third party due diligence report. NSC should have at minimum required Beamreach to submit and pay for a third-party due diligence report to be made since there was no MGP or other members of a selling group. I assure you that no responsible 3rd party due diligence firm would have ever allowed the Convertible Note Supplement offering to waive its $10 million "minimum to go effective" before releasing any commissions to NSC.

Mr. Purcell also makes the point that large institutional investors like Kleiner Perkins, GAF and the Saudi Sovereign Wealth Fund invested on their own as evidence of an offering that should be approved from a due diligence standpoint. As I've pointed out before, the criteria for a speculative investment by an institution is far removed from that of a retail investor and in no way proves NSC's due diligence met its reasonable basis suitability obligation. He forgets too that institutional money largely dried up in 2015 due to the collapse of the U.S. solar industry and by then Beamreach was unsuitable for anyone. He also makes a statement that to me seems very dangerous. He states, "The most difficult task of a surviving company is an ability to continuously raise new capital". A FINRA broker dealer should not allow any company to survive only through the continual raising of capital. But that's exactly what NSC did! It continued to take investors capital in a start-up company who for at least eight years produced no revenues. After raising some $250+ million from investors over that time-period with mounting losses, a going concern letter from its auditor, and in or near lender default with its equipment pledged to Opus Bank as collateral, NSC should have said, that's enough! We can't in good conscience sanction raising one more dollar for you. But they didn't, and Mr. Purcell praises the due diligence in what was in Mr. Trocolli's own words, a "Hail Mary" approval by due diligence.

Finally, Mr. Purcell states that NSC was not negligent and goes on to cite to FINRA's description of negligence as "culpable carelessness". Of all the phrases I could ascribe to the due diligence done by NSC, that one fits perfectly. My original report speaks to that point succinctly. In addition to the failure of NSC to perform adequate due diligence, my original report also covers the multitude of red flags that were not considered by Mr. Purcell or addressed by Com-Com due diligence.

Below, I will discuss each of the following points:

**A. Commission Disparity**

**B. Missing Risk Disclaimer**

**C. Conflicts of Interest Abounded**

3

**D.  No Independent 3rd, Party Valuation of the IP**

**E.  Failure of Bring-Down Due Diligence**

**F.  Comparison of Company Prepared v. Audited Balance Sheets**

**G.  Conclusion**

    **A.  Commission Disparity** – Mr. Purcell merely cites the commissions that were shown in the PPM Supplement for the Note Offering to be paid to NSC (i.e. 10% for non-institutional investors; 11% for non-institutional investors if money raised exceed $10 million and 5% for institutional investors).  However, it is extremely important for an expert to view the Reg. D filings with the SEC.  It states the actual commissions and must be "truthful".  Form Reg. D for the Note Offering dated 11-22-2016, states that sales commissions of $1,800,000 were paid on cash raised of $8,055,797 or 22.4%.  That is a far cry from 10%. Any analyst rendering an expert opinion should have at least looked over these Reg. D filings and make a comparison.  Were the warrants given to NSC added to the cash received?  Mr. Purcell failed to check.  Further, in my original report, I showed the two conflicting numbers for front end load commissions based on NSC raising the full $15 million.  One was $1,281,000 and the other was $1,375,000. This discrepancy was not addressed by Mr. Purcell.

    **B.  Missing Risk Disclaimer** – Mr. Purcell points out and states unequivocally that the following risk disclaimer appears in "all" the PPM'S and the Note PPM Supplement:

> An investment in the shares is speculative, involves a high degree of risk and should be considered only by sophisticated investors who are prepared to bear the economic risk of such investment for an indefinite period of time and are able to withstand a total loss of such investment. Investors should carefully consider the risk factors described in this memorandum [the PPM], in addition to their own investigation and due diligence of the company and the terms of the offering.

Importantly, the above disclaimer referred to investment in the "shares" not "notes" as in the Supplement.  This was a 180 degree material change of investment vehicle.  Further, it refers to the "PPM" and not the "Supplement".  It should have been reprinted to specifically apply this disclaimer to the D-2 Note Offering.

    Clearly, this risk disclaimer was not printed out in the D-2 PPM Supplement as it was in the prior PPM's.  A prospective investor had to click on a link which would take them to the lengthy D-1 PPM and try to find it as shown in the D-1 Offering only.  That is clearly not how an investor warning as important as this one should be printed.  The disclosure was important since some new investors invested in the D-2 Note offering only, not having invested in the D-1 Offering.  Instead of reprinting the disclosure in a conspicuous location, a new and softer disclaimer was printed in the PPM Supplement as follows: "As discussed throughout this

4

## FRCP 26(a)(2)(D)(ii) WRITTEN REBUTTAL REPORT
## Mason Alan Dinehart III, RFC

### REBUTTAL TO OPPOSING EXPERTS' REPORTS

**1.  The qualifications and opinions National Securities' Expert Witnesses:**

**A.  Both Experts rely extensively on the opinion of Dr. Thomas Surek. This reliance is misplaced for several reasons**. It's important to remember that initially Dr. Surek was hired by the issuer to opine on the validity of the solar technology of Beamreach in September 2011. Irrespective of subsequent assignments, he cannot be considered a 3rd party objective source in his reporting.  Further, a true objective third party report is presumed to be fair and balanced. However, in his 4th report on Beamreach technology he is anything but objective.  99% of his report is positive with only 1% being negative. Furthermore, one item was delayed in the port of entry in Los Angeles (the item is not specified so we don't know how important it was).  He uses words like "spectacular", "valid", "relevant" and "on-track". He comments that production start-up would be slated in the next couple of months. This report is dated February 2015, and centers thoroughly on the high-volume manufacturing (HVM) of solar panels in pilot production in Milpitas, CA.

As discussed in my original report, many news articles after February 2015 discussed the collapse of many solar companies and the technological advancement in solar by Asian companies. The significant declines in the U.S. solar market happened between 2015 and 2016 and are not addressed by Dr. Surek.

It is important to note that in March of 2016, Beamreach changed its company production structure entirely to the extent of going to a Contract Manufacturing basis in Asia, mainly Malaysia, but also in Taiwan and Vietnam.  His report fails to discuss or consider or verify contract manufacturing in Malaysia where the manufacturing plant in Milpitas, CA was to be duplicated. Finally, and this is most important, Dr. Surek was charged with opining on the validity and function of the Beamreach technology only. He never was charged with valuation of the Beamreach intellectual property in terms of worth or protection.  Any suggestion that Surek did this is wrong and National Securities failing to understand the actual value of the Beamreach IP at any time is below the standard of care.

In conclusion, I feel that Dr. Surek's reports should be discounted greatly since he is biased in favor of the issuer, he opined on the technology only (not the IP), and discussed production at the pilot plant only in Milpitas and in no way relative to the change to contract manufacturing in 2016 (applicable to both the D-1 PPM and Supplement (D-2)). Instead, in their reports, Both Mr. Fotouhi and Mr. Purcell put great weight on Dr. Surek's report, which I find to be inappropriate.

1

2. **Kamran Fotouhi –** The first thing that I noticed in Mr. Fotouhi's background is that 7 of the 21 cases where he has been retained as a securities expert were for NSC or one of its subsidiaries or corporate owners. That's 33%, so I would say he should not be considered totally objective in his opinions where NSC is concerned. First, he accords the condition in the solar industry and validity of the Beamreach IP by quoting Dr. Surek (already covered) and then by IP counsel of the issuer. Again, this is not a 3rd party objective valuation by a law firm retained and paid by the issuer. Then he opines that investors that want to speculate in high risk investments should be allowed to do so. That might be appropriate for institutional investors that invest 1%-2% of their respective net worth's to take a bite of a private placement with the knowledge that 4 out of 5 will fail.

In my original report, I cited FINRA AWC No. 2018057457101 that stated that just because retail investors are rich and sophisticated does not make a speculative investment like Beamreach suitable for any of them. FINRA stated, "A firm that had failed to conduct reasonable due diligence of a private placement may then lack a reasonable basis to make the recommendation in that security to any customer, regardless of the customer's wealth, willingness to bear risk, age or other individual characteristics". My opinion is that not only did this happen with Beamreach but the reward in no way merited the risk the investors were taking. I believe the Beamreach offerings had an impossible risk to reward ratio. I believe that Mr. Fotouhi was not only biased, but failed to grasp the significance of a company that survived only by money raised for its continuing existence. For a due diligence team not to put a halt to this travesty by 2016 was below the standard of care.

3. **William Purcell –** He is a gentleman with 50 years of experience as an Investment Banker. He has never worked for a FINRA broker dealer or even held any securities licenses. He has never served in the role of a gatekeeper for investors by running a due diligence department of a broker dealer. If he had done so, he would have had to face FINRA audits where he would have had to answer for all the securities procedures, rules, and regulations that the auditors claim to have been bent or broken. His feet would have been held to the fire in upholding the standard of care in the securities industry. Within the securities broker dealer world that I have been a part of for 50 years, private placements are sold differently than in the investment banking community. Strong broker dealers require that an issuer of private placements have a managing broker dealer which stands objectively apart from the inner workings of the issuer (by Chinese Wall). This adds a layer of protection to the investors as the Managing Broker Dealer ("MBD") is usually separate from the issuer. The MBD brings the due diligence binder to numerous members that the MBD forms as a selling group for the offering. It is made up of if other broker dealers who each agree to sign a selling agreement with the issuer and join the selling group which will sell the offering to investors. The issuer also is typically asked by the MBD to enlist the services of a third-party due diligence firm who, for a fee, issues a due diligence report both on the issuer and on the offering which can be distributed to members of the selling group, but not the investors. This report is "for dealer use only". This 3rd party due diligence report is prepared by companies like Mick &

2

Associates, FactRight, Robert A. Stanger & Co., Buttonwood, or Snyder Kearney, LLC, whose fees are paid without promise of that independent firm's approval of the offering.

It is unusual to see an issuer agree to sell a multimillion dollar private placement offering through one broker dealer which will sell the offering to only its own investors and without any third party due diligence report. NSC should have at minimum required Beamreach to submit and pay for a third-party due diligence report to be made since there was no MGP or other members of a selling group. I assure you that no responsible 3rd party due diligence firm would have ever allowed the Convertible Note Supplement offering to waive its $10 million "minimum to go effective" before releasing any commissions to NSC.

Mr. Purcell also makes the point that large institutional investors like Kleiner Perkins, GAF and the Saudi Sovereign Wealth Fund invested on their own as evidence of an offering that should be approved from a due diligence standpoint. As I've pointed out before, the criteria for a speculative investment by an institution is far removed from that of a retail investor and in no way proves NSC's due diligence met its reasonable basis suitability obligation. He forgets too that institutional money largely dried up in 2015 due to the collapse of the U.S. solar industry and by then Beamreach was unsuitable for anyone. He also makes a statement that to me seems very dangerous. He states, "The most difficult task of a surviving company is an ability to continuously raise new capital". A FINRA broker dealer should not allow any company to survive only through the continual raising of capital. But that's exactly what NSC did! It continued to take investors capital in a start-up company who for at least eight years produced no revenues. After raising some $250+ million from investors over that time-period with mounting losses, a going concern letter from its auditor, and in or near lender default with its equipment pledged to Opus Bank as collateral, NSC should have said, that's enough! We can't in good conscience sanction raising one more dollar for you. But they didn't, and Mr. Purcell praises the due diligence in what was in Mr. Trocolli's own words, a "Hail Mary" approval by due diligence.

Finally, Mr. Purcell states that NSC was not negligent and goes on to cite to FINRA's description of negligence as "culpable carelessness". Of all the phrases I could ascribe to the due diligence done by NSC, that one fits perfectly. My original report speaks to that point succinctly. In addition to the failure of NSC to perform adequate due diligence, my original report also covers the multitude of red flags that were not considered by Mr. Purcell or addressed by Com-Com due diligence.

Below, I will discuss each of the following points:

**A. Commission Disparity**

**B. Missing Risk Disclaimer**

**C. Conflicts of Interest Abounded**

3

**D. No Independent 3rd, Party Valuation of the IP**

**E. Failure of Bring-Down Due Diligence**

**F. Comparison of Company Prepared v. Audited Balance Sheets**

**G. Conclusion**

**A. Commission Disparity** – Mr. Purcell merely cites the commissions that were shown in the PPM Supplement for the Note Offering to be paid to NSC (i.e. 10% for non-institutional investors; 11% for non-institutional investors if money raised exceed $10 million and 5% for institutional investors). However, it is extremely important for an expert to view the Reg. D filings with the SEC. It states the actual commissions and must be "truthful". Form Reg. D for the Note Offering dated 11-22-2016, states that sales commissions of $1,800,000 were paid on cash raised of $8,055,797 or 22.4%. That is a far cry from 10%. Any analyst rendering an expert opinion should have at least looked over these Reg. D filings and make a comparison. Were the warrants given to NSC added to the cash received? Mr. Purcell failed to check. Further, in my original report, I showed the two conflicting numbers for front end load commissions based on NSC raising the full $15 million. One was $1,281,000 and the other was $1,375,000. This discrepancy was not addressed by Mr. Purcell.

**B. Missing Risk Disclaimer** – Mr. Purcell points out and states unequivocally that the following risk disclaimer appears in "all" the PPM'S and the Note PPM Supplement:

> An investment in the shares is speculative, involves a high degree of risk and should be considered only by sophisticated investors who are prepared to bear the economic risk of such investment for an indefinite period of time and are able to withstand a total loss of such investment. Investors should carefully consider the risk factors described in this memorandum [the PPM], in addition to their own investigation and due diligence of the company and the terms of the offering.

Importantly, the above disclaimer referred to investment in the "shares" not "notes" as in the Supplement. This was a 180 degree material change of investment vehicle. Further, it refers to the "PPM" and not the "Supplement". It should have been reprinted to specifically apply this disclaimer to the D-2 Note Offering.

Clearly, this risk disclaimer was not printed out in the D-2 PPM Supplement as it was in the prior PPM's. A prospective investor had to click on a link which would take them to the lengthy D-1 PPM and try to find it as shown in the D-1 Offering only. That is clearly not how an investor warning as important as this one should be printed. The disclosure was important since some new investors invested in the D-2 Note offering only, not having invested in the D-1 Offering. Instead of reprinting the disclosure in a conspicuous location, a new and softer disclaimer was printed in the PPM Supplement as follows: "As discussed throughout this

4

Supplement, investment in the Notes involves significant risks, which risks depend, in part, on the amount of capital raised in the Offering.  The Company cannot guarantee any future closings of the Offering.  Accordingly, early participation in the Offering comes with heightened risks as further described below".

The key point is that there was no specific emboldened warning about investors being able to withstand a "total loss" of such "note" investment.  That was a material omission in my opinion and for Mr. Purcell to imply that it was specifically stated in the PPM Supplement was disingenuous and again below the standard of care in the securities industry as well as the investment banking industry itself.

**C.  Conflicts of Interest Abounded** – Once again, Mr. Purcell attempts to justify certain acts by NSC when they are below the standard of care.  One example is how he shirks NSC's important due diligence responsibility of contacting customers of the Company.  Especially this company which had no verified sales orders, only MOU's.  He states, "Direct discussions with customers was impractical". Obtaining permission from the company to verify results with customers and vendors is standard procedure in the securities industry.  Here, a clear conflict of interest existed when NSC due diligence relied on Opus Bank to do that for them.  I can't imagine an investment banking firm failing to call customers and suppliers to verify sales orders and account receivables. This conflict of interest was below the standard of care.  Clearly, by checking with suppliers, they would have discovered the $378,000 in vender debt was with a collection agency.  They did not, and depended on the Company's lender to do it for them.

Another conflict of interest was to allow the issuer to breach the escrow impound minimum of $10 million minimum to go effective.  No reasonable due diligence department should have allowed the sponsor to accomplish this unless it had a clear motivation. I suggest that motivation was clearly defined in NSC's compensation which would now be paid along with warrants in addition for raising money (less than $10 million) for Beamreach.  If any members of the com-com personally had warrants this would have been a further conflict of interest relative to their objectivity.  NSC also had the hope of brokering the sale of the company and/or its IP, as well as, being selected as its lead investment banker.

Mr. Purcell also raises the point that there is no conflict between a brokerage firm raising money for the issuer and its duty to objectively provide due diligence for the firm's investor's. That is of course true only if the reward projected in the Offering justifies the risk taken by those investors.  But in this particular case, I think the risk reward ratio was upside down and a conflict clearly existed here. Furthermore, this inherent conflict is only overcome if the transaction has a reasonable probability of achieving its stated objectives.  In my opinion, the Beamreach Note offering had no chances of surviving. It was dead on arrival.  Consequently, the conflict was relevant and flourishing in both areas.

5

NSC knew that this company was not an up and comer, had no product in November of 2016, had a going concern warning from its auditors, had no revenues, mounting losses, in loan default with its bank, and a short cash runway.  Further it was entirely changing its manufacturing and distribution structure by launching into contract manufacturing in Asia where the results of that competition is immediate (there are no 2, 4, and 6 year election cycles in China).  The per watt cost of solar panels, as also stated by Dr. Surek, was about one-half in Asia compared to the U.S.  That immediate cost reduction was devastating to the U.S. solar industry and it was time for NSC to finally uphold its due diligence responsibility and stop raising another dollar for Beamreach and do the right thing.  Mr. Purcell disregarded these realities as conflicts of interest, which fell below the standard of care in the securities industry.

**D.  No Verification of the Beamreach Intellectual Property (IP)** - NASD Notice to Members 03-71 defines the basis of reasonable basis suitability in non-conventional investments, requires due diligence to include "The Value of Underlying Collateral in a Reg D Private Placement".  FINRA Regulatory Notice 10-22 also describes a broker dealer's due diligence responsibility as investigating and verifying the  "Assets Held or to be Acquired by the Issuer".  It should be no surprise then that I point out that NSC failed to verify the intellectual property value of Beamreach.

Mr. Purcell unbelievably implies that NSC inquired about it, sent questionnaires about it, and then stated that Dr. Surek provided three assessments of Beamreach's IP completed 9-23-2011, 1-31-2013 and 5-2-2014.  Clearly, as in his 4th report dated February 2015, Dr. Surek was providing verification of the Beamreach technology only and nowhere does he state or verify the "value" of the Beamreach IP. My original expert report is replete with the varying "numbers off a bus" that were discussed and thrown out both during com-com meetings and even at the FINRA OTR.  In the securities industry, a third party independent appraisal of a start-up development stage company's IP would be demanded first by the Managing Broker Dealer, then by the third party due diligence firm, and finally by every member of the selling group.  NSC as the sole broker dealer had virtually the same responsibility to get that independent appraisal.  This goes without question since this PPM Supplement D-2  was done primarily to raise money to sell the Company or its intellectual property in the form of patent assets. The proof of this clearly was when NSC had the meeting to become the Beamreach Lead Investment Banker, NSC was escorted out of the meeting with its tail between its legs for precisely not independently valuing the intellectual property.  Mr. Purcell did not state the reason Imperial Bank was chosen as the lead banker but I strongly suggest, this was the unstated reason for the choice.

Then Mr. Purcell suggests that NSC required an updated technology assessment prior to offering D-2. Again that is not an assessment of the IP's value.  To address that, NSC relies on the opinion of Beamreach's IP Counsel, John Wood at Fenwick and West LLP which provided a Certificate of Good Standing. Mr. Purcell opines that this should suffice for the demand, marketability, defensibility and value of the IP.  Once again, the issuers counsel is not a third-

6

party objective source in any manner.  Only an outside appraisal from a disinterested independent third party would suffice to establish the range of IP value that due diligence could rely upon for the benefit of its investors.  Asking Opus Bank once again for its opinion would not be considered a viable alternative.

Finally, Mr. Purcell notes that NSC conducted both a "precedent transaction analysis" and "comparable trading analysis" (commercial trading multiples) supported by two slides from the NSC Road Show presentation which impute the patent portfolio in the first and a valuation analysis in the second.  All of this is fine fluff, but clearly masks the undeniable responsibility of NSC due diligence to have gotten an independent third-party appraisal valuation on the IP with Beamreach paying for it.

**E.  Failure of Bring-Down Due Diligence –** In the securities industry when a company offers successive rounds of financing by way of Reg. D private placements, a Broker Dealer must resist the temptation to get lax, comfortable or lazy in its due diligence obligation. It must be wary of knowing the company too well and treating new offerings as "old hat".  Each successive round is a new private placement offering and should be treated as it were the first and only one. Typically, the 3rd party due diligence firm is paid and asked to provide a new report on the new offering totally separate and distinct from the last one.  This is why a separate and distinct Reg D filing with the SEC is required each time a private placement is offered to the investors. This would be especially true when the Note Offering Supplement was formed.  Notably since it was such a substantial change from preferred stock to secured promissory notes, due diligence should have looked at D-2 as a separate offering from the D-1.  Not just a supplemented continuation of D-1. Further, in his comments Mr. Purcell describes the approach of Bring-Down due diligence as analyzing the company by way of any "changes" in the Company as opposed to looking at it as a new and separate offering that required reviewing all the original essential analysis steps from beginning to end.

As a side note, I suggest that it would have been harder to breach the $10 million minimum to go effective.  That would have been a good reason to call D-2 a Supplement and eliminate the $10 million minimum amount they had to raise before breaking escrow impounds and paying commissions.  In my opinion, the com-com due diligence team approached each round of financing, not with new and fresh eyes but with old and familiar ones.  On page 20 of his report, Mr. Purcell under number 70 (d) cites with considerable detail what was originally known about Beamreach. From the February 2015, Series D PPM, it states, "The Company has also secured, contingent upon the Company's finalization of certain other financing arrangements in Malaysia, an incentive package viewed at up to $1 billion from the Malaysian government, including an agreement to facilitate a $150 million loan from Malaysian banks…, an agreement to provide $12 million in training and R&D grants, and tax-free status for 10 years".   It seems that NSC due diligence has relied on this assertion since February of 2015 and not ever tried to confirm it by letter, teleconference, phone or email let alone a needed visit to Malaysia to verify these specific

7

facts. The fact is that a statement like this one comes straight from the issuer to lend credence to its efforts to grow the company and keep it afloat. If it were true, things could possibly change for the better now in November 2016 when Beamreach was changing its structure to contract manufacturing in the far east rather than on-site production. NSC due diligence took the word of the issuer instead of verifying these important facts independently.

FINRA in its AWC referenced in my original report describes the securities violation when a broker dealer due diligence does this. It states on page 2, "Generally, a firm may not rely blindly upon the issuer or information concerning a company, nor may it rely on the information provided by the issuer and its counsel in lieu of conducting its own reasonable investigation". To demonstrate that it has completed a reasonable investigation, a broker-dealer firm should retain reports documenting both the process and results of its investigation. These Malaysian facts were stated by the issuer in February 2015 and never challenged, investigated or verified as they should have been during bring-down due diligence. This was clearly necessary since the pilot plant in Milpitas was to be duplicated in Malaysia. NSC due diligence relied on the old facts provided by the issuer in analyzing the D-1 and D-2 offerings. Mr. Purcell's description of NSC's bring down due diligence was in violation of FINRA Rules 2010, 2090, 2110, 2210, and 2111 (RN 10-22) and below the standard of care.

**F. Comparison of Company Prepared v. Audited Balance Sheets** – It was surprising to me in reading Mr. Purcell's well fashioned expert report that in discussing the financial disclosures he discussed only the Beamreach company prepared financial statements of the Company. His point was that even the company itself disclosed the worsening trend of its financials. My analysis goes much deeper than that since as a due diligence officer, part of my due diligence analysis is to compare the company prepared statements to the audited ones. Here we had PricewaterhouseCoopers audits for December 31, 2014 and 2015. The Company states that its net worth or stockholder's equity as of year-end 2014 was a positive $20.4 million. For this same period, PWC Auditors differed substantially from this 2014 number by stating it was not positive but a negative ($151.4 million). For year-end 2015, the Company reported a positive net worth of $8.6 million, a decline but still sizeable and positive stockholders equity. However, the PWC auditors for year-end 2015 showed a negative ($208.1 million). From a due diligence standpoint, it's important to determine why and how such a large difference was reported by comparing the net worth numbers in both 2014 and 2015. This is something Mr. Purcell never questioned, compared or calculated. It turns out that the difference for 12-31-2014 is $171.8 million and for 2015 was $216.7 million. When the reports are examined it becomes apparent that the difference between the company prepared net worth and the audited net worth is because the preferred stock assets for Beamreach in its company prepared balance sheet at year-end 2014 totaled $171.8 million. Then in 2015, if we look at the same preferred stock assets in the company prepared statements, that the amount shown for preferred stock was $216.7 million. This is important because the PWC auditors gave no credit for the value of the preferred stock of Beamreach as a "going concern" company in its net worth calculations for year-end 2014 and

8

EXHIBIT EXCERPT

2015.  Specifically, the difference in the two year end numbers is exactly the amount in company prepared value of preferred stock on its balance sheets.  This analysis seems accurate.  However, a due diligence department doesn't stop there.  Remember Mr. Purcell earlier discussed teleconference calls between NSC and PWC auditors. This massive difference should have been discussed.

The difference each year is in the millions of dollars between the company and its auditor. After raising over $250 million in four rounds of preferred stock, had the net worth of Beamreach declined so much that its preferred stock held by many investors was given no value by the PWC auditors?  I believe that was a question that demanded to be answered.  It was not only a huge red flag not disclosed to the investors (simply disclosing the numbers in the PPM Supplement doesn't disclose the harm of the difference).

The com-com in exercising its reasonable due diligence responsibility simply had to reconcile that difference and would have needed to ask PWC if that is the reason for the stated difference in audited net worth for the two time periods.  Of course this didn't happen and no one even questioned PWC about these millions of dollars in differences in net worth numbers.  Again, Mr. Purcell is silent on the net worth difference issue while it should stick out like a sore thumb begging for an answer in the form of a reasonable due diligence investigation.

**G. Conclusion –** In addressing my rebuttal comments about these expert reports it's important to note that my Report was written November 10, 2021.  Both Mr. Fotouhi and Mr. Purcell's reports were also written the same day.  Consequently, since neither of them reviewed my report at the time they issued their reports, many of the items in my original report serve as rebuttal to their reports as well.  This is especially true in the areas of:  1) inadequate due diligence; 2) failure to respond to red flags; and 3) risks not disclosed or assumed by the class investors.

To rely on Dr. Surek for valuing the Beamreach IP was misplaced in that he evaluated the technology and not the IP.  Clearly, his comments in February 2015 were not only biased (he was hired first and had loyalty to the issuer) but were not responsive to the change in production and distribution structure by Beamreach turning away from pilot production and engaging in contract manufacturing in Asia, a decision made one year after his report.   Dr. Surek only dealt with pilot production in Milpitas, CA.  To not have dealt with Asian contract manufacturing essentially made his report useless.  He was soon to retire at this time and his over-zealous and ultra-positive comments reflected his abundant "all-in" excitement and fascination with the changes occurring in mono-crystalline silicon photovoltaic technology and products. Further, Asian solar panel competition took firm hold after his report of 2/2015 and are not dealt with by Dr. Surek.  Clearly an independent 3rd party appraiser should have been retained later in 2015 to fully evaluate not only the IP but the present competition of Asian Solar panels to the U.S.  The failure of com-com due diligence to demand both of these functions demonstrated negligence on the part of NSC in my opinion.

9

As to the other experts, I feel that they ignored key obligations of NSC due diligence by rationalizing away their importance. To justify the negligence of NSC's failure to demand an independent appraisal of the Beamreach IP is well below the standard of care. It was also negligent of NSC to continue to raise money for this dying company from 2015 on when it knew the D-2 offering was a "Hail Mary". NSC knew that Beamreach's survival was only made possible by NSC's raising money and not from any production or sales efforts on Beamreach's part. Its decision to abrogate the $10 million minimum to go effective in D-2 was a clear sign that NSC's motivation was really the compensation it could garner from D-2 sales, being selected to act as broker of the sale of the company and/or IP assets, and becoming the lead investment banker for Beamreach. These important breaches were ignored by both experts.

Further, both experts ignored the commission disparity in the D-2 offering, the missing risk disclaimer, the conflicts of interest and the balance sheet disparity between the auditor and the company rendering Beamreach preferred stock to have no value. Finally, NSC's bring-down due diligence was rationalized as thorough and effective when it clearly was ineffective and deficient as opposed to looking at D-1 and D-2 as a new and stand-alone offering totally apart and distinct from Series D.

Both experts failed to recognize that combining them was below the standard of care and only inured to NSC's benefit in being compensated. Finally, the value of Mr. Purcell's report was diminished significantly by citing language that came directly from the issuer and not from any due diligence investigation. That practice was directly in violation of FINRA Regulatory Notice 10-22. I can only conclude that NSC was negligent, and its due diligence was below the standard of care.

### Additional Documents Relied on in Formulating This Rebuttal Opinion

- Expert Report submitted by Kamran Fotouhi, along with documents referenced and identified therein;
- Expert Report submitted by William Purcell, along with documents referenced and identified therein.

10

I declare under penalty of perjury that the foregoing is true and correct, and if called as a witness would testify competently thereto.


Mason A. Dinehart III, RFC

December 15, 2021

11

# EXHIBIT 15

**FRCP 26(a)(2)(B) WRITTEN REPORT**
**Mason Alan Dinehart III, RFC**

## INTRODUCTION

I am celebrating my 50th year in the securities industry. Currently, I am licensed as a Registered Principal Outside Business Activities Compliance for LightPath Capital, Inc. in Southlake TX. Since 1999, I have served as a member of the FINRA Board of Arbitrators and have served as an arbitrator on ten panels. While six of those cases settled, I have entered four arbitration awards. During my career in the securities field, I became extremely familiar with corporate finance along with asset allocation models and modern portfolio theory. I have supervised, lectured and provided direct financial planning advice to dozens of clients (personal, corporate and trust) regarding diversified and balanced securities portfolio implementation. My work in the securities industry, as well as in my consulting experience includes without limitation (i) organization of various issuers of securities including corporations, limited partnerships and limited liability companies; (ii) the issuance of equities, debentures, partnership interests and membership interests in the issuers (iii) capitalization of the issuer of securities including the risk assessment and underwriting of the respective securities instrument (iv) evaluation of business plans and related financing and forecasting, and (v) corporation and corporate governance, including conflicts of interest. Early in my career, I spent two years in the Acquisition and Mergers Division of Corporate Finance at Bank of America. In December 2018, I was designated as the securities expert witness for the California State Bar.

## SCOPE OF ASSIGNMENT AND COMPENSATION

In this case, I have been asked to review and opine on the following issues:

1. The duties owed by a FINRA member broker-dealer when conducting due diligence on a Regulation D private placement securities offering.

2. The duties owed by a FINRA member broker-dealer when approving a Regulation D private placement securities offering for sale to its customers.

3. The adequacy of the due diligence conducted by National Securities Corporation (NSC) of several Regulation D private placement securities offerings in Beamreach Solar, Inc. f/k/a/ Solexel, Inc. by National Securities Corporation (NSC). The Beamreach securities offerings I have been retained to opine on are Beamreach Series D Preferred Stock Offering, Beamreach Series D1 Preferred Stock Offering, and Beamreach Convertible Secured Promissory Note Offering ("D-2") (collectively, the "Beamreach Offerings").

4. The adequacy of NSC's approval of the Beamreach Offerings to NSC's customers.

5. Risks not assumed by investors in Regulation D private placement offerings, and risks not assumed by NSC's customers in the Beamreach Offerings.

6. The damages to the Plaintiffs and the Class.

Ex 15 pg 001
EXHIBIT EXCERPT

is $1,281,000 while in another, the load number is $1,375,000. The load averages about 9% of the $15,000,000 cash raised, meaning that 91% of the proceeds would go into the Company. However, the Use of Proceeds section does not break it down by percentage as is the usual custom and practice in the securities industry.

Also, when reviewing the Regulation D filing with the SEC for the Note Offering dated November 22, 2016, the numbers are quite different. This document reflects sales commissions of $1,800,000 on cash raised to date or $8,055,797. That amount of commissions would be 22.4% of the cash raised which would mean that the company would only be getting 77.6% of the cash raised or $6,251,298. If the NSC compensation were broken down with 12% cash[1] and 10% warrants, this may have been why the Reg. D numbers are so much higher than what is stated in the PPM. If this is an accurate disclosure and breakdown (the SEC requires the numbers submitted on Reg. D to be "truthful"), the load is much higher than most private debenture Offerings sold in the securities marketplace. Normally such an offering as this would have a load in the range of 8% - 10%.[2]

The responsibility for this front-end load breakdown and clarification falls squarely on National Securities Corporation, the Company's Placement Agent. When the Reg. D was filed, NSC should have held Beamreach's feet to the fire and demanded a breakdown of the 22.4% front-end load in the amount of $1,800,000.

5.      DUE DILIGENCE RISK:

FINRA Rule 2111.05 (a) explains the Reasonable Basis suitability obligation. It states, "The reasonable-basis obligation requires a member or associated person to have a reasonable basis to believe, based on reasonable diligence, that the recommendation is suitable for at least some investors. In general, what constitutes reasonable diligence will vary depending on, among other things, the complexity of and risks associated with the security or investment strategy and the member's or associated person's familiarity with the security or investment strategy. A member's or associated person's reasonable diligence must provide the member or associated person with an understanding of the potential risks and rewards associated with the recommended security or strategy. The lack of such an understanding when recommending a security or strategy violates the suitability rule". Section 11(c) of the Securities Exchange Act of 1933 defines reasonable as follows, "The standard of reasonableness is that of a prudent man in the management of his property".

Now, let me define due diligence in my own words since FINRA only requires a "reasonable investigation". It is the process of reasonable investigation that independently evaluates an issuer's integrity, accuracy, competency, financial strength, and organizational depth. It is adversarial in nature and utilizes quantitative and intuitive means. Due diligence includes a comprehensive analysis that challenges the deal points, assumptions, and

---

[1] To make things more confusing, there is a Flow of Funds Memorandum dated November 16, 2016 which indicates the cash NSC received from commissions that equaled 12% ($666,665.06 - $5,565,766,20 = 12%) which is not the commission stated in the PPM Supplement.

[2] To make things more confusing, there is a Flow of Funds Memorandum dated 11-16-2016 which indicates the cash NSC received from commissions that equaled 12% ($666,665.06 -: $5,565,766,20 = 12%) which is not the commission stated in the PPM Supplement.

Ex 15 pg 002
EXHIBIT EXCERPT

projections in each offering examined. The process evaluates and determines the probability of the transaction achieving its stated objectives.

As the NASD states in Notice to Members 03-71, "Among the issues highlighted are members' responsibilities to: 1) conduct appropriate due diligence; 2) perform a reasonable-basis suitability analysis; 3) perform customer specific suitability analysis for recommended transactions; 4) ensure that promotional materials used by the member are fair, accurate and balanced; 5) implement appropriate internal controls; and 6) provide appropriate training to registered persons involved in the sale of these products".

I have previously noted the standards for due diligence that FINRA Regulatory Notice 10-22 specifically identifies for due diligence that would be covered in a Reg D Offering. While FINRA states that the brokerage firm must complete a reasonable investigation on each Offering, the SEC requires brokerage firms to retain records documenting both the process and results of its investigation.

On August 14, 2020, FINRA's Department of Enforcement issued a Letter of Acceptance, Waiver and Consent (AWC) No. 2018057457101 against CFD Investments (CRD No. 25427) and Mathew Bahrenburg, General Securities Principal (CRD No. 529566). In November 2014, CFD, through Bahrenburg approved an oil and gas private placement offering for sale to its customers.  The issuer, Payson Petroleum, Inc. was the subject of an April 2014 jury verdict in excess of $9 million and was in financial distress.  From March 2015 to February 2016, CFD sold interests in Payson to 31 of its retail customers without conducting reasonable due diligence into the Payson offering.  In addition, CFD sold interests in Payson to its customers without having a reasonable basis for making recommendations to purchase this private placement.  CFD customers who invested in Payson lost their investments when Payson filed for bankruptcy just four months after CFD's last sale of the offering.   As FINRA wrote, "a firm that has failed to conduct reasonable due diligence of a private placement may thus lack a reasonable basis to make the recommendation in that security to any customer, regardless of the customer's wealth, willingness to bear risk, age, or other individual characteristics".  On November 23, 2016, the SEC filed a complaint against the principals of Payson, alleging fraud, including misrepresentations and omissions to investors in connection with various Payson offerings sold between November 2013 and July 2014.  The principals thereafter consented to the facts as alleged in the complaint and were ordered to pay approximately $7.7 million in fines, disgorgement and interest.

Bahrenburg, Registered Principal Due Diligence, did not comply with the firm's written procedures pertaining to due diligence.  Instead, in November 2014, he approved the Payson offerings for sale to the firm's accredited investors, based only on a review of documents provided by Payson and interviews of Payson personnel. This due diligence process was not reasonable for the following reasons:  First, CFD, through Bahrenburg, did not reasonably assess Payson's financial condition. The financial documents that Payson provided to CFD painted a bleak picture, and showed that the company had substantial liabilities and negative net income of more than $1.5 million in 2013.  In addition, due to incurring recurring losses from operations and pending litigation, the firm's independent auditor included a note that these facts raised substantial doubt about its ability to continue as a "going concern". FINRA wrote in its AWC that Bahrenburg did not reasonably investigate the circumstances of the 2012 investor lawsuit, failed to review Payson's prior offerings, failed to conduct any independent review or assessment of the current project generally and

Page | 10

EXHIBIT EXCERPT

instead simply accepted the information and representations provided by the issuer.  Finally, Bahrenburg and CFD failed to conduct any ongoing due diligence, despite that it was required by CFD's written procedures.  For example, CFD did not request, obtain or review Payson's 2014 audited financial information. CFD continued to sell the offering until February, 2016.  Because of its failure to conduct reasonable due diligence of the Payson offerings, CFD failed to make a reasonable determination as to whether Payson was suitable for any class of investor.  Therefore, CFD had no reasonable basis to recommend the Payson offerings to its customers, even accredited investors, and violated FINRA Rule 2111 and 2010 by recommending and selling these offerings to 31 customers.

CFD Investments, Inc. consented to the following sanctions:

1) Censure; 2) a 45 calendar day suspension of any and all private placement activities, and: 3) Partial restitution to affected customers in the total amount of $750,000. Mathew Bahrenburg consented to the following sanctions; 1) a 45 calendar day suspension from association with any FINRA member firm in a principal capacity, and 2) a $5,000 fine.

National Securities Corporation (NSC) itself has also been the recipient of a FINRA AWC, No. 2009019068201 which was issued in May of 2011 and stated the following. "National Securities did not have reasonable grounds to believe that certain private placements offered by Medical Capital Holdings, Inc. (MedCap) and Provident Royalties, LLC (Provident_ pursuant to Regulation D were suitable for any customer.  Additionally, NSC, acting through its Director of Alternative Investments/Director of Syndications, Mathew G. Portes, (i) failed to conduct adequate due diligence of the private placements offered by MedCap and Provident pursuant to Regulation D, and (ii) failed to establish, maintain and enforce sufficient supervisory system reasonably designed to achieve compliance with applicable securities laws and regulations and NASD Rules in connection with applicable securities laws and regulations and NASD Rules in connection with the sale of the private placements offered by MedCap and Provident pursuant to Regulation D. Accordingly, NSC violated NASD Conduct rules 2310, 3010, 2110 and FINRA Rule 2010 and Portes violated NASD Conduct Rules 2010, and 2110 and FINRA Rule 2010.

NSC, acting through Portes, failed to adequately enforce its supervisory procedures to conduct adequate due diligence as it relates to MPFC VI.  Beyond reviewing the MPFC VI private placement memorandum and reading a 9/3-/2008 due diligence report prepared by Buttonwood Investment Services, LLC, in October 2008, some 2 months after it had begun selling MPEC VI, Portes, and thereby NSC, did not perform sufficient due diligence for MPEC VI.  Portes, and thereby NSC did not question the above-referenced use of proceeds section of the MPEC VI private PPM, did not review any financial statements for MedCap or MPEC VI, and did not sufficiently follow up or otherwise investigate concerns noted in either the 9/2008 Buttonwood Due Diligence Report or a revised due diligence report prepared by Buttonwood Investment Services, LLC dated 12/2/2008.  From early October 2008 through March 2009, Portes and thereby NSC, became aware of multiple red flags regarding MedCap, including liquidity concerns, missed interest payments and defaults that should have put them on notice of possible problems with the offering.  Nevertheless, the Firm continued to sell the MPFC VI offering to customers through March 2009.  Then with respect to Provident, between July 23, 2008 and January 10, 2009, NSC sold $1,755,000 in Provident offerings numbered 16, 17 and 19 to thirty customers.  Again, NSC, acting through Portes, failed to enforce the Firm's supervisory procedures to conduct adequate due diligence relating to these

Ex 15 pg 004
EXHIBIT EXCERPT

offerings.  Without adequate due diligence NSC and Portes could not identify and understand the inherent risks of these offerings.  The high interest payments of the Provident Offerings were themselves red flags.  However, Portes, and thereby the Firm, did not take the necessary steps, through obtaining financial information or otherwise, to ensure that these rates of return were legitimate, and not payable from the proceeds of later offerings, in the manner of a Ponzi scheme.

NSC was 1) censured; 2) fined in paying restitution of $81,427.50 to Provident investors and $93,572.50 to MedCap investors and 3) a suspension of Portes for 6 months along with a $10,000 fine.

Let me now begin with the Solexel, Inc. Series D Preferred Stock Offering which was marketed by NSC between February 2015 and June 2016 or almost 1.5 years. Did NSC fully investigate the issuer and management as required by 10-22? In my opinion, they showed little concern for this company which was eight years old and produced no revenues. It had no government approvals for its products, had no production of any kind beyond a demo-facility in California, and had mounting operational losses.

Did the Com-Com (the NSC due diligence committee) thoroughly investigate the business prospects of the issuer? In my opinion, Solexel's position in the solar market was declining rapidly. The Chinese were flooding the market with cheaper solar technology. While the company projected a lighter and more efficient solar panel, there was no evidence of a production facility in Malaysia to produce such a product to allow the company to scale-up.

Did due diligence explore and verify the assets held by the issuer? Many positive valuation opinions were promulgated by Com-Com but no 3rd party appraisal was suggested or accomplished by NSC. This was critically important since the intellectual property was the asset that its investors could fall back on if the company was imperiled. The verification responsibility of NSC failed for certain in this area.

Next, did NSC investigate and verify the use of proceeds of the offering? The Company's cash runway was problematic to say the least. Its cash burn climbed during this period from $2 million per month to nearly $3 million without any offsetting revenues. It should have been obvious that the Company was surviving only from the capital being raised in rounds of financing, mainly through NSC with no positive results forthcoming from the Company Com-Com approved the Series D Preferred Stock offering and the D-2 note offering. The D-1 preferred stock offering was never formally approved, even though NSC was well aware that its brokers were selling it and that its investors were investing in it, in clear violation of NSC's internal processes and procedures. The Scorecards on these offerings (Exhibit B and Exhibit D) demonstrate unequivocally that all three failed "reasonable basis suitability" in my opinion.

While NSC did provide records of meetings and dates along with questionnaires filled out by the issuer with basically yes or no answers, it failed to document the results of its investigation, list the specific tasks performed, along with who performed them and summarize the results of such reviews. It had no records of visits to the Company, beyond receipts of hotel stays and airfare, no notes exist from these meetings. There are no documents establishing any visit to a foreign production facility. There was no patent

Ex 15 pg 005
EXHIBIT EXCERPT

obviate NSC's duty to investigate and disclose all material facts to these accredited investors. In my opinion, investors did not assume all the risks. For example, consider the following, NSC's investors did not assume the risk of worthless patents because this wasn't disclosed. They did not assume the risk of the investor's own credit impairment converting a liquid cash asset to a worthless, illiquid and ultra-speculative security which no lender would give any credit to because credit impairment was not disclosed. This was a material red flag.

Furthermore, they did not assume the risk that NSC was waiving any fiduciary duty to them because NSC was acting as an independent contractor and was putting NSC's interests ahead of the investors. They did not assume the risk that NSC failed to provide and perform reasonably adequate due diligence on the offering. Furthermore, the obligation to perform adequate due diligence was at no times waived. They did not assume the risk of Beamreach vendor debt in the amount of $377,065 that was assigned to a collection agency as of November 3, 2016, eleven days before the Supplement D-2 PPM. They did not assume the risk of the issuer they were investing in retaining bankruptcy counsel on October 20, 2016, three weeks before the Supplemented D-2 offering went effective. Again, this was a highly material red flag.

Investors did not assume the risk that Beamreach was in full default of its Opus bank loan and it was set to foreclose on the Company. Instead, they were given the hopeful assumption that somehow, there could be a work-out or moratorium on this debt. Investors did not assume that risk because it was not fully disclosed to them. Investors did not assume the risk that Beamreach never had any production facility or production contract in Asia. No one went there or verified the purported plant in Malaysia that through lower labor cost would allow Beamreach to compete with the strong and well financed competitors in the solar field. Investors did not assume the risk that Beamreach produced company prepared financial statements showing positive net worth, while for the same years its auditors showed negative and declining net worth numbers because this disparity was not questioned or clearly documented or explained to them in the PPM.

Did they really assume the risk as an accredited investor who was prepared to bear the economic risk of holding the investment for an indefinite period and was able to withstand a total loss of this investment? I would be surprised if the investors even saw this as it was not in bold type alone, setting it apart, but rather not on page one but on page two, which was all caps and totally in bold. Most investors would skim through, skipping this page as it appears to be boilerplate language in repetitive large cap and just prior to the Table of Contents section. It should have been set apart in bold on page one so no one reading the PPM can miss its meaning and implications.

In the D-2 Offering Supplement, this risk legend does not appear at all. Since there was great concern over money raising in the D-1 preferred stock offering. Some investors could have been investing for the first time and had to press a link in the Supplement PPM to see the original D-1 PPM. The risk legend should have been reprinted in the D-2 Supplement PPM. It is reasonable to assume that many of these new investors did not see the risk legend at all. The investors did not assume this risk unless it was pointed out to them or they were careful enough to find it and carefully read through it. The investors did not assume the risk of NSC raiding the impounds escrow to withdraw $2.5 million before the required $10 million was raised in the D-1 offering. Without permission they changed the requirement in the supplement PPM to break impounds prior to raising the required capital. The investors did

Ex 15 pg 006
EXHIBIT EXCERPT

8. Beamreach misinterpreted its net worth as positive when it was negative in 2014 and 2015 per its auditor.

9. Beamreach was in default with Opus Bank and its vendor creditors.

10. The company had raised over $250 million in securities offerings and was surviving only through capital raised by rounds of financing.

11. The Company was never able to get the high volume production facility in Malaysia up and running, and Beamreach had only one demonstration production field by 2015 after 8 years.

12. The Company's solar modules had not been government certified for commercial use.

13. By February 2015, the Company was burning cash at $2 million per month with no committed revenue to offset the cash burn.

14. By October 2016, the Company was burning cash at the rate of $3.2 million per month with no committed revenue to offset the cash burn.

15. The Company withdrew $2,500,000 from the escrow impounds without investor disclosure or approval when the required minimum to go effective under the original D-1 PPM was $10,000,000.

16. In the convertible debt offering, when it dramatically changed from a preferred stock Offering to one with Convertible Promissory Notes the investors were given no opportunity for recertification and/or were given no rescission offer.

17. The timing leading up to and including the convertible note Offering was in violation of the standard of care.

18. November 10, 2016 – NSC allows Beamreach to withdraw $2.5 million from escrow when the PPM dated November 10, 2016 required $10 million to have it released.

19. November 14, 2016 – The date of the Convertible Promissory Note PPM for D-2.

20. November 22, 2016 – Form D filed with the SEC indicated the Note Offering raised only $8.055 million.

21. The conflict between significantly cutting expenses and staff versus the needs of key employees and executive officers who have individual incentive programs.

22. The motivation for NSC to remain as the key placement agent through the three Offerings was to (a) remain loyal to friendships with Beamreach officers and directors; (b) to earn sizable fees and commissions; (c) to be selected as the Financial Adviser/Investment Banker for Beamreach and earn future commissions and fees for its IPO and/or sale.

23. Any future revenues would come only from a small number of distributers in the form

Ex 15 pg 007
EXHIBIT EXCERPT

dating back to the 1990's and early 2000's which "remind" members, supervisors and brokers of their long-standing due diligence obligations. In my opinion, NSC violated FINRA Conduct Rule 2110, which states "a member, in the conduct of his business, shall observe high standards of commercial honor and just and equitable principles of trade". NCS further violated FINRA Conduct Rule 2210 which requires all public communications to uphold fair dealing with customers with no material fact or qualification to be omitted.

## DOCUMENTS REVIEWED:

Complaint against NSC
Defendant's Answer
PPM (Series D Preferred Stock) dated February 2015 and subscription agreement
PPM – February 2015 Subscription Agreement
Series D capital raise brochure – February 2015
PPM - Series D-1 Units of preferred and common stock – June 2016
PPM Supplement for $15 Million of convertible secured promissory notes – November 2016
Subscription Agreement for the PPM – November 2016 Offering
Investor update letter for the third quarter 2015
Form D's filed by Beamreach with the Securities and Exchange Commission
FINRA Broker Check for National Securities Corporation
Deposition of Carmelo Troccoli
FINRA OTR (On the Record) of Carmelo Troccoli
FINRA OTR (On the Record) of Sagiv Shiv
Plaintiffs' deposition transcripts
Spreadsheets provided by NSC reflecting Beamreach investors and amounts of each investment
Defendant's Expert Report attached to their opposition to the motion to certify
Due Diligence notes, letters, emails, industry data, and numerous case documents
FINRA NTM'S/Regulatory Notices 96-60, 03-71, 05-26, 10-22

## DAMAGES

Based upon my review of NSC records as set forth in various spreadsheets, the compensatory damages for the plaintiffs/class are as follows:

| | |
|---|---|
| For Solexel, Inc. 2015 - | $28,726,686.97 |
| For Solexel, Inc. 2016 - | $10,915,417,79 |
| For Beamreach D-1 & D-2 - | $ 5,355,760.20 |
| Total | $44,997,864.96 |

I have seen no documents indicating that any class member received any interest, dividend, or distribution payments in connection with Solexel/Beamreach. I have seen no records indicating any class member received a return of any amount invested in Beamreach/Solexel.

I reserve the right to supplement and amend my damages opinions to consider information learned up to and throughout the trial.

Offerings
Exhibit D – Beamreach Convertible Secured Promissory Note Offering Scorecard
Exhibit E – Dinehart CV


      I declare under penalty of perjury that the foregoing is true and correct, and if called as a witness would testify competently thereto.


Mason A. Dinehart III, RFC November 10, 2021

Ex 15 pg 009
EXHIBIT EXCERPT

# FRCP 26(a)(2)(D)(ii) WRITTEN REBUTTAL REPORT
## Mason Alan Dinehart III, RFC

### REBUTTAL TO OPPOSING EXPERTS' REPORTS

**1. The qualifications and opinions National Securities' Expert Witnesses:**

**A.  Both Experts rely extensively on the opinion of Dr. Thomas Surek. This reliance is misplaced for several reasons**. It's important to remember that initially Dr. Surek was hired by the issuer to opine on the validity of the solar technology of Beamreach in September 2011. Irrespective of subsequent assignments, he cannot be considered a 3rd party objective source in his reporting.  Further, a true objective third party report is presumed to be fair and balanced. However, in his 4th report on Beamreach technology he is anything but objective.   99% of his report is positive with only 1% being negative. Furthermore, one item was delayed in the port of entry in Los Angeles (the item is not specified so we don't know how important it was).  He uses words like "spectacular", "valid", "relevant" and "on-track". He comments that production start-up would be slated in the next couple of months. This report is dated February 2015, and centers thoroughly on the high-volume manufacturing (HVM) of solar panels in pilot production in Milpitas, CA.

As discussed in my original report, many news articles after February 2015 discussed the collapse of many solar companies and the technological advancement in solar by Asian companies. The significant declines in the U.S. solar market happened between 2015 and 2016 and are not addressed by Dr. Surek.

It is important to note that in March of 2016, Beamreach changed its company production structure entirely to the extent of going to a Contract Manufacturing basis in Asia, mainly Malaysia, but also in Taiwan and Vietnam.  His report fails to discuss or consider or verify contract manufacturing in Malaysia where the manufacturing plant in Milpitas, CA was to be duplicated. Finally, and this is most important, Dr. Surek was charged with opining on the validity and function of the Beamreach technology only. He never was charged with valuation of the Beamreach intellectual property in terms of worth or protection.  Any suggestion that Surek did this is wrong and National Securities failing to understand the actual value of the Beamreach IP at any time is below the standard of care.

In conclusion, I feel that Dr. Surek's reports should be discounted greatly since he is biased in favor of the issuer, he opined on the technology only (not the IP), and discussed production at the pilot plant only in Milpitas and in no way relative to the change to contract manufacturing in 2016 (applicable to both the D-1 PPM and Supplement (D-2)). Instead, in their reports, Both Mr. Fotouhi and Mr. Purcell put great weight on Dr. Surek's report, which I find to be inappropriate.

1

EXHIBIT EXCERPT

**2. Kamran Fotouhi –** The first thing that I noticed in Mr. Fotouhi's background is that 7 of the 21 cases where he has been retained as a securities expert were for NSC or one of its subsidiaries or corporate owners. That's 33%, so I would say he should not be considered totally objective in his opinions where NSC is concerned. First, he accords the condition in the solar industry and validity of the Beamreach IP by quoting Dr. Surek (already covered) and then by IP counsel of the issuer. Again, this is not a 3rd party objective valuation by a law firm retained and paid by the issuer. Then he opines that investors that want to speculate in high risk investments should be allowed to do so. That might be appropriate for institutional investors that invest 1%-2% of their respective net worth's to take a bite of a private placement with the knowledge that 4 out of 5 will fail.

In my original report, I cited FINRA AWC No. 2018057457101 that stated that just because retail investors are rich and sophisticated does not make a speculative investment like Beamreach suitable for any of them. FINRA stated, "A firm that had failed to conduct reasonable due diligence of a private placement may then lack a reasonable basis to make the recommendation in that security to any customer, regardless of the customer's wealth, willingness to bear risk, age or other individual characteristics". My opinion is that not only did this happen with Beamreach but the reward in no way merited the risk the investors were taking. I believe the Beamreach offerings had an impossible risk to reward ratio. I believe that Mr. Fotouhi was not only biased, but failed to grasp the significance of a company that survived only by money raised for its continuing existence. For a due diligence team not to put a halt to this travesty by 2016 was below the standard of care.

**3. William Purcell –** He is a gentleman with 50 years of experience as an Investment Banker. He has never worked for a FINRA broker dealer or even held any securities licenses. He has never served in the role of a gatekeeper for investors by running a due diligence department of a broker dealer. If he had done so, he would have had to face FINRA audits where he would have had to answer for all the securities procedures, rules, and regulations that the auditors claim to have been bent or broken. His feet would have been held to the fire in upholding the standard of care in the securities industry. Within the securities broker dealer world that I have been a part of for 50 years, private placements are sold differently than in the investment banking community. Strong broker dealers require that an issuer of private placements have a managing broker dealer which stands objectively apart from the inner workings of the issuer (by Chinese Wall). This adds a layer of protection to the investors as the Managing Broker Dealer ("MBD") is usually separate from the issuer. The MBD brings the due diligence binder to numerous members that the MBD forms as a selling group for the offering. It is made up of if other broker dealers who each agree to sign a selling agreement with the issuer and join the selling group which will sell the offering to investors. The issuer also is typically asked by the MBD to enlist the services of a third-party due diligence firm who, for a fee, issues a due diligence report both on the issuer and on the offering which can be distributed to members of the selling group, but not the investors. This report is "for dealer use only". This 3rd party due diligence report is prepared by companies like Mick &

2

EXHIBIT EXCERPT

Associates, FactRight, Robert A. Stanger & Co., Buttonwood, or Snyder Kearney, LLC, whose fees are paid without promise of that independent firm's approval of the offering.

It is unusual to see an issuer agree to sell a multimillion dollar private placement offering through one broker dealer which will sell the offering to only its own investors and without any third party due diligence report.  NSC should have at minimum required Beamreach to submit and pay for a third-party due diligence report to be made since there was no MGP or other members of a selling group.  I assure you that no responsible 3rd party due diligence firm would have ever allowed the Convertible Note Supplement offering to waive its $10 million "minimum to go effective" before releasing any commissions to NSC.

Mr. Purcell also makes the point that large institutional investors like Kleiner Perkins, GAF and the Saudi Sovereign Wealth Fund invested on their own as evidence of an offering that should be approved from a due diligence standpoint. As I've pointed out before, the criteria for a speculative investment by an institution is far removed from that of a retail investor and in no way proves NSC's due diligence met its reasonable basis suitability obligation. He forgets too that institutional money largely dried up in 2015 due to the collapse of the U.S. solar industry and by then Beamreach was unsuitable for anyone. He also makes a statement that to me seems very dangerous.  He states, "The most difficult task of a surviving company is an ability to continuously raise new capital".  A FINRA broker dealer should not allow any company to survive only through the continual raising of capital.  But that's exactly what NSC did!  It continued to take investors capital in a start-up company who for at least eight years produced no revenues.  After raising some $250+ million from investors over that time-period with mounting losses, a going concern letter from its auditor, and in or near lender default with its equipment pledged to Opus Bank as collateral, NSC should have said, that's enough!  We can't in good conscience sanction raising one more dollar for you.  But they didn't, and Mr. Purcell praises the due diligence in what was in Mr. Trocolli's own words, a "Hail Mary" approval by due diligence.

Finally, Mr. Purcell states that NSC was not negligent and goes on to cite to FINRA's description of negligence as "culpable carelessness".  Of all the phrases I could ascribe to the due diligence done by NSC,  that one fits perfectly. My original report speaks to that point succinctly. In addition to the failure of NSC to perform adequate due diligence, my original report also covers the multitude of red flags that were not considered by Mr. Purcell or addressed by Com-Com due diligence.

Below, I will discuss each of the following points:

**A.  Commission Disparity**

**B.  Missing Risk Disclaimer**

**C.  Conflicts of Interest Abounded**

3

**D. No Independent 3rd, Party Valuation of the IP**

**E. Failure of Bring-Down Due Diligence**

**F. Comparison of Company Prepared v. Audited Balance Sheets**

**G. Conclusion**

    **A. Commission Disparity** – Mr. Purcell merely cites the commissions that were shown in the PPM Supplement for the Note Offering to be paid to NSC (i.e. 10% for non-institutional investors; 11% for non-institutional investors if money raised exceed $10 million and 5% for institutional investors). However, it is extremely important for an expert to view the Reg. D filings with the SEC. It states the actual commissions and must be "truthful". Form Reg. D for the Note Offering dated 11-22-2016, states that sales commissions of $1,800,000 were paid on cash raised of $8,055,797 or 22.4%. That is a far cry from 10%. Any analyst rendering an expert opinion should have at least looked over these Reg. D filings and make a comparison. Were the warrants given to NSC added to the cash received? Mr. Purcell failed to check. Further, in my original report, I showed the two conflicting numbers for front end load commissions based on NSC raising the full $15 million. One was $1,281,000 and the other was $1,375,000. This discrepancy was not addressed by Mr. Purcell.

    **B. Missing Risk Disclaimer** – Mr. Purcell points out and states unequivocally that the following risk disclaimer appears in "all" the PPM'S and the Note PPM Supplement:

> An investment in the shares is speculative, involves a high degree of risk and should be considered only by sophisticated investors who are prepared to bear the economic risk of such investment for an indefinite period of time and are able to withstand a total loss of such investment. Investors should carefully consider the risk factors described in this memorandum [the PPM], in addition to their own investigation and due diligence of the company and the terms of the offering.

Importantly, the above disclaimer referred to investment in the "shares" not "notes" as in the Supplement. This was a 180 degree material change of investment vehicle. Further, it refers to the "PPM" and not the "Supplement". It should have been reprinted to specifically apply this disclaimer to the D-2 Note Offering.

    Clearly, this risk disclaimer was not printed out in the D-2 PPM Supplement as it was in the prior PPM's. A prospective investor had to click on a link which would take them to the lengthy D-1 PPM and try to find it as shown in the D-1 Offering only. That is clearly not how an investor warning as important as this one should be printed. The disclosure was important since some new investors invested in the D-2 Note offering only, not having invested in the D-1 Offering. Instead of reprinting the disclosure in a conspicuous location, a new and softer disclaimer was printed in the PPM Supplement as follows: "As discussed throughout this

4

EXHIBIT EXCERPT

Supplement, investment in the Notes involves significant risks, which risks depend, in part, on the amount of capital raised in the Offering.  The Company cannot guarantee any future closings of the Offering.  Accordingly, early participation in the Offering comes with heightened risks as further described below".

The key point is that there was no specific emboldened warning about investors being able to withstand a "total loss" of such "note" investment.  That was a material omission in my opinion and for Mr. Purcell to imply that it was specifically stated in the PPM Supplement was disingenuous and again below the standard of care in the securities industry as well as the investment banking industry itself.

**C.  Conflicts of Interest Abounded –** Once again, Mr. Purcell attempts to justify certain acts by NSC when they are below the standard of care.  One example is how he shirks NSC's important due diligence responsibility of contacting customers of the Company.  Especially this company which had no verified sales orders, only MOU's.  He states, "Direct discussions with customers was impractical". Obtaining permission from the company to verify results with customers and vendors is standard procedure in the securities industry.  Here, a clear conflict of interest existed when NSC due diligence relied on Opus Bank to do that for them.  I can't imagine an investment banking firm failing to call customers and suppliers to verify sales orders and account receivables. This conflict of interest was below the standard of care.  Clearly, by checking with suppliers, they would have discovered the $378,000 in vender debt was with a collection agency.  They did not, and depended on the Company's lender to do it for them.

Another conflict of interest was to allow the issuer to breach the escrow impound minimum of $10 million minimum to go effective.  No reasonable due diligence department should have allowed the sponsor to accomplish this unless it had a clear motivation. I suggest that motivation was clearly defined in NSC's compensation which would now be paid along with warrants in addition for raising money (less than $10 million) for Beamreach.  If any members of the com-com personally had warrants this would have been a further conflict of interest relative to their objectivity.  NSC also had the hope of brokering the sale of the company and/or its IP, as well as, being selected as its lead investment banker.

Mr. Purcell also raises the point that there is no conflict between a brokerage firm raising money for the issuer and its duty to objectively provide due diligence for the firm's investor's. That is of course true only if the reward projected in the Offering justifies the risk taken by those investors.  But in this particular case, I think the risk reward ratio was upside down and a conflict clearly existed here. Furthermore, this inherent conflict is only overcome if the transaction has a reasonable probability of achieving its stated objectives. In my opinion, the Beamreach Note offering had no chances of surviving. It was dead on arrival.  Consequently, the conflict was relevant and flourishing in both areas.

5

As to the other experts, I feel that they ignored key obligations of NSC due diligence by rationalizing away their importance. To justify the negligence of NSC's failure to demand an independent appraisal of the Beamreach IP is well below the standard of care. It was also negligent of NSC to continue to raise money for this dying company from 2015 on when it knew the D-2 offering was a "Hail Mary". NSC knew that Beamreach's survival was only made possible by NSC's raising money and not from any production or sales efforts on Beamreach's part. Its decision to abrogate the $10 million minimum to go effective in D-2 was a clear sign that NSC's motivation was really the compensation it could garner from D-2 sales, being selected to act as broker of the sale of the company and/or IP assets, and becoming the lead investment banker for Beamreach. These important breaches were ignored by both experts.

Further, both experts ignored the commission disparity in the D-2 offering, the missing risk disclaimer, the conflicts of interest and the balance sheet disparity between the auditor and the company rendering Beamreach preferred stock to have no value. Finally, NSC's bring-down due diligence was rationalized as thorough and effective when it clearly was ineffective and deficient as opposed to looking at D-1 and D-2 as a new and stand-alone offering totally apart and distinct from Series D.

Both experts failed to recognize that combining them was below the standard of care and only inured to NSC's benefit in being compensated. Finally, the value of Mr. Purcell's report was diminished significantly by citing language that came directly from the issuer and not from any due diligence investigation. That practice was directly in violation of FINRA Regulatory Notice 10-22. I can only conclude that NSC was negligent, and its due diligence was below the standard of care.

### **Additional Documents Relied on in Formulating This Rebuttal Opinion**

- Expert Report submitted by Kamran Fotouhi, along with documents referenced and identified therein;
- Expert Report submitted by William Purcell, along with documents referenced and identified therein.

10

I declare under penalty of perjury that the foregoing is true and correct, and if called as a witness would testify competently thereto.

Mason A. Dinehart III, RFC

December 15, 2021

11

EXHIBIT EXCERPT

**EXHIBIT 16**

**FRCP 26(a)(2)(B) WRITTEN REPORT**
**Mason Alan Dinehart III, RFC**

## INTRODUCTION

I am celebrating my 50th year in the securities industry. Currently, I am licensed as a Registered Principal Outside Business Activities Compliance for LightPath Capital, Inc. in Southlake TX. Since 1999, I have served as a member of the FINRA Board of Arbitrators and have served as an arbitrator on ten panels. While six of those cases settled, I have entered four arbitration awards. During my career in the securities field, I became extremely familiar with corporate finance along with asset allocation models and modern portfolio theory. I have supervised, lectured and provided direct financial planning advice to dozens of clients (personal, corporate and trust) regarding diversified and balanced securities portfolio implementation. My work in the securities industry, as well as in my consulting experience includes without limitation (i) organization of various issuers of securities including corporations, limited partnerships and limited liability companies; (ii) the issuance of equities, debentures, partnership interests and membership interests in the issuers (iii) capitalization of the issuer of securities including the risk assessment and underwriting of the respective securities instrument (iv) evaluation of business plans and related financing and forecasting, and (v) corporation and corporate governance, including conflicts of interest. Early in my career, I spent two years in the Acquisition and Mergers Division of Corporate Finance at Bank of America. In December 2018, I was designated as the securities expert witness for the California State Bar.

## SCOPE OF ASSIGNMENT AND COMPENSATION

In this case, I have been asked to review and opine on the following issues:

1. The duties owed by a FINRA member broker-dealer when conducting due diligence on a Regulation D private placement securities offering.

2. The duties owed by a FINRA member broker-dealer when approving a Regulation D private placement securities offering for sale to its customers.

3. The adequacy of the due diligence conducted by National Securities Corporation (NSC) of several Regulation D private placement securities offerings in Beamreach Solar, Inc. f/k/a/ Solexel, Inc. by National Securities Corporation (NSC). The Beamreach securities offerings I have been retained to opine on are Beamreach Series D Preferred Stock Offering, Beamreach Series D1 Preferred Stock Offering, and Beamreach Convertible Secured Promissory Note Offering ("D-2") (collectively, the "Beamreach Offerings").

4. The adequacy of NSC's approval of the Beamreach Offerings to NSC's customers.

5. Risks not assumed by investors in Regulation D private placement offerings, and risks not assumed by NSC's customers in the Beamreach Offerings.

6. The damages to the Plaintiffs and the Class.

EXHIBIT EXCERPT

I reserve the right to supplement and amend my opinions to consider information learned up to and throughout the trial. I am being paid on an hourly basis for this engagement and my billing rate is $375 per hour for preparation of this report, deposition testimony, and for trial testimony. My compensation is not contingent on the outcome of this litigation.

## SUMMARY OF OPINIONS

**In this report I will discuss the following opinions:**

1. NSC had a duty of care under the FINRA Suitability Rule.

2. NSC had a duty of care to conduct adequate due diligence.
   a. The standard of care in the securities industry is compliance with FINRA Regulatory Notice 10-22 and other applicable FINRA notices.

3. NSC had a duty to only approve those offerings with a reasonable risk-reward proposition.

4. The due diligence performed by NSC did not meet the industry standard of care.

5. In light of the risk-reward proposition the Beamreach Offerings presented, the Beamreach Offerings should not have been approved for sale by NSC.

6. The Plaintiffs and the Class did not assume the risk of inadequate due diligence or approval.

7. The damages for the Plaintiffs and the Class.

Consistent with FINRA Regulatory Notice 10-22, in order to ensure that it has fulfilled its suitability responsibilities, a broker-dealer in a Regulation D offering should, at a minimum, conduct a reasonable investigation concerning the issuer and its management; the business prospects of the issuer; the assets held by or to be acquired by the issuer; the claims being made; and the intended use of proceeds of the offering. NSC had these obligations for each Beamreach Offering it sold. Furthermore, FINRA Regulatory Notice 10-22 states that NSC should have conducted a reasonable investigation concerning the following areas:

1. The issuer and its management.

   a. Examining Beamreach's governing documents including any charter, bylaws and partnership agreement, noting particularly the amount of its authorized stock and any restrictions on its activities. Since Beamreach is a corporation, NSC should inquire whether it has perpetual existence or is obligated to operate with a long term strategy for growth i.e. a Delaware corp. Investigation might reveal that the corporation might have a stipulation in its charter limiting the life of the company such as an expiration or liquidation date. Finally no investigation was made in the Beamreach corporate bylaws that could have shown it to have adopted a resolution to dissolve after a vote by the shareholders. The point is that NSC made no effort to investigate these

Page | 2

EXHIBIT EXCERPT

areas.

b. Examining historical financial statements of Beamreach and its affiliates, with particular focus, if available, on financial statements that had been audited by an independent certified public accountant and auditor letters to management which expressed "going concern" opinions, compared to the company prepared financial statements, which should have been a red flag to NSC. NSC should have determined that the preferred stock (the exact difference in stockholders' equity or net worth) was apparently given no value by the auditors and the offerings should not have been approved.

c. Looking at trends indicated by the financial statements should have uncovered the known fact that Beamreach had a permanent cash burn rate problem. Beamreach had a constant short cash runway with no forward momentum or growth in the business. This alone should have caused NSC to reject the offerings. Beamreach had a cash burn rate of between $2 million and $3 million per month, with no ability to support itself beyond raising more investor capital. This fact should have also caused the offerings to be rejected by NSC.

d. NSC should have made reasonable inquiries concerning Beamreach's management. A broker-dealer might inquire about such issues as the expertise of the management of Beamreach's business and the extent to which management has changed or is expected to change. For example, a broker-dealer might inquire about any regulatory or disciplinary history on the part of management and any loans or other transactions between the issuer or its affiliates and members of management that might be inappropriate or might otherwise affect the issuers business.

e. NSC had an obligation to inquire about the forms and amounts of management compensation, who determines compensation, and the extent to which the forms of compensation could present serious conflicts of interest. A broker-dealer might make similar inquiries concerning the qualifications and integrity of any board of directors or similar body of Beamreach. NSC did not fully evaluate the salaries and stock options of key employees for conflict of interest purposes. No credit, litigation or conflict checks were made on any board members even though the results of these verifications could have led to the rejection of the offerings.

f. NSC had a duty to inquire about the industry in which Beamreach conducted its business, the prospects for that industry, and any existing or potential regulatory restrictions on that business and the competitive position of Beamreach. The solar industry was in severe decline. Many solar firms went out of business as shown in numerous Wall Street Journal articles between 2010 and 2016 when the Chinese were flooding the market with below cost of production parts, and it was difficult if not impossible for Beamreach to compete with that reality. Intense competition should have caused the rejection of the offerings. During this period, numerous articles reported that the price of solar panels declined by 30% and toward the end of it, the Chinese were

Page | 3

selling solar panels at below their own cost, supported by government subsidies. (Washington Post, March 23, 2013; Dallas Business Journal, November 1, 2013, and Christian Science Monitor, March 20, 2012).

g.  NSC should have requested business plans, business models, or other description of business intentions of Beamreach and its management and their expectations for the business and analyzed management's assumptions upon which any business forecast was based. NSC should have tested these models with information from representative assets to validate projected returns, break-even points and similar information provided to investors. Solexel was floundering due to the short cash runway which was increasing. It floundered also due to the necessity of continually having to change its business model along with the name change to Beamreach. This should have caused a rejection of the offerings by NSC.

h.  NSC should have requested financial models used to generate projections or targeted returns. Beamreach produced no revenues for nine years as a development stage company. It had mounting operational losses. Now, as a late-stage development company its projections (a 300% premium on original principal at the end of 6 months in D-2) were meaningless in that there were no government approvals and no production facility. Further, its auditors had questioned its standing as a "going concern". The Offerings should not have been approved by NSC

i.  NSC had an obligation to maintain in the broker-dealer's files a summary of the analysis that was performed on financial models provided by Beamreach that detailed the results of any stress tests performed on Beamreach's assumptions and projections. Little or no analysis of this kind was done by NSC. The Offerings should have been rejected by NSC.

j.  NSC should have inquired about internal audit controls of Beamreach. Had NSC taken this step, the examination would have revealed that after $250 million being raised, the cash burn was accelerating and Beamreach was surviving only through raising additional capital. A proper review would have demonstrated how there was little, if any, management mechanism in place to control the cash burn and the offerings should have been rejected.

k.  NSC failed to contact customers and suppliers regarding their dealing with Beamreach. NSC was unaware of the extent of vendor debt and impending collection problems. NSC was also unaware of the fact that there were no firm orders from customers, only memorandums of understanding (MOU's) which were never verified. Knowledge of these facts should have caused NSC to reject the offerings.

l.  NSC should have reviewed Beamreach's contracts, leases, mortgages, financing arrangements, and contractual arrangements between Beamreach and its management, employment agreements and stock option plans. This investigation would have shown delinquencies and collections, conflicts with its key employees and focus on the non- binding MOU's that were not firm

Page | 4

orders for Beamreach. This discovery also should have caused the Offerings to be rejected.

m.  NSC had an obligation to inquire about past securities offerings by Beamreach and the degree of success while keeping in mind that simply because a certain product or sponsor historically met obligations to investors, there are no guarantees that it will continue to do so. This is particularly true since Beamreach had been dependent on continuously raising new capital. This inquiry may be especially important for any blind pool or blank-check offering. NSC continued to earn fees and commissions with the continuing hope that it would be chosen to be the investment banking firm for the Beamreach IPO or the investment broker for the sale of the Company or its IP. What NSC failed to realize was that Beamreach was only being propped up after 8-9 years through rounds and rounds of capital raising as a result of its increasing cash burn and total failure to generate revenue and business prospects. Recognition of these facts should have replaced greed with reality and the offerings would have been summarily rejected.

n.  NSC should have inquired about the previous or potential regulatory or disciplinary problems of Beamreach. Furthermore, NSC should have run a credit check of Beamreach. Severe credit collection problems were in the offing and had a credit check been conducted by NSC the firm would have known of this red flag. Aside from the $24.2 million Beamreach owed to Opus Bank, NSC would have learned of $17.2 million of vendor debt along with $380K of collections that had just been filed. This knowledge should have caused rejection of the Offerings.

o.  NSC had an obligation to inquire about the length of time that Beamreach had been in business and whether the focus of its business was expected to change. In its 9 years of existence, Beamreach had raised nearly $600 million dollars in venture capital and should have been considered a late stage venture firm. However, NSC knew that there was virtually no interest from institutional investors. This fact alone should have caused a rejection of the offerings by NSC.

p.  NSC should have inquired about the assets held or to be acquired by the issuer. NSC should have done its due diligence on the viability of any patent or other intellectual Property (IP) rights held by Beamreach. Beamreach never did a formal valuation of the actual intellectual property. Instead, NSC relied on the repeatedly glowing evaluations of the purported technology. When it came to actual valuation of the IP - which became the company's core asset and was material and outcome determinative to investor return - NSC relied on "back of the napkin math" on Beamreach's IP as various NSC employees testified to before FINRA. NSC therefore had no understanding of the viability or value of Beamreach's intellectual property. This should have caused a rejection of the offerings.

q.  NSC should have visited and inspected a sample of Beamreach's assets and facilities to determine whether the value of assets reflected in the financial

Page | 5

statements was reasonable and that management's assertions concerning the condition of Beamreach's physical plant and the adequacy of its equipment were accurate. Beamreach never obtained high volume manufacturing in Malaysia as it projected and which was necessary for the company to scale-up. In a change of strategy, Beamreach abruptly switched to possible contract manufacturing before collapsing. In the final analysis, Beamreach had no real manufacturing relationship to scale whatsoever. NSC should have rejected the Offerings.

r.  NSC should have carefully examined any engineering or other reports by third-party experts that might have raised red flags. Dr. Surek was hired again after formerly giving positive reports on Beamreach's technology. It was a conflict of interest and not truly independent for him to be asked again to analyze the technology after giving glowing reports in the past. Conflicted expert reports could have caused the rejection of these offerings.

s.  NSC should have obtained, independent expert opinions from engineers and others necessary as a basis for determining the suitability of the investment prior to recommending the security to investors. None of these opinions were obtained by NSC during due diligence and is yet another reason for rejecting the offerings.

t.  NSC should have conducted a reasonable investigation concerning Beamreach's claims that it could continue as a going concern. NSC should have challenged this assertion and claim in light of the facts that the Company had no revenues in nine years; the Company had no government certification for its product; the Company had no binding contractual commitments for revenue; the Company had no manufacturing capability, foreign or domestic; the auditors of Beamreach reflected three continuing years of negative net worth and mounting operational losses; the Company had no verifiable value of its equipment or IP; the Company was surviving only by raising investor capital; and the intended use of proceeds of the Beamreach offerings.

u.  NSC should have conducted a reasonable investigation concerning the cash runway for Beamreach which was very short and the intended use of the funds raised was not for further research and development of its solar technology. In reality, the use of the proceeds from investor capital was used for Beamreach just to stay alive in the short term. Operational losses of Beamreach were continuing. The cash raised in the D-2 round was used for a bankruptcy or fire sale of the supposed valuable intellectual property. This was a huge red flag.

In addition to the analysis under FINRA Regulatory Notice 10-22, I have assessed the following additional factors and opine on them and on the adequacy of Defendant NSC's due diligence, the reasonable basis suitability of the offerings to the Plaintiffs and the class along with the adequacy of the disclosures in the Series D, Series D-1 and D-2 PPM's concerning the following:

Securities Risk
Lender Credit Risk

EXHIBIT EXCERPT

Liquidity Risk
Costs and Fees Risk
Due Diligence Risk
Investor Assumption Risk
Diversification Risk
Beamreach Company Risk
NSC FINRA Violations

1.      SECURITIES RISK

a. DILUTION

Beamreach issued its Series C Preferred Stock that allowed the holders to convert their stock into common stock at an exercise price of $1.499 per share. The effect of this price is to value the entire Company at $250 million in 2013. The Company issued Class C shares with an exercise price of $1.1784. That price valued the Company at $100 million. The lower value indicated the difficulty Beamreach was having in raising money and obtaining additional financing. Since the company was so dependent on additional financing this decline in value was alarming. Because the company had to continually raise money to stay alive, it is inevitable that the Series D and D-1 preferred stock would be diluted. Each successive investor would have a smaller share of the corporation.

The D-1 Offering set the value of the Company at $189 million. These lower valuations required anti-dilution adjustments for the Series B, Series C and Series D Preferred stock. The adjustment increases the number of common shares that each of the above series can receive upon conversion of that stock into common stock, and therefore, reduced the share of the corporation for the investors in the offering.

Without the supplemented convertible promissory note offering, existing stockholders sat behind a significant amount of secured and unsecured creditors in the event of a sale of the Company. If the D-2 Offering were consummated, the position of existing stockholders would worsen, as the Notes would be paid in full (both the Secured Portion and the Unsecured Portion) and all other secured and unsecured creditors would be paid in full before existing stockholders would receive any proceeds. This kind of dilution is unconscionable.

b.  NSC MARKETING AND ADVERTISING SALES PRACTICES

Given the multiple distribution channels and the marketing and wholesaling activities of NSC, Beamreach's primary placement agent, NSC appears to have made little effort to control with discipline the distribution of advertising and promotional materials in its marketing of the D-2 Offering. One example of this is that the D-2 Convertible Promissory Note Offering was supposed to be available for and only recommended to existing D and D-1 preferred stock investors so they could convert their preferred stock positions into a convertible promissory note position with a 300% bonus reward if the Company was successful. However, it is clear that certain investors went into the D-2 Offering alone, including Plaintiff James Ginzkey.

EXHIBIT EXCERPT

2.      LENDER CREDIT RISK.

Beamreach owed Opus Bank $24.2 million which was secured by all of the Company's assets and which had to be paid before any proceeds of sale could be paid to holders of the Notes. Under the terms of the 5th Amended Agreement with Opus Bank, the Company was required to reduce the outstanding Opus debt, raise significant additional equity or sell the Company on or before March 31, 2017 (4 months). Further, the Company had approximately $17.5 million of debt obligations to vendors. Without revenue and with mushrooming operating losses, the company was in default of its debt obligations, behind on its lease payments and far below even a 1-1 debt service coverage ratio.

On November 3, 2016, Laurie Relos of Beamreach sent an email to RMU Credit/ Collections agency confirming that the Company was in arrears on vendor assigned debt in the sum of $377,969. She offered to make payments of $34,497 per week beginning November 4, 2016 to satisfy this obligation. This was only eleven days before the effective date of the D-2 Offering being sold to NSC investors. NSC failed to run a litigation or credit check on Beamreach during this period. Thus, while Carmelo Troccoli (NSC com-com due diligence) was emailing Beamreach CEO Mark Kerstens asking for a rundown of debt owed by Beamreach, he was leading the offering of these promissory notes to NSC clients. Two weeks before the note went live, Mr. Troccoli had no handle on the Company's debt, which was unfathomable.

a.  CREDIT ANALYSIS:

The credit issues addressed above are in fact the most basic concerns of credit analysis. Lenders are taught at the introductory level to evaluate the credit worthiness of the source of repayment first. Broker dealers are responsible to make sure that this element is performed. There is no indication or evidence of NSC or the Commitment Committee ("Com-Com") ever ordering a litigation or credit check on Beamreach which is again, well below the standard of care.

3.      LIQUIDITY RISK:

The risk legend that states that an investment in Beamreach would be for an indefinite period of time clearly indicates the uncertain nature of how long one would expect to hold this investment.  There was all the talk of an IPO or sale of the IP as an exit strategy but no verification of either one whatsoever.  There was no institutional interest and no 3rd party appraiser ever evaluated the value of the patents.  These strategies were unrealistic and illusory.  Clearly, there was no liquidity and the likelihood that Beamreach could survive, let alone pay back these notes with a 300% reward for the D-2 bridge loan round, was highly in doubt. The illiquidity of this investment is mentioned as a risk factor, but leaves great unanswered questions in one's mind as to the true nature of the uncertain holding period for the notes.

4.      COSTS AND FEES RISK:

In the Beamreach Convertible Secured Promissory Note Program there is no breakdown of commissions, fees and organizing costs of the Offering. In fact, there is an inconsistency in the amounts of front-end load. In one place, the PPM indicates that the load

EXHIBIT EXCERPT

is $1,281,000 while in another, the load number is $1,375,000. The load averages about 9% of the $15,000,000 cash raised, meaning that 91% of the proceeds would go into the Company. However, the Use of Proceeds section does not break it down by percentage as is the usual custom and practice in the securities industry.

Also, when reviewing the Regulation D filing with the SEC for the Note Offering dated November 22, 2016, the numbers are quite different. This document reflects sales commissions of $1,800,000 on cash raised to date or $8,055,797. That amount of commissions would be 22.4% of the cash raised which would mean that the company would only be getting 77.6% of the cash raised or $6,251,298. If the NSC compensation were broken down with 12% cash[1] and 10% warrants, this may have been why the Reg. D numbers are so much higher than what is stated in the PPM. If this is an accurate disclosure and breakdown (the SEC requires the numbers submitted on Reg. D to be "truthful"), the load is much higher than most private debenture Offerings sold in the securities marketplace. Normally such an offering as this would have a load in the range of 8% - 10%.[2]

The responsibility for this front-end load breakdown and clarification falls squarely on National Securities Corporation, the Company's Placement Agent. When the Reg. D was filed, NSC should have held Beamreach's feet to the fire and demanded a breakdown of the 22.4% front-end load in the amount of $1,800,000.

5.      DUE DILIGENCE RISK:

FINRA Rule 2111.05 (a) explains the Reasonable Basis suitability obligation. It states, "The reasonable-basis obligation requires a member or associated person to have a reasonable basis to believe, based on reasonable diligence, that the recommendation is suitable for at least some investors. In general, what constitutes reasonable diligence will vary depending on, among other things, the complexity of and risks associated with the security or investment strategy and the member's or associated person's familiarity with the security or investment strategy. A member's or associated person's reasonable diligence must provide the member or associated person with an understanding of the potential risks and rewards associated with the recommended security or strategy. The lack of such an understanding when recommending a security or strategy violates the suitability rule". Section 11(c) of the Securities Exchange Act of 1933 defines reasonable as follows, "The standard of reasonableness is that of a prudent man in the management of his property".

Now, let me define due diligence in my own words since FINRA only requires a "reasonable investigation". It is the process of reasonable investigation that independently evaluates an issuer's integrity, accuracy, competency, financial strength, and organizational depth. It is adversarial in nature and utilizes quantitative and intuitive means. Due diligence includes a comprehensive analysis that challenges the deal points, assumptions, and

---

[1] To make things more confusing, there is a Flow of Funds Memorandum dated November 16, 2016 which indicates the cash NSC received from commissions that equaled 12% ($666,665.06 - $5,565,766,20 = 12%) which is not the commission stated in the PPM Supplement.

[2] To make things more confusing, there is a Flow of Funds Memorandum dated 11-16-2016 which indicates the cash NSC received from commissions that equaled 12% ($666,665.06 -: $5,565,766,20 = 12%) which is not the commission stated in the PPM Supplement.

EXHIBIT EXCERPT

projections in each offering examined. The process evaluates and determines the probability of the transaction achieving its stated objectives.

As the NASD states in Notice to Members 03-71, "Among the issues highlighted are members' responsibilities to: 1) conduct appropriate due diligence; 2) perform a reasonable-basis suitability analysis; 3) perform customer specific suitability analysis for recommended transactions; 4) ensure that promotional materials used by the member are fair, accurate and balanced; 5) implement appropriate internal controls; and 6) provide appropriate training to registered persons involved in the sale of these products".

I have previously noted the standards for due diligence that FINRA Regulatory Notice 10-22 specifically identifies for due diligence that would be covered in a Reg D Offering. While FINRA states that the brokerage firm must complete a reasonable investigation on each Offering, the SEC requires brokerage firms to retain records documenting both the process and results of its investigation.

On August 14, 2020, FINRA's Department of Enforcement issued a Letter of Acceptance, Waiver and Consent (AWC) No. 2018057457101 against CFD Investments (CRD No. 25427) and Mathew Bahrenburg, General Securities Principal (CRD No. 529566). In November 2014, CFD, through Bahrenburg approved an oil and gas private placement offering for sale to its customers.  The issuer, Payson Petroleum, Inc. was the subject of an April 2014 jury verdict in excess of $9 million and was in financial distress. From March 2015 to February 2016, CFD sold interests in Payson to 31 of its retail customers without conducting reasonable due diligence into the Payson offering.  In addition, CFD sold interests in Payson to its customers without having a reasonable basis for making recommendations to purchase this private placement.  CFD customers who invested in Payson lost their investments when Payson filed for bankruptcy just four months after CFD's last sale of the offering.   As FINRA wrote, "a firm that has failed to conduct reasonable due diligence of a private placement may thus lack a reasonable basis to make the recommendation in that security to any customer, regardless of the customer's wealth, willingness to bear risk, age, or other individual characteristics".  On November 23, 2016, the SEC filed a complaint against the principals of Payson, alleging fraud, including misrepresentations and omissions to investors in connection with various Payson offerings sold between November 2013 and July 2014.  The principals thereafter consented to the facts as alleged in the complaint and were ordered to pay approximately $7.7 million in fines, disgorgement and interest.

Bahrenburg, Registered Principal Due Diligence, did not comply with the firm's written procedures pertaining to due diligence.  Instead, in November 2014, he approved the Payson offerings for sale to the firm's accredited investors, based only on a review of documents provided by Payson and interviews of Payson personnel. This due diligence process was not reasonable for the following reasons:  First, CFD, through Bahrenburg, did not reasonably assess Payson's financial condition. The financial documents that Payson provided to CFD painted a bleak picture, and showed that the company had substantial liabilities and negative net income of more than $1.5 million in 2013.  In addition, due to incurring recurring losses from operations and pending litigation, the firm's independent auditor included a note that these facts raised substantial doubt about its ability to continue as a "going concern". FINRA wrote in its AWC that Bahrenburg did not reasonably investigate the circumstances of the 2012 investor lawsuit, failed to review Payson's prior offerings, failed to conduct any independent review or assessment of the current project generally and

Page | 10

instead simply accepted the information and representations provided by the issuer.  Finally, Bahrenburg and CFD failed to conduct any ongoing due diligence, despite that it was required by CFD's written procedures.  For example, CFD did not request, obtain or review Payson's 2014 audited financial information. CFD continued to sell the offering until February, 2016.  Because of its failure to conduct reasonable due diligence of the Payson offerings, CFD failed to make a reasonable determination as to whether Payson was suitable for any class of investor.  Therefore, CFD had no reasonable basis to recommend the Payson offerings to its customers, even accredited investors, and violated FINRA Rule 2111 and 2010 by recommending and selling these offerings to 31 customers.

CFD Investments, Inc. consented to the following sanctions:

1) Censure; 2) a 45 calendar day suspension of any and all private placement activities, and: 3) Partial restitution to affected customers in the total amount of $750,000. Mathew Bahrenburg consented to the following sanctions; 1) a 45 calendar day suspension from association with any FINRA member firm in a principal capacity, and 2) a $5,000 fine.

National Securities Corporation (NSC) itself has also been the recipient of a FINRA AWC, No. 2009019068201 which was issued in May of 2011 and stated the following. "National Securities did not have reasonable grounds to believe that certain private placements offered by Medical Capital Holdings, Inc. (MedCap) and Provident Royalties, LLC (Provident_ pursuant to Regulation D were suitable for any customer.  Additionally, NSC, acting through its Director of Alternative Investments/Director of Syndications, Mathew G. Portes, (i) failed to conduct adequate due diligence of the private placements offered by MedCap and Provident pursuant to Regulation D, and (ii) failed to establish, maintain and enforce sufficient supervisory system reasonably designed to achieve compliance with applicable securities laws and regulations and NASD Rules in connection with applicable securities laws and regulations and NASD Rules in connection with the sale of the private placements offered by MedCap and Provident pursuant to Regulation D. Accordingly, NSC violated NASD Conduct rules 2310, 3010, 2110 and FINRA Rule 2010 and Portes violated NASD Conduct Rules 2010, and 2110 and FINRA Rule 2010.

NSC, acting through Portes, failed to adequately enforce its supervisory procedures to conduct adequate due diligence as it relates to MPFC VI.  Beyond reviewing the MPFC VI private placement memorandum and reading a 9/3-/2008 due diligence report prepared by Buttonwood Investment Services, LLC, in October 2008, some 2 months after it had begun selling MPEC VI, Portes, and thereby NSC, did not perform sufficient due diligence for MPEC VI.  Portes, and thereby NSC did not question the above-referenced use of proceeds section of the MPEC VI private PPM, did not review any financial statements for MedCap or MPEC VI, and did not sufficiently follow up or otherwise investigate concerns noted in either the 9/2008 Buttonwood Due Diligence Report or a revised due diligence report prepared by Buttonwood Investment Services, LLC dated 12/2/2008.  From early October 2008 through March 2009, Portes and thereby NSC, became aware of multiple red flags regarding MedCap, including liquidity concerns, missed interest payments and defaults that should have put them on notice of possible problems with the offering.  Nevertheless, the Firm continued to sell the MPFC VI offering to customers through March 2009.  Then with respect to Provident, between July 23, 2008 and January 10, 2009, NSC sold $1,755,000 in Provident offerings numbered 16, 17 and 19 to thirty customers.  Again, NSC, acting through Portes, failed to enforce the Firm's supervisory procedures to conduct adequate due diligence relating to these

offerings.  Without adequate due diligence NSC and Portes could not identify and understand the inherent risks of these offerings.  The high interest payments of the Provident Offerings were themselves red flags.  However, Portes, and thereby the Firm, did not take the necessary steps, through obtaining financial information or otherwise, to ensure that these rates of return were legitimate, and not payable from the proceeds of later offerings, in the manner of a Ponzi scheme.

NSC was 1) censured; 2) fined in paying restitution of $81,427.50 to Provident investors and $93,572.50 to MedCap investors and 3) a suspension of Portes for 6 months along with a $10,000 fine.

Let me now begin with the Solexel, Inc. Series D Preferred Stock Offering which was marketed by NSC between February 2015 and June 2016 or almost 1.5 years. Did NSC fully investigate the issuer and management as required by 10-22? In my opinion, they showed little concern for this company which was eight years old and produced no revenues. It had no government approvals for its products, had no production of any kind beyond a demo-facility in California, and had mounting operational losses.

Did the Com-Com (the NSC due diligence committee) thoroughly investigate the business prospects of the issuer? In my opinion, Solexel's position in the solar market was declining rapidly. The Chinese were flooding the market with cheaper solar technology. While the company projected a lighter and more efficient solar panel, there was no evidence of a production facility in Malaysia to produce such a product to allow the company to scale-up.

Did due diligence explore and verify the assets held by the issuer? Many positive valuation opinions were promulgated by Com-Com but no 3rd party appraisal was suggested or accomplished by NSC. This was critically important since the intellectual property was the asset that its investors could fall back on if the company was imperiled. The verification responsibility of NSC failed for certain in this area.

Next, did NSC investigate and verify the use of proceeds of the offering? The Company's cash runway was problematic to say the least. Its cash burn climbed during this period from $2 million per month to nearly $3 million without any offsetting revenues. It should have been obvious that the Company was surviving only from the capital being raised in rounds of financing, mainly through NSC with no positive results forthcoming from the Company Com-Com approved the Series D Preferred Stock offering and the D-2 note offering. The D-1 preferred stock offering was never formally approved, even though NSC was well aware that its brokers were selling it and that its investors were investing in it, in clear violation of NSC's internal processes and procedures. The Scorecards on these offerings (Exhibit B and Exhibit D) demonstrate unequivocally that all three failed "reasonable basis suitability" in my opinion.

While NSC did provide records of meetings and dates along with questionnaires filled out by the issuer with basically yes or no answers, it failed to document the results of its investigation, list the specific tasks performed, along with who performed them and summarize the results of such reviews. It had no records of visits to the Company, beyond receipts of hotel stays and airfare, no notes exist from these meetings. There are no documents establishing any visit to a foreign production facility. There was no patent

verification by an independent third party. Questionnaires and phone interviews only were insufficient. Direct face to face contact with the issuer at its locations was essential. There were no records of contact with suppliers or customers or any verification of sales orders. There were opinions, but no lists of documents reviewed or summaries of the results of such reviews. Documentation of results and verification is vital in order to conduct a reasonable investigation.

Solexel changed its name to Beamreach commensurate with the D-1 offering. Then Beamreach launched the Series D-2 round as a supplement to the D-1 offering. NSC failed to conduct a reasonable investigation in the following areas. First, Sagiv Shiv, Managing Director of NSC and Carmelo Troccoli, Investment Banking, were the two respective heads of the Commitment Committee (Com-Com) for Due Diligence. This was NSC's due diligence committee for due diligence and was comprised of eight members of which four voted. The PPM and Supplement were the primary source documents for com-com's memos in relation to the Beamreach Reg. D Offerings. Mr. Troccoli testified that a majority ruled, but was uncertain what happened if the vote was 2-2. Then, there was no formal vote to approve the D-2 offering despite a litany of red flags. This was far below the standard of care in the securities industry.

Second, memo notes reflected a failure of due diligence with respect to vetting the value of the intellectual property of Beamreach. The company had 79 patent families including 122 granted/allowed patent assets and 112 pending patent applications. The value of the IP was the basis of all Beamreach Offerings. Beamreach's position was that it was worth so much that, worst case, it could sell for enough to cover all debts and still pay a return. NSC due diligence did not actually determine the value of the IP.

The Com-Com notes were very revealing. On October 13, 2016, one member of the committee stated that Beamreach was "attempting to monetize its IP". On October 19, 2016, another committee member stated, "The Company had a lot of intellectual property". Then on October 26, 2016 just nineteen days before the D-2 Offering was being sold, a member stated, "The Company has $24 - $30 million of IP". Finally, on that same date, a member stated, "We continue to discuss that the cushion of the investment portfolio and value of the Company's IP Portfolio". In his OTR, Mr. Shiv stated, "It was always my belief that the value of Beamreach's IP was worth realistically in a range from $50 million to $250 million at a 'fire sale'." However, he supplied no basis for that belief. The fact is that they did not have any idea of its value. A reasonable investigatory due diligence team would have demanded that a third-party appraiser be engaged by Beamreach to provide an independent appraisal of the Company's IP. Later on, when they stood before Beamreach with a presentation to become its lead Financial Advisor/Investment Banker, they were sent back to the drawing board harshly for not offering a third-party appraisal of its IP. While it was true that the IP was pledged to Opus Bank under its credit line of $24 million, a firm value of the IP should have been determined with first monies going to pay down Opus Bank. No independent valuation was demanded, and none was obtained by NSC which is below the standard of care in the due diligence area. NASD Notice to Members 03-71 states that for all Non-Conventional Investments, which I conclude Beamreach's securities to be, due diligence requires the verification of the "creditworthiness and value of any underlying collateral". NSC failed to conduct reasonable due diligence on the Beamreach IP.

Third, a due diligence standard of care is to communicate with customers to question

EXHIBIT EXCERPT

orders and suppliers to determine payment history and experience. This would have been especially true of Beamreach which for nine years had no revenue, had no production facility and was without government certification for its product. In his deposition, Mr. Troccoli testified that the com-com deferred to Opus Bank and its second-hand due diligence of customers and suppliers. One email/letter from Walmart indicated that solar cells on its many facility rooftops were far down on their to-do list and on slow burn for its locations at present.

Then, in its due diligence notes, it states "the Company has received $12.5 million in venture debt from Fortress". In his deposition, Mr. Troccoli indicated that this was bogus and untrue, as Fortress just vanished, never to be heard from again. Probably the most egregious revelation of something NSC knew or should have known is that on November 3, 2016, eleven days before the Supplemented D-2 offering went effective, debt of Beamreach venders in the amount of $377,969 was turned over to RMV Credit Collections and required payment immediately. This impending event was unknown to com-com and again is below the due diligence standard of care. Why wasn't a Beamreach legal and credit search done prior to the D-2 Offering being recommended to accredited investors?

The fourth lapse of due diligence occurred when com-com never mentions or discusses the tremendous disparity between the audited net worth (stockholders equity) numbers and the company prepared balance sheet. The Company in the PPM states that its net worth as of December 31, 2013 was $16.1 million, for December 31, 2014 was $20.4 million and for December 31, 2015 was $8.6 million. However, if we look at the PricewaterhouseCoopers audited numbers, who warned of Beamreach not being a "going concern", it reported for December 31, 2014 a negative net worth of ($151.4 million) and for December 31, 2015 a negative net worth of ($208.1 million). The difference in these numbers is the company's preferred stock holdings which normally are a part of stockholders equity. However, with no revenues, mounting operating losses, no government certification for its products, default with its lending bank and the fact of the Company's survival through $250 million of fundraising only, without any production facility, the auditors apparently gave no credit for the preferred stock of this development stage company. The financial net worth discrepancy was never compared or discussed, never brought up or looked at in com-com meetings, and that is simply below the standard of care in the due diligence process. A call to the auditors could have confirmed this disparity, but was never undertaken.

The fifth failing of Com-Com, was not verifying the Company's claim that it had lined-up a production facility in Malaysia, an area of low-cost labor which would have made Beamreach more competitive in its products. No one verified this or visited such a facility to determine its existence. In late 2016, talk of Malaysia and how the Company was setting up an Asian production facility in Taiwan or Thailand began. This assertion was critical to com-com and greatly served as a basis for its approving of the D Round. Furthermore, to buttress its position for support of its technology, Beamreach provided an engineering report from the same "expert" that had issued a glowing report on its technology previously. This expert had no experience in international engineering.

The sixth and final due diligence failure was the fact that NSC knew or should have known that Beamreach was seeking advice from counsel to declare bankruptcy before the D-2 supplement dated November 14, 2015. Com-Com sent out a questionnaire to the issuer, Beamreach and asked if they had retained bankruptcy counsel. This fact was revealed in the Com-Com due diligence notes on October 26, 2016 in Part 3 (NSC155-156). The answer

EXHIBIT EXCERPT

was, "No one yet". The "No one yet" should have raised a red flag to drill down on the subject face to face with legal counsel at Beamreach to determine if in fact, a possible bankruptcy was being discussed and planned with bankruptcy counsel. In fact, in two meetings dated October 19, 2016 and October 24, 2016, Beamreach was meeting and seeking advice and retention from bankruptcy counsel, Pachulski Stang for legal services in connection with its restructuring in bankruptcy. Again, no pin-pointed discussions or obtaining a legal or credit check were undertaken by NSC's com-com whatsoever. According to its CA Client Trust account wiring instructions, Beamreach engaged Pachulski Stang on October 20, 2016, prior to the date of the D-2 PPM, which was dated November 14, 2016.

There were no visits to the purported Malaysian plant, no direct calls to suppliers, trade creditors, or customers. Opus Bank was left to do that. There were no demands to convert MOU's to actual binding revenues. There were no records following up on tasks performed, summaries of the results of such reviews and analysis, demonstrating that the firm followed through and did not simply gather documents and place them in a file with no analysis. The only documents provided were questionnaires along with meeting notes by date and a checklist of items with notes and comments attached.

NSC's due diligence was below the standard of care and in violation of FINRA rules (Violation of FINRA Conduct Rule 2010 – Just and Equitable Principals of Trade) as well as its own WSP which sets a structure for com-com reporting to Chief Oversight, Jonathan Rich, head of Investment Banking along with NSC Compliance to monitor and approve the activities of NSC's com-com. In the final analysis, NSC and the com-com failed to uphold its responsibility of being a gatekeeper required to vet and approve only reasonable based suitable offerings for recommendation to its accredited investors. In late October 2016, when members of com-com refused to add additional necessary material disclosures, I'm reminded of something I learned long ago: Reg D private placement offerings are exempt from registration, not disclosure.

6.      INVESTOR ASSUMPTIONS RISK:

In this case, defendant argued that all facts and risks were disclosed to investors. Further, they said that by subscribing to the investment, the investor agreed to assume all the risks of the investment. Defendant went on to state that if that was not true, the trier of fact would hold every brokerage firm and/or its broker liable every time a speculative investment failed. In other words, despite all the warning made, knowledgeable accredited investors assumed the risk and lost. Finally, the defendant points to a multitude of investors went into this speculative deal, were willing to speculate by consenting to accept the risk in order to get the reward. This last point comes under the headline of "So What"?

These speculative securities were recommended and implemented by NSC to NSC's captive clients as opposed to being sought out for their purchase. In other words, they were "sold" not "bought". Both institutional and retail investors were sold the Series D, D-1 and D-2 Offerings by super salesmen who demonstrated with style how Beamreach would mitigate these risks and conflicts. It should be pointed out that NSC was not an "A" list investment banking firm. It was a "B-" brokerage firm at best. Finally, a multitude of sales to accredited investors doesn't make it right, when in the final analysis the Offerings failed reasonable basis suitability and shouldn't have been recommended or sold to even one accredited investor. The fact that NSC's customers were sophisticated and knowledgeable does not

EXHIBIT EXCERPT

obviate NSC's duty to investigate and disclose all material facts to these accredited investors. In my opinion, investors did not assume all the risks. For example, consider the following, NSC's investors did not assume the risk of worthless patents because this wasn't disclosed. They did not assume the risk of the investor's own credit impairment converting a liquid cash asset to a worthless, illiquid and ultra-speculative security which no lender would give any credit to because credit impairment was not disclosed. This was a material red flag.

Furthermore, they did not assume the risk that NSC was waiving any fiduciary duty to them because NSC was acting as an independent contractor and was putting NSC's interests ahead of the investors. They did not assume the risk that NSC failed to provide and perform reasonably adequate due diligence on the offering. Furthermore, the obligation to perform adequate due diligence was at no times waived. They did not assume the risk of Beamreach vendor debt in the amount of $377,065 that was assigned to a collection agency as of November 3, 2016, eleven days before the Supplement D-2 PPM. They did not assume the risk of the issuer they were investing in retaining bankruptcy counsel on October 20, 2016, three weeks before the Supplemented D-2 offering went effective. Again, this was a highly material red flag.

Investors did not assume the risk that Beamreach was in full default of its Opus bank loan and it was set to foreclose on the Company. Instead, they were given the hopeful assumption that somehow, there could be a work-out or moratorium on this debt. Investors did not assume that risk because this was not fully disclosed to them. Investors did not assume the risk that Beamreach never had any production facility or production contract in Asia. No one went there or verified the purported plant in Malaysia that through lower labor cost would allow Beamreach to compete with the strong and well financed competitors in the solar field. Investors did not assume the risk that Beamreach produced company prepared financial statements showing positive net worth, while for the same years its auditors showed negative and declining net worth numbers because this disparity was not questioned or clearly documented or explained to them in the PPM.

Did they really assume the risk as an accredited investor who was prepared to bear the economic risk of holding the investment for an indefinite period and was able to withstand a total loss of this investment? I would be surprised if the investors even saw this as it was not in bold type alone, setting it apart, but rather not on page one but on page two, which was all caps and totally in bold. Most investors would skim through, skipping this page as it appears to be boilerplate language in repetitive large cap and just prior to the Table of Contents section. It should have been set apart in bold on page one so no one reading the PPM can miss its meaning and implications.

In the D-2 Offering Supplement, this risk legend does not appear at all. Since there was great concern over money raising in the D-1 preferred stock offering. Some investors could have been investing for the first time and had to press a link in the Supplement PPM to see the original D-1 PPM. The risk legend should have been reprinted in the D-2 Supplement PPM. It is reasonable to assume that many of these new investors did not see the risk legend at all. The investors did not assume this risk unless it was pointed out to them or they were careful enough to find it and carefully read through it. The investors did not assume the risk of NSC raiding the impounds escrow to withdraw $2.5 million before the required $10 million was raised in the D-1 offering. Without permission they changed the requirement in the supplement PPM to break impounds prior to raising the required capital. The investors did

Page | 16

not assume this risk because they did not approve it.

Proof of this was the selling agreement it signed to be placement agent for a potential E Offering following the completion of the offerings at issue. NSC knew internally that there was little to no chance for this Company to survive without its raising millions of dollars and was compensated generously for doing so. In addition, by pressing on, the warrants the Company held by at least one member of com-com (Carmelo Troccoli) and selected NSC brokers would be worth something. Finally, it was not surprising that no other broker-dealers joined NSC in the selling group.

7.    BEAMREACH CORPORATION RISK (See the Beamreach Scorecards – Exhibits B & D).

## RED FLAGS

"Red Flags" surrounding the due diligence and risk management of the Beamreach securities Offering's abounded and were not effectively acted upon by NSC. SIFMA, which is comprised of securities defense lawyers, in its Compliance and Legal Division Seminar of 2013, supplied materials on written supervisory procedures which stated that, "any supervisor who learns of an indication of impropriety ("a red flag") must investigate with reasonable diligence and must pursue the matter to closure. Inadequate investigation and follow-up is an invitation to regulatory scrutiny to be followed by enforcement action". Furthermore, FINRA Regulatory Notice 10-22 required NSC to follow up on any red flags it encountered, as well as investigate any "substantial adverse information" about Beamreach. FINRA also stated that NSC was required to do more than "simply rely upon representations by issuer's management, the disclosure in an offering document or even a due diligence report of issuer's counsel."

Beamreach presented the following, which were not adequately investigated by NSC:

1. The solar industry was experiencing a steep decline, and between 2009 and 2013 more than 100 solar companies were sold or liquidated.

2. No independent valuation of Beamreach's intellectual property by a qualified third party.

3. Beamreach was a 9-year old company with no revenues.

4. Beamreach's operating losses exceeded the capital raised in 2014 and 2017.

5. Despite previously raising more than $250 million, Beamreach was unable to attract further investment by institutional or venture capital firms – forcing it to seek capital from retail investor.

6. Its operating losses were ($27 million) in 2014 and ($49 million) in 2015 (81% increase.)

7. There was a going concern warning from PricewaterhouseCoopers for 2014 and 2015.

8. Beamreach misinterpreted its net worth as positive when it was negative in 2014 and 2015 per its auditor.

9. Beamreach was in default with Opus Bank and its vendor creditors.

10. The company had raised over $250 million in securities offerings and was surviving only through capital raised by rounds of financing.

11. The Company was never able to get the high volume production facility in Malaysia up and running, and Beamreach had only one demonstration production field by 2015 after 8 years.

12. The Company's solar modules had not been government certified for commercial use.

13. By February 2015, the Company was burning cash at $2 million per month with no committed revenue to offset the cash burn.

14. By October 2016, the Company was burning cash at the rate of $3.2 million per month with no committed revenue to offset the cash burn.

15. The Company withdrew $2,500,000 from the escrow impounds without investor disclosure or approval when the required minimum to go effective under the original D-1 PPM was $10,000,000.

16. In the convertible debt offering, when it dramatically changed from a preferred stock Offering to one with Convertible Promissory Notes the investors were given no opportunity for recertification and/or were given no rescission offer.

17. The timing leading up to and including the convertible note Offering was in violation of the standard of care.

18. November 10, 2016 – NSC allows Beamreach to withdraw $2.5 million from escrow when the PPM dated November 10, 2016 required $10 million to have it released.

19. November 14, 2016 – The date of the Convertible Promissory Note PPM for D-2.

20. November 22, 2016 – Form D filed with the SEC indicated the Note Offering raised only $8.055 million.

21. The conflict between significantly cutting expenses and staff versus the needs of key employees and executive officers who have individual incentive programs.

22. The motivation for NSC to remain as the key placement agent through the three Offerings was to (a) remain loyal to friendships with Beamreach officers and directors; (b) to earn sizable fees and commissions; (c) to be selected as the Financial Adviser/Investment Banker for Beamreach and earn future commissions and fees for its IPO and/or sale.

23. Any future revenues would come only from a small number of distributers in the form

of non-binding MOU's (memorandums of understanding).

24. Beamreach's product was not commercially tested and it changed its product midstream from manufacturing ultra-thin wafers to its "sprint" racking system for commercial rooftops. (No one was installing them because it was cheaper and far simpler to just buy green power from the utilities to achieve green quotas.)

25. By summer of 2016, Beamreach had changed its strategy several times (along with its name) and was not performing up to budget and not meeting their internal projections.

26. NSC did not demand more strict internal controls on Beamreach to curb its spending.

27. Dr. Surek was hired by Beamreach to evaluate its international solar technology. Early on he gave it glowing reports, however he had no experience in industrial engineering. NSC enlisted and paid him later on to opine on their production manufacturing capability. He was not an unbiased independent source having already given positive technology reports on Beamreach.

28. A change in foreign production from Malaysia to Thailand or Taiwan was a late and unproven change in market strategy that was more illusion than reality.

29. Beamreach continually adjusted its milestones and timelines.

30. No one at com-com spoke with any customer who actually signed a Master Sales Agreement as opposed to a non-binding MOU.

31. The company was running out of cash and could only be propped up by monies raised by NSC.

32. The Company in the PPM Supplement discusses selling some obsolete equipment, but all of its equipment was leased. Any equipment owned was pledged under lien to Opus Bank.

33. Beamreach became financially distressed in late 2013 and cultivated new placement agents.

34. By late 2016, Beamreach had little to no chance of an IPO or sale.

35. By late 2016, the Company's valuation would have been cut by more than half.

36. The D-2 Offering was to save the Company helping it secure a game-changing client or sell the Company or its IP, all unrealistic goals by NSC. The only thing it could have achieved realistically was to pay down Opus debt.

37. Beamreach's only LOI was on a non-binding term sheet

38. Whatever proceeds that came about from a fire sale of the IP would go to Opus Bank.

39. Beamreach was in discussions to retain bankruptcy counsel, but they claimed they had

not retained one yet. No follow up with Company counsel occurred.

40. Beamreach depended heavily on Opus Bank thereby outsourcing its due diligence responsibility to learn about customers and suppliers.

41. NSC red-lined out a provision in its Placement Agent Agreement which stated, "It's not in default or a breach of the agreement".

42. Beamreach further limited the inspection rights that NSC could inquire about for the D-2 Offering.

43. NSC did no due diligence on what rights the placement agent had under the Placement Agent Agreement.

44. Investors had to affirm that all discussions and materials provided to them and the marketing materials that were utilized to raise capital [from them] were firm, fair, factual and complete.

45. NSC was advised that Opus Bank was going to foreclose on Beamreach sometime in the January 2017 timeframe. NSC sought no communication with Opus about the status of its credit facility.

46. A report generated in November 2016 in Project RA by Ocean Tomo indicated that it would be "hard to sell the company or its IP".

47. Carmelo Troccoli lead banker of com-com held Beamreach warrants.

48. There were no other broker dealers that joined NSC in the selling group.

49. NSC due diligence, under Sagiv Shiv, used other distressed technology companies to forecast the hypothetical value of the Beamreach IP. None had solar patents.

50. The one Solar company NSC projected to acquire the Beamreach IP, was Sunpower but NSC never spoke with them before presenting the idea to Beamreach.

51. In comparing a median value of IP in non-solar technology companies Mr. Shiv came up with a value of $16,000,000 ($47,000 x 342 Beamreach patents). This comparison was unrelated to solar companies with patents. Even Jonathan Rich, head of Investment Banking and Compliance looked the other way and let com-com stand alone and fail in upholding its due diligence responsibility. Because NSC abrogated its due diligence duties to fully and thoroughly investigate these red flags, it is clear that the firm was in violation of FINRA Rule 2010 and 2090 along with FINRA NTM's 03-71 and 10-22. FINRA Notice to Members 10-22 "reminds" FINRA members and their associated person's (brokers) that "As a general matter, any reference in this notice to the (due diligence) obligations of a BD firm is also intended to cover the concomitant responsibilities of any registered representative who recommends a Regulation D Offering to his/her customers and any registered principal who is charged by his/her firm with supervising this registered representative". It is important to note that in the Endnotes, there are case law cites

dating back to the 1990's and early 2000's which "remind" members, supervisors and brokers of their long-standing due diligence obligations. ==In my opinion, NSC violated FINRA Conduct Rule 2110, which states "a member, in the conduct of his business, shall observe high standards of commercial honor and just and equitable principles of trade". NCS further violated FINRA Conduct Rule 2210 which requires all public communications to uphold fair dealing with customers with no material fact or qualification to be omitted.==

## DOCUMENTS REVIEWED:

Complaint against NSC
Defendant's Answer
PPM (Series D Preferred Stock) dated February 2015 and subscription agreement
PPM – February 2015 Subscription Agreement
Series D capital raise brochure – February 2015
PPM - Series D-1 Units of preferred and common stock – June 2016
PPM Supplement for $15 Million of convertible secured promissory notes – November 2016
Subscription Agreement for the PPM – November 2016 Offering
Investor update letter for the third quarter 2015
Form D's filed by Beamreach with the Securities and Exchange Commission
FINRA Broker Check for National Securities Corporation
Deposition of Carmelo Troccoli
FINRA OTR (On the Record) of Carmelo Troccoli
FINRA OTR (On the Record) of Sagiv Shiv
Plaintiffs' deposition transcripts
Spreadsheets provided by NSC reflecting Beamreach investors and amounts of each investment
Defendant's Expert Report attached to their opposition to the motion to certify
Due Diligence notes, letters, emails, industry data, and numerous case documents
FINRA NTM'S/Regulatory Notices 96-60, 03-71, 05-26, 10-22

## DAMAGES

Based upon my review of NSC records as set forth in various spreadsheets, the compensatory damages for the plaintiffs/class are as follows:

| | | |
|---|---|---|
| For Solexel, Inc. 2015 - | $28,726,686.97 | |
| For Solexel, Inc. 2016 - | $10,915,417,79 | |
| For Beamreach D-1 & D-2 - | $ 5,355,760.20 | |
| | Total | $44,997,864.96 |

I have seen no documents indicating that any class member received any interest, dividend, or distribution payments in connection with Solexel/Beamreach. I have seen no records indicating any class member received a return of any amount invested in Beamreach/Solexel.

I reserve the right to supplement and amend my damages opinions to consider information learned up to and throughout the trial.

## CONCLUSION

Based on the foregoing, NSC's due diligence of the various Beamreach Offerings was inadequate based on the standard of care in the securities industry. In addition, none of the Beamreach offerings (Series D, D-1, or D-2) should have been approved for sale would not have had a grasp on the true risk-reward proposition for any of the offerings based on the multitude of red flags and items discussed above. In my opinion, NSC did not have a reasonable basis for offering to sell any of the Series D, D-1, or D-2 rounds of Beamreach securities to any NSC customer.

In the final analysis, NSC was really engaged to help the Beamreach avoid its inevitable demise as opposed to giving it needed capital to achieve its goals of growth and expansion. After $250 million had already been raised, Beamreach continued to have a short cash runway (burning through $3.2 million per month by late 2016) that could only be met by continued money raising to keep them alive. In his depo, Mr. Troccoli was asked if the com-com discussed Beamreach's cash runway in their October meetings and he did not recall. In simple point of fact, no one at NSC could answer for or justify the liberties and latitude that Beamreach was permitted to take advantage of. NSC raised the capital and Beamreach spent it. In a com-com meeting on October 27, 2016, Carmelo Troccoli stated "We raise money for the Company to keep it alive so it can continue in business. $7 million will put the Company into liquidation, but orderly liquidation instead of a fire sale". He was then asked "how desperate was Beamreach to raise capital to survive?" and  "Very" he said.   He went on to say that, "by the fall of 2016, there was no chance of an IPO. It was a distressed Company and its value was cut in half". Sagiv Shiv said, "The Company is going out of business more likely (than not) if we don't do something". Later, when asked by FINRA in his OTR, he responded concerning questions about the value of the Beamreach IP and he told them, "It was hard to value a house on fire". In his deposition, Mr. Troccoli was asked if the com-com ever evaluated the liquidation value of other solar companies that went under. The answer was, "No, we did not". He was also asked if NSC considered the risk a 9 out of 10? He responded, "A Hail Mary is a good nomenclature". Finally, Mr. Troccoli was posed with the question "So at this point in time, NSC would agree that the risk of loss in the short term for the D-2 round outweighed any long-term benefit that might come from the D-2 Offering"? His answer was "You're right". He went on to say, "we were trying to save the Company so that their (the investor's) money was not a complete loss". He was asked if he was doubling down and responded "Sure".

Finally, I was quite surprised to read in Mr. Troccoli's deposition that irrespective of the com-com notes reflecting its uncertainty of the IP value of Beamreach, he told FINRA that the IP assets of Beamreach could be worth somewhere within the range of $89 million to $895 million. After reading all the contemporaneous com-com notes, I have no idea where those numbers came from. The late October final days of hope for Beamreach were best summarized in the FINRA OTR of NSC Managing Director Sagiv Shiv when he told them, "The company really had no business and all it had was an IP portfolio. The company should last only 3 – 6 months in distress, and this would be, 'a fire sale'." This was really a simple strategy (referring to the D-2 Offering), "it was a Hail Marty pass". He concluded, "This company was burning cash and was quickly reaching its end of life".

In the end, it is clear that the Beamreach Offering Supplement was dead upon arrival since nothing could save the Company. Without question the outlandish and illusory reward

of a 300% bonus assuming the impossibility of the repayment of the notes, in the long term could never outweigh the short term loss risk ending in Beamreach's demise. In the final analysis, NSC's due diligence failed to fully understand the imminent death of this issuer; it rationalized and justified rather than understood and realized Beamreach's business prospects; it never verified the patent assets (IP) of the Company; and it permitted Beamreach to obscure the Use of Proceeds.

## COURT RECORD OF MASON ALAN DINEHART III, RFC

During the last four years, I have been deposed and/or testified as a securities expert witness in the following State Court matters.  They include:

A. *Shidan Taslimi and Mehran Taslimi v. Third Wave Ventures, LLC and Atash Ventures, LLC et al* – Los Angeles County California Superior Court, Mosk Division. Plaintiff (Deposed) Counsel for Plaintiffs were Mike Lieb, Erwin Cohen & Jessup LLC (310) 281-6338 mlieb@ecjlaw.com (Settled)

B. *Michael and Carole Smith v. Berthel Fisher & Co., Inc.,* Case No. STK CV-UF-2015-6952*;* San Joaquin County, California Superior Court, Stockton Division. Plaintiff. (Deposed) Counsel for Plaintiffs was Kenneth J. Catanzarite: kcatanzarite@catanzarite.com (714) 231-2350

C. *State Bar of CA v. Timothy Peabody*, Case No. S259927 (Cal. Mar. 2, 2020). California Supreme Court. Plaintiff (Testified) Akili P. Nickson, Sr. Trial Counsel for the California Bar (213) 765-1273 Akili.Nickson@calbar.ca.gov

D. *Anne McNellis v. Ferris Neumeyer* – El Dorado, California Superior Court; Plaintiff (Testified) Counsel for Plaintiff, James I. Gwinup, CFLS (510) 677-1611 james@eldoradolawfirm.com

E. *Ian Gu, Ph.D., v. Asahi Medical Technologies, Inc., f.k.a. Retrovascular, Inc*. Alameda County California Superior Court.  Defendant (Deposed)  David B. Monks – Fuller Law Group P.C.  (858) 450-4050    DMonks@fullerlawgroup.com

F. *Moshe Pereg v. Pacific Shore Holding, Inc*.  Los Angeles County California Superior Court, Case No. PC056339, Plaintiff, Deposed.  Counsel for Plaintiff, Joseph Maher, II (310) 204-1910;  joe@jmaherlaw.com

## BACKGROUND AND QUALIFICATIONS

I am currently celebrating my fiftieth year of experience in the securities industry, having devoted a substantial part of my career to securities sales, compliance and supervision of registered representatives.

EXHIBIT EXCERPT

I was a Registered Securities Principal with the NASD/FINRA and was Vice-President, Marketing Compliance Officer and Acting Branch Manager for Boardwalk Capital Corporation, a Southern California based regional financial services firm from January 1987 until January 1990. I also acted as President of Boardwalk Asset Management Company, the company's Registered Investment Advisor supervising in excess of 150 Registered Investment Advisor Representatives.

I served as a Branch Supervisor for Eric Equities, Inc. from 1991 to 1999. From 2000 to 2010, I was registered with Empire Securities Corporation as a Registered Principal, Due Diligence, Home Office Supervising Principal and Director of Advertising Compliance.
While at Boardwalk Capital Corporation, as the marketing and training liaison between the field force of 200 representatives and management, I was directly responsible for the marketing and licensing compliance of the firm. I participated in the due diligence function as chairman of the corporate finance committee and utilized the ScoreCards method of due diligence, an industry recognized evaluation technique specifically designed for analyzing securities including common stocks, IPO's, private common and preferred stock offerings, bonds, limited partnerships and real estate based offerings such as real estate limited partnerships and REITS along with direct participation programs, mutual funds and variable annuities.

Additionally, I supervised the firm's insurance and annuity activities and was the author of the firm's securities sales training program. I negotiated for and brought in the company's clearing firm, PaineWebber in 1988 and was responsible for the firm's recruiting activities.
I was directly responsible for a substantial portion of the new firm underwriting revenues as a result of coordinating the investment banking, structure and placement of eight private placement real estate syndication offerings during 1988 – 89.

I am a graduate of California State College at Los Angeles in Speech and Communication. For thirteen years, between 1969 and 1982, I was Vice-President and Branch Manager for Carlsberg Securities Corporation where my responsibilities included the Direction of Investor Services, Due Diligence and Compliance Director as well as public and private real estate syndication sales. I also directed the sales of over 60 representatives including 5 wholesalers at Carlsberg Securities where common stocks, bonds, mutual funds, life insurance and annuities along with real estate securities were sold to investors. Under my direction, over $40,000,000 of investment capital was raised annually for the purchase of securities, insurance, annuities, pre-developed land and income- producing properties. I was a member of the parent company's Board of Directors from 1971 – 1978. Between 1982 and 1986, I held the title of Vice- President, Branch Manager for Westfield Capital Corporation, a real estate securities investment firm in Orange County, California.

From 1965 to 1960, I was Vice-President and Manager of Business Development for Union Bank's corporate headquarters and for seven years prior to that, I was Assistant Vice-President in the National Division of Corporate Finance for Bank of America in Los Angeles.
I am a life member of the American Institute of Banking (AIB) and a graduate of the American Institute of Banking School of Finance and Taxation. I have spoken before numerous professional and business associations including the national convention of the National Management Association, the Southern California Conference of the International Association of Financial Planners, Town Hall, the National Association of Accountants and

EXHIBIT EXCERPT

the State Society of CPA's.

My article on "Selling Syndication Shares Successfully" was published in Real Estate Review. In 2002, my article on diversification appeared in the Summer issue of The Register, a publication by the International Association of Registered Financial Consultants, and in the 2002 issue of The Advisor's Network. In 2004, I also published articles on expertlaw.com regarding variable annuities and junk bonds.

During 1972, I traveled with a panel to five U.S. cities with the Practising Law Institute and lectured on marketing compliance in nationwide seminars on real estate syndication, given primarily to attorneys and judges. I was the only non-attorney on the panel It was at that time that I developed an arithmetic method to assist in evaluating real estate direct participation programs including limited partnerships, REITS and LLC's. This method was developed to assist broker/dealers and syndicators evaluate offerings to potential investors and to better explain the working aspects and deal points of packaged real estate programs to members of the bar and bench.

I have been a Branch Manager for 3 broker-dealers: Carlsberg Securities (1969-1982), Westfield Capital (1982 – 1986) and Boardwalk Capital (1987 – 1989) and I acted as a Branch Supervisor for Eric Equities, Inc. from 1991 – 1999 and Silber Bennett Financial, Inc. in 2018.

From 1990 through 2001, as principal of my own firm, Financial Education Network Development (FEND), I conducted over 500 financial planning/pre-retirement seminars for the executives of Fortune 100 corporations, nationally. I worked extensively in both 401-K and Trust planning. I have provided expert witness testimony in over 350 arbitrations (700+ retentions) before the NASD/FINRA, AAA, PSE, NYSE, and JAMS. I have testified in 25 states nationally. I am listed as a securities expert witness with Thomson Reuters (Refinitive), Forensics Group, TASA, HG Experts, Securities Experts Roundtable and Pro Counsel. I have also been qualified and have testified as a Securities Expert Witness before the Los Angeles, Fresno, Alameda, Stockton, El Dorado and Orange County State Courts and Federal Court in L.A. I was also qualified and testified before the Nevada State Court as an Expert in Insurance Industry Supervision in the early 2000's. I have been qualified and testified on numerous occasions regarding corporate finance, common and preferred stock and bond offerings, IPO's, due diligence, suitability, fiduciary duty, standards of care and supervision along with damages in securities matters since 1991.

I have been an active arbitrator for NASD/FINRA since 1999, and I hold the following securities sales and related licenses: Series 7, 24, 27*. 63, 65, 79 (investment banking) & 99 (Back Office); Real Estate sales*[3] Life/Variable Annuity sales.

## EXHIBITS TO REPORT

Exhibit A – The Scorecard Master Template for Preferred Stock Offerings
Exhibit B – Beamreach Series D and Series D-1 Scorecard
Exhibit C – The Scorecard Master Template for Convertible Secured Promissory Note

---

[3] * denotes license "previously held"

EXHIBIT EXCERPT

Offerings
Exhibit D – Beamreach Convertible Secured Promissory Note Offering Scorecard
Exhibit E – Dinehart CV

I declare under penalty of perjury that the foregoing is true and correct, and if called as a witness would testify competently thereto.

Mason A. Dinehart III, RFC November 10, 2021

EXHIBIT EXCERPT

## FRCP 26(a)(2)(D)(ii) WRITTEN REBUTTAL REPORT
## Mason Alan Dinehart III, RFC

### REBUTTAL TO OPPOSING EXPERTS' REPORTS

**1. The qualifications and opinions National Securities' Expert Witnesses:**

**A.** **Both Experts rely extensively on the opinion of Dr. Thomas Surek.** **This reliance is misplaced for several reasons**. It's important to remember that initially Dr. Surek was hired by the issuer to opine on the validity of the solar technology of Beamreach in September 2011. Irrespective of subsequent assignments, he cannot be considered a 3rd party objective source in his reporting. Further, a true objective third party report is presumed to be fair and balanced. However, in his 4th report on Beamreach technology he is anything but objective. 99% of his report is positive with only 1% being negative. Furthermore, one item was delayed in the port of entry in Los Angeles (the item is not specified so we don't know how important it was). He uses words like "spectacular", "valid", "relevant" and "on-track". He comments that production start-up would be slated in the next couple of months. This report is dated February 2015, and centers thoroughly on the high-volume manufacturing (HVM) of solar panels in pilot production in Milpitas, CA.

As discussed in my original report, many news articles after February 2015 discussed the collapse of many solar companies and the technological advancement in solar by Asian companies. The significant declines in the U.S. solar market happened between 2015 and 2016 and are not addressed by Dr. Surek.

It is important to note that in March of 2016, Beamreach changed its company production structure entirely to the extent of going to a Contract Manufacturing basis in Asia, mainly Malaysia, but also in Taiwan and Vietnam. His report fails to discuss or consider or verify contract manufacturing in Malaysia where the manufacturing plant in Milpitas, CA was to be duplicated. Finally, and this is most important, Dr. Surek was charged with opining on the validity and function of the Beamreach technology only. He never was charged with valuation of the Beamreach intellectual property in terms of worth or protection. Any suggestion that Surek did this is wrong and National Securities failing to understand the actual value of the Beamreach IP at any time is below the standard of care.

In conclusion, I feel that Dr. Surek's reports should be discounted greatly since he is biased in favor of the issuer, he opined on the technology only (not the IP), and discussed production at the pilot plant only in Milpitas and in no way relative to the change to contract manufacturing in 2016 (applicable to both the D-1 PPM and Supplement (D-2)). Instead, in their reports, Both Mr. Fotouhi and Mr. Purcell put great weight on Dr. Surek's report, which I find to be inappropriate.

1

**2. Kamran Fotouhi –** The first thing that I noticed in Mr. Fotouhi's background is that 7 of the 21 cases where he has been retained as a securities expert were for NSC or one of its subsidiaries or corporate owners. That's 33%, so I would say he should not be considered totally objective in his opinions where NSC is concerned. First, he accords the condition in the solar industry and validity of the Beamreach IP by quoting Dr. Surek (already covered) and then by IP counsel of the issuer. Again, this is not a 3rd party objective valuation by a law firm retained and paid by the issuer. Then he opines that investors that want to speculate in high risk investments should be allowed to do so. That might be appropriate for institutional investors that invest 1%-2% of their respective net worth's to take a bite of a private placement with the knowledge that 4 out of 5 will fail.

In my original report, I cited FINRA AWC No. 2018057457101 that stated that just because retail investors are rich and sophisticated does not make a speculative investment like Beamreach suitable for any of them. FINRA stated, "A firm that had failed to conduct reasonable due diligence of a private placement may then lack a reasonable basis to make the recommendation in that security to any customer, regardless of the customer's wealth, willingness to bear risk, age or other individual characteristics". My opinion is that not only did this happen with Beamreach but the reward in no way merited the risk the investors were taking. I believe the Beamreach offerings had an impossible risk to reward ratio. I believe that Mr. Fotouhi was not only biased, but failed to grasp the significance of a company that survived only by money raised for its continuing existence. For a due diligence team not to put a halt to this travesty by 2016 was below the standard of care.

**3. William Purcell** – He is a gentleman with 50 years of experience as an Investment Banker. He has never worked for a FINRA broker dealer or even held any securities licenses. He has never served in the role of a gatekeeper for investors by running a due diligence department of a broker dealer. If he had done so, he would have had to face FINRA audits where he would have had to answer for all the securities procedures, rules, and regulations that the auditors claim to have been bent or broken. His feet would have been held to the fire in upholding the standard of care in the securities industry. Within the securities broker dealer world that I have been a part of for 50 years, private placements are sold differently than in the investment banking community. Strong broker dealers require that an issuer of private placements have a managing broker dealer which stands objectively apart from the inner workings of the issuer (by Chinese Wall). This adds a layer of protection to the investors as the Managing Broker Dealer ("MBD") is usually separate from the issuer. The MBD brings the due diligence binder to numerous members that the MBD forms as a selling group for the offering. It is made up of if other broker dealers who each agree to sign a selling agreement with the issuer and join the selling group which will sell the offering to investors. The issuer also is typically asked by the MBD to enlist the services of a third-party due diligence firm who, for a fee, issues a due diligence report both on the issuer and on the offering which can be distributed to members of the selling group, but not the investors. This report is "for dealer use only". This 3rd party due diligence report is prepared by companies like Mick &

2

Associates, FactRight, Robert A. Stanger & Co., Buttonwood, or Snyder Kearney, LLC, whose fees are paid without promise of that independent firm's approval of the offering.

It is unusual to see an issuer agree to sell a multimillion dollar private placement offering through one broker dealer which will sell the offering to only its own investors and without any third party due diligence report.  NSC should have at minimum required Beamreach to submit and pay for a third-party due diligence report to be made since there was no MGP or other members of a selling group.  I assure you that no responsible 3rd party due diligence firm would have ever allowed the Convertible Note Supplement offering to waive its $10 million "minimum to go effective" before releasing any commissions to NSC.

Mr. Purcell also makes the point that large institutional investors like Kleiner Perkins, GAF and the Saudi Sovereign Wealth Fund invested on their own as evidence of an offering that should be approved from a due diligence standpoint. As I've pointed out before, the criteria for a speculative investment by an institution is far removed from that of a retail investor and in no way proves NSC's due diligence met its reasonable basis suitability obligation. He forgets too that institutional money largely dried up in 2015 due to the collapse of the U.S. solar industry and by then Beamreach was unsuitable for anyone. He also makes a statement that to me seems very dangerous.  He states, "The most difficult task of a surviving company is an ability to continuously raise new capital".  A FINRA broker dealer should not allow any company to survive only through the continual raising of capital.  But that's exactly what NSC did!  It continued to take investors capital in a start-up company who for at least eight years produced no revenues.  After raising some $250+ million from investors over that time-period with mounting losses, a going concern letter from its auditor, and in or near lender default with its equipment pledged to Opus Bank as collateral, NSC should have said, that's enough!  We can't in good conscience sanction raising one more dollar for you.  But they didn't, and Mr. Purcell praises the due diligence in what was in Mr. Trocolli's own words, a "Hail Mary" approval by due diligence.

Finally, Mr. Purcell states that NSC was not negligent and goes on to cite to FINRA's description of negligence as "culpable carelessness".  Of all the phrases I could ascribe to the due diligence done by NSC,  that one fits perfectly. My original report speaks to that point succinctly. In addition to the failure of NSC to perform adequate due diligence, my original report also covers the multitude of red flags that were not considered by Mr. Purcell or addressed by Com-Com due diligence.

Below, I will discuss each of the following points:

**A. Commission Disparity**

**B. Missing Risk Disclaimer**

**C. Conflicts of Interest Abounded**

3

**D. No Independent 3rd, Party Valuation of the IP**

**E. Failure of Bring-Down Due Diligence**

**F. Comparison of Company Prepared v. Audited Balance Sheets**

**G. Conclusion**

    **A. Commission Disparity** – Mr. Purcell merely cites the commissions that were shown in the PPM Supplement for the Note Offering to be paid to NSC (i.e. 10% for non-institutional investors; 11% for non-institutional investors if money raised exceed $10 million and 5% for institutional investors).  However, it is extremely important for an expert to view the Reg. D filings with the SEC.  It states the actual commissions and must be "truthful".  Form Reg. D for the Note Offering dated 11-22-2016, states that sales commissions of $1,800,000 were paid on cash raised of $8,055,797 or 22.4%.  That is a far cry from 10%. Any analyst rendering an expert opinion should have at least looked over these Reg. D filings and make a comparison.  Were the warrants given to NSC added to the cash received?  Mr. Purcell failed to check.  Further, in my original report, I showed the two conflicting numbers for front end load commissions based on NSC raising the full $15 million.  One was $1,281,000 and the other was $1,375,000. This discrepancy was not addressed by Mr. Purcell.

    **B. Missing Risk Disclaimer** – Mr. Purcell points out and states unequivocally that the following risk disclaimer appears in "all" the PPM'S and the Note PPM Supplement:

> An investment in the shares is speculative, involves a high degree of risk and should be considered only by sophisticated investors who are prepared to bear the economic risk of such investment for an indefinite period of time and are able to withstand a total loss of such investment. Investors should carefully consider the risk factors described in this memorandum [the PPM], in addition to their own investigation and due diligence of the company and the terms of the offering.

Importantly, the above disclaimer referred to investment in the "shares" not "notes" as in the Supplement.  This was a 180 degree material change of investment vehicle.  Further, it refers to the "PPM" and not the "Supplement".  It should have been reprinted to specifically apply this disclaimer to the D-2 Note Offering.

    Clearly, this risk disclaimer was not printed out in the D-2 PPM Supplement as it was in the prior PPM's.  A prospective investor had to click on a link which would take them to the lengthy D-1 PPM and try to find it as shown in the D-1 Offering only.  That is clearly not how an investor warning as important as this one should be printed.  The disclosure was important since some new investors invested in the D-2 Note offering only, not having invested in the D-1 Offering.  Instead of reprinting the disclosure in a conspicuous location, a new and softer disclaimer was printed in the PPM Supplement as follows: "As discussed throughout this

4

Supplement, investment in the Notes involves significant risks, which risks depend, in part, on the amount of capital raised in the Offering.  The Company cannot guarantee any future closings of the Offering.  Accordingly, early participation in the Offering comes with heightened risks as further described below".

The key point is that there was no specific emboldened warning about investors being able to withstand a "total loss" of such "note" investment.  That was a material omission in my opinion and for Mr. Purcell to imply that it was specifically stated in the PPM Supplement was disingenuous and again below the standard of care in the securities industry as well as the investment banking industry itself.

**C.  Conflicts of Interest Abounded** – Once again, Mr. Purcell attempts to justify certain acts by NSC when they are below the standard of care.  One example is how he shirks NSC's important due diligence responsibility of contacting customers of the Company.  Especially this company which had no verified sales orders, only MOU's.  He states, "Direct discussions with customers was impractical". Obtaining permission from the company to verify results with customers and vendors is standard procedure in the securities industry.  Here, a clear conflict of interest existed when NSC due diligence relied on Opus Bank to do that for them.  I can't imagine an investment banking firm failing to call customers and suppliers to verify sales orders and account receivables. This conflict of interest was below the standard of care.  Clearly, by checking with suppliers, they would have discovered the $378,000 in vender debt was with a collection agency.  They did not, and depended on the Company's lender to do it for them.

Another conflict of interest was to allow the issuer to breach the escrow impound minimum of $10 million minimum to go effective.  No reasonable due diligence department should have allowed the sponsor to accomplish this unless it had a clear motivation. I suggest that motivation was clearly defined in NSC's compensation which would now be paid along with warrants in addition for raising money (less than $10 million) for Beamreach.  If any members of the com-com personally had warrants would have been a further conflict of interest relative to their objectivity.  NSC also had the hope of brokering the sale of the company and/or its IP, as well as, being selected as its lead investment banker.

Mr. Purcell also raises the point that there is no conflict between a brokerage firm raising money for the issuer and its duty to objectively provide due diligence for the firm's investor's.  That is of course true only if the reward projected in the Offering justifies the risk taken by those investors.  But in this particular case, I think the risk reward ratio was upside down and a conflict clearly existed here. Furthermore, this inherent conflict is only overcome if the transaction has a reasonable probability of achieving its stated objectives. In my opinion, the Beamreach Note offering had no chances of surviving. It was dead on arrival.  Consequently, the conflict was relevant and flourishing in both areas.

5

NSC knew that this company was not an up and comer, had no product in November of 2016, had a going concern warning from its auditors, had no revenues, mounting losses, in loan default with its bank, and a short cash runway.  Further it was entirely changing its manufacturing and distribution structure by launching into contract manufacturing in Asia where the results of that competition is immediate (there are no 2, 4, and 6 year election cycles in China).  The per watt cost of solar panels, as also stated by Dr. Surek, was about one-half in Asia compared to the U.S.  That immediate cost reduction was devastating to the U.S. solar industry and it was time for NSC to finally uphold its due diligence responsibility and stop raising another dollar for Beamreach and do the right thing.  Mr. Purcell disregarded these realities as conflicts of interest, which fell below the standard of care in the securities industry.

**D.  No Verification of the Beamreach Intellectual Property (IP)** - NASD Notice to Members 03-71 defines the basis of reasonable basis suitability in non-conventional investments, requires due diligence to include "The Value of Underlying Collateral in a Reg D Private Placement".  FINRA Regulatory Notice 10-22 also describes a broker dealer's due diligence responsibility as investigating and verifying the  "Assets Held or to be Acquired by the Issuer".  It should be no surprise then that I point out that NSC failed to verify the intellectual property value of Beamreach.

Mr. Purcell unbelievably implies that NSC inquired about it, sent questionnaires about it, and then stated that Dr. Surek provided three assessments of Beamreach's IP completed 9-23-2011, 1-31-2013 and 5-2-2014.  Clearly, as in his 4th report dated February 2015, Dr. Surek was providing verification of the Beamreach technology only and nowhere does he state or verify the "value" of the Beamreach IP. My original expert report is replete with the varying "numbers off a bus" that were discussed and thrown out both during com-com meetings and even at the FINRA OTR. In the securities industry, a third party independent appraisal of a start-up development stage company's IP would be demanded first by the Managing Broker Dealer, then by the third party due diligence firm, and finally by every member of the selling group.  NSC as the sole broker dealer had virtually the same responsibility to get that independent appraisal.  This goes without question since this PPM Supplement D-2  was done primarily to raise money to sell the Company or its intellectual property in the form of patent assets. The proof of this clearly was when NSC had the meeting to become the Beamreach Lead Investment Banker, NSC was escorted out of the meeting with its tail between its legs for precisely not independently valuing the intellectual property.  Mr. Purcell did not state the reason Imperial Bank was chosen as the lead banker but I strongly suggest, this was the unstated reason for the choice.

Then Mr. Purcell suggests that NSC required an updated technology assessment prior to offering D-2. Again that is not an assessment of the IP's value.  To address that, NSC relies on the opinion of Beamreach's IP Counsel, John Wood at Fenwick and West LLP which provided a Certificate of Good Standing. Mr. Purcell opines that this should suffice for the demand, marketability, defensibility and value of the IP.  Once again, the issuers counsel is not a third-

6

party objective source in any manner.  Only an outside appraisal from a disinterested independent third party would suffice to establish the range of IP value that due diligence could rely upon for the benefit of its investors.  Asking Opus Bank once again for its opinion would not be considered a viable alternative.

Finally, Mr. Purcell notes that NSC conducted both a "precedent transaction analysis" and "comparable trading analysis" (commercial trading multiples) supported by two slides from the NSC Road Show presentation which impute the patent portfolio in the first and a valuation analysis in the second.  All of this is fine fluff, but clearly masks the undeniable responsibility of NSC due diligence to have gotten an independent third-party appraisal valuation on the IP with Beamreach paying for it.

**E.  Failure of Bring-Down Due Diligence –** In the securities industry when a company offers successive rounds of financing by way of Reg. D private placements, a Broker Dealer must resist the temptation to get lax, comfortable or lazy in its due diligence obligation. It must be wary of knowing the company too well and treating new offerings as "old hat".  Each successive round is a new private placement offering and should be treated as it were the first and only one. Typically, the 3rd party due diligence firm is paid and asked to provide a new report on the new offering totally separate and distinct from the last one.  This is why a separate and distinct Reg D filing with the SEC is required each time a private placement is offered to the investors. This would be especially true when the Note Offering Supplement was formed.  Notably since it was such a substantial change from preferred stock to secured promissory notes, due diligence should have looked at D-2 as a separate offering from the D-1.  Not just a supplemented continuation of D-1. Further, in his comments Mr. Purcell describes the approach of Bring-Down due diligence as analyzing the company by way of any "changes" in the Company as opposed to looking at it as a new and separate offering that required reviewing all the original essential analysis steps from beginning to end.

As a side note, I suggest that it would have been harder to breach the $10 million minimum to go effective.  That would have been a good reason to call D-2 a Supplement and eliminate the $10 million minimum amount they had to raise before breaking escrow impounds and paying commissions.  In my opinion, the com-com due diligence team approached each round of financing, not with new and fresh eyes but with old and familiar ones.  On page 20 of his report, Mr. Purcell under number 70 (d) cites with considerable detail what was originally known about Beamreach. From the February 2015, Series D PPM, it states, "The Company has also secured, contingent upon the Company's finalization of certain other financing arrangements in Malaysia, an incentive package viewed at up to $1 billion from the Malaysian government, including an agreement to facilitate a $150 million loan from Malaysian banks…, an agreement to provide $12 million in training and R&D grants, and tax-free status for 10 years".  It seems that NSC due diligence has relied on this assertion since February of 2015 and not ever tried to confirm it by letter, teleconference, phone or email let alone a needed visit to Malaysia to verify these specific

7

facts.  The fact is that a statement like this one comes straight from the issuer to lend credence to its efforts to grow the company and keep it afloat.  If it were true, things could possibly change for the better now in November 2016 when Beamreach was changing its structure to contract manufacturing in the far east rather than on-site production.  NSC due diligence took the word of the issuer instead of verifying these important facts independently.

FINRA in its AWC referenced in my original report describes the securities violation when a broker dealer due diligence does this.  It states on page 2, "Generally, a firm may not rely blindly upon the issuer or information concerning a company, nor may it rely on the information provided by the issuer and its counsel in lieu of conducting its own reasonable investigation".  To demonstrate that it has completed a reasonable investigation, a broker-dealer firm should retain reports documenting both the process and results of its investigation.  These Malaysian facts were stated by the issuer in February 2015 and never challenged, investigated or verified as they should have been during bring-down due diligence.  This was clearly necessary since the pilot plant in Milpitas was to be duplicated in Malaysia.  NSC due diligence relied on the old facts provided by the issuer in analyzing the D-1 and D-2 offerings. Mr. Purcell's description of NSC's bring down due diligence was in violation of FINRA Rules 2010, 2090, 2110, 2210, and 2111 (RN 10-22) and below the standard of care.

**F.  Comparison of Company Prepared v. Audited Balance Sheets –** It was surprising to me in reading Mr. Purcell's well fashioned expert report that in discussing the financial disclosures he discussed only the Beamreach company prepared financial statements of the Company.  His point was that even the company itself disclosed the worsening trend of its financials.  My analysis goes much deeper than that since as a due diligence officer, part of my due diligence analysis is to compare the company prepared statements to the audited ones.  Here we had PricewaterhouseCoopers audits for December 31, 2014 and 2015.  The Company states that its net worth or stockholder's equity as of year-end 2014 was a positive $20.4 million.  For this same period, PWC Auditors differed substantially from this 2014 number by stating it was not positive but a negative ($151.4 million).  For year-end 2015, the Company reported a positive net worth of $8.6 million, a decline but still sizeable and positive stockholders equity.  However, the PWC auditors for year-end 2015 showed a negative ($208.1 million).  From a due diligence standpoint, it's important to determine why and how such a large difference was reported by comparing the net worth numbers in both 2014 and 2015.  This is something Mr. Purcell never questioned, compared or calculated.  It turns out that the difference for 12-31-2014 is $171.8 million and for 2015 was $216.7 million.  When the reports are examined it becomes apparent that the difference between the company prepared net worth and the audited net worth is because the preferred stock assets for Beamreach in its company prepared balance sheet at year-end 2014 totaled $171.8 million.  Then in 2015, if we look at the same preferred stock assets in the company prepared statements, that the amount shown for preferred stock was $216.7 million.  This is important because the PWC auditors gave no credit for the value of the preferred stock of Beamreach as a "going concern" company in its net worth calculations for year-end 2014 and

8

2015. Specifically, the difference in the two year end numbers is exactly the amount in company prepared value of preferred stock on its balance sheets. This analysis seems accurate. However, a due diligence department doesn't stop there. Remember Mr. Purcell earlier discussed teleconference calls between NSC and PWC auditors. This massive difference should have been discussed.

The difference each year is in the millions of dollars between the company and its auditor. After raising over $250 million in four rounds of preferred stock, had the net worth of Beamreach declined so much that its preferred stock held by many investors was given no value by the PWC auditors? I believe that was a question that demanded to be answered. It was not only a huge red flag not disclosed to the investors (simply disclosing the numbers in the PPM Supplement doesn't disclose the harm of the difference).

The com-com in exercising its reasonable due diligence responsibility simply had to reconcile that difference and would have needed to ask PWC if that is the reason for the stated difference in audited net worth for the two time periods. Of course this didn't happen and no one even questioned PWC about these millions of dollars in differences in net worth numbers. Again, Mr. Purcell is silent on the net worth difference issue while it should stick out like a sore thumb begging for an answer in the form of a reasonable due diligence investigation.

**G. Conclusion –** In addressing my rebuttal comments about these expert reports it's important to note that my Report was written November 10, 2021. Both Mr. Fotouhi and Mr. Purcell's reports were also written the same day. Consequently, since neither of them reviewed my report at the time they issued their reports, many of the items in my original report serve as rebuttal to their reports as well. This is especially true in the areas of: 1) inadequate due diligence; 2) failure to respond to red flags; and 3) risks not disclosed or assumed by the class investors.

To rely on Dr. Surek for valuing the Beamreach IP was misplaced in that he evaluated the technology and not the IP. Clearly, his comments in February 2015 were not only biased (he was hired first and had loyalty to the issuer) but were not responsive to the change in production and distribution structure by Beamreach turning away from pilot production and engaging in contract manufacturing in Asia, a decision made one year after his report. Dr. Surek only dealt with pilot production in Milpitas, CA. To not have dealt with Asian contract manufacturing essentially made his report useless. He was soon to retire at this time and his over-zealous and ultra-positive comments reflected his abundant "all-in" excitement and fascination with the changes occurring in mono-crystalline silicon photovoltaic technology and products. Further, Asian solar panel competition took firm hold after his report of 2/2015 and are not dealt with by Dr. Surek. Clearly an independent 3rd party appraiser should have been retained later in 2015 to fully evaluate not only the IP but the present competition of Asian Solar panels to the U.S. The failure of com-com due diligence to demand both of these functions demonstrated negligence on the part of NSC in my opinion.

As to the other experts, I feel that they ignored key obligations of NSC due diligence by rationalizing away their importance. To justify the negligence of NSC's failure to demand an independent appraisal of the Beamreach IP is well below the standard of care. It was also negligent of NSC to continue to raise money for this dying company from 2015 on when it knew the D-2 offering was a "Hail Mary". NSC knew that Beamreach's survival was only made possible by NSC's raising money and not from any production or sales efforts on Beamreach's part. Its decision to abrogate the $10 million minimum to go effective in D-2 was a clear sign that NSC's motivation was really the compensation it could garner from D-2 sales, being selected to act as broker of the sale of the company and/or IP assets, and becoming the lead investment banker for Beamreach. These important breaches were ignored by both experts.

Further, both experts ignored the commission disparity in the D-2 offering, the missing risk disclaimer, the conflicts of interest and the balance sheet disparity between the auditor and the company rendering Beamreach preferred stock to have no value. Finally, NSC's bring-down due diligence was rationalized as thorough and effective when it clearly was ineffective and deficient as opposed to looking at D-1 and D-2 as a new and stand-alone offering totally apart and distinct from Series D.

Both experts failed to recognize that combining them was below the standard of care and only inured to NSC's benefit in being compensated. Finally, the value of Mr. Purcell's report was diminished significantly by citing language that came directly from the issuer and not from any due diligence investigation. That practice was directly in violation of FINRA Regulatory Notice 10-22. I can only conclude that NSC was negligent, and its due diligence was below the standard of care.

### Additional Documents Relied on in Formulating This Rebuttal Opinion

- Expert Report submitted by Kamran Fotouhi, along with documents referenced and identified therein;
- Expert Report submitted by William Purcell, along with documents referenced and identified therein.

10

I declare under penalty of perjury that the foregoing is true and correct, and if called as a witness would testify competently thereto.

Mason A. Dinehart III, RFC

December 15, 2021

11

EXHIBIT EXCERPT

**EXHIBIT 17**

FINRA Dispute Resolution

Arbitrator ID:    A30388

# Arbitrator Disclosure Report

Report reflects information provided by the arbitrator through  03/09/2009

## ARBITRATOR

| | | |
|---|---|---|
| **Name:** | Mr. Mason A. Dinehart, III | |
| **Arbitrator ID:** | A30388 | |
| **CRD #:** | 68314 | |
| **City/State/Country:** | Los Angeles / CA / United States | |
| **Classification:** | Non-public | |
| **FINRA Mediator:** | No | |
| **Chair Status:** | None | |

**Skills in Controversy:**

Account Related - Dividends, Account Related - Margin Calls, Account Related - Transfer, Executions - Execution Price, Executions - Limit v. Market Order, Employment - Wrongful Termination, Other - Clearing Disputes, Other - Underwriting, Trading Disputes - Mark-ups, Trading Disputes - Stock Loans

**Skills in Securities:**

Annuities, Common Stock, Corporate Bonds, Fannie Mae, Freddie Macs, Ginnie Maes, Government Securities, Limited Partnerships, Mutual Funds, Municipal Bonds, Municipal Bond Funds, Options, Preferred Stock, Real Estate Investment Trust, Stock Index Futures, Warrants/Rights

## EMPLOYMENT

| Start Date | End Date | Firm | Position |
|---|---|---|---|
| 01/2001 | Present | Empire Securities Corporation | Dir. of Advertising Compliance |
| 03/1999 | 12/2000 | Locust Street Securities, Inc. | Registered Representative |
| 12/1991 | 03/1999 | Eric Equities, Inc. | Branch Supervisor |
| 03/1990 | 03/1990 | Promontory Capital Corporation | Representative |
| 02/1990 | 03/1990 | Nilcorp Securities Company | Sr. V.P. Marketing |
| 01/1990 | Present | Fin'l Ed. Network Development (FEND) | Owner/Founder |
| 01/1987 | 02/1990 | Boardwalk Capital Corporation | VP Marketing Compliance |
| 01/1982 | 12/1986 | Westfield Capital Corp. R/E Syndication | VP Marketing/Branch Manager |
| 09/1969 | 01/1982 | Carlsberg Securities Corporation | Vice President/Branch Manager |
| 10/1965 | 09/1969 | Union Bank | Vice President |
| 09/1959 | 09/1965 | Bank of America | Assistant Vice President |

## EDUCATION

| Start Date | End Date | School | Degree |
|---|---|---|---|
| 09/1963 | 06/1965 | American Institute of Banking | Life Member |
| 09/1963 | 06/1965 | AIB School of Finance & Taxation | Graduate Certificate |
| 09/1955 | 06/1958 | California State College | Bachelor of Arts |
| 09/1953 | 06/1955 | Los Angeles City College | Associate of Arts |
| 09/1950 | 06/1953 | Hollywood High School | Diploma |

## TRAINING

| Completed | Description | Details | Firm/School | Hours | Location |
|---|---|---|---|---|---|

Publicly Available Awards Section, Current as of  03/11/2009

EXHIBIT EXCERPT